# EXHIBIT A

# Docket Report

## Case Description

**Case ID:** 260501884
**Case Caption:** UNIVERSAL GROUP COMPANY INC. VS CBRE, INC. ETAL
**Filing Date:** Wednesday, May 13th, 2026
**Location:** CH - CITY HALL
**Case Type:** KA - DISPUTE-SALE OF BUS. OR ASSETS
**Status:** CLLSC - LISTED-PROJ. SETTLEMENT CONF.

## Related Cases

*No related cases were found.*

## Case Event Schedule

| Event | Date/Time | Room | Location | Judge |
|---|---|---|---|---|
| PROJECTED SETTLEMENT CONF DATE | 07-SEP-2027 09:00 AM | CITY HALL | COURTROOM 646 | ERDOS, MICHAEL |
| PROJECTED PRE-TRIAL CONF. DATE | 04-OCT-2027 09:00 AM | CITY HALL | COURTROOM 646 | ERDOS, MICHAEL |
| PROJECTED TRIAL DATE | 01-NOV-2027 09:00 AM | CITY HALL | COURTROOM 646 | ERDOS, MICHAEL |

## Case Motions

*No case motions were found.*

## Case Parties

| Seq # | Assoc | Expn Date | Type | ID | Name |
|---|---|---|---|---|---|
| 1 | | | ATTORNEY FOR PLAINTIFF | A82983 | GOSSETT JR, GEORGE |
| **Address:** | 4840 OLD YORK RD<br>PHILADELPHIA PA 19140<br>(267)978-1879<br>(866)919-6834 - FAX<br>Gossettlaw@msn.com | | **Aliases:** | *none* | |
| | | | | | |
| 2 | 1 | | PLAINTIFF | @12593523 | UNIVERSAL GROUP COMPANY INC |
| **Address:** | 380 RED LION RD<br>HUNTINGTON VALLEY PA 19006 | | **Aliases:** | *none* | |

| | | | | | |
|---|---|---|---|---|---|
| 3 | | | DEFENDANT | @12593524 | CENTRE SQUARE BASE LLC |
| **Address:** | 2400 MARKET STREET<br>SUITE 301<br>PHILADELPHIA PA 19103 | | **Aliases:** | *none* | |
| | | | | | |
| 4 | | | DEFENDANT | @12593525 | LUBERT-ADLER PARTNERS LP |
| **Address:** | 2400 MARKET STREET<br>SUITE 301<br>PHILADELPHIA PA 19103 | | **Aliases:** | *none* | |
| | | | | | |
| 5 | 14 | | DEFENDANT | @12593526 | CBRE INC |
| **Address:** | 200 PARK AVENUE<br>NEW YORK NY 10166 | | **Aliases:** | *none* | |
| | | | | | |
| 6 | | | DEFENDANT | @12593527 | PMC PROPERTY GROUP INC |
| **Address:** | 1608 WALNUT STREET<br>SUITE 1400<br>PHILADELPHIA PA 19103 | | **Aliases:** | *none* | |
| | | | | | |
| 7 | | | DEFENDANT | @12593528 | ADLER & COMPANY |
| **Address:** | C/O DEAN S. ADLER<br>2400 MARKET STREET<br>SUITE 301<br>PHILADELPHIA PA 19103 | | **Aliases:** | *none* | |
| | | | | | |
| 8 | | | DEFENDANT | @12593529 | ADLER, DEAN S |
| **Address:** | C/O LUBERT-ADLER PARTNERS, L.P<br>2400 MARKET STREET<br>SUITE 301<br>PHILADELPHIA PA 19103 | | **Aliases:** | *none* | |
| | | | | | |
| 9 | | | DEFENDANT | @12593530 | CENTRE SQUARE EAST UPPER LLC |
| **Address:** | 2400 MARKET STREET<br>SUITE 301<br>PHILADELPHIA PA 19103 | | **Aliases:** | *none* | |
| | | | | | |
| 10 | | | DEFENDANT | @12593531 | CENTRE SQUARE EAST LOWER LLC |

| | | | | | |
|---|---|---|---|---|---|
| **Address:** | 2400 MARKET STREET<br>SUITE 301<br>PHILADELPHIA PA 19103 | | **Aliases:** | *none* | |
| | | | | | |
| 11 | | | DEFENDANT | @12593532 | CENTRE SQUARE WEST UPPER LLC |
| **Address:** | 2400 MARKET STREET<br>SUITE 301<br>PHILADELPHIA PA 19103 | | **Aliases:** | *none* | |
| | | | | | |
| 12 | | | DEFENDANT | @12593533 | CENTRE SQUARE WEST LOWER LLC |
| **Address:** | 2400 MARKET STREET<br>SUITE 301<br>PHILADELPHIA PA 19103 | | **Aliases:** | *none* | |
| | | | | | |
| 13 | | | TEAM LEADER | J487 | ERDOS, MICHAEL |
| **Address:** | 532A CITY HALL<br>PHILADELPHIA PA 19148 | | **Aliases:** | *none* | |
| | | | | | |
| 14 | | | ATTORNEY FOR DEFENDANT | A59466 | BURNS III, GERALD E |
| **Address:** | BUCHANAN INGERSOLL & ROONEY<br>32ND FLOOR<br>50 S. 16TH STREET<br>PHILADELPHIA PA 19102<br>(215)665-5360<br>(215)665-8760 - FAX<br>gerald.burns@bipc.com | | **Aliases:** | *none* | |
| | | | | | |
| 15 | 14 | | ATTORNEY FOR DEFENDANT | A330573 | MCDERMOTT, FRANCES R |
| **Address:** | TWO LIBERTY PLACE<br>50 S. 16TH STREET<br>SUITE 3200<br>PHILADELPHIA PA 19102<br>(215)665-3677<br>frances.mcdermott@bipc.com | | **Aliases:** | *none* | |

## Docket Entries

☐ **Check for Threaded Docket**
This feature will reduce the docket
to motion related entries only.

| Filing Date/Time | Docket Type | Filing Party | Disposition Amount |
|---|---|---|---|
| 13-MAY-2026 07:10 PM | ACTIV - ACTIVE CASE | | |
| **Docket Entry:** | E-Filing Number: 2605033540 | | |
| | | | |
| 13-MAY-2026 07:10 PM | CIVIJ - COMMENCEMENT CIVIL ACTION JURY | GOSSETT JR, GEORGE | |
| **Documents:** | Final Cover | | |
| **Docket Entry:** | *none.* | | |
| | | | |
| 13-MAY-2026 07:10 PM | CMPLC - COMPLAINT FILED NOTICE GIVEN | GOSSETT JR, GEORGE | |
| **Documents:** | 00_State_Complaint_PCCP_Commerce_Program.pdf<br>Commerce Addendum | | |
| **Docket Entry:** | COMPLAINT WITH NOTICE TO DEFEND WITHIN TWENTY (20) DAYS AFTER SERVICE IN ACCORDANCE WITH RULE 1018.1 FILED. | | |
| | | | |
| 13-MAY-2026 07:10 PM | JURYT - JURY TRIAL PERFECTED | GOSSETT JR, GEORGE | |
| **Docket Entry:** | 12 JURORS REQUESTED. | | |
| | | | |
| 13-MAY-2026 07:10 PM | CLWCM - WAITING TO LIST CASE MGMT CONF | GOSSETT JR, GEORGE | |
| **Docket Entry:** | *none.* | | |
| | | | |
| 26-JUN-2026 07:01 PM | CMREI - PRAECIPE TO REINSTATE CMPLT | GOSSETT JR, GEORGE | |
| **Documents:** | FILING_A_Praecipe_to_Reinstate.pdf | | |
| **Docket Entry:** | COMPLAINT WITH NOTICE TO DEFEND WITHIN TWENTY (20) DAYS AFTER SERVICE IN ACCORDANCE WITH RULE 1018.1 REINSTATED. (FILED ON BEHALF OF UNIVERSAL GROUP COMPANY INC) ENTRY OF APPEARANCE FILED ON BEHALF OF UNIVERSAL GROUP COMPANY INC. | | |
| | | | |
| 30-JUN-2026 11:53 AM | MTAMD - MOTION TO AMEND | GOSSETT JR, GEORGE | |
| **Documents:** | FILING_C_Motion_for_Leave_to_Amend.pdf<br>Motion CoverSheet Form | | |
| **Docket Entry:** | 94-26066494 RESPONSE DATE 07/20/2026. (FILED ON BEHALF OF UNIVERSAL GROUP COMPANY INC) | | |

| | | | |
|---|---|---|---|
| 07-JUL-2026 10:33 AM | CLLCM - LISTED FOR CASE MGMT CONF | | |
| **Docket Entry:** | *none.* | | |
| | | | |
| 07-JUL-2026 10:33 AM | CLCDS - CONFERENCE DATE SET | | |
| **Documents:** | CLCDS_9.pdf | | |
| **Docket Entry:** | *none.* | | |
| | | | |
| 07-JUL-2026 10:34 AM | ZR236 - NOTICE GIVEN UNDER RULE 236 | | |
| **Docket Entry:** | NOTICE GIVEN ON 07-JUL-2026 OF CONFERENCE DATE SET ENTERED ON 07-JUL-2026. | | |
| | | | |
| 22-JUL-2026 02:48 PM | MTASN - MOTION ASSIGNED | | |
| **Docket Entry:** | 94-26066494 MOTION TO AMEND ASSIGNED TO JUDGE: ERDOS, MICHAEL . ON DATE: JULY 22, 2026 | | |
| | | | |
| 13-AUG-2026 01:51 PM | ORDER - ORDER ENTERED/236 NOTICE GIVEN | ERDOS, MICHAEL | |
| **Documents:** | ORDER_12.pdf | | |
| **Docket Entry:** | 94-26066494 AND NOW, THIS 13TH DAY OF AUGUST, 2026, UPON CONSIDERATION OF PLAINTIFF'S MOTION TO LEAVE TO FILE AN AMENDED COMPLAINT, IT IS HEREBY ORDERED AND DECREED THAT THE MOTION IS GRANTED AND PLAINTIFF IS GRANTED LEAVE TO FILE THE FIRST AMENDED CIVIL ACTION COMPLAINT ATTACHED AS EXHIBIT A TO THE MOTION. BY THE COURT: JUDGE ERDOS, 8/13/26. | | |
| | | | |
| 13-AUG-2026 01:51 PM | ZR236 - NOTICE GIVEN UNDER RULE 236 | | |
| **Docket Entry:** | NOTICE GIVEN ON 13-AUG-2026 OF ORDER ENTERED/236 NOTICE GIVEN ENTERED ON 13-AUG-2026. | | |
| | | | |
| 18-AUG-2026 12:46 PM | CMREI - PRAECIPE TO REINSTATE CMPLT | GOSSETT JR, GEORGE | |
| **Documents:** | Praecipe_to_Reinstate_Aug18_2026 (1).pdf<br>h9b!B8W9F.pdf | | |
| **Docket Entry:** | AMENDED COMPLAINT WITH NOTICE TO DEFEND WITHIN TWENTY (20) DAYS AFTER SERVICE IN ACCORDANCE WITH RULE 1018.1 REINSTATED. (FILED ON BEHALF OF UNIVERSAL GROUP COMPANY INC) | | |

| | | | |
|---|---|---|---|
| 25-AUG-2026 10:12 AM | CLCCC - CASE MGMT CONFERENCE COMPLETED | ERDOS, MICHAEL | |
| **Docket Entry:** | *none.* | | |
| | | | |
| 25-AUG-2026 10:12 AM | CMOIS - CASE MANAGEMENT ORDER ISSUED | | |
| **Documents:** | CMOIS_16.pdf | | |
| **Docket Entry:** | CASE MANAGEMENT ORDER, STANDARD TRACK - IT IS ORDERED THAT: 1) THE CASE MANAGEMENT AND TIME STANDARDS ADOPTED FOR COMMERCE PROGRAM, STANDARD TRACK CASES SHALL APPLY AND ARE INCORPORATED. 2) ALL DISCOVERY SHALL BE COMPLETED NOT LATER THAN 07-JUN-2027. 3) PLAINTIFF(S) SHALL IDENTIFY AND SUBMIT CURRICULUM VITAE AND EXPERT REPORTS FOR ALL EXPERT WITNESSES INTENDED TO TESTIFY AT TRIAL TO ALL OTHER PARTIES NOT LATER THAN 07-JUN-2027. 4) DEFENDANT(S) AND ANY ADDITIONAL DEFENDANT(S) SHALL INDENTIFY AND SUBMIT CURRICULUM VITAE AND EXPERT REPORTS FOR ALL EXPERT WITNESSES INTENDED TO TESTIFY AT TRIAL TO ALL OTHER PARTIES NOT LATER THAN 06-JUL-2027. 5) ALL PRETRIAL MOTIONS (OTHER THAN MOTIONS IN LIMINE) SHALL BE FILED NOT LATER THAN 15-JUL-2027. 6) A SETTLEMENT CONFERENCE MAY BE SCHEDULED ANY TIME AFTER 07-SEP-2027. 7) A PRETRIAL CONFERENCE MAY BE SCHEDULED ANY TIME AFTER 04-OCT-2027. 9) IT IS EXPECTED THAT THE CASE WILL BE READY FOR TRIAL 01-NOV-2027, WHICH IS THE EARLIEST TRIAL DATE PURSUANT TO PA.R.C.P. 212.1 AND COUNSEL SHOULD ANTICIPATE TRIAL TO BEGIN EXPEDITIOUSLY THEREAFTER. ALL COUNSEL ARE UNDER A CONTINUING OBLIGATION AND ARE HEREBY ORDERED TO SERVE A COPY OF THIS ORDER UPON ALL UNREPRESENTED PARTIES AND UPON ALL COUNSEL ENTERING AN APPEARANCE SUBSEQUENT TO THE ENTRY OF THIS ORDER. ... BY THE COURT: MICHAEL ERDOS, J. 25-AUG-2026 | | |
| | | | |
| 25-AUG-2026 10:12 AM | CLLSC - LISTED-PROJ. SETTLEMENT CONF. | | |
| **Docket Entry:** | *none.* | | |
| | | | |
| 25-AUG-2026 10:12 AM | CLLPT - LISTED-PROJ. PRE-TRIAL CONF | | |
| **Docket Entry:** | *none.* | | |
| | | | |
| 25-AUG-2026 10:12 AM | CLLTR - LISTED FOR TRIAL | | |
| **Docket Entry:** | *none.* | | |
| | | | |
| 25-AUG-2026 10:12 AM | ZR236 - NOTICE GIVEN UNDER RULE 236 | | |

| | | | |
|---|---|---|---|
| **Docket Entry:** | NOTICE GIVEN ON 25-AUG-2026 OF CASE MANAGEMENT ORDER ISSUED ENTERED ON 25-AUG-2026. | | |
| | | | |
| 28-AUG-2026 10:56 AM | CLLRR - LISTED RULE RETURNABLE DATE | | |
| **Docket Entry:** | *none.* | | |
| | | | |
| 28-AUG-2026 10:58 AM | CLRSC - RULE TO SHOW CAUSE ENTERED | | |
| **Documents:** | CLRSC_22.pdf | | |
| **Docket Entry:** | the plaintiff is directed to timely prosecute the above captioned matter. A Rule is entered upon plaintiff to Show Cause why the matter should not be non prossed. The Rule is Returnable before the Commerce Program Team Leader on Wednesday, September 23, 2026, at 09:30 AM, in COURTROOM 646, Philadelphia, Pennsylvania. All counsel must appear unless the case is settled or withdrawn, in which case counsel is directed to notify the court immediately in writing. If service is effectuated prior to the Rule Returnable date, counsels' appearance will not be required and all deadlines imposed on the Case Management Order issued will govern this action. All counsel are under a continuing obligation and are hereby Ordered to serve a copy of the Case Management Order upon all unrepresented parties and upon all counsel entering an appearance subsequent to the entry of this Order. ...BY THE COURT: MICHAEL ERDOS, J. 28-AUG-2026 | | |
| | | | |
| 28-AUG-2026 10:58 AM | ZR236 - NOTICE GIVEN UNDER RULE 236 | | |
| **Docket Entry:** | NOTICE GIVEN ON 28-AUG-2026 OF RULE TO SHOW CAUSE ENTERED ENTERED ON 28-AUG-2026. | | |
| | | | |
| 17-SEP-2026 01:08 PM | ENAPP - ENTRY OF APPEARANCE | BURNS III, GERALD E | |
| **Documents:** | Notices of Appearance for GEB and FRM.pdf | | |
| **Docket Entry:** | ENTRY OF APPEARANCE OF GERALD E BURNS III AND FRANCES R MCDERMOTT FILED. (FILED ON BEHALF OF CBRE INC) | | |
| | | | |
| 17-SEP-2026 04:52 PM | AFDVT - AFFIDAVIT OF SERVICE FILED | GOSSETT JR, GEORGE | |
| **Documents:** | service.pdf | | |
| **Docket Entry:** | AFFIDAVIT OF SERVICE OF FIRST AMENDED CIVIL ACTION COMPLAINT WITH NOTICE TO DEFEND UPON PMC PROPERTY GROUP INC, LUBERT-ADLER PARTNERS LP, DEAN S ADLER, CENTRE SQUARE WEST UPPER LLC, CENTRE SQUARE WEST LOWER LLC, CENTRE SQUARE EAST UPPER LLC, CENTRE SQUARE EAST LOWER LLC, CENTRE SQUARE BASE LLC, CBRE INC AND ADLER & COMPANY BY PERSONAL SERVICE ON 09/15/2026 FILED. (FILED ON BEHALF OF UNIVERSAL GROUP COMPANY INC) | | |
| | | | |

| | | | |
|---|---|---|---|
| 21-SEP-2026 01:33 PM | CLOEC - OTHER EVENT CANCELLED | | |
| **Docket Entry:** | *none.* | | |

# NOTICE TO DEFEND

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this Complaint and Notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the Complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER. IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

**Philadelphia Bar Association**

**Lawyer Referral and Information Service**

1101 Market Street, 11th Floor

Philadelphia, PA 19107

(215) 238-6333

**AVISO**

Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las páginas siguientes, usted tiene veinte (20) días de plazo al partir de la fecha de la demanda y la notificación. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomará medidas y puede continuar la demanda en contra suya sin previo aviso o notificación. Además, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELÉFONO A LA OFICINA CUYA DIRECCIÓN SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

**Asociación de Licenciados de Filadelfia**

**Servicio de Referencia e Información Legal**

1101 Market Street, 11th Floor

Philadelphia, PA 19107

(215) 238-6333

**COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**COMMERCE PROGRAM**

| | |
|---|---|
| UNIVERSAL GROUP COMPANY INC.,<br>380 Red Lion Road<br>Huntingdon Valley, PA 19006<br><br>Plaintiff, | |
| v. | CIVIL ACTION |
| CBRE, INC.,<br>200 Park Avenue<br>New York, NY 10166 | NO. _______________ |
| PMC PROPERTY GROUP, INC.,<br>1608 Walnut Street, Suite 1400<br>Philadelphia, PA 19103 | JURY TRIAL DEMANDED |
| ADLER & CO.,<br>c/o Dean S. Adler<br>2400 Market Street, Suite 301<br>Philadelphia, PA 19103 | |
| DEAN S. ADLER, individually,<br>c/o Lubert-Adler Partners, L.P.<br>2400 Market Street, Suite 301<br>Philadelphia, PA 19103 | |
| CENTRE SQUARE EAST UPPER, LLC,<br>CENTRE SQUARE EAST LOWER, LLC,<br>CENTRE SQUARE WEST UPPER, LLC,<br>CENTRE SQUARE WEST LOWER, LLC, and<br>CENTRE SQUARE BASE, LLC,<br>(registered offices on file with the<br>Pennsylvania Department of State;<br>principal place of business, on<br>information and belief, at 2400 Market<br>Street, Suite 301, Philadelphia, PA 19103) | |
| and | |
| LUBERT-ADLER PARTNERS, L.P.<br>(in the alternative, pending discovery),<br>2400 Market Street, Suite 301<br>Philadelphia, PA 19103 | |



Case ID: 260501884
Control No.: 26066494

Defendants. : :

## FIRST AMENDED CIVIL ACTION COMPLAINT

Plaintiff Universal Group Company Inc. ("Universal"), by counsel, brings this First Amended Civil Action Complaint and alleges as follows:

## PRELIMINARY STATEMENT

1. This action seeks damages, disgorgement, and equitable relief arising from a coordinated scheme to suppress Universal Group Company Inc.'s superior $75,000,000 all-cash offer for 1500 Market Street, Philadelphia ("Centre Square"), in favor of a $70,000,000 conditional joint-venture transaction with PMC Property Group, Inc. and Adler & Co. CBRE, Inc. engineered that scheme while acting in two distinct fiduciary capacities: court-appointed Receiver of Centre Square and broker marketing its sale. CBRE acted while concealing that the buyer's principal, Dean S. Adler, is the co-founder of Lubert-Adler Partners, L.P., an institutional investor CBRE had previously sworn was among its own "Clients Represented" by the very Capital Markets personnel through whom CBRE marketed the Property.

2. The scheme operated on three tracks. First, CBRE invited Universal into a formal, Lender-approved buyer-qualification process, accepted Universal's January 22, 2026 lawyer-tendered written acceptance of CBRE's own draft Purchase and Sale Agreement at $70,000,000, and then signed with the conflicted PMC-Adler buyer one week later, without disclosing the competing offer to the federal court. Second, on February 23, 2026, CBRE rejected Universal's superior $75,000,000 offer in a single sentence claiming the Property



Case ID: 260501884
Control No.: 26066494

was “currently under agreement.” The agreement CBRE invoked, produced seventy-eight days later, was conditional, unapproved, unconsummated, and expressly not binding on the Seller. Third, CBRE certified under oath in two consecutive 175- and 196-page monthly receivership reports that there were “[n]o incidents and/or legal issues to report,” covering the precise months in which the conduct alleged here occurred.

3. CBRE’s own contradictory sworn filings in the parallel federal receivership action document the scheme. On May 19, 2026, CBRE’s litigation counsel certified to the federal court, under Federal Rule of Civil Procedure 11(b), that “Universal offered $63.5 million.” That figure is fabricated. Seven days later, CBRE filed a sworn declaration of its own Real Estate Manager and Purchase and Sale Agreement “knowledge agent,” John Svorcek, conceding under penalty of perjury that “[t]he Receiver and Broker also received an offer of $70,000,000.00 from Universal Group.” On June 16, 2026, CBRE filed yet a third version, asserting for the first time that two separate bidding rounds had occurred: a debt-assumption round in which Universal offered $70,000,000 and a separate all-cash conversion round in which Universal offered $63,500,000. That two-rounds construct is supported by no declaration, no affidavit, no email, no bid sheet, and no internal CBRE record. Three sworn or certified representations on the same single bidding round, made by the same party in the same court within twenty-nine days, cannot all be true.

4. The conduct caused realized harm. Universal lost the bargain of a Centre Square acquisition built over six months. It lost a documented engagement with Hard Rock Hotels International for a 400-room Hard Rock hotel anchor at the Property, an engagement CBRE itself convened on its corporate Zoom system. It lost prospective anchor tenants, capital partners, and a redevelopment-program design team built around the acquisition. It



Case ID: 260501884
Control No.: 26066494

incurred substantial out-of-pocket diligence costs. Its reputation as a national-scale acquirer of Class A urban office assets was damaged.

5. Universal sues CBRE in its corporate capacity, the PMC-Adler Joint Venture entities, Dean S. Adler personally, the five Buyer special-purpose entities, and Lubert-Adler in the alternative pending discovery. Universal does not name any individual CBRE employee. The conduct at issue is CBRE's, in its institutional capacity, acting through its Capital Markets and Receivership-Officer Functions and through corporate decision-makers above both. Universal seeks compensatory damages, treble damages under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, punitive damages, disgorgement of the undisclosed broker compensation, declaratory relief, a constructive trust, and attorneys' fees and costs.

## THE PARTIES

6. Universal is a Pennsylvania corporation with its principal place of business at 380 Red Lion Road, Huntingdon Valley, Pennsylvania 19006. Universal acquires and develops commercial real estate, with a focus on urban Class A assets and adaptive reuse.

7. Defendant CBRE, Inc. ("CBRE") is a Delaware corporation with its principal place of business at 200 Park Avenue, New York, New York 10166. CBRE is the world's largest commercial real estate services firm. In this matter, CBRE acted through (i) CBRE Capital Markets / National Office Partners (the "Capital Markets Function"), as marketing broker; (ii) CBRE Property Management, as the court-appointed Receiver under the Receivership Order entered April 14, 2023 in the Federal Action at ECF 20 (the "Receivership-Officer Function"); and (iii) corporate decision-makers above both Functions. All references to



Case ID: 260501884
Control No.: 26066494

"CBRE" in this Complaint mean CBRE acting in its corporate capacity through these channels.

8. Defendant PMC Property Group, Inc. ("PMC") is a Pennsylvania corporation principally led by Ronald Caplan, with its principal place of business at 1608 Walnut Street, Suite 1400, Philadelphia, Pennsylvania 19103.

9. Defendant Adler & Co. is a Pennsylvania real estate investment and development entity led by Dean S. Adler. The Philadelphia Inquirer reported on February 28, 2026 that Adler & Co. is participating in the Centre Square acquisition through the PMC-Adler Joint Venture.

10. Defendant Dean S. Adler is an individual residing in Pennsylvania and the principal of Adler & Co. He is the co-founder of Lubert-Adler. He is sued in his individual capacity as a buyer principal of the PMC-Adler Joint Venture.

11. Defendants Centre Square East Upper, LLC; Centre Square East Lower, LLC; Centre Square West Upper, LLC; Centre Square West Lower, LLC; and Centre Square Base, LLC (collectively, the "Buyer SPEs") are Pennsylvania limited liability companies. Their registered offices are on file with the Pennsylvania Department of State. On information and belief, their principal place of business is 2400 Market Street, Suite 301, Philadelphia, Pennsylvania 19103. The Buyer SPEs are identified as the Buyer, taking as tenants in common, in the preamble of the executed Purchase and Sale Agreement between CBRE-as-Seller and the Buyer SPEs (the "PMC PSA"). On information and belief, the Buyer SPEs are beneficially owned by PMC, Adler & Co., Dean S. Adler, and/or Lubert-Adler.

12. Defendant Lubert-Adler Partners, L.P. ("Lubert-Adler") is a Delaware limited partnership with its principal place of business at 2400 Market Street, Suite 301, Philadelphia, Pennsylvania 19103. Lubert-Adler was co-founded by Dean S. Adler. Lubert-Adler is



Case ID: 260501884
Control No.: 26066494

named in the alternative pending discovery, to the extent discovery establishes its direct involvement, beneficial ownership of any Buyer SPE, or other participation in the conduct alleged here.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction under 42 Pa. C.S. § 931. The amount in controversy exceeds the jurisdictional minimum.

14. This action is properly designated to the Commerce Program of the Philadelphia Court of Common Pleas under Phila. Civ. R. *213.1. The action involves the sale of commercial real estate, fiduciary obligations of a licensed Pennsylvania real estate broker, and commercial relationships among business entities.

15. Venue is proper under Pa. R.C.P. 1006 and 2179. The Property is located in Philadelphia County. The transactions occurred in Philadelphia County. Several Defendants maintain regular places of business in Philadelphia County. The cause of action arose in Philadelphia County.

16. Universal's claims are in personam only. Universal does not seek to unwind any sale of the Property, to impose any lien or interest on the Property itself, or to recover from receivership funds under the control of the United States District Court for the Eastern District of Pennsylvania in *Wells Fargo Bank, N.A., as Trustee, et al. v. NG 1500 Market St. LLC*, No. 23-cv-00146-NIQA (E.D. Pa.) (the "Federal Action"). On May 29, 2026, Universal filed a Limited Opposition in the Federal Action [ECF 97] requesting that any sale order entered there include an express preservation provision confirming that the federal order shall not release, bar, enjoin, or adjudicate the merits of these claims. *See Princess Lida of Thurn & Taxis v. Thompson*, 305 U.S. 456, 466 (1939) ("[W]here the



Case ID: 260501884
Control No.: 26066494

judgment sought is strictly *in personam*, both the state court and the federal court, having concurrent jurisdiction, may proceed with the litigation.”).

## FACTUAL BACKGROUND

### A. The Property and the Federal Receivership.

17. 1500 Market Street (“Centre Square”) comprises approximately 1,760,000 square feet on the block bounded by Market, 15th, 16th, and JFK Boulevard. It is among the largest Class A office complexes in Center City Philadelphia.

18. On April 14, 2023, in the Federal Action, the United States District Court for the Eastern District of Pennsylvania entered a Consent Order Appointing Receiver [ECF 20] appointing CBRE as Receiver over the Property (the “Receivership Order”). Section 1(n) of the Receivership Order, as modified by ECF 43, requires prior court approval before the Receiver may sell or contract to sell the Property.

### B. CBRE’s Two Functions and Institutional Knowledge.

19. CBRE acted through two functional units. The Capital Markets Function marketed the Property, distributed offering materials, conducted property inspections, exchanged diligence, and transmitted CBRE’s communications to Universal. The Receivership-Officer Function, operated by CBRE Property Management, exercised CBRE’s receivership powers and duties under the Receivership Order.

20. PSA Section 4.1 (produced to Universal’s counsel on May 11, 2026) expressly identifies John Svorcek (identified by varying titles across CBRE documents, including “Associate Director of CBRE Property Management” in PSA Section 4.1 and “Real Estate Manager with CBRE, Inc.” in the sworn declaration at ECF 92-1), as the knowledge agent for

"Seller's knowledge" under the PSA. Mr. Svorcek is the affiant of the sworn declaration at Federal Action ECF 92-1.

21. CBRE corporate decision-makers above both Functions exercised institutional control. The face of CBRE's February 23, 2026 rejection email, addressed below, confirms that the decision to reject Universal's $75,000,000 offer was made above the Capital Markets Function, which transmitted the rejection as messenger.

**C. CBRE's Sworn Disclosure of the Lubert-Adler Client Relationship.**

22. On January 6, 2025, CBRE filed in the Federal Action a Motion to Modify the Receivership Order [ECF 41]. The motion was supported by a sworn affidavit of CBRE Capital Markets Function personnel [ECF 41-2]. Exhibit A to that affidavit, captioned "Clients Represented," identifies approximately thirty-five institutional clients of those personnel, including Lubert-Adler.

23. CBRE thereby swore, on its own motion and in its own filing, that Lubert-Adler was a client of the Capital Markets Function personnel through whom the Property sale was later marketed. CBRE captioned the list "Clients Represented."

24. Approximately thirteen months later, in February 2026, CBRE executed the PMC PSA with the Buyer SPEs affiliated with Dean S. Adler, the co-founder of Lubert-Adler. CBRE did not disclose the Lubert-Adler client relationship to the federal court, to Universal, or, on information and belief, to Wells Fargo as Lender.

**D. The PMC-Lubert-Adler Joint Venture History.**

25. PMC and Lubert-Adler are longstanding joint-venture partners. In 2014, they jointly acquired the former Marketplace Design Center at 2400 Market Street, Philadelphia, for



Case ID: 260501884
Control No.: 26066494

$42,000,000. Dean S. Adler publicly described the transaction as "the most exciting project Lubert-Adler has worked on in 15 years."

26. The PMC-Lubert-Adler venture renovated 2400 Market Street, secured Aramark Corporation as headquarters tenant, and refinanced the property in December 2021 with a $220,000,000 Deutsche Bank loan. Lubert-Adler's corporate headquarters sits at 2400 Market Street, Suite 301. So does Adler & Co. So, on information and belief, do the Buyer SPEs.

27. The PMC-Lubert-Adler relationship extends to additional Philadelphia commercial real estate projects spanning more than a decade.

**E. Universal's Formal Qualification and Lender Approval.**

28. Beginning in October 2025, CBRE engaged Universal in the Centre Square sale process. CBRE distributed offering materials, granted Universal access to CBRE's structured virtual deal room ("Dealflow"), conducted multiple property tours, and led Universal through buyer-qualification activities.

29. On November 21, 2025, Universal's Chief Executive Officer, Shamikh Kazmi, attended a formal "1500 Market St Buyer Interview" hosted by CBRE on Zoom. The interview was attended by John Svorcek of CBRE Property Management, the knowledge agent for the Receivership-Officer Function; Tom Floyd and Steve Britt of KeyBank, acting as special servicer for Wells Fargo as Lender; and multiple CBRE Capital Markets Function personnel. The interview was a formal qualification proceeding. Universal was vetted by both CBRE's Receivership-Officer Function and the Lender's authorized representative.

30. On December 12, 2025, CBRE Capital Markets Function personnel transmitted to Mr. Kazmi an email titled "1500 Market Next Steps." It stated: "Thank you for your patience.



Case ID: 260501884
Control No.: 26066494

We have been given the green light from KeyBank to continue the sale process with a limited set of potential buyers. Attached is a draft PSA for 1500 Market Street."

31. In CBRE's own written words, Universal was approved by KeyBank, as the Lender's special servicer, as one of the "limited set of potential buyers." CBRE attached its draft PSA to Universal for review.

**F. Universal's Bidding Progression.**

32. Universal participated in CBRE's selective bidding process through multiple rounds of diligence, multiple property inspections, multiple substantive offers, and active negotiation.

33. On December 17, 2025, Universal transmitted an initial offer to CBRE at $61,000,000, with a five percent non-refundable deposit and no due-diligence contingency.

34. CBRE provided transaction-level diligence to Universal, including Argus rent rolls, Parkway Corporation lease information, Radian termination calculations, and operating-expense projections.

35. Universal conducted three formal property inspections on January 7, 9, and 12, 2026, accompanied by CBRE Capital Markets and Property Management personnel.

36. On January 15, 2026, CBRE Capital Markets Function personnel transmitted to Mr. Kazmi a formal "Next Steps" communication soliciting Universal's pricing bid by January 22, 2026.

37. On January 22, 2026, at 3:55 PM EST, Andrew Teitelman, Esquire, on behalf of Universal, transmitted to Christopher Schueller of Buchanan Ingersoll & Rooney PC ("BIPC"), CBRE's transactional counsel, a written acceptance of CBRE's proposed Purchase and Sale Agreement (version 4924-2945-3447 v2) and Assumption Agreement (version v1) at



Case ID: 260501884
Control No.: 26066494

$70,000,000. CBRE Capital Markets Function personnel were copied. At 5:55 PM EST that day, Mr. Teitelman transmitted a marked-up PSA with $70,000,000 in Section 2.1.

38. On January 23, 2026, Mr. Schueller responded: “Thanks, Andrew.” He then asked: “Does your client want to assume the existing loan?” Mr. Teitelman responded: “They do.”

39. Universal’s January 22, 2026 written acceptance was a lawyer-tendered acceptance of CBRE’s own draft PSA. The only material change was the price.

**G. The Undisclosed Execution of the Conflicted PMC-Adler PSA.**

40. In late January 2026, approximately one week after Universal’s $70,000,000 written acceptance, Mr. Kazmi received a telephone call from CBRE Capital Markets Function personnel. CBRE informed him that “a higher offer was signed yesterday.” Mr. Kazmi asked whether the federal court had approved any such offer. CBRE acknowledged it had not.

41. On information and belief, the “higher offer” CBRE referenced was the PMC PSA with the Buyer SPEs. The PMC PSA was executed in February 2026.

42. The PMC PSA, as produced May 11, 2026, was on its face a conditional instrument. Section 2.1 listed a cash purchase price of $70,000,000, the same price Universal had accepted in writing a week earlier. The preamble identified the Buyer as the five Buyer SPEs taking as tenants in common. Section 4.6 made the agreement subject to Court Approval and Lender Approval as conditions precedent, auto-terminated the agreement if those approvals were not obtained, and provided that the agreement would not bind the Seller unless and until fully executed. Article VIII, Section 8.1 referenced a separate written broker-compensation agreement between CBRE-as-Seller and CBRE-as-Broker.



Case ID: 260501884
Control No.: 26066494

The terms and amount of that separate compensation agreement have never been disclosed to Universal.

43. The PMC PSA bears a stated Effective Date of February 17, 2026, the same day Universal transmitted its $75,000,000 all-cash offer to CBRE. When CBRE rejected Universal's offer six days later, on February 23, 2026, the agreement CBRE invoked as the basis for the rejection was six days old, conditional, unapproved, and unconsummated.

44. CBRE executed the PMC PSA without prior court approval. That violated Section 1(n) of the Receivership Order as modified by ECF 43.

**H. Universal's Superior $75,000,000 Offer and the One-Sentence Rejection.**

45. On February 17, 2026 at 8:25 PM EST, Mr. Kazmi transmitted to CBRE Capital Markets Function personnel an email titled "1500 Market, URGENT!!!" Universal offered $75,000,000 all cash, no financing contingency, no due-diligence contingency, ten-business-day close. The offer was on its face materially superior to the $70,000,000 conditional PMC PSA.

46. On February 19, 2026, Mr. Kazmi transmitted a follow-up email.

47. On February 23, 2026 at 12:44 PM EST, CBRE Capital Markets Function personnel transmitted to Mr. Kazmi a one-sentence rejection: "Your updated offer has been presented to the Receiver for 1500 Market. Unfortunately, he has asked me to let you know that 1500 Market is currently under agreement, and as such, the Receiver cannot entertain any offers at this time. If anything changes I will certainly let you know right away."

48. The text of the rejection email confirms two facts on its face. First, the decision was made above the Capital Markets Function, by the Receivership-Officer Function or CBRE corporate decision-makers above it. Second, the rejection was premised on a representation

that the Property was "under agreement" such that the Receiver "cannot entertain" Universal's superior offer. The agreement CBRE invoked was six days old, conditional, unapproved, and unconsummated.

49. Both premises were false. The agreement CBRE invoked was the conditional, unapproved, unconsummated PMC PSA. By its own terms, that agreement did not foreclose evaluation of Universal's superior offer by the Court before any sale was confirmed. The May 11, 2026 PSA production confirms this. So does PSA Section 4.6, on which CBRE itself drafted the language.

**I. Universal's Acquisition Pipeline, Including Hard Rock.**

50. Universal's $75,000,000 offer was not a stand-alone cash bid. Universal had assembled an acquisition ecosystem over the preceding six months.

51. Among Universal's prospective relationships was a documented engagement with Hard Rock Hotels International ("Hard Rock") for a Hard Rock hotel component at the Property. The engagement is documented in written correspondence dated October 31 through November 22, 2025, on file in the Federal Action as Motion Exhibit 24 (sub-exhibits 24-A through 24-E). It advanced through six substantive interactions: (i) the October 31, 2025 introductory meeting, convened by CBRE Capital Markets Function personnel on CBRE's corporate Zoom system under the subject line "1500 Market Discussion with Universal Group and Hard Rock Hotels"; (ii) Hard Rock's November 4, 2025 transmission to Universal of an underwritten 400-room Hard Rock hotel program, identified by Hard Rock as the program "previously underwritten for the Center City market," meaning Philadelphia Center City; (iii) Universal's November 7, 2025 site tour of Hard Rock Hotel New York; (iv) Universal's November 8, 2025 written communication to Hard Rock and the



Case ID: 260501884
Control No.: 26066494

introducing broker, with CBRE Capital Markets Function personnel copied, stating that Universal "would be thrilled to bring Hard Rock to Philadelphia, especially at 1500 Market" and was "very interested in securing the rights to bring Hard Rock to 1500 Market through a deposit or similar arrangement"; (v) the November 10, 2025 escalation to Hard Rock's Senior Vice President of Global Hotel Business Development; and (vi) continued CBRE-coordinated Hard Rock engagement through November 22, 2025, with CBRE Capital Markets Function personnel on every email.

52. CBRE Capital Markets Function personnel, acting within the scope of their CBRE corporate employment as the marketing broker for the Property, personally coordinated meetings between Universal and Hard Rock executives in November 2025. CBRE had actual, contemporaneous, institutional knowledge of Universal's Hard Rock relationship and its connection to Centre Square.

53. Universal also developed prospective relationships with major corporate occupiers, anchor tenants, capital partners, and a redevelopment-program design team aligned with its acquisition plan. Records of those relationships exist in Universal's possession. Universal will identify the Hard Rock-related communications, meeting records, site-tour materials, and the affected tenant, operator, and capital-partner relationships in discovery subject to a protective order.

54. Universal's pipeline counterparties knew Universal was actively pursuing the Property as a qualified, Lender-approved buyer and were positioned to participate in Universal's acquisition.



Case ID: 260501884
Control No.: 26066494

**J. Concealment Through ECF 71 and ECF 72, and Continuing Concealment.**

55. On February 6, 2026, CBRE filed in the Federal Action its 175-page Monthly Report for December 2025 [ECF 71]. The report was signed under oath by Mark D. Pfeiffer of BIPC as litigation counsel of record for the Receiver. The Section 11 narrative section, titled "Incident Reports and/or Legal Issues," contains one sentence: "No incidents and/or legal issues to report."

56. The December 2025 Monthly Report covered the precise month in which Universal attended the Buyer Interview, received the draft PSA, received Lender approval, conducted property inspections, and submitted Universal's first formal offer.

57. On March 24, 2026, CBRE filed in the Federal Action its 196-page Monthly Report for January 2026 [ECF 72], also signed under oath by Mr. Pfeiffer. The Section 11 certification again states: "No incidents and/or legal issues to report."

58. The January 2026 Monthly Report covered the month in which Universal submitted its $70,000,000 written acceptance, CBRE telephonically informed Universal that "a higher offer was signed yesterday," and the PMC PSA was executed. CBRE filed the report three weeks after the PMC-Adler transaction had been reported in the trade press.

59. The certifications at ECF 71 and ECF 72 were materially misleading. Discovery is required as to what was known to CBRE, who knew it, and when.

60. CBRE's concealment continues as of the date of this First Amended Complaint. After Universal twice formally demanded the documentary support for the $63,500,000 representation CBRE certified to the federal court (in Universal's Motion to Intervene at Federal Action ECF 82, filed May 12, 2026, and in Universal's Limited Opposition at Federal Action ECF 97, filed May 29, 2026), CBRE has produced no supporting writing. After Universal raised in the Federal Action the Article VIII, Section 8.1 separate broker-



Case ID: 260501884
Control No.: 26066494

compensation agreement between CBRE-as-Seller and CBRE-as-Broker, CBRE has produced no such agreement. After Universal raised in the Federal Action the Lubert-Adler client relationship and demanded current disclosure of its nature, duration, and scope, CBRE has produced no updated disclosure. Each component of the concealment alleged in this Complaint is current and ongoing as of the date of filing.

**K. The Premature Market-Finality Narrative.**

61. Between February 28 and April 13, 2026, the PMC-Adler Joint Venture, with CBRE's institutional knowledge and without any public correction from CBRE, caused or permitted statements to appear in commercial real estate trade publications, including the Philadelphia Inquirer, Commercial Real Estate Direct, Bisnow Philadelphia, Philly Office Space, and The Real Deal. The statements created a premature and materially misleading market-finality narrative regarding the Centre Square sale.

62. CBRE knew the PMC PSA was conditional, unapproved, and unconsummated. CBRE issued no correction.

**L. Pipeline Impairment.**

63. After the February 23, 2026 rejection, and after the trade-press market-finality narrative attributed actual or imminent ownership of the Property to the PMC-Adler Joint Venture, Universal's pipeline counterparties, including Hard Rock, paused, withdrew from, or ceased to advance their engagement with Universal regarding the Property.

64. The destruction of Universal's acquisition pipeline between CBRE's February 23, 2026 rejection and the May 11, 2026 PSA production caused realized harm.



Case ID: 260501884
Control No.: 26066494

**M. The May 11, 2026 PSA Production and the May 14, 2026 CSC PSA Filing.**

65. On May 11, 2026, Christopher Schueller of BIPC transmitted to Universal's counsel the executed PMC PSA and a redline of a proposed PSA with CSC Coliving LLC. Mr. Schueller wrote: "The receiver intends to notify the Court of any and all proposals and let the Court decide which buyer to approve."

66. The May 11, 2026 PSA production confirmed: (i) the cash purchase price of $70,000,000; (ii) the Buyer SPE structure; (iii) Court Approval and Lender Approval as conditions precedent; (iv) auto-termination if those approvals were not obtained; (v) John Svorcek as named knowledge agent for the Receivership-Officer Function; (vi) the Article VIII separate written broker-compensation agreement between CBRE-as-Seller and CBRE-as-Broker, terms and amount undisclosed; and (vii) an outside Closing Date of October 16, 2026.

67. That same day, CSC Coliving LLC filed in the Federal Action a Letter of Intent at ECF 79. CSC offered $80,000,000 for the Property, with a $2,500,000 non-refundable deposit, no due diligence, and no financing contingency. CSC stated on the face of ECF 79 that CSC was the "second highest bidder for this property, got qualified in the process, had multiple interviews with the servicer and got approved as a buyer."

68. CSC's $80,000,000 Letter of Intent is a later nonbinding proposal that exceeds the PMC PSA cash component by approximately $10,000,000. CSC was qualified through the same Buyer Interview process to which Universal had been subjected.

69. Three days later, on May 14, 2026, CBRE itself filed on the federal docket at ECF 86 a Purchase and Sale Agreement between CBRE-as-Receiver and CSC Coliving LLC, signed by CSC Coliving LLC as Buyer (the "CSC PSA"). Section 2.1 of the CSC PSA sets the purchase price at $80,000,000. Section 2.2 commits CSC to a $5,000,000 non-refundable



Case ID: 260501884
Control No.: 26066494

earnest money deposit. The CSC PSA bears the signature of Salo Smeke, Managing Partner of CSC Coliving LLC. CBRE itself filed the CSC PSA on the federal court's public docket. Twelve days later, on May 26, 2026, CBRE filed at ECF 92 a separate motion seeking confirmation of a private sale of the same Property to the conflicted PMC-Adler Joint Venture at $70,000,000. The Sale Motion does not address the relationship between the two filings. The CSC PSA establishes a competing price of $80,000,000, exceeding the proposed PMC sale price by $10,000,000, or 14.3 percent, which is 4.3 percentage points above the 10 percent statutory upset-bid threshold under 28 U.S.C. § 2001(b). CBRE has placed before the federal court two materially inconsistent positions on the same single transaction and has not reconciled them.

**N. Subsequent Federal-Court Filings Confirming and Compounding the Conduct.**

70. On May 19, 2026, in the Federal Action, CBRE, through its litigation counsel Christopher Schueller of BIPC, filed a Status Report and Motion for Agreed Scheduling Order [ECF 89]. Paragraph 4 of the Status Report represented to the federal court, under counsel's certification pursuant to Federal Rule of Civil Procedure 11(b), that "[i]n the end when the Receiver called for final and best offers, Centre Square made the highest cash offer at $70 million; Universal offered $63.5 million and CSC offered $60 million." Federal Action, ECF 89 ¶ 4. The $63,500,000 figure attributed to Universal does not correspond to any offer Universal made or authorized. Universal's only written acceptance during CBRE's January 2026 solicitation was the lawyer-tendered January 22, 2026 acceptance at $70,000,000, on CBRE's own draft PSA, with the existing loan to be assumed.

71. Seven days later, on May 26, 2026, in the same Federal Action, CBRE filed its Motion for Order Approving Private Sale [ECF 92]. The motion was supported by a sworn declaration



Case ID: 260501884
Control No.: 26066494

of John Svorcek, the CBRE Real Estate Manager identified in PSA Section 4.1 as the knowledge agent for CBRE's Receivership-Officer Function. Mr. Svorcek's declaration, executed under penalty of perjury pursuant to 28 U.S.C. § 1746, states: "With respect to the best and final bids, the Receiver and Broker received a $70,000,000.00 offer from CSC 1500 Market Prop Co, LLC . . . . The Receiver and Broker also received an offer of $70,000,000.00 from Universal Group . . . ." Federal Action, ECF 92-1 (Svorcek Decl.) ¶¶ 23-24.

72. CBRE's sworn declaration confirms Universal's January 22, 2026 written acceptance at $70,000,000. It also directly contradicts CBRE's May 19, 2026 Rule 11-certified representation to the same federal court that Universal's offer was $63,500,000. The two representations, filed eight days apart by the same party in the same court, cannot both be true. CBRE has not reconciled them or identified which it stands behind.

73. The Svorcek declaration also reflects, on its face, that CBRE characterized the "best and final" offers from all three remaining bidders, namely CSC, Universal, and the PMC-Adler Joint Venture, as each exactly $70,000,000. Federal Action, ECF 92-1 (Svorcek Decl.) ¶¶ 23-24. Three independent bids at the identical dollar figure on a Class A office complex of approximately 1,760,000 square feet, in an arm's-length "best and final" round, is statistically improbable in a fair competitive process. The improbability is confirmed by what the same bidders did when given subsequent opportunities. Universal offered $75,000,000 six days later, on February 17, 2026. CSC offered $80,000,000 on May 11, 2026 [Federal Action, ECF 79] and then executed a Purchase and Sale Agreement at $80,000,000 on May 14, 2026 [Federal Action, ECF 86]. Both subsequent offers materially exceeded the $70,000,000 CBRE attributed to each bidder as "best and final." At a



Case ID: 260501884
Control No.: 26066494

minimum, this establishes that CBRE's "best and final" process was inadequate to elicit the market-clearing price. On information and belief, the round was structured to produce an apparent three-way tie that CBRE could then resolve in favor of its conflicted PMC-Adler counterparty.

74. On June 16, 2026, in the Federal Action, CBRE, through Gerald E. Burns of BIPC, filed its Memorandum in Opposition to Universal's Motion to Intervene [ECF 98]. At page 6 of the Opposition, CBRE introduced for the first time a new factual construct: that CBRE conducted two separate best-and-final bidding rounds, first a debt-assumption round in which Universal allegedly bid $70,000,000 and second a separate all-cash conversion round in which Universal allegedly bid $63,500,000. The construct was advanced to reconcile CBRE's May 19, 2026 Rule 11-certified representation at ECF 89 ¶ 4 with CBRE's May 26, 2026 sworn declaration at ECF 92-1 ¶¶ 23-24. No declaration supports the construct. No affidavit supports it. No email, no bid sheet, no internal CBRE record, and no communication from Universal supports it. The construct is attorney argument advanced in a brief, in direct response to Universal's challenge to the $63,500,000 representation. After two formal opportunities to substantiate the $63,500,000 figure with documentary evidence, first in the May 19, 2026 Status Report itself, and then in the June 16, 2026 Opposition, CBRE has produced no supporting writing.

75. CBRE has now made three mutually inconsistent representations to the federal court on the same single bidding round: the Rule 11-certified $63,500,000 representation at ECF 89 ¶ 4; the sworn $70,000,000 declaration at ECF 92-1 ¶¶ 23-24; and the unsupported two-rounds construct at ECF 98 page 6. The three cannot all be true. Two were signed by the same law firm within twenty-nine days. The third was sworn under penalty of perjury by CBRE's



Case ID: 260501884
Control No.: 26066494

own knowledge agent and is consistent with Universal's documented January 22, 2026 written acceptance.

76. Defendants PMC, Adler & Co., Dean S. Adler, the Buyer SPEs, and, on information and belief, Lubert-Adler are presently and actively seeking entry of a federal sale order that would, by its terms, "forever bar, estop, and permanently enjoin" any party from asserting claims against the Receiver, the Buyer SPEs, the Lender, or the Property. Federal Action, ECF 92 (Proposed Order) ¶ p. The proposed order would also: extinguish all claims, encumbrances, and interests against the Receiver, Buyer, Lender, or Property, id. ¶ n; disclaim any successor or vicarious liability of the Buyer or Lender, id. ¶ o; recite that the sale "was conducted in a commercially reasonable manner," id. ¶ b; and recite that all parties had "a full and fair opportunity to analyze and object" to the sale, id. ¶ f. Universal's May 29, 2026 Limited Opposition [ECF 97] objects to those provisions and seeks an express preservation provision protecting the claims pleaded here.

77. Taken together, CBRE has made five separate false or materially misleading representations on this same underlying conduct, to two different forums: (i) the February 23, 2026 representation to Universal that the Property was "currently under agreement" such that the Receiver "cannot entertain" the $75,000,000 offer, when the agreement was conditional and unconsummated; (ii) the sworn ECF 71 and ECF 72 monthly-report certifications to the federal court that there were "[n]o incidents and/or legal issues to report," covering the months the conduct was underway; (iii) the May 19, 2026 Rule 11-certified representation at ECF 89 ¶ 4 that Universal's offer was $63,500,000; (iv) the proposed Finding of Fact at ECF 92 (Proposed Order) ¶ b reciting that the sale process "was conducted in a commercially reasonable manner," when CBRE's own filing at ECF 86

establishes a signed $80,000,000 competing transaction exceeding the proposed PMC sale price by 14.3 percent; and (v) the June 16, 2026 two-rounds construct at ECF 98 page 6, unsupported by any declaration, affidavit, or documentary record. The pattern is institutional.

**O. Damages.**

78. Defendants' conduct caused Universal the following damages: (i) loss of the bargain of a Property purchase Universal had developed for six months; (ii) loss of the prospective tenant, hotel-operator, anchor-tenant, and capital-partner relationships Universal had assembled, including its documented relationship with Hard Rock; (iii) substantial out-of-pocket diligence expenditures; (iv) loss of completed redevelopment-program work; (v) consequential damage to Universal's reputation as a qualified national-scale acquirer of Class A urban office assets; (vi) the suppressed-market-price differential of at least $10,000,000, measured against the CSC PSA filed by CBRE itself at Federal Action ECF 86, which is signed by CSC Coliving LLC at $80,000,000 and establishes a contract-evidenced competing-bid floor exceeding the $70,000,000 PMC PSA cash component by 14.3 percent; (vii) opportunity cost; and (viii) other compensatory damages to be proved at trial.

**COUNT I**

**PROMISSORY ESTOPPEL**

*(Universal v. CBRE)*

79. Universal incorporates paragraphs 1 through 78 as if fully set forth herein.



Case ID: 260501884
Control No.: 26066494

80. CBRE made clear and definite representations to Universal that Universal would be evaluated and treated as a qualified buyer in a fair, court-supervised process. Those representations included the November 21, 2025 Buyer Interview at which CBRE's Receivership-Officer Function and the Lender's special servicer vetted Universal; the December 12, 2025 written confirmation that Universal had received KeyBank's "green light" as part of a "limited set of potential buyers"; the transmission of CBRE's draft PSA to Universal; and Mr. Schueller's substantive engagement with Universal's counsel on the January 22, 2026 written acceptance.

81. CBRE reasonably should have expected Universal to rely on those representations, and Universal did rely. Universal committed resources to extensive diligence, attended property inspections, performed transaction-level financial modeling, developed the prospective tenant, operator, anchor-tenant, and capital-partner pipeline described above, and submitted successive substantive offers, including the $75,000,000 all-cash, no-contingency offer on February 17, 2026.

82. Universal's reliance was reasonable and detrimental.

83. Injustice can be avoided only by enforcement of CBRE's representations. *See Crouse v. Cyclops Indus.*, 560 Pa. 394, 745 A.2d 606, 610 (2000); *Travers v. Cameron Cty. Sch. Dist.*, 117 Pa. Commw. 606, 544 A.2d 547, 550 (1988).

**WHEREFORE,** Universal demands judgment against CBRE in an amount in excess of fifty thousand dollars ($50,000), exclusive of interest and costs, together with consequential damages, equitable relief, and such other relief as this Court deems just and proper.



Case ID: 260501884
Control No.: 26066494

## COUNT II

## FRAUDULENT INDUCEMENT

*(Universal v. CBRE, PMC, Adler & Co., Dean S. Adler, and the Buyer SPEs)*

84. Universal incorporates paragraphs 1 through 78 as if fully set forth herein.

85. CBRE and the PMC-Adler Joint Venture Defendants made knowingly false material representations to Universal. CBRE represented that Universal would be evaluated in a fair, court-supervised process; that Universal had received Lender approval as part of a defined and limited set of potential buyers; that competing offers would be evaluated on their merits and presented to the federal court and the Lender; and, on February 23, 2026, that the Property was "under agreement" such that the Receiver "cannot entertain any offers." Through trade-press communications between February 28 and April 13, 2026, Defendants caused or permitted statements attributing actual or imminent ownership of the Property to the PMC-Adler Joint Venture.

86. CBRE knew the representations were false or made them with reckless disregard for their truth. The PMC-Adler Joint Venture Defendants, on information and belief and as discovery will establish, knowingly participated in or institutionally benefited from the conduct.

87. Defendants intended that Universal rely on the representations.

88. Universal reasonably relied on the representations to its detriment.

89. Universal's damages exceed fifty thousand dollars ($50,000), exclusive of interest and costs.

**WHEREFORE,** Universal demands judgment against each named Defendant, jointly and severally, in an amount in excess of fifty thousand dollars ($50,000), exclusive of interest and



Case ID: 260501884
Control No.: 26066494

costs, together with punitive damages, attorneys' fees and costs, and such other relief as this Court deems just and proper.

**COUNT III**

**FRAUDULENT CONCEALMENT**

*(Universal v. CBRE, PMC, Adler & Co., Dean S. Adler, and the Buyer SPEs)*

90. Universal incorporates paragraphs 1 through 78 as if fully set forth herein.

91. CBRE had an affirmative duty to disclose, as Receiver and as a licensed Pennsylvania real estate broker, all material facts concerning the sale of the Property. Those facts included the Lubert-Adler client relationship CBRE itself swore to at ECF 41-2 Exhibit A; the negotiation and execution of the PMC PSA; CBRE's rejection of Universal's $75,000,000 offer; the Article VIII separate broker-compensation agreement referenced in PSA Section 8.1; the existence of the CSC PSA, signed by CSC at $80,000,000 and filed by CBRE itself at ECF 86; and any additional commercial arrangements between CBRE and the PMC-Adler Joint Venture Defendants.

92. CBRE intentionally concealed those facts from Universal, the federal court, and Wells Fargo as Lender. CBRE certified at ECF 71 and ECF 72 that there were "[n]o incidents and/or legal issues to report," during the precise months the conduct was underway. CBRE failed to correct the trade-press market-finality narrative. CBRE then represented to the federal court at ECF 89 ¶ 4 that Universal's offer was $63,500,000, a representation contradicted seven days later by CBRE's own sworn declaration at ECF 92-1 ¶¶ 23-24 confirming Universal's $70,000,000 offer, and a third time on June 16, 2026 by the unsupported two-rounds construct at ECF 98 page 6. After two formal opportunities to



Case ID: 260501884
Control No.: 26066494

substantiate the $63,500,000 representation with documentary evidence, CBRE has produced none.

93. The PMC-Adler Joint Venture Defendants knowingly participated in and institutionally benefited from the concealment. They are presently, in the Federal Action, actively seeking entry of an overbroad federal sale order purporting to "permanently enjoin" the very claims pleaded here. See Federal Action, ECF 92 (Proposed Order) ¶ p.

94. Universal reasonably relied on the absence of disclosure and incurred damages.

**WHEREFORE,** Universal demands judgment against each named Defendant, jointly and severally, in an amount in excess of fifty thousand dollars ($50,000), exclusive of interest and costs, together with punitive damages, attorneys' fees and costs, and such other relief as this Court deems just and proper.

## COUNT IV

## VIOLATIONS OF THE PENNSYLVANIA REAL ESTATE LICENSING AND REGISTRATION ACT (63 P.S. §§ 455.604, 455.606A)

*(Universal v. CBRE)*

95. Universal incorporates paragraphs 1 through 78 as if fully set forth herein.

96. CBRE is a licensed Pennsylvania real estate broker subject to the Pennsylvania Real Estate Licensing and Registration Act, 63 P.S. §§ 455.101-455.902 ("RELRA").

97. Section 604 of RELRA, 63 P.S. § 455.604, prohibits a broker from making substantial misrepresentations; acting for more than one party in a transaction without the knowledge and written consent of all parties; accepting valuable consideration from more than one party in a transaction; failing to comply with broker fiduciary obligations; and any conduct



Case ID: 260501884
Control No.: 26066494

that violates any provision of the Act. The duty to provide written statements of estimated cost and return is separately established by 49 Pa. Code § 35.334.

98. Section 606a of RELRA, 63 P.S. § 455.606a, and the implementing regulations at 49 Pa. Code § 35.292, impose duties on a broker including reasonable professional skill and care, honesty and good faith, timely presentation of written offers and counteroffers, disclosure of conflicts and financial interests, competent service, and the obligation to keep the consumer informed of material information concerning the transaction.

99. CBRE violated RELRA. CBRE failed to disclose to Universal the Lubert-Adler client relationship CBRE itself swore to at ECF 41-2 Exhibit A. CBRE acted simultaneously as Receiver, broker, and counterparty to a conflicted joint venture without the disclosures and consents required of a licensee. CBRE failed to disclose to Universal or to the federal court the Article VIII separate broker-compensation agreement between CBRE-as-Seller and CBRE-as-Broker. CBRE made the February 23, 2026 rejection statement that the Receiver "cannot entertain" Universal's $75,000,000 offer, when the executed PSA produced May 11, 2026 confirms the underlying agreement was conditional and unconsummated. CBRE failed to timely present or disclose the disposition of Universal's January 22, 2026 written acceptance and February 17, 2026 $75,000,000 offer. CBRE made the materially inaccurate $63,500,000 representation at Federal Action ECF 89 ¶ 4, contradicted seven days later by its own sworn declaration at ECF 92-1 ¶¶ 23-24 and again twenty-eight days later by an unsupported two-rounds construct at ECF 98 page 6.

100. Universal suffered damages as a result of CBRE's RELRA violations. In addition, and independently of whether the Court determines that Section 604 and Section 606a give rise to a freestanding private cause of action, the RELRA violations set forth in this Count



Case ID: 260501884
Control No.: 26066494

establish the standard of care applicable to CBRE's broker conduct under Counts II (Fraudulent Inducement), III (Fraudulent Concealment), V (Breach of Fiduciary Duty), VI (Tortious Interference with Prospective Contractual Relations), and IX (Unfair Trade Practices and Consumer Protection Law), and serve as negligence per se establishing breach of the duty of care under those counts. The factual allegations and statutory predicates set forth in this Count IV are incorporated into the broker-conduct elements of each of those counts whether or not Count IV is sustained as a freestanding cause of action.

**WHEREFORE,** Universal demands judgment against CBRE in an amount in excess of fifty thousand dollars ($50,000), exclusive of interest and costs, together with punitive damages, attorneys' fees and costs, and such other relief as this Court deems just and proper.

## COUNT V
## BREACH OF FIDUCIARY DUTY
*(Universal v. CBRE)*

101. Universal incorporates paragraphs 1 through 78 as if fully set forth herein.

102. As court-appointed Receiver and as a licensed Pennsylvania real estate broker, CBRE owed fiduciary duties to the receivership estate, to the federal court, and to Wells Fargo as Lender. CBRE further owed Universal independent statutory and professional duties under RELRA and 49 Pa. Code §§ 35.292 and 35.334 as a known bidder and consumer of CBRE's regulated services, including duties of honesty, good faith, candor, timely presentation of written offers, and disclosure of conflicts and material facts.

103. CBRE breached those duties. CBRE executed the PMC PSA without the prior court approval required by Section 1(n) of the Receivership Order. CBRE rejected Universal's



Case ID: 260501884
Control No.: 26066494

superior $75,000,000 offer in favor of the conflicted $70,000,000 PMC PSA. CBRE concealed the Lubert-Adler client relationship and the Article VIII separate broker-compensation agreement. CBRE certified sworn monthly reports as containing no incidents during the months the conduct was underway. CBRE failed to correct the trade-press market-finality narrative. CBRE made materially inconsistent sworn and Rule 11-certified representations to the federal court at ECF 89 ¶ 4, ECF 92-1 ¶¶ 23-24, and ECF 98 page 6, and filed its own competing $80,000,000 CSC PSA at ECF 86 while seeking confirmation of a different sale at $70,000,000 at ECF 92, without reconciling the inconsistency.

104. Universal suffered damages as a result.

**WHEREFORE,** Universal demands judgment against CBRE in an amount in excess of fifty thousand dollars ($50,000), exclusive of interest and costs, together with punitive damages, disgorgement of any unauthorized compensation, attorneys' fees and costs, and such other relief as this Court deems just and proper.

## COUNT VI

## TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS

*(Universal v. CBRE, PMC, Adler & Co., Dean S. Adler, and the Buyer SPEs)*

105. Universal incorporates paragraphs 1 through 78 as if fully set forth herein.

106. Pennsylvania recognizes a cause of action for intentional interference with existing or prospective contractual relations where the defendant intentionally and improperly interferes with the relationship and causes actual harm. *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 412 A.2d 466, 471 (1979).



Case ID: 260501884
Control No.: 26066494

107. Universal had developed prospective contractual relationships with multiple counterparties. They included Hard Rock, with which Universal had advanced documented engagement with senior executives responsible for North American development and global hotel business development concerning a Hard Rock hotel component at Centre Square; other prospective anchor tenants and corporate occupiers; prospective capital partners for the acquisition; and redevelopment-program design partners.

108. The prospective relationships were reasonably likely to result in actual contracts but for Defendants' conduct.

109. Defendants had actual or constructive knowledge of Universal's prospective relationships. CBRE had specific institutional knowledge of the Hard Rock relationship through the participation of CBRE Capital Markets Function personnel in coordinating meetings between Universal and Hard Rock executives in November 2025.

110. Defendants interfered intentionally and improperly. CBRE rejected Universal's $75,000,000 offer on grounds the produced PSA confirms were materially misleading. CBRE executed the PMC PSA without the prior court approval required by the Receivership Order. CBRE failed to present Universal's offers to the federal court and the Lender for evaluation against the PMC PSA on equivalent terms. The PMC-Adler Joint Venture Defendants cultivated, or knowingly permitted, the trade-press market-finality narrative between February 28 and April 13, 2026, and benefited from it. None of the Defendants corrected the narrative.

111. Defendants' conduct was without privilege or justification.



Case ID: 260501884
Control No.: 26066494

112. As a direct and proximate result, Universal's pipeline counterparties, including Hard Rock, paused, withdrew from, or ceased to advance their engagement with Universal, on the stated or implied basis that Universal no longer had a viable path to the Property.

113. Universal suffered substantial damages.

**WHEREFORE,** Universal demands judgment against each named Defendant, jointly and severally, in an amount in excess of fifty thousand dollars ($50,000), exclusive of interest and costs, together with punitive damages, consequential damages, attorneys' fees and costs, and such other relief as this Court deems just and proper.

## COUNT VII
## CIVIL CONSPIRACY

*(Universal v. CBRE, PMC, Adler & Co., Dean S. Adler, and the Buyer SPEs)*

114. Universal incorporates paragraphs 1 through 78 as if fully set forth herein.

115. On information and belief, CBRE, PMC, Adler & Co., Dean S. Adler, and the Buyer SPEs combined and agreed, with malice or intent to injure Universal, to: execute the PMC PSA without the prior court approval required by Section 1(n) of the Receivership Order; cause the rejection of Universal's superior $75,000,000 offer without contemporaneous Lender or court evaluation of the differential; conceal the conflicted nature of the transaction from the federal court, the Lender, and Universal; deploy or permit the trade-press sale-status reporting that suppressed Universal's competing acquisition pipeline; and now seek entry of an overbroad federal sale order purporting to "forever bar, estop, and permanently enjoin" claims (including Universal's in personam damages claims) against the Receiver,



Case ID: 260501884
Control No.: 26066494

the Buyer SPEs, the Lender, and the Property. See Federal Action, ECF 92 (Proposed Order) ¶ p.

116. Defendants also acted in concert to keep the underlying documents out of public view. The Receiver's motions seeking expedited hearing and approval of the PMC PSA were originally filed under seal at Federal Action ECF 73, ECF 74, and ECF 75 on May 1, 2026. The federal court denied the sealing in three orders entered May 27-28, 2026 [ECF 94, ECF 95, ECF 96], requiring the materials to be refiled publicly at ECF 91 and ECF 92. The pattern is consistent with the concealment alleged above: the same materials Defendants now ask the federal court to "permanently enjoin" Universal from challenging were the materials Defendants first attempted to seal from the public docket.

117. Each Defendant took overt acts in furtherance of the combination.

118. Universal suffered damages as a direct and proximate result.

**WHEREFORE,** Universal demands judgment against each named Defendant, jointly and severally, in an amount in excess of fifty thousand dollars ($50,000), exclusive of interest and costs, together with punitive damages, attorneys' fees and costs, and such other relief as this Court deems just and proper.

## COUNT VIII

## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

*(Universal v. PMC, Adler & Co., Dean S. Adler, and the Buyer SPEs)*

119. Universal incorporates paragraphs 1 through 78 as if fully set forth herein.

120. CBRE owed the fiduciary duties set forth in Count V.

121. CBRE breached those duties as set forth in Count V.



Case ID: 260501884
Control No.: 26066494

122. PMC, Adler & Co., Dean S. Adler, and the Buyer SPEs had actual knowledge of CBRE's fiduciary duties to the receivership estate, the federal court, Wells Fargo as Lender, and competing buyers in CBRE's marketed sale process. Their actual knowledge is supported by the institutional sophistication of PMC Property Group, Inc. and Adler & Co. as longstanding participants in the federal-receivership commercial real estate market; the personal client relationship between Dean S. Adler's affiliated firm Lubert-Adler and the CBRE Capital Markets Function personnel through whom the sale was marketed, as confirmed by CBRE's own sworn affidavit at Federal Action ECF 41-2 Exhibit A; the trade-press market-finality reporting they directly benefited from; the public character of the federal receivership order at Federal Action ECF 20, which sets forth Section 1(n) court-approval prerequisites known to any sophisticated buyer in a receivership transaction; and the unusual five-SPE tenants-in-common structure of the PMC PSA, which is consistent with knowledge that the transaction structure was conflicted and required heightened diligence.

123. PMC, Adler & Co., Dean S. Adler, and the Buyer SPEs provided substantial assistance to CBRE's breaches with actual knowledge of the breach. They negotiated and executed the PMC PSA at $70,000,000 with actual knowledge, drawn from the personal client relationship between Lubert-Adler and the CBRE Capital Markets Function personnel, that CBRE's marketed sale process had attracted multiple competing institutional bidders and that Universal had submitted or was developing higher and more favorable offers. They accepted CBRE's execution of the PSA without prior court approval, knowing under PSA Section 4.6 that the agreement was conditional on court approval and that Section 1(n) of the federal Receivership Order required such approval. They benefited from CBRE's



Case ID: 260501884
Control No.: 26066494

institutional knowledge of competing offers, including Universal's $75,000,000 offer, without disclosure or inquiry. They benefited from the trade-press sale-status reporting that suppressed competing buyer engagement. They accepted the benefit of the personal client relationship between Dean S. Adler's affiliated firm Lubert-Adler and the CBRE Capital Markets Function personnel through whom the sale was marketed. They are now actively seeking entry of a federal sale order containing overbroad claim-bar, no-successor-liability, and permanent-injunction provisions purporting to insulate them from liability for the very conduct alleged here, conduct of which they have actual knowledge of having participated in.

124. The substantial assistance was a proximate cause of Universal's damages.

**WHEREFORE,** Universal demands judgment against PMC, Adler & Co., Dean S. Adler, and the Buyer SPEs, jointly and severally, in an amount in excess of fifty thousand dollars ($50,000), exclusive of interest and costs, together with punitive damages, attorneys' fees and costs, and such other relief as this Court deems just and proper.

## COUNT IX

## VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (73 P.S. § 201-1 ET SEQ.)

*(Universal v. CBRE)*

125. Universal incorporates paragraphs 1 through 78 as if fully set forth herein.

126. The Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1 *et seq.* ("UTPCPL"), prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce.



Case ID: 260501884
Control No.: 26066494

127. Universal asserts this Count in the alternative and to preserve the issue. To the extent the Court determines that CBRE's regulated professional real-estate services and the deceptive conduct alleged here fall within the UTPCPL's remedial scope as to a transaction participant, Universal is entitled to UTPCPL relief. Universal does not concede that the Centre Square purchase is outside the UTPCPL. Universal asserts the Count to preserve the issue for the Court's determination.

128. CBRE engaged in unfair and deceptive acts and practices in the conduct of trade or commerce: the misrepresentations and concealments set forth in Counts II, III, and IV; the conflicted self-dealing through the Lubert-Adler client relationship and the Article VIII separate broker-compensation agreement; conduct creating the likelihood of confusion as to the status of the Property sale; conduct creating a likelihood of misunderstanding; and the materially inconsistent representations to the federal court at ECF 89 ¶ 4, ECF 92-1 ¶¶ 23-24, and ECF 98 page 6.

129. Universal justifiably relied on CBRE's conduct and suffered ascertainable loss.

**WHEREFORE,** Universal demands judgment against CBRE in an amount in excess of fifty thousand dollars ($50,000), exclusive of interest and costs, trebled under 73 P.S. § 201-9.2, together with attorneys' fees and costs, and such other relief as this Court deems just and proper.

**COUNT X**

**UNJUST ENRICHMENT**

*(Universal v. All Defendants)*

130. Universal incorporates paragraphs 1 through 78 as if fully set forth herein.



Case ID: 260501884
Control No.: 26066494

131. Universal conferred benefits on Defendants. Universal conducted extensive diligence whose findings and analysis benefit any subsequent buyer of the Property and benefited Defendants. Universal developed the prospective tenant, hotel-operator, anchor-tenant, and capital-partner relationships described in paragraphs 50 through 54, the institutional knowledge from which benefits Defendants. Universal submitted bids that established a competitive bid floor benefiting Defendants and any subsequent buyer.

132. Defendants knew or should have known of the benefits and retained them.

133. Defendants' retention of those benefits without compensation to Universal is unjust under the circumstances.

**WHEREFORE,** Universal demands judgment against each Defendant, jointly and severally, in an amount in excess of fifty thousand dollars ($50,000), exclusive of interest and costs, together with restitution, disgorgement, attorneys' fees and costs, and such other relief as this Court deems just and proper.

## COUNT XI

## DECLARATORY JUDGMENT (42 PA. C.S. § 7531 ET SEQ.)

*(Universal v. All Defendants)*

134. Universal incorporates paragraphs 1 through 78 as if fully set forth herein.

135. An actual controversy exists between Universal and Defendants concerning the validity, enforceability, and binding effect of the PMC PSA as a conditional, unapproved, unconsummated instrument; CBRE's obligations under the Receivership Order and Pennsylvania real estate licensing law; Universal's rights as a Lender-approved, formally-



Case ID: 260501884
Control No.: 26066494

qualified competing buyer; and the existence and disclosure obligations applicable to any side agreements between CBRE and any of the PMC-Adler Joint Venture Defendants.

136. Universal is entitled to declaratory relief under the Pennsylvania Declaratory Judgments Act, 42 Pa. C.S. § 7531 *et seq.*

**WHEREFORE,** Universal respectfully requests this Court enter declaratory judgment: (a) declaring that the PMC PSA, as a conditional, unapproved, and unconsummated instrument, does not transfer title to the Property and confers no enforceable rights on the Buyer SPEs absent prior approval by the United States District Court for the Eastern District of Pennsylvania in the Federal Action; (b) declaring that CBRE owed Universal statutory and professional duties under RELRA and its implementing regulations as a known bidder and consumer of CBRE's regulated services; (c) declaring that Universal's January 22, 2026 written acceptance and February 17, 2026 $75,000,000 offer were, when made, written communications entitled to be received, evaluated, and presented consistent with those duties; and (d) granting such other and further declaratory relief as this Court deems just and proper.

**COUNT XII**

**CONSTRUCTIVE TRUST AND EQUITABLE RELIEF**

*(Universal v. All Defendants)*

137. Universal incorporates paragraphs 1 through 78 as if fully set forth herein.

138. Pennsylvania recognizes a constructive trust as an equitable remedy imposed to prevent unjust enrichment where a defendant has obtained property or proceeds by fraud, breach of fiduciary duty, or other wrongful conduct. *See Yohe v. Yohe*, 466 Pa. 405, 353 A.2d 417 (1976); *Stauffer v. Stauffer*, 465 Pa. 558, 351 A.2d 236, 240-41 (1976).



Case ID: 260501884
Control No.: 26066494

139. By reason of Defendants' wrongful conduct alleged above, including the breaches of fiduciary duty, fraudulent inducement, fraudulent concealment, RELRA violations, civil conspiracy, and aiding and abetting, Defendants hold any benefits derived from such conduct in constructive trust for Universal.

140. Those benefits include any sale commission, broker compensation, or other compensation paid or payable to CBRE in connection with the PMC PSA or any subsequent sale of the Property, including under the Article VIII separate broker-compensation agreement; any economic benefit derived by PMC, Adler & Co., Dean S. Adler, the Buyer SPEs, or Lubert-Adler from the suppression of Universal's offers; and any benefits derived from any additional commercial arrangements between CBRE and any of PMC, Adler & Co., Dean S. Adler, the Buyer SPEs, or Lubert-Adler.

141. Universal does not seek a constructive trust over funds held by the federal receivership estate or over res under the federal court's direct control unless that court permits. The relief sought is limited to *in personam* relief against the Defendants and to proceeds or compensation outside the federal res. *See Princess Lida of Thurn & Taxis v. Thompson*, 305 U.S. 456, 466 (1939).

142. Universal has no adequate remedy at law for the foregoing as to these benefits.

**WHEREFORE,** Universal respectfully requests this Court: (a) impose a constructive trust on the benefits described above; (b) order disgorgement of those benefits to Universal; and (c) grant such other equitable relief as this Court deems just and proper.

**COUNT XIII**

**BREACH OF CONTRACT (IN THE ALTERNATIVE)**

*(Universal v. CBRE)*

143. Universal incorporates paragraphs 1 through 78 as if fully set forth herein.

144. In the alternative, on January 22, 2026, Universal, through counsel Andrew Teitelman, Esquire, in a written and signed communication to BIPC as Receiver's transactional counsel, accepted in writing CBRE's proposed Purchase and Sale Agreement (version 4924-2945-3447 v2) and Assumption Agreement (version v1) at $70,000,000, in response to CBRE's January 15, 2026 "Next Steps" solicitation.

145. Universal's January 22, 2026 written acceptance, CBRE's January 23, 2026 substantive responses ("Thanks, Andrew" and "Does your client want to assume the existing loan?"), and the parties' subsequent course of conduct constitute an enforceable contract under Pennsylvania law, the terms of which are the substantive terms of CBRE's own draft PSA at $70,000,000 with the existing loan assumed.

146. CBRE has now publicly admitted, in a sworn declaration filed in the Federal Action on May 26, 2026, that "[t]he Receiver and Broker . . . also received an offer of $70,000,000.00 from Universal Group." Federal Action, ECF 92-1 (Svorcek Decl.) ¶ 24. CBRE's sworn admission corroborates Universal's January 22, 2026 written acceptance. Universal's $70,000,000 offer is no longer a contested fact: it is a fact CBRE has formally conceded under penalty of perjury in a parallel proceeding.

147. CBRE's sworn admission at Federal Action ECF 92-1 ¶ 24 collaterally and judicially estops CBRE from contesting in this action that Universal tendered a $70,000,000 offer to CBRE in the January 2026 best-and-final solicitation. *See Trowbridge v. Scranton Artificial Limb Co.*, 560 Pa. 640, 747 A.2d 862 (2000); *Sunbeam Corp. v. Liberty Mut. Ins.*



Case ID: 260501884
Control No.: 26066494

*Co.*, 566 Pa. 494, 781 A.2d 1189, 1192-93 (2001). Contract formation on the price term is therefore established by CBRE's own evidence.

148. CBRE breached the contract by executing the PMC PSA with the Buyer SPEs in violation of the prior agreement with Universal.

149. This Count is pleaded in the alternative to Count I and is not duplicative of the principal claims in Counts II through X.

**WHEREFORE,** Universal demands judgment in the alternative against CBRE in an amount in excess of fifty thousand dollars ($50,000), exclusive of interest and costs, including expectation damages, consequential damages, attorneys' fees and costs, and such other relief as this Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Universal respectfully requests that this Court enter judgment in its favor and against Defendants, and grant the following relief:

A. Compensatory damages in an amount in excess of fifty thousand dollars ($50,000), exclusive of interest and costs, including (i) the price differential between Universal's $75,000,000 offer and the PMC PSA price; (ii) Universal's out-of-pocket diligence expenditures; (iii) consequential damages from the destruction of Universal's acquisition pipeline; (iv) consequential damages to Universal's industry reputation; and (v) such other compensatory damages as may be proved at trial;

B. Treble damages under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-9.2;



Case ID: 260501884
Control No.: 26066494

C. Punitive damages in an amount sufficient to punish Defendants and deter future similar conduct;

D. Disgorgement of all benefits derived from the wrongful conduct alleged here, including any sale commission or broker compensation paid or payable under the Article VIII separate broker-compensation agreement referenced in the PMC PSA, and any benefits to PMC, Adler & Co., Dean S. Adler, the Buyer SPEs, or Lubert-Adler;

E. Imposition of a constructive trust on the benefits described in (D) above;

F. Declaratory judgment as set forth in Count XI;

G. Attorneys' fees and costs under 73 P.S. § 201-9.2(a) and as otherwise authorized by law;

H. Pre-judgment and post-judgment interest; and

I. Such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Universal demands trial by jury on all issues so triable pursuant to Pa. R.C.P. 1007.1.

Dated: June 26, 2026

Respectfully submitted,

/s/ George S. Gossett, Jr.

George S. Gossett, Jr., Esquire
Pennsylvania Bar No. 82983
Law Office of George S. Gossett, Jr.
408 Green Lane, Suite 201
Philadelphia, PA 19128
(215) 779-7501
gossettlawpa@gmail.com

Counsel for Plaintiff
Universal Group Company Inc.

**VERIFICATION**

I, Shamikh Kazmi, state that I am the Chief Executive Officer of Plaintiff Universal Group Company Inc., that I am authorized to make this Verification on Universal's behalf, and that the facts set forth in the foregoing First Amended Civil Action Complaint are true and correct to the best of my knowledge, information, and belief. Allegations made on information and belief are believed by me to be true. I understand that false statements herein are subject to the penalties of 18 Pa. C.S. § 4904 relating to unsworn falsification to authorities.

Executed this 26th day of June, 2026.

/s/ Shamikh Kazmi

______________________________
Shamikh Kazmi
Chief Executive Officer
Universal Group Company Inc.



Case ID: 260501884
Control No.: 26066494

**CERTIFICATE OF SERVICE**

I, George S. Gossett, Jr., Esquire, certify that on this 26th day of June, 2026, I caused a true and correct copy of the foregoing First Amended Civil Action Complaint to be served upon all named Defendants in accordance with the Pennsylvania Rules of Civil Procedure, by the Philadelphia Sheriff or such permitted alternative means as the Rules allow.

/s/ George S. Gossett, Jr.

George S. Gossett, Jr., Esquire
Pennsylvania Bar No. 82983

# INDEX OF EXHIBITS

*to First Amended Civil Action Complaint*

**A.** December 12, 2025 "Next Steps" Email from CBRE to Universal *(¶ 30)*

**B.** CBRE Draft Purchase and Sale Agreement (Version 4924-2945-3447 v2) *(¶¶ 30, 37)*

**C.** CBRE Draft Assumption Agreement (Version 4916-0197-0055 v1) *(¶ 37)*

**D.** January 22, 2026 Written Acceptance Email from Teitelman to Schueller *(¶¶ 37-39)*

**E.** January 22, 2026 Marked-Up PSA Tendered by Universal at $70,000,000 *(¶ 37)*

**F.** February 17, 2026 $75,000,000 All-Cash Offer Email from Kazmi to CBRE *(¶ 45)*

**G.** February 23, 2026 One-Sentence Rejection Email from CBRE to Kazmi *(¶¶ 47-49)*

**H.** April 14, 2023 Consent Order Appointing Receiver (Federal Action, ECF 20) *(¶ 18)*

**I.** ECF 41-2 Exhibit A ("Clients Represented") Identifying Lubert-Adler *(¶¶ 22-24)*

**J.** May 14, 2026 CSC Coliving LLC PSA at $80,000,000 (Federal Action, ECF 86) *(¶ 69)*

**K.** May 19, 2026 Status Report (Federal Action, ECF 89) - $63.5M Rule 11 Certification at ¶ 4 *(¶ 70)*

**L.** May 26, 2026 Svorcek Declaration (Federal Action, ECF 92-1) - $70M Sworn at ¶¶ 23-24 *(¶¶ 71-72)*

**M.** June 16, 2026 Receiver's Opposition (Federal Action, ECF 98) - Two-Rounds Construct at p. 6 *(¶¶ 74-75)*

Case ID: 260501884
Control No.: 26066494

# EXHIBIT A

*December 12, 2025 "Next Steps" Email from CBRE Capital Markets to Universal*

Referenced in First Amended Complaint, paragraph 30

# EXHIBIT A

*December 12, 2025 "1500 Market Next Steps" Email from CBRE Capital Markets to Universal*

---

**From:** Jerome E. Kranzel <Jerome.kranzel@cbre.com>
**To:** Shamikh Kazmi <sk@upssites.com>
**Cc:** Doug.Rodio@cbre.com; Bruer.Kershner@cbre.com; Mark.Lunney@cbre.com; Layal.Zuabi@cbre.com
**Date:** Friday, December 12, 2025 3:35 PM EST
**Attachment:** Purchase and Sale Agreement (4917-2097-8046 v2)-c.doc

**Subject: 1500 Market Next Steps**

---

Kazmi:

Thank you for your patience.

We have been given the green light from KeyBank to continue the sale process with a limited set of potential buyers. Attached is a draft PSA for 1500 Market Street. We are asking that you have your attorney review the PSA, and get a red-lined version back to us by end of business on Wednesday December 17. The PSA markup should include your specific deal terms, including your willingness to go non-refundable upon signing the PSA. KeyBank has expressed that an ability to quickly sign a PSA with a non-refundable deposit will be an important part of their decision as to who to proceed with on this transaction.

Additionally, KeyBank is considering offering Seller bridge financing on this transaction. To be clear, there is no guaranty that KeyBank will ultimately offer this financing, they will only offer this financing if there is a significant premium in pricing, and so, you should not assume seller financing as your base case. The financing terms that you should consider are the following:

1. Loan amount will be 80% of purchase price 2. One-year term with one-year extension option upon additional $10,000,000 paydown 3. Rate shall be 4% fixed during the term of the loan 4. The loan will be a modification/restructure of the existing CMBS loan

If potentially interested in this debt structure, in addition to submitting the PSA with your "as is" pricing, you should indicate what pricing you would be willing to pay if this debt was made available.

We're available to discuss further or answer any questions.

Thanks

Jerry, Doug and Bruer

Jerome E. Kranzel Senior Vice President CBRE | National Office Partners Two Liberty Place, 30th Floor | Philadelphia, PA 19102, USA 555 East Lancaster Avenue, Suite 120 | Radnor, PA 19087, USA T +1 215 561-8954 | C +1 215 439-2383 jerome.kranzel@cbre.com

*True and correct copy of email transmitted on December 12, 2025, exported from Gmail mailbox sk@upssites.com.*



Case ID: 260501884
Control No.: 26066494

# EXHIBIT B

*CBRE Draft Purchase and Sale Agreement (Version 4924-2945-3447 v2)*

Referenced in First Amended Complaint, paragraphs 30 and 37

# PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** ("**Agreement**") is made to be effective as of the Effective Date (as hereinafter defined), by and between **CBRE, INC.**, solely in its capacity as receiver and not in its personal capacity (hereinafter referred to as "**Seller**") under the Order entered on April 14, 2023 ("**Receivership Order**" and the receivership appointment thereunder the "**Receivership**") in a case in the United States District Court for the Eastern District of Pennsylvania ("**Court**"), entitled *Wells Fargo Bank, National Association, as Trustee, for the Benefit of Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2020-MKST Commercial Mortgage Pass-Through Certificates, Series 2020-MKST, the RR Interest Owner and the Future Advance Lender v. NG 1500 Market St. LLC*, Case No. 23-146, ("**Receivership Action**") and ______________________________, a ________________________________ (together with its permitted assignee as hereinafter provided in this Agreement, collectively and jointly and severally, the "**Buyer**").

**WHEREAS**, the Court empowered Seller, with the consent of Wells Fargo Bank, National Association, as Trustee, for the Benefit of Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2020-MKST Commercial Mortgage Pass-Through Certificates, Series 2020-MKST, the RR Interest Owner and the Future Advance Lender (together with its successors and assigns, "**Lender**"), to market the Property (defined below) for sale and to execute proposed contracts, provided that no sale of the Property shall be effective or consummated except with the approval of the Lender in its sole discretion and upon approval of the Court, all as set forth below; and

**WHEREAS**, the Seller has been informed by Lender that NG 1500 Market St. LLC executed and delivered that certain Open-End Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of November 6, 2019 but made effective as of December 6, 2019, recorded on December 12, 2019 in the real estate records of Philadelphia County, Pennsylvania (the "**Records**") as Instrument Number 53604614, as amended by that certain First Amendment to Open-End Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of December 27, 2019 but made effective as of December 31, 2019, recorded on January 7, 2020 in the Records as Instrument No. 53615245, certain promissory notes, and other documents evidencing and securing the loan, and Elchonon Schwartz ("<u>Loan Guarantor</u>"), executed and delivered a certain Guaranty Agreement (together with all such other loan documents executed by any NG 1500 Market St. LLC, Loan Guarantor, and any other persons, in connection with the Loan, collectively, the "<u>Loan Documents</u>"); and

**WHEREAS**, subject to Court approval and Lender Approval, Seller desires to sell and convey the Property upon the terms and conditions set forth herein, [**OPTIONAL INSERT**: including, without limitation, Buyer's agreement to assume the obligations of NG 1500 Market St. LLC under the Loan Documents, as amended (such assumption, the "**<u>Loan Assumption</u>**", and such Loan Documents as are to be assumed pursuant to the Loan Assumption Agreement (hereinafter defined), the "**<u>Assumed Loan Documents</u>**") arising on the Closing Date (as defined in Section 5.1, below), and Buyer's agreement to execute and deliver such other guaranties, collateral assignments, instruments, certificates and other documents as may be required by Lender in connection with the Loan Assumption subject to and in accordance with the terms of the Loan Assumption Agreement].



Case ID: 260501884
Control No.: 26066494

**NOW, THEREFORE, IN CONSIDERATION** of the mutual covenants hereinafter set forth in this Agreement, the parties hereto, intending to be legally bound, agree as follows:

ARTICLE I
The Property

1.1 For the price and upon and subject to the terms, conditions and provisions herein set forth, Seller agrees to sell and convey to Buyer "**as-is, where-is and with all faults**," and Buyer agrees to purchase from Seller "**as-is, where-is and with all faults**," free, clear and marketable title, inclusive of all of Seller's right, title and interest, in, to and under the following (collectively, and subject to the Permitted Exceptions (as hereinafter defined) in all respects, the "**Property**"):

(i) that certain improved real property generally located at 1500 Market Street, Philadelphia, Pennsylvania, all as legally described in **Exhibit A** attached hereto and made a part hereof by this reference, together with all rights, privileges, easements, strips or gores, rights-of-way and hereditaments and appurtenances thereto; all fixtures, buildings and improvements located thereon; and any and all oil, gas, mineral, and water rights held by Seller therein, thereunder or thereto, if any (collectively, the "**Real Property**") at the time of Closing (as such term is hereinafter defined);

(ii) All of the personal property (including, without limitation, surveys, plans, drawings and operating manuals), fixtures and equipment, if any, presently affixed or attached to, placed or situated upon the Real Property and used in connection with the ownership, operation and occupancy of the Real Property, and specifically excluding any items of personal property owned by lawful tenants at or on the Real Property pursuant to the Leases (individually a "**Tenant**" and collectively, the "**Tenants**") and further excluding all items of personal property owned by third parties or that are leased (which personal property, fixtures and equipment not so excluded is hereinafter collectively referred to as the "**Personal Property**") and for the avoidance of doubt the Personal Property includes the clothespin statue and statue of Benjamin Franklin which are both located on the exterior of the Real Estate;

(iii) All leases now or hereafter affecting the Real Property and that are in effect as of the date of the Closing Date (as such term is defined in **Section 5.1**) and any guaranties associated therewith, if any (individually a "**Lease**" and collectively, the "**Leases**"), together with, as of the time of Closing, all refundable tenant security deposits from Tenants under Leases, but with respect to such tenant security deposits, only to the extent such refundable tenant security deposits were received by Seller or its property manager in connection with Seller's appointment as receiver of the Real Property or were previously remitted by Tenants under Leases to Seller or its property manager and have not been applied by Seller or its property manager against any obligations owing by such Tenants under the Leases (as so limited, the "**Security Deposits**") but excluding all Leases which are the subject of any pending litigation and as to such leases all

rights under those lease and rights to any recoveries in those litigation matters are expressly retained by the Seller for the benefit of the Lender;

(iv) All assignable contracts, if any, relating to the operation, maintenance and/or management of the Real Property that Buyer notifies Seller in writing during the Approval Period (as such term is hereinafter defined) that it desires to assume (with all other such contracts, including the existing property management agreement and any rental listing agreement, if any, relating to the operation of the Property to be terminated by Seller, at Seller's cost and expense, on or before Closing) (collectively, the "**Assumed Contracts**"); and

(v) all assignable guarantees, warranties, licenses, permits, licenses, certificates of occupancy, development rights, entitlements, so called "tap-ins" and "EDUs" and any deposits associated therewith, consents, approvals and authorizations, if any, related to the Real Property (collectively, the "**Intangible Rights**").

Notwithstanding any provision of this Agreement to the contrary, the parties acknowledge that the Property does not include any monies, if any, of Seller or any of its agents that are held by any utility company or other service company as a deposit, that all of such monies, if any, shall be and remain the sole property of Seller, and Buyer shall not have any right, title, interest or claim in, to or under any of such monies. Buyer hereby acknowledges that it has been informed by Seller that Seller acquired the Property in connection with a foreclosure (or similar transaction) and that Seller did not receive, nor has Seller subsequently received, all of the refundable security deposits from Tenants. The parties acknowledge that the sole security deposits from Tenants to be assigned or remitted to Buyer at Closing shall be the Security Deposits as defined hereinabove. After the Closing, Buyer shall be solely liable to any Tenant for the return of all Security Deposits and other security deposits as set forth in the Leases.

ARTICLE II
Purchase Price; Earnest Money

2.1 Purchase Price. The total purchase price ("**Purchase Price**") to be paid by Buyer to Seller for the Property shall be sixty one million ($61,000,000) dollars.2.2 Earnest Money. Within two (2) Business Days (as such term is hereinafter defined) following the full execution of this Agreement, Buyer shall deliver to Commonwealth Land Title Company______________ ("**Escrow Agent**"), by wire transfer of immediately available funds, the sum of one-million five-hundred thousand ($1,500,000) dollars (the "**Initial Deposit**") and on or before ________________ Buyer shall deliver to the Escrow Agent by wire transfer of immediately available funds, the sum of one-million five-hundred thousand ($1,500,000) dollars (the "**Second Deposit**" and together with the Initial Deposit the "**Earnest Money**"). Notwithstanding any provisions of this Agreement to the contrary, if Buyer fails to timely make the Initial Deposit or Second Deposit within two (2) business days of the date contemplated by this Section 2.2, Buyer shall automatically be deemed to have terminated this Agreement and the parties shall thereafter have no further rights or obligations hereunder except for any obligations that expressly survive the termination of this Agreement. The Earnest Money shall be held in escrow by the Escrow Agent in a non-interest bearing account in accordance with the terms of this Agreement. The Initial Deposit and/or Second Deposit will be non-refundable to Buyer

(except upon a default by Seller, or as specifically provided herein). The Earnest Money shall be applied against the Purchase Price at the Closing unless (i) this transaction does not close in accordance with the terms of this Agreement due to a default by Buyer, in which event the Earnest Money shall be payable in accordance with **Section 7.3** herein, or (ii) this transaction does not close in accordance with the terms of this Agreement due to a default by Seller, in which event the Earnest Money shall be payable in accordance with **Section 7.3** herein. Buyer hereby acknowledges and agrees that following the Approval Period, except (A) in the event of a default by Seller or a Material Casualty (as defined in **Section 6.1** below); or (B) as set forth in **Section 4.6** or **Article XII**, the Earnest Money is non-refundable under all circumstances.

2.2 Balance of Purchase Price. The balance of the Purchase Price, together with the Earnest Money that previously has been delivered as hereinabove provided in this Agreement, and following any prorations and adjustments at Closing (all as provided below), shall be paid by Buyer to Seller by wire transfer of immediately available funds at the Closing.

[**OPTIONAL INSERT**: Balance of Purchase Price. The balance of the Purchase Price, together with the Earnest Money that previously has been delivered as hereinabove provided in this Agreement, subject to any prorations and adjustments at Closing (all as provided below), shall be paid by Buyer by assumption by Buyer of the loan in an amount equal to the Purchase Price and any other amounts required to be paid and/or assumed by Buyer pursuant to the Loan Assumption Agreement (as defined in Section 4.6 hereof)].

ARTICLE III
Buyer's Inspection of the Property

3.1 Seller has provided the Buyer with a title commitment from Commonwealth Land Title Company describing the Real Property (the "**Title Commitment**") and the Buyer has approved the Title Commitment. All such title encumbrances or exceptions set forth in the Title Commitment are deemed to be permitted exceptions to the status of Seller's title (collectively, the "**Permitted Exceptions**").

3.2 Buyer acknowledges that, except as otherwise expressly set forth in this Agreement or any documents delivered by Seller at Closing to the contrary, (i) neither Seller, Lender Group (as hereinafter defined), nor anyone acting for or on behalf of Seller or Lender Group, has made any representation, warranty, promise or statement, express or implied, to Buyer, or to anyone acting for or on behalf of Buyer, concerning any of the Property, (ii) in entering into and closing the purchase of the Property contemplated under this Agreement, Buyer has not relied on any representation, warranty, promise or statement, express or implied, of Seller, Lender Group, or anyone acting for or on behalf of Seller or Lender Group and (iii) **AS A MATERIAL INDUCEMENT TO THE EXECUTION AND DELIVERY OF THIS AGREEMENT BY SELLER, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS AGREEMENT AND ANY DOCUMENTS DELIVERED BY SELLER AT CLOSING, BUYER IS PURCHASING THE PROPERTY IN AN "AS-IS, WHERE- IS" CONDITION AND IN AN "AS-IS, WHERE-IS" STATE OF REPAIR, AND WITH ALL FAULTS**. Without limiting the generality of the foregoing, there is no express or implied warranty of merchantability, habitability or of fitness for a particular purpose made by Seller or Lender Group regarding the Property. Buyer represents to Seller and



Case ID: 260501884
Control No.: 26066494

Lender Group that Buyer has either already conducted or, prior to the end of the Approval Period, will have conducted or will have had an adequate opportunity to conduct such investigations of the Property, including, but not limited to, the physical and environmental conditions thereof, as Buyer deems necessary to satisfy itself as to the condition of the Property and the existence or nonexistence of, or curative action to be taken with respect to, any hazardous or toxic substances on or discharged from the Property and will rely solely upon same and not upon any information provided by or on behalf of Seller, Lender Group or any of their respective agents or employees with respect thereto. Upon Closing, Buyer shall assume the risk that adverse matters, including, but not limited to, adverse physical and environmental conditions and matters that may have been revealed by a survey of the Property, may not be revealed by Buyer's investigations, and Buyer, upon Closing, shall be deemed to have waived, relinquished and released Seller, Lender Group and all of their respective agents and employees from and against all claims, demands, causes of action (including, without limitation, causes of action in tort), losses, damages, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and court costs) of any and every kind or character, known or unknown, which Buyer might have asserted or alleged against Seller, Lender Group or any of their respective agents or employees at any time by reason of or arising out of any defects, physical conditions, violations of any applicable laws, rules, regulations or ordinances (including, without limitation, any environmental, housing or rent control laws, rules, regulations or ordinances) and any and all other acts, omissions, events, circumstances or matters regarding the Property or its occupancy or operation. Buyer agrees that if any clean-up, remediation or removal of hazardous substances or other environmental conditions on the Property is required after the date of Closing, such clean-up, removal or remediation shall be the sole responsibility of and shall be performed at the sole cost and expense of Buyer. The foregoing release includes claims of which Buyer is presently unaware or which Buyer does not presently suspect to exist which, if known by Buyer, would materially affect Buyer's release of Seller and/or Lender Group. As used in this Agreement, the term "**Lender Group**" shall mean Wells Fargo Bank, National Association, as Trustee, for the Benefit of Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2020-MKST Commercial Mortgage Pass-Through Certificates, Series 2020-MKST and KeyBank National Association and their respective past, present, and future officers, directors, shareholders, general partners, limited partners, agents, representatives, heirs, successors, assigns and attorneys and their respective heirs, successors, and assigns.

Seller has given Buyer material concessions regarding this transaction in exchange for Buyer agreeing to the provisions of this **Section 3.2**. Buyer hereby specifically acknowledges that Buyer has carefully reviewed this **Section 3.2**, and discussed its import with legal counsel, is fully aware of its consequences, and that the provisions of this **Section 3.2** are a material part of this Agreement.

Notwithstanding anything to the contrary set forth in this **Section 3.2**, this **Section 3.2** shall not limit the rights and remedies of Buyer upon a breach of any of Seller's representations or warranties that are expressly set forth in this Agreement or any documents delivered by Seller at Closing.

3.3 Prior to the Effective Date, Buyer commenced its due diligence and inspections of the Property. Buyer shall have up to and including the first Business Day which is thirty (30) days after the Effective Date (the "**Approval Period**") to complete its due diligence and

inspection of the Property (collectively, the "**Inspections**"). Buyer agrees to restore the Property to the fullest extent possible to its condition prior to the Inspections. Buyer agrees to defend, indemnify and hold Seller and Lender Group harmless from and against all damage and losses to the Property from its Inspections and from and against all claims, assertions, lawsuits, liens, costs, expenses and liabilities, including, without limitation, reasonable attorneys' fees (collectively, "**Losses**"), which may arise from any actions of or occurrences related to Buyer's performance of the Inspections; provided, however, that such indemnification shall specifically exclude any Losses (i) caused by the gross negligence or willful misconduct of Seller, Lender Group or any of their respective affiliates, agents, employees or contractors or (ii) attributable to the mere discovery of any pre-existing condition at the Property except to the extent such condition is exacerbated by Buyer or any of its agents, employees or contractors. Prior to any entry by Buyer or any of its agents onto the Property for the Inspections, Buyer shall provide to Seller evidence satisfactory to Seller that Buyer has in force commercial general liability and worker's compensation insurance with a combined single limit of not less than $1,000,000.00 for personal injury, including bodily injury and death and property damage, with the commercial general liability policy naming Seller as an additional insured and protecting Seller against all liability, claims, demands, damages and costs (including, but not limited to, reasonable attorneys' fees and expenses and court costs) which may occur as a result of any activity of Buyer or its agents on the Property. The foregoing shall not limit, diminish, negate or release Buyer's indemnification obligations contained above.

3.4 Buyer may terminate this Agreement for any reason or no reason by giving Seller and Escrow Agent a written notice of termination prior to expiration of the Approval Period, whereupon (i) this Agreement shall be null and void and of no further force or effect except for those provisions that expressly survive termination and (ii) the Earnest Money (the Initial Deposit and/or the Second Deposit) shall be promptly forwarded to Seller by Escrow Agent (to the extent such Earnest Money was previously delivered by Buyer to Escrow Agent). Time shall be of the essence with regard to Buyer's right to terminate pursuant to this **Section 3.4**. If Buyer does not terminate this Agreement during the Approval Period by timely giving the above-noted termination notice to Seller and Escrow Agent, Buyer shall be irrevocably deemed to accept the Property, and Buyer shall be bound to proceed to Closing and consummate the purchase of the Property subject to the terms of this Agreement.

The indemnity obligations of Buyer set forth in this **Article 3** and the release by Buyer as hereinabove set forth shall survive the Closing and any termination of this Agreement.

## ARTICLE IV
## Representations, Warranties and Covenants; Court and Lender Approval

4.1 Representations and Warranties of Seller. Seller hereby represents and warrants to Buyer and agrees as follows (which representations and warranties shall also be true and correct as of the Closing):

(a) To Seller's knowledge, subject to obtaining Lender Approval and Court Approval (as those terms are hereinafter defined) as provided for in this Agreement, Seller has the legal power, right and authority to execute this Agreement and to consummate all of the



Case ID: 260501884
Control No.: 26066494

transactions contemplated herein and the individual of the Seller who executes and delivers this Agreement and all documents to be delivered to Buyer hereunder is duly authorized to do so.

(b) Seller is not a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of the U.S. Treasury Department's Office of Foreign Assets Control ("**OFAC**") or under any statute, executive order, or other governmental action.

(c) To Seller's knowledge, Seller has not received written notice indicating that the Property or use thereof is in violation or breach of any applicable legal requirements, including, without limitation, Environmental Laws and Regulations. "**Environmental Laws and Regulations**" shall mean any federal, state or local laws now or hereafter in effect relating to pollution or protection of the environment or emissions, discharges, spills, releases or threatened releases of any Hazardous Materials into the environment (including without limitation indoor air, ambient air, surface water, ground water or land), including without limitation, the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq., as amended, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq., as amended, the Hazardous Materials Transportation Act, 49 U.S.C. §§ 1801 et seq., as amended, the Clean Water Act, 33 U.S.C. §§ 1251 et seq., as amended, the Clean Air Act, 42 U.S.C. §§ 7401 et seq., as amended, the Toxic Substance Control Act, 15 U.S.C. § 2601 et seq., as amended, and any rules and regulations now or hereafter promulgated under any of such acts. The term "**Hazardous Materials**" shall mean and refer to any "hazardous waste" or "hazardous substance," as such terms are set forth in, under or pursuant to the Environmental Laws and Regulations, oil or petroleum products or their derivatives, polychlorinated biphenyls, asbestos, radioactive materials or waste, and any other toxic, ignitable, reactive, corrosive, explosive, contaminating or polluting materials which are now or in the future subject to governmental regulation.

As used in this Agreement, "to Seller's knowledge" or derivations thereof shall mean the current actual knowledge of John Svorcek, in his capacity as associate director of CBRE, Inc. Property Management, without any obligation to make investigation or inquiry.

4.2 Representations and Warranties of Buyer. Buyer hereby represents and warrants to Seller (which representations and warranties shall also be true and correct as of the Closing):

(a) Buyer, if an entity, is duly organized, validly existing and in good standing under the laws of the state of its origin;

(b) Buyer has full right, authority and capacity to execute and perform this Agreement and to consummate all of the transactions contemplated herein;

(c) if Buyer is an entity or a trustee of a trust, the individual of the Buyer who executes and delivers this Agreement and all documents to be delivered to Seller hereunder is and shall be duly authorized to do so;

(d) Buyer is not owned, in whole or in part, nor does Buyer own or hold any part of the beneficial ownership in Seller;



Case ID: 260501884
Control No.: 26066494

(e) Buyer is not in a significantly disparate bargaining position in relation to Seller;

(f) Buyer is represented by legal counsel of its own choice and designation in connection with the transaction contemplated by this Agreement;

(g) Buyer's legal counsel was not directly or indirectly identified, suggested or selected by Seller or any agent of Seller; and

(h) Buyer is purchasing the Property for business or commercial investment or similar purpose and not for use as Buyer's residence.

4.3 Survival. All representations and warranties in this Agreement shall survive the Closing for a period equal to the lesser of (a) three (3) months and (b) ten (10) days after Seller provides written notice to Buyer of the complete termination of the Receivership Action resulting in the discharge of the Receivership (the "**Survival Period**"). In order to preserve any claim for any alleged breach of a representation or warranty under this Agreement, the party alleging the breach shall give written notice to the other within the Survival Period.

4.4 Covenant of Buyer.

(a) Buyer hereby covenants with Seller that Buyer shall, in connection with its Inspections during the Approval Period, perform all Inspections of the Property deemed reasonably necessary by Buyer in order to proceed to Closing. Buyer shall also furnish to Seller at Closing copies of any other reports received by Buyer relating to any other inspections of the Property conducted on Buyer's behalf, if any (including, specifically, without limitation, any reports analyzing compliance of the Property with the provisions of the Americans with Disabilities Act ("**ADA**"), 42 U.S.C. §12101, et seq., if applicable), except to the extent the same contain Buyer's proprietary information.

4.5 Covenants of Seller.

(a) Promptly after the Effective Date and until Closing or earlier termination of this Agreement, Seller shall use good faith, continuous and commercially reasonable efforts to obtain Court Approval and Lender Approval.

(b) From the Effective Date until the Closing or earlier termination of this Agreement, Seller shall operate and insure the Property in a manner generally consistent with the manner in which Seller has operated and insured the Property prior to the Effective Date. Risk of loss shall remain on Seller until Closing.

4.6 Court Approval and Lender Approval. Buyer acknowledges and agrees that this Agreement and the sale contemplated hereby is subject to approval by Lender, and in its capacity as lead lender on behalf of any serviced *pari passu* companion loan holder(s), as lender holding the loan secured by the Property. Neither the submission of any proposal or this Agreement for examination to Buyer, nor any correspondence or course of dealing between Buyer or Seller shall constitute a reservation of or option for the Property or in any manner bind Seller until this Agreement is fully executed by both Buyer and Seller. Buyer further

acknowledges that it is a condition precedent to Seller's and Buyer's obligations under this Agreement that the following conditions are satisfied (i) the Court shall have entered a final, non-appealable order ("**Sale Order**"), in form and substance reasonably acceptable to Buyer and Seller and Title Company, approving this Agreement, the sale of the Property pursuant to the terms of this Agreement and the Closing by Seller on the terms of this Agreement ("**Court Approval**"), (ii) Lender shall have agreed, in Lender's sole and absolute discretion, that Lender shall accept the Purchase Price in satisfaction of any existing mortgage and that, upon receipt by Lender of the net proceeds of the Purchase Price, it shall release and discharge any mortgage, security or lien encumbering the Property [**OPTIONAL INSERT after "Lender shall"**: received all internal and third-party approvals (including from any and all rating agencies as required under Lender's governing Pooling and Servicing Agreement) with respect to the Loan Assumption and Assumption Documents] ("**Lender Approval**"), [**OPTIONAL INSERT**: and (iii) NG 1500 Market St. LLC, Lender and Buyer shall have executed and delivered the Assumption Agreement by and between, among others, NG 1500 Market St. LLC, Lender and Buyer in a form and substance and containing such modifications to the loan documents as are satisfactory to Buyer and Lender, each in their sole and absolute discretion (the "**Loan Assumption Agreement**") and which Loan Assumption Agreement shall provide that Buyer shall not be not liable for any accrued interest, fees, penalties and other charges accruing prior to Closing, and all documents required in connection with the Loan Assumption Agreement (collectively with the Loan Assumption Agreement, the "**Assumption Documents**"), and all conditions precedent under the Loan Assumption Agreement shall have been satisfied or waived. If there is any conflict between this Agreement and the Assumption Documents, the Assumption Documents shall control]. Buyer acknowledges and agrees that this Section 4.6 may not be amended or modified by Seller so as to reduce the amount payable to Lender or the timing of the Closing (other than as may be adjusted as expressly provided herein) except with the prior written consent of Lender. If Seller does not obtain the Lender Approval or Court Approval on or prior to the Closing Date, then this Agreement will automatically terminate, whereupon the Earnest Money will be returned to Buyer and neither party will have any further obligations or liabilities hereunder, except as expressly provided in this Agreement.

4.7 Limitation on Liability. Buyer expressly acknowledges and agrees that (a) this Agreement is subject to the terms and conditions of the Receivership Order and the Sale Order; and (b) Seller's obligations and liability under this Agreement are limited by the terms of the Receivership Order, and (c) the obligations and liability of Seller under this Agreement and any document referenced herein shall not constitute personal obligations of the officers, directors, shareholders, employees, agents, representatives, trustees, partners, members, certificate holders or other principals of Seller. Notwithstanding anything to the contrary, Seller's liability, if any, arising in connection with this Agreement or with the Property shall be limited to the assets of the receivership, and Seller shall not be personally liable for any duly authorized actions properly and lawfully taken pursuant to the Receivership Order or the Sale Order and Seller shall not be personally liable for any such judgment or deficiency after execution on the assets of the Receivership. The limitations of liability contained in this paragraph shall apply equally and inure to the benefit of Seller's present and future officers, directors, shareholders, employees, agents, representatives, trustees, partners, members, certificate holders or other principals, and their respective heirs, successors and assigns. The provisions of this Section shall survive termination and Closing.

ARTICLE V
Closing

5.1 Time and Place of Closing. The closing of the transaction contemplated by this Agreement (the "**Closing**") shall take place at the offices of the Escrow Agent (x) within ten (10) Business Days following the date that the Sale Order becomes final and non-appealable (unless the Title Company agrees to issue the Title Policy without exception to any appeal of the Sales Order, in which event the Closing shall occur within ten (10) Business Days of signing and entry of the Sale Order), or (y) on such other date as may be mutually agreed upon in writing by Buyer and Seller, but in no event later than ___________________ (as so determined or mutually agreed upon, the "**Closing Date**"). Time is of the essence with respect to the Closing Date.

5.2 Events of Closing. At the Closing:

(a) Seller shall deliver in escrow to Escrow Agent the following:

(1) A No Warranty Deed in form and substance satisfactory to Seller and Buyer in their reasonable discretion and satisfactory to the Title Company (the "**Deed**"), duly executed and acknowledged by Seller, conveying title to the Property to Buyer, all in an "**as-is, where-is condition, and with all faults**," and without any representation or warranty except as may survive Closing pursuant to this Agreement, subject to all of the following: the Leases and the rights of Tenants under the Leases; all taxes and general and special assessments not yet due and payable; all other Permitted Exceptions; all matters that would be shown on an accurate survey of the Property; underground and overhead cables, lines and utility services; and all existing and applicable zoning ordinances, laws, codes, statutes and subdivision regulations and other governmental laws, rules, codes, statutes and regulations;

(2) Such documents, certificates, affidavits and other instruments as may be reasonably required by and solely in favor of the Title Company and Escrow Agent in order to close the transaction contemplated under this Agreement, including the Title Company's standard owner's closing affidavit (the "**Owner's Affidavit**"); provided, however, that with respect to any such owner's closing affidavit or any other affidavit, Seller may in its sole discretion modify such affidavit in a manner that is reasonably acceptable to Title Company and Escrow Agent and, in any event, Seller shall only be obligated to opine with respect to facts thereunder to its then current actual knowledge and without having made, or being required to make, any independent investigation of the facts, and only with respect to those matters first occurring during the pendency of the Receivership Action; provided, further, that Seller shall not be required to take any action or make any payment to remove or satisfy any mechanic's lien, and any such liens shall instead be discharged, released, or otherwise rendered unenforceable against the Property pursuant to the Sale Order, the Title Company insuring the Property free and clear of the same;

(3) A certificate executed by Seller with respect to the Foreign Investment in Real Property Tax Act, certifying that Seller is not a foreign person with the



Case ID: 260501884
Control No.: 26066494

meaning of Section 1445 of the Internal Revenue Code of 1986, as amended and the Treasury Regulations promulgated thereunder;

(4) A written assignment and quitclaim bill of sale duly executed by Seller, assigning to Buyer, in their then "**as-is, where-is condition, and with all faults**," all of Seller's right, title and interest, if any, in and to all Leases, Personal Property, Assumed Contracts and the other Intangible Rights. The assignment and quitclaim bill of sale (the "**Assignment and Bill of Sale**") shall be in form and substance reasonably acceptable to Seller and Buyer, and shall contain no indemnity by Seller and shall include an assumption by Buyer of Seller's obligations under the Leases and Assumed Contracts (which assumption shall include, without limitation, an assumption of all obligations of landlord under the Leases with respect to the return of any refundable security deposits under the Leases);

(5) Copies of all Leases received pursuant to **Article XII**, all keys, and books and records relating to the Property which are in the possession of Seller or reasonably available to Seller;

(6) A letter to each Tenant, executed by Seller, notifying such Tenants of the transfer of the Property from Seller to Buyer and directing such Tenants to remit all rental payments and notices to Buyer ("**Notice to Tenant**"), together with updated payment instructions;

(7) Such evidence of the authority and capacity of Seller and its representatives as the Escrow Agent and Title Company may reasonably require; and

(8) Such documents, certificates, affidavits and other instruments as may be reasonably required by the Escrow Agent and Title Company in order to close the transaction contemplated under this Agreement.

(b) Buyer shall deliver to Seller the following:

(1) Buyer shall deliver to the Escrow Agent and shall thereafter cause the Escrow Agent to deliver the balance of the Purchase Price required pursuant to **Article II** above, in immediately available U.S. funds by wire transfer, to Seller, plus or minus the prorations referred to in **Section 5.4** below;

(2) Such evidence of the authority and capacity of Buyer and its representatives as the Escrow Agent and Title Company may reasonably require;

(3) Such documents, certificates, affidavits and other instruments as may be reasonably required by the Escrow Agent and Title Company in order to close the transaction contemplated under this Agreement [**OPTIONAL INSERT**: including original counterparts of the Assumption Documents];

(4) A copy of the Notice to Tenant for each Tenant executed by Purchase; and

(5) A counterpart of the Assignment and Bill of Sale duly executed by Buyer.

5.3 Expenses. Seller shall pay the cost of performing its obligations under this Agreement, its share of the prorations as set forth in **Section 5.4** hereof (including its prorated portion of taxes and special assessments as set forth in **Section 5.4** below), its own attorneys' fees, any fees to effectuate the assignment of the Assumed Contracts, one-half of any customary escrow fee charged by the Escrow Agent in connection with the Closing and one-half of any transfer taxes due in connection with the recording of the Deed.

Regardless of local custom or practice, Buyer shall pay its proportionate share of the prorations as set forth in **Section 5.4** hereof (including its prorated portion of taxes and special assessments as set forth in **Section 5.4** below) and, in addition, Buyer shall be responsible for and shall pay all other costs that are the responsibility of Buyer under the provisions of this Section or **Section 5.4**, including the full amount of the premium for the Title Policy and the premium for any costs attributable to any extended coverage or the issuance of any endorsements thereto, any fees for a loan policy of title insurance issued by the Title Company or any other title insurance company, [**OPTIONAL INSERT**: all of Lender's expenses, including, without limitation, legal fees, with respect to this Agreement, the Assumption Documents and the closing of the transaction contemplated under this Agreement and the Assumption Documents, all amounts due to Lender under the Assumption Documents,] one-half of any transfer taxes due in connection with the recording of the Deed, all recording fees and charges for the recording of the Deed [**OPTIONAL INSERT**: and Assumption Documents], one-half of any customary escrow fee charged by the Escrow Agent in connection with the Closing, and all other fees or charges of the Escrow Agent and Title Company (not payable by Seller) in connection with the Closing of the transactions contemplated under this Agreement, all due diligence and investigation expenses, the cost of any survey and the cost and expense of Buyer performing its obligations under this Agreement, and its own attorneys' fees.

5.4 Prorations and Credits.

(a) Real estate taxes and installments of special assessments, Business Improvement District Taxes and supplemental and personal property taxes and assessments for the Property shall be prorated by the parties as of the Closing Date on the basis of a three hundred sixty-five (365) day year on the basis that Seller is responsible for (i) all such taxes and installments of special assessments for the fiscal year of the applicable taxing authority occurring prior to the Current Tax Period (as such term is hereinafter defined) and (ii) that portion of such taxes and installments of special assessments for the Current Tax Period through 11:59 p.m. Pittsburgh, Pennsylvania time on the date immediately preceding the Closing Date, whether or not the same shall be payable prior to the Closing Date, provided, however, that Seller shall not be responsible for any portion of an increase in real, supplemental or personal property taxes or assessments resulting from the sale of the Property to Buyer (whether for taxes or assessments that accrued before or after the Closing) and Buyer shall be solely obligated for payment of the same and agrees to hold Seller harmless from any liability relating to the same. The phrase "**Current Tax Period**" refers to the fiscal year of the applicable taxing authority in which the Closing occurs. All tax and assessment prorations shall be based upon the latest available tax and assessment statement(s) and, accordingly, if the amount of any such real estate taxes or special assessments



Case ID: 260501884
Control No.: 26066494

for the Current Tax Period cannot be ascertained at the Closing as the result of the unavailability of any tax or assessment statement for such period, then the proration shall be computed on the amount of the preceding fiscal year's tax or assessment, with no adjustment to be made post-closing.

(b) At the Closing, Buyer shall receive a credit against the Purchase Price with respect to the Security Deposits. All obligations under the Assumed Contracts shall be prorated between the parties so that Seller shall be responsible for all such expenses and obligations thereunder to the extent the same have accrued through and including the date immediately preceding the Closing Date and Buyer shall be responsible for all such expenses and obligations under the Assumed Contracts that accrue from and after the Closing Date. At Closing, Buyer shall receive a credit against the Purchase Price with respect to any prepaid base rent or additional rent from any Tenants actually paid to Seller.

(c) All rent payable under the Leases shall be prorated for the month of Closing as if paid in full when due (irrespective of whether such rent has not been previously collected by Seller) and Buyer shall be entitled to a credit for the same for such month inclusive of, and after, the Closing Date. With respect to any delinquent rents or other revenue (including any amounts unpaid on the Closing Date for the month in which the Closing Date occurs), following Closing (i) Buyer shall use reasonable and good faith efforts to collect the same but shall not be required to institute any proceedings to collect the same and (ii) Seller may attempt to collect any such delinquent rent or other revenue directly from any tenant or other party owing such amounts but may not institute any proceedings to collect the same. All such collections, less costs of collection, including reasonable attorney fees, shall be remitted promptly after receipt to the party entitled to the same, but in any event not later than 10 days after receipt, after giving effect to the following order of payment priority: the collected amounts shall be applied first to the current month's rents and any other amounts due to Buyer; second, to the rents and other revenues for the month of the Closing, prorated accordingly; and third, to rents and other revenues delinquent as of the Closing Date until the delinquency has been satisfied. The provisions of this Section shall survive Closing for the Survival Period.

(d) Utility costs with respect to the Property and for which Seller is liable shall be prorated at the Closing upon the basis of utility readings, with Seller responsible for utility expenses through and including the date immediately preceding the Closing Date. If Seller does not obtain such reading(s) for any or no reason for any utility serving the Property, Seller shall furnish a reading for such utility as of a date not more than thirty (30) days prior to the Closing Date and the unknown charges shall be apportioned on the basis of an estimate computed by utilizing such reading and the most recent bill from the utility provider. All other income and operating expenses (excluding taxes and assessments and utility charges apportioned as aforesaid) not hereinabove described and prorated shall be prorated in connection with the Closing and through the date of the Closing (and with respect to operating expenses, with Seller being responsible for operating expenses through and including the date immediately preceding the Closing Date and with Buyer responsible for all time periods from and after the Closing Date), and if any such income or operating expenses (excluding taxes and assessments and utility charges apportioned as aforesaid) are not determinable as of the Closing, then at the earliest possible opportunity following the Closing, but in no event later than thirty (30) days after the



Case ID: 260501884
Control No.: 26066494

Closing, Seller and Buyer shall make any interim and final adjustments, which obligation shall survive the Closing.

(e) Charges which are payable by any Tenant to a third party shall not be apportioned hereunder, and Buyer shall accept title subject to any of such charges unpaid and Buyer shall look solely to the Tenant responsible therefor for the payment of the same. If Seller shall have paid any of such charges on behalf of any Tenant and shall not have been reimbursed therefor by the time of Closing, Buyer shall credit to Seller an amount equal to all such charges so paid by Seller.

(f) Seller shall receive the entire advantage of any discounts for the prepayment by it of any taxes, water rates or sewer rents. Buyer acknowledges that Seller may be appealing the valuation of the Property and agrees that Seller shall be entitled, at Seller's cost and expense, to pursue such appeal to completion and to receive (i) any tax refunds or reductions attributable to the years prior to the year of the Closing, and (ii) any tax refund or reduction attributable to the year of the Closing, shall be prorated between Seller and Buyer after deducting (or crediting Seller, as applicable) any expenses, (including attorneys' fees) relating to the appeal, and Buyer shall remit such amounts to Seller within ten (10) days following Buyer's receipt thereof. Notwithstanding anything to the contrary set forth in this Agreement, (A) prior to Closing, Seller may not settle or terminate any assessment appeal for the Property that is pending for tax year 2026 (the "**Pending 2026 Appeal**") without Buyer's prior written consent, which shall be in Buyer's sole discretion and (B) at Closing, Seller shall reasonably cooperate with Buyer to transition the Pending 2026 Appeal to counsel of Buyer's choosing; provided, however, the foregoing notwithstanding, Seller shall be permitted to settle or terminate the Pending 2026 Appeal without Buyer's consent if the resulting 2026 Total Assessed Value is less than or equal to $60,000,000.00. In the event the Pending Appeals are not resolved on or before Closing, the Pending 2026 Appeal shall remain open, and counsel of Buyer's choosing may enter its appearance and represent Buyer solely with respect to the Pending 2026 Appeal and Buyer shall have full control over the Pending 2026 Appeal. This Section 5.4(h) shall survive Closing.

(g) The Personal Property is included in this sale, without further charge, except that Buyer shall pay to the applicable taxing authority the amount of any and all sales or similar taxes, if any, payable in connection with the Personal Property which is to be transferred to Buyer under this Agreement and Buyer shall execute and deliver any tax returns required of it in connection therewith, said obligations of Buyer to survive Closing.

(h) At Closing, Buyer shall assume responsibility for the payment of any leasing commissions becoming due and payable from and after the Effective Date, including any leasing commissions becoming due and payable from and after the Effective Date under Leases executed after the Effective Date and any leasing commissions becoming due and payable from and after the Effective Date by reason of the expansion of the premises demised by a Lease existing as of the Effective Date or the renewal of a Lease existing as of the Effective Date.

(i) At Closing, Buyer shall assume responsibility for the payment of any Tenant Inducement Costs (as hereinafter defined) becoming due and payable from and after the Effective Date by reason of a Tenant's exercise of a right to (i) expand the premises demised by a Lease, where such expansion right existed as of the Effective Date, or (ii) renew or extend a



Case ID: 260501884
Control No.: 26066494

Lease, where such right to renew or extend existed as of the Effective Date. Seller shall be responsible for all other Tenant Inducement Costs due and payable prior to Closing. For purposes of the foregoing provisions, the term "**Tenant Inducement Costs**" shall mean any payment required under a Lease to be paid by the landlord thereunder to or for the benefit of the Tenant thereunder which is in the nature of a tenant inducement, including specifically, without limitation, tenant improvement costs, lease buyouts and moving allowances.

5.5 Possession. Possession of the Property, subject to all Leases, shall be delivered and surrendered by Seller to Buyer at the Closing.

ARTICLE VI
Damage to Property and Condemnation

6.1 Promptly after obtaining knowledge thereof, Seller agrees to give to the Buyer written notice of any casualty affecting the Property or any actual or threatened taking or condemnation of all or any portion of the Property between the Effective Date and the Closing Date. If prior to the Closing there shall occur damage to the Property caused by casualty or the taking or condemnation of all or any portion of the Property, then the Closing shall take place as provided herein without abatement of the Purchase Price, and there shall be assigned to Buyer at the Closing all of Seller's interest in and to all insurance proceeds to which Seller is entitled to receive from the insurance carrier or condemnation awards pertaining to the Property to which Seller may be entitled to receive, and Buyer shall receive a credit against the Purchase Price in an amount equal to Seller's deductible under such insurance policy; provided, however, that if any casualty causes 20% or more of the square footage of the income generating buildings located on the Property to become uninhabitable for a period of over nine (9) months, as determined by Seller, based on the written estimate of a recognized licensed claims adjuster or contractor that regularly offers services in Center City Philadelphia, in its commercially reasonable discretion (a "**Material Casualty**"), then either Seller or Buyer may terminate this Agreement by written notice to the other, in which case the Earnest Money shall be returned to Buyer and all other rights and obligations of either party under this Agreement (other than any indemnification rights and obligations under this Agreement and any other obligations which by the express terms of this Agreement are intended to survive any cancellation or termination of this Agreement (collectively, the "**Continuing Obligations**")) shall be terminated and this Agreement shall be of no further force or effect. If neither Seller nor Buyer elects to terminate this Agreement within ten (10) days after Seller sends Buyer written notice of the occurrence of a Material Casualty, then Seller and Buyer shall be deemed to have elected to proceed with Closing as provided in this Section.

ARTICLE VII
Termination, Default and Remedies

7.1 Default by Seller. Seller shall be in default under this Agreement upon the occurrence of any one or more of the following events:

(a) Any of Seller's warranties or representations set forth in this Agreement are untrue or inaccurate in any material respect.



Case ID: 260501884
Control No.: 26066494

(b) Seller shall fail to (i) meet, comply with or perform any material covenant, agreement, or obligation on its part required within the time limits and in the manner required in this Agreement for any reason other than a default by Buyer under this Agreement or (ii) deliver at the Closing any of the items required of Seller in **Article V** hereof, for any reason other than a default by Buyer under this Agreement.

7.2 Default by Buyer. Buyer shall be in default under this Agreement if Buyer shall fail to (i) meet, comply with or perform any material covenant, agreement or obligation on its part required within the time limits and in the manner required in this Agreement for any reason other than a default by Seller under this Agreement or (ii) deliver at the Closing any of the items required of Buyer in **Article V** hereof, for any reason other than a default by Seller under this Agreement.

7.3 Remedies. In the event of a default by Buyer, if the Earnest Money is delivered to Escrow Agent as required under this Agreement, Seller's sole and exclusive remedy shall be to terminate this Agreement and to receive and retain the Earnest Money and all interest thereon, if any, as liquidated damages, and Seller shall not be entitled to any other damages of any kind, whether actual, consequential, special or punitive. The parties acknowledge and agree that (a) it would be extremely difficult and impracticable to ascertain Seller's actual damages resulting from such default by Buyer under this Agreement; (b) that the Earnest Money represents a reasonable estimate of Seller's actual damages resulting from such default by Buyer under this Agreement; and (c) Seller's retention of the Earnest Money pursuant to this Section 7.3 is not a penalty. In the event of a default by Seller, the Buyer may, at its option, do either of the following (but not both) as its sole and exclusive remedy under this Agreement, under applicable law or in equity, and Buyer shall not be entitled to any damages of any kind, whether actual, consequential, special or punitive:

(1) Terminate this Agreement by written notice delivered to Seller at or prior to the Closing, whereupon (a) the Earnest Money shall be immediately returned to Buyer and (b) Seller shall reimburse Buyer for Buyer's Costs (as hereinafter defined), in an amount not to exceed $75,000.00, within thirty (30) days following receipt of paid invoices therefor, whereupon such payment this Agreement shall be deemed null and void, and the parties shall have no further rights or obligations to each other hereunder except for the Continuing Obligations. The term "Buyer's Costs" is defined for purposes of this Agreement as the documented out-of-pocket third party expenses actually incurred by Buyer for: (i) title examination, survey and searches, including issuance of Buyer's title commitment; (ii) fees paid to Buyer's engineers and consultants for preparing any environmental and engineering reports with respect to the Property; and (iii) actual costs incurred by Buyer in connection with the negotiation of this Agreement, Buyer's reasonable legal fees associated with this transaction, Buyer's due diligence with respect to the Property and limited predevelopment feasibility work directly related to evaluating the Property for Buyer's intended use, such as preliminary site planning, code or zoning analysis or building systems evaluation, but expressly excluding any architectural, engineering, permitting, entitlement, tenant improvement or other design-related costs associated with Buyer's proposed redevelopment or occupancy of the Property; or

(2) Enforce specific performance of this Agreement.

Notwithstanding the foregoing, if the Earnest Money is not delivered to Escrow Agent as required under this Agreement, then this Agreement shall automatically terminate and be of no further force or effect, except for the Continuing Obligations.

ARTICLE VIII
Brokerage Commission

8.1 Seller represents to Buyer that Seller has engaged the services of CBRE, Inc. (the "**Broker**"), as a broker in connection with this transaction and that Seller shall be responsible for and shall pay all sums due Broker pursuant to the terms of a separate written agreement between Broker and Seller. Seller further represents to Buyer that Seller has not engaged the services of any other broker in connection with this transaction and shall indemnify and save Buyer harmless from any claims of Broker or any other broker claiming through Seller as a result of this transaction. Buyer represents to Seller that Buyer has not engaged the services of any broker in connection with this transaction and Buyer shall indemnify and save Seller harmless from any claims of any broker claiming through Buyer as a result of this transaction. The foregoing indemnification obligations shall survive any termination of this Agreement or the Closing.

ARTICLE IX
Miscellaneous

9.1 Notices. All notices, demands, requests and other communications required or permitted by this Agreement by any party hereto to any other party or to Escrow Agent or to Title Company shall be in writing and shall be validly given or made by any party, or any party's attorney on behalf of such party, only if deposited in the United States mail, sent by certified or registered mail, postage prepaid, return receipt requested, or if made by Federal Express or other similar reputable national courier service keeping records of deliveries and attempted deliveries. Service by mail or courier shall be conclusively deemed made on the first Business Day delivery is attempted or upon receipt, whichever is sooner. Notices shall also be given by e-mail to the e-mail address of the intended recipient as hereinafter set forth, provided that in connection therewith a responsive e-mail is returned to the party giving notice that acknowledges receipt of such e-mailed notice. Notices may be given by the attorneys for the respective parties hereto.

All such notices, demands, requests and other communications shall be addressed to the addressee at its address set forth below or at such other address as such party may have previously specified by notice delivered in accordance with this Section:

If to Seller:

CBRE, Inc., as Receiver
One Oxford Centre
301 Grant Street
Pittsburgh, PA 15219
Attn: John Svorcek
Attn: Joseph Petak
email: John.Svorcek@cbre.com
email: Joseph.Petak@cbre.com



Case ID: 260501884
Control No.: 26066494

With a copy to:

Buchanan Ingersoll & Rooney P.C.
501 Grant St., Suite 200
Pittsburgh, PA 15219
Attn: Christopher P. Schueller, Esquire
email: christopher.schueller@bipc.com

With a copy to Lender:

Wells Fargo Bank, National Association, as Trustee, for the Benefit of Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2020-MKST Commercial Mortgage Pass-Through Certificates, Series 2020-MKST
c/o KeyBank National Association
8117 Preston Road, Suite 400
Dallas, TX 75225
Attn: Steve Britt
email: steve_britt@keybank.com

If to Buyer:

[NEWCO]
380 Red Lion Road, Ste. 202
Huntingdon Valley, PA 19006
Attention: Shamikh Kazmi
email: sk@upssites.com

With a copy to:

If to Escrow Agent / Title Company:

Commonwealth Land Title Company CWOC-042
4400 MacArthur Blvd, Suite 800
Newport Beach, CA 92660
Phone: (949)724-3140

Any person or entity may change their address for the purpose of receiving notices or demands as herein provided by a written notice given in the manner aforesaid to the others, which notice of change of address shall not become effective, however, until the actual receipt thereof by the others.

9.2 Governing Law; Venue. The laws of the Commonwealth of Pennsylvania shall govern the validity, enforcement and interpretation of this Agreement. Any dispute or cause of action under this Agreement shall be resolved in a court of competent subject matter jurisdiction in the County in which the Property is located.



Case ID: 260501884
Control No.: 26066494

9.3 Integration; Modification; Waiver. This Agreement constitutes the complete and final expression of the agreement of the parties relating to the Property, and supersedes all previous contracts, agreements and understandings of the parties, either oral or written, relating to the Property. This Agreement cannot be modified, nor may any of the terms hereof be waived, except by an instrument in writing (referring specifically to this Agreement) executed by the party against whom enforcement of the modification or waiver is sought.

9.4 Counterpart Execution; Copies of Signatures. This Agreement may be executed in two or more counterparts, each of which shall constitute an original and all of which together shall constitute one and the same agreement. A photocopied, scanned, telecopied or other electronic signature of any party to this Agreement shall have the same force and effect as an original signature for all purposes.

9.5 Headings; Construction. The headings which have been used throughout this Agreement have been inserted for convenience of reference only and do not constitute matter to be construed in interpreting this Agreement. Words of any gender used in this Agreement shall be held and construed to include any other gender and words in the singular number shall be held to include the plural, and vice versa, unless the context requires otherwise. The words "herein," "hereof," "hereunder" and other similar compounds of the word "here" when used in this Agreement shall refer to the entire Agreement and not to any particular provision or section. If the last day of any time period stated herein shall fall on a Saturday, Sunday or legal holiday in the Commonwealth of Pennsylvania, then the duration of such time period shall be extended so that it shall end on the next succeeding day which is not a Saturday, Sunday or legal holiday in the Commonwealth of Pennsylvania. As used in this Agreement, the term "**Business Day**" shall mean any day other than a Saturday, Sunday or legal holiday in the Commonwealth of Pennsylvania.

9.6 Invalid Provisions. If any one or more of the provisions of this Agreement, or the applicability of any such provision to a specific situation, shall be held invalid or unenforceable, such provision shall be modified to the minimum extent necessary to make it or its application valid and enforceable, and the validity and enforceability of all other provisions of this Agreement and all other applications of any such provision shall not be affected thereby.

9.7 Binding Effect. This Agreement shall be binding upon and inure to the benefit of Seller and Buyer and, with respect to the provisions of **Article XI** of this Agreement, the Escrow Agent, and with respect to **Section 3.2** of this Agreement, the persons and entities receiving the benefits provided in such **Section 3.2**, and, in each case, their respective heirs, executors, personal and legal representatives, successors and permitted assigns. Without the prior consent of Seller, Buyer may assign all, but not less than all, of its rights and obligations under this Agreement to any entity that is owned or controlled by Buyer; provided, however, that no such assignment shall relieve Buyer of any of its obligations under this Agreement, and in the event of such an assignment, Buyer and the assignee of Buyer shall be jointly and severally liable for all of the obligations of the Buyer under this Agreement. Buyer shall provide written evidence of any such permitted assignment to Seller and Escrow Agent at least three (3) Business Days prior to the Closing. Except as aforesaid, Buyer may not otherwise assign any of its rights or obligations under this Agreement without the prior written consent of Seller, and except as expressly provided herein (including, without limitation, as expressly provided in **Section 3.2** of



Case ID: 260501884
Control No.: 26066494

this Agreement), nothing in this Agreement is intended to confer on any person or entity, other than the parties hereto, those persons and entities noted in **Section 3.2** of this Agreement (but only to the extent such persons and entities are entitled to the benefits of the provisions of such **Section 3.2**) and, with respect to the provisions of **Article XI** of this Agreement, the Escrow Agent, and their respective heirs, executors, personal and legal representatives, successors and permitted assigns, any rights or remedies under or by reason of this Agreement. If Seller shall consent to any assignment of this Agreement by Buyer other than any assignment which is permitted by the express terms of this Agreement without Seller's consent, then Buyer shall nonetheless not be relieved of any of its obligations under this Agreement and shall remain jointly and severally liable under this Agreement with the assignee of Buyer.

9.8 Further Acts; Survival of Continuing Obligations. In addition to the acts recited in this Agreement to be performed by Seller and Buyer, Seller and Buyer agree to promptly perform or cause to be performed at the Closing or after the Closing all such further acts as may be reasonably necessary to consummate the transactions contemplated hereby. The obligations described in this **Section 9.8** and the Continuing Obligations shall in all respects survive the Closing and transfer of the Property by Seller to Buyer.

9.9 Time of the Essence. Time is of the essence of this transaction and all of the terms and provisions of this Agreement.

9.10 Legal Expenses. In the event of litigation arising out of the terms and conditions of this Agreement, the prevailing party in such litigation shall have the right to recover from the non-prevailing party reasonable attorneys' fees and court costs incurred as a result of such litigation.

9.11 Interpretation of Agreement. The preparation of this Agreement has been a joint effort of Buyer and Seller, each of whom have had an adequate opportunity to consult with counsel of their choice, and this Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted. If any words or phrases in this Agreement shall have been stricken out or otherwise added, this Agreement shall be construed as if the words or phrases so stricken out are otherwise eliminated or never included in this Agreement. No implication or inference shall be drawn from the fact that such words or phrases were so stricken out or otherwise eliminated.

9.12 Limitation of Liability upon Seller. Subject to **Section 4.7** hereof, all of Seller's obligations and liabilities under this Agreement, under any of the documents or instruments delivered in connection with the consummation of the transaction contemplated under this Agreement or with respect to the Property shall be without recourse to Seller or any of its assets (including any of the monies received by Seller as the result of the consummation of the purchase and sale transaction contemplated under this Agreement).

9.13 Discharge of Obligations. The acceptance of the Deed by Buyer shall be deemed to be a full performance and discharge of every representation, warranty and covenant made by Seller herein and every agreement and obligation on the part of Seller to be performed pursuant to the provisions of this Agreement, except those, if any, which are herein specifically stated to survive Closing.



Case ID: 260501884
Control No.: 26066494

9.14 Intentionally Deleted.

9.15 No Third Party Beneficiary. Except as expressly provided herein to the contrary, the provisions of this Agreement and of the documents to be executed and delivered at Closing are and will be for the benefit of Seller and Buyer only and are not for the benefit of any third party, and accordingly, no third party shall have the right to enforce the provisions of this Agreement or of the documents to be executed and delivered at Closing.

9.16 Exhibits and Schedules. The following schedules or exhibits attached hereto shall be deemed to be an integral part of this Agreement:

Exhibit A - Legal Description of the Property

9.17 Intentionally Deleted.

9.18 Intentionally Deleted.

9.19 Effective Date. The date of delivery to Escrow Agent of a fully executed counterpart of this Agreement, as evidenced by Escrow Agent's notation in the space set forth below, shall be deemed the effective date of this Agreement (the "**Effective Date**").

9.20 Pennsylvania-Specific Provisions.

(a) Intentionally Deleted.

(b) Sewage Facilities: In accordance with the Pennsylvania Sewage Facilities Act of January 24, 1996, No. 537 P.L. 1535, as amended, the following statement regarding the availability of a community sewage system is included: the Property is connected to or serviced by a Community Sewage System.

(c) Waiver of Pennsylvania Bulk Sales Law Compliance: Buyer hereby waives the requirement for Seller's delivery, by Closing, of the tax clearance certificates to be issued in compliance with Pennsylvania's Bulk Sales Statutes ("**Tax Clearance Certificates**"). As used herein, the term "**Pennsylvania's Bulk Sales Statutes**" shall mean all of the following: the Act of April 9, 1929, P.L. 343, art. XIV, 72 P.S. § 1403, as amended; the Act of May 10, 1927, § 1, P.L. 879, No. 446, 69 P.S. § 529; the Act of March 4, 1971, P.L. 6, No. 2, 72 P.S. § 7240, as amended; the Act of August 4, 1991, P.L. 97, No. 22, 72 P.S. § 7321.1, as amended; and the Act of December 5, 1936 (2nd Sp. Sess., 1937 P.L. 2897, No. 1), as amended by the Act of June 22, 1964, P.L. 112, No. 7, 43 P.S. § 788.3, and other similar statutes. The provisions of this Section shall survive Closing and shall not be merged into the Deed.

(d) Coal Notice: **NOTICE -- THIS DOCUMENT MAY NOT SELL, CONVEY, TRANSFER, INCLUDE OR INSURE THE TITLE TO THE COAL AND RIGHT OF SUPPORT UNDERNEATH THE SURFACE LAND DESCRIBED OR REFERRED TO HEREIN, AND THE OWNER OR OWNERS OF SUCH COAL MAY HAVE THE COMPLETE LEGAL RIGHT TO REMOVE ALL OF SUCH COAL AND, IN THAT CONNECTION, DAMAGE MAY RESULT TO THE SURFACE OF THE LAND AND ANY HOUSE, BUILDING OR OTHER STRUCTURE ON OR IN SUCH**



Case ID: 260501884
Control No.: 26066494

**LAND. THE INCLUSION OF THIS NOTICE DOES NOT ENLARGE, RESTRICT OR MODIFY ANY LEGAL RIGHTS OR ESTATES OTHERWISE CREATED, TRANSFERRED, EXCEPTED OR RESERVED BY THIS INSTRUMENT.** This notice is set forth in the manner provided in Section 1 of the Act of July 17, 1957, P.L. 984, as amended, and is not intended as notice of unrecorded instruments, if any.

ARTICLE X
Confidentiality and Public Disclosure

10.1 Confidentiality. Buyer agrees that it shall keep this Agreement, the terms and conditions of this Agreement and all materials, documents and information pertaining to the Property or the Leases that is at any time delivered or made available by Seller or any of its agents or representatives to the Buyer or any of its agents or representatives (collectively, the "**Confidential Information**") confidential and that Buyer shall not disclose the Confidential Information to any person or entity for any reason whatsoever except as specifically permitted herein or except as may be necessary to comply with the order of any court of competent jurisdiction. Buyer shall restrict dissemination of Confidential Information within its own organization and to Buyer's representatives, advisors, consultants or lenders and to the Title Company and Escrow Agent so that the Confidential Information shall be revealed only to the extent necessary to enable Buyer to fulfill the terms of this Agreement. In the event this Agreement is terminated or Buyer defaults hereunder, Buyer shall promptly return to Seller any and all Confidential Information. In the event of a breach or threatened breach by Buyer or its agents under this Section, Seller shall be entitled to an injunction restraining Buyer or its agents from disclosing, in whole or in part, any Confidential Information. Nothing herein shall be construed as prohibiting Seller from pursuing any other available remedy at law or in equity for such breach or threatened breach.

10.2 Public Disclosure. Prior to Closing, any release to the public of information by Buyer or Seller with respect to any matters set forth in this Agreement, including the existence of this Agreement, will be made only in the form approved by the other party and its counsel.

ARTICLE XI
Escrow Provisions

11. Provisions Pertaining to Escrow Agent and Earnest Money. The following provisions pertain to the Earnest Money, the maintenance of the account into which the Earnest Money is to be placed by the Escrow Agent and the Escrow Agent's limitation of liability:

11.1 Except as hereinafter provided in this **Section 11.1** to the contrary, in the event that the Escrow Agent receives conflicting instructions from the parties or determines in good faith that a bona fide dispute exists as to whether the Escrow Agent is obligated to deliver the Earnest Money, or as to whom the Earnest Money is to be delivered, the Escrow Agent, at its option, (a) may refuse to comply with any claims or demands on it and continue to hold the Earnest Money until (i) the Escrow Agent receives written notice signed by Seller and Buyer directing the release and delivery of the Earnest Money, in which event the Escrow Agent shall then release and deliver the Earnest Money in accordance with said direction, or (ii) the Escrow Agent receives a certified copy of a final non-appealable judgment of a court of competent



Case ID: 260501884
Control No.: 26066494

jurisdiction directing the release and delivery of the Earnest Money, in which event the Escrow Agent shall then release and deliver the Earnest Money in accordance with said direction, or (b) may deliver the Earnest Money to the Philadelphia County Court of Common Pleas, or (c) may take such affirmative steps as the Escrow Agent may elect in order to substitute another impartial party reasonably satisfactory to Seller and Buyer (whose consents to such substitution shall not be unreasonably withheld), to hold the Earnest Money, including, without limitation, the deposit thereof in a court of competent jurisdiction and the commencement of an action for interpleader, the costs thereof to be the joint obligation of Buyer and Seller (but notwithstanding the foregoing, as between Seller and Buyer, such costs shall be borne by whichever of Seller or Buyer is the losing party, or in accordance with any mutual agreement of Seller and Buyer if neither party is the losing party).

11.2 Escrow Agent is acting as a stakeholder only with respect to the Earnest Money. It is agreed that the duties of the Escrow Agent are only as herein specifically provided in this Agreement, are purely ministerial in nature, and that Escrow Agent shall incur no liability whatsoever except for its own willful misconduct or gross negligence. Seller and Buyer each hereby release the Escrow Agent from any act done or omitted to be done by the Escrow Agent in good faith in the performance of its duties hereunder.

11.3 Except as and only to the extent otherwise provided elsewhere in this Agreement to the contrary, all out-of-pocket costs and expenses (including, without limitation, reasonable attorneys' fees and costs) incurred by Escrow Agent as the result of its serving as escrow agent under this Agreement (other than any of such costs and expenses incurred as the result of the Escrow Agent taking any action or omitting to take any action in bad faith, in willful disregard of this Agreement or involving gross negligence on the part of Escrow Agent) and all escrow fees charged by Escrow Agent in connection with its acting as escrow agent with respect to the Earnest Money shall be paid for one-half by Buyer and the other one-half by Seller.

11.4 Buyer and Seller agree and acknowledge that the Escrow Agent has no liability in connection with the Earnest Money in the event of the failure or insolvency of the financial institution in which the Earnest Money is deposited.

11.5 All notices and demands to Escrow Agent or from Escrow Agent to Seller or Buyer shall be in writing and shall be governed by **Section 9.1** of this Agreement. Escrow Agent shall be entitled to rely on all communications which purport to be on behalf of the party giving such communication and purporting to be signed by an authorized party or any attorney of any party as may be designated from time to time by Seller or Buyer.

11.6 Escrow Agent may resign from serving as escrow agent under this Agreement at any time by giving ten (10) Business Days prior written notice to that effect to each of Seller and Buyer. In such event, the successor escrow agent shall be selected by Seller and approved by Buyer, such approval not to be unreasonably withheld or delayed. Escrow Agent shall then deliver the Earnest Money to the successor escrow agent, to be held by such successor escrow agent pursuant to the terms of this Agreement and thereupon such successor escrow agent shall thereafter be deemed to be the "Escrow Agent" under this Agreement.



Case ID: 260501884
Control No.: 26066494

11.7 In its capacity as Escrow Agent, Escrow Agent shall not be responsible for the genuineness or validity of any security, instrument, document or item deposited with it, and shall have no responsibility other than to faithfully follow the instructions contained in this Agreement, and Escrow Agent is fully protected in acting in accordance with any written instrument given to it hereunder by Buyer or Seller and believed by Escrow Agent to have been signed by the proper person. Escrow Agent may assume that any person purporting to give any notice under this Agreement and representing that they have authority to do so has been duly authorized to do so.

11.8 Escrow Agent shall have no duties or responsibilities other than those expressly set forth in this Agreement and that pertain to its duties as escrow agent. Escrow Agent shall have no duty to enforce any obligation of any person or entity to make any payment or delivery or to enforce any obligation of any person or entity to perform any other act. Escrow Agent shall be under no liability to Buyer or Seller or to anyone else by reason of any failure on the part of Buyer or Seller to perform its obligations under any document.

11.9 Escrow Agent shall be entitled to approve (not to be unreasonably withheld or delayed) legal counsel who may be retained to defend or prosecute any action on behalf of Escrow Agent under or arising out of this Agreement.

11.10 The duties, obligations and liabilities of Buyer, Seller and Escrow Agent as set forth in this **Article XI** of this Agreement shall be interpreted, construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania.

ARTICLE XII
Buyer's Closing Conditions

12.1 Notwithstanding anything in this Agreement to the contrary, Buyer's obligation to consummate the purchase of the Property is expressly contingent upon the satisfaction of the following conditions as of the Closing Date ("**Buyer's Closing Conditions**"):

(a) All representations and warranties of Seller under this Agreement continue to be materially true and correct.

(b) The Title Company shall issue or be irrevocably and unconditionally committed to issue to Buyer an owner's title insurance policy in the full amount of the Purchase Price insuring that good and marketable, fee simple title to the Property is vested in Buyer subject only to the Permitted Exceptions (the "**Title Policy**"). Buyer shall bear the cost of the premium for the Title Policy.

12.2 If any of Buyer's Closing Conditions are not satisfied on or prior to the Closing Date (except as a result of a default by Seller, in which case Section 7.1 and Section 7.3 shall apply), Buyer may, by delivering written notice at or prior to the Closing Date, to Seller, elect to either (i) waive any such condition; or (ii) terminate this Agreement. If Buyer elects to terminate this Agreement, the Earnest Money will be returned to Buyer and neither party will have any further obligations or liabilities hereunder, except as expressly provided in this Agreement. Time

is agreed to be strictly of the essence with respect to terminating this Agreement. Buyer's failure to timely deliver written notice of termination prior to the Closing Date shall be conclusively deemed a waiver of Buyer's right to terminate this Agreement pursuant to the terms of this Section 12.2.

THE REMAINDER OF THIS PAGE INTENTIONALLY BLANKIN WITNESS WHEREOF, the parties have executed this Agreement on the dates set forth next to their signatures below.

**SELLER:**

**CBRE, INC.**, solely in its capacity as receiver under the Order entered on April 14, 2023 in a case in the United States District Court for the Eastern District of Pennsylvania, entitled *Wells Fargo Bank, National Association, as Trustee, for the Benefit of Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2020-MKST Commercial Mortgage Pass-Through Certificates, Series 2020-MKST, the RR Interest Owner and the Future Advance Lender v. NG 1500 Market St. LLC*, Case No. 23-146 and not in its personal capacity

By: ________________________________
Name: ______________________________
Title: _______________________________

**BUYER:**

______________________,
a ____________________________________

By:_____________________________________
Name:
Title:



Case ID: 260501884
Control No.: 26066494

**<u>JOINDER BY ESCROW AGENT</u>**

The undersigned, Commonwealth Land Title Company, has joined in the execution of this Agreement solely for the purpose of evidencing its agreement to serve as the "Escrow Agent" under and in accordance with the terms and provisions of this Agreement. Escrow Agent acknowledges receipt of a fully executed counterpart of this Agreement as of ___________, _____________, which date shall be deemed the "Effective Date" of this Agreement.

**<u>ESCROW AGENT</u>**:

**COMMONWEALTH LAND TITLE COMPANY**

By:_________________________________________
Name:_______________________________________
Title:_______________________________________

# EXHIBIT A

Legal Description of Property

All that certain lot or piece of ground with buildings and improvements thereon erected, situate in the 8th Ward of the City of Philadelphia and described as follows, to wit:

BEGINNING at a point of intersection formed by the Westerly side of 15th Street (variable width) and the Southerly side of Market Street (100 feet wide); thence extending Southwardly along the said Westerly side of 15th Street the distance of 265 feet 0 inches to a point on the Northeasterly end of a corner cut off which connects the said Westerly side of 15th Street and the Northerly side of Ranstead Street (20 feet wide), said point also being on the Northwesterly side of an easement for cutback which easement for cutback applies only to certain land and/or space between an elevation of +/- 38.50 and an elevation of +/- 68.50; thence Southwardly along the Westerly side of said 15th Street extended and along the Easterly side of said Easement for cutback 21 feet 0 inches to a point on the Northerly side of said Ranstead Street extended and on the Southerly side of said Easement for cutback; thence Westwardly along the Northerly side of said Ranstead Street extended and along the Southerly side of said Easement for cutback 30 feet 0 inches to a point on the Southwesterly end of said corner cut off and on the Northwesterly side of said Easement for cutback; thence Westwardly along the Northerly side of said Ranstead Street (part 20 feet wide and part 30 feet wide) 346 feet 0 inches to a point on the Easterly side of 16th Street (70 feet wide); thence Northwardly along the said Easterly side of 16th Street 286 feet 0 inches to a point on the said Southerly side of Market Street; thence Eastwardly along the said Southerly side of Market Street 376 feet 0 inches to a point on the said Westerly side of 15th Street, being the first mentioned point and place of beginning.

LESS AND EXCEPT the portion of the herein before described premises by Deed of Dedication from the Redevelopment Authority of the City of Philadelphia to the City of Philadelphia dated June 20, 1969 and recorded in the Department of Records in and for the City of Philadelphia in Deed for J.R.S. No. 456, Page 258 &c.

BEING the same premises which EQC Operating Trust, a Maryland real estate investment trust formerly known as Hub Properties Trust by Special Warranty Deed dated 06/28/2017 and recorded 07/18/2017 in the Office of the Recorder of Deeds in and for the County of Philadelphia as Document No. 53239762, granted and conveyed unto NG 1500 Market St. LLC, a Delaware limited liability company.

NOTE FOR INFORMATION: Being Parcel No. 88-3320000, of the City of Philadelphia, County of Philadelphia, State of Pennsylvania.

Address: 1500 Market Street
Philadelphia, PA 19102

4924-2945-3447, v. 2
4924-2945-3447, v. 2

# EXHIBIT C

*CBRE Draft Assumption Agreement (Version 4916-0197-0055 v1)*

Referenced in First Amended Complaint, paragraph 37

POLS DRAFT 12/24

Loan No. _______________

# ASSUMPTION AGREEMENT

**THIS ASSUMPTION AGREEMENT** ("**Agreement**") is made as of ________________, 2026 (the "**Effective Date**") by and among __________________ ("**New Borrower**"), ____________________ ("**New Guarantor**"), and **WELLS FARGO BANK, NATIONAL ASSOCIATION, AS TRUSTEE, FOR THE BENEFIT OF HOLDERS OF J.P. MORGAN CHASE COMMERCIAL MORTGAGE SECURITIES TRUST 2020-MKST, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2020-MKST, THE RR INTEREST OWNER AND THE FUTURE ADVANCE LENDER** (together with its successors and assigns, "**Lender**"). New Borrower and New Guarantor are collectively the "**Borrower Parties**." The Borrower Parties and Lender are each a "**Party**" and collectively the "**Parties**" to this Agreement.

## RECITALS:

A. Pursuant to that certain Loan Agreement dated as of December 6, 2019 (the "**Original Loan Agreement**"), JPMorgan Chase Bank, National Association ("**Original Lender**") made a loan in the maximum principal amount of $388,000,000.00 (the "**Original Loan**") to NG 1500 Market St., LLC, a Delaware limited liability company ("**Original Borrower**"), for the financing of certain real property commonly known as 1500 Market Street, Philadelphia, Pennsylvania (such real estate, together with all improvements thereon and personal property associated therewith, is hereinafter collectively called the "**Property**").

B. Original Borrower and Original Lender subsequently entered into that certain Omnibus Amendment to Loan Documents and Reaffirmation Agreement dated as of December 27, 2019 (collectively with the Original Loan Agreement, as the same may from time to time have been further amended, consolidated, renewed, replaced and/or assigned, the "**Loan Agreement**") to increase the maximum principal amount of the Original Loan to $390,000,000.00 (the "**Loan**").

C. The Loan is further evidenced by (i) that certain Promissory Note A-1 dated December 6, 2019 made payable by Original Borrower to the order of Original Lender in the stated principal amount of $368,000,000.00 (as the same may from time to time have been amended, consolidated, renewed, replaced and/or assigned, "**Note A-1**"), and (ii) that certain Amended and Restated Promissory Note A-2 dated December 27, 2019 made payable by Original Borrower to the order of Original Lender in the maximum principal amount of $22,000,000.00 (as the same may from time to time have been further amended, consolidated, renewed, replaced and/or assigned, "**Note A-2**") (Note A-1 and Note A-2 are collectively the "**Note**"), and secured by, among other things, that certain Open-End Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of November 6, 2019 but made effective as of December 6, 2019 from Original Borrower to Original Lender, recorded on December 12, 2019 in the real estate records of Philadelphia County, Pennsylvania (the "**Records**") as Instrument Number 53604614, as amended by that certain First Amendment to Open-End Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of December 27, 2019 but made effective as of December 31, 2019, recorded on January 7, 2020 in the Records as Instrument No. 53615245, and as assigned by Original Lender to Lender by that certain Assignment Open-End Mortgage,



Case ID: 260501884
Control No.: 26066494

Assignment of Leases and Rents, Security Agreement and Fixture Filing dated effective as of February 19, 2020 and recorded in the Records on April 30, 2020 as Instrument No. 53662686 (collectively, as the same may from time to time have been amended, consolidated, renewed, replaced and/or assigned, the "**Security Instrument**").

D. In order to induce Original Lender to make the Loan to Original Borrower, Elchonon Schwartz, a natural person ("**Original Guarantor**"), executed and delivered (i) that certain Guaranty Agreement dated as of December 6, 2019 in favor of Original Lender (as the same may from time to time have been amended, consolidated, renewed, replaced and/or assigned, the "**Original Guaranty**"), and (ii) together with Original Borrower, that certain Environmental Indemnity Agreement dated as of December 6, 2019 in favor of Original Lender (as the same may from time to time have been amended, consolidated, renewed, replaced and/or assigned, the "**Original Indemnity**").

E. The Loan Agreement, the Note, the Security Instrument, the Original Guaranty, the Original Indemnity, and all other documents and instruments evidencing and/or securing the Note which were executed on or before the Effective Date by Original Borrower or Original Guarantor in connection with or related to the Loan, including any assignments of leases and rents, other assignments, security agreements, financing statements, guaranties, indemnity agreements, cash management agreements, letters of credit, escrow agreements or escrow/holdback arrangements, together with all amendments, modifications, substitutions or replacements thereof, are collectively the "**Original Loan Documents**."

F. Lender is successor-in-interest to Original Lender and the current owner and holder of the Original Loan Documents, other than Note A-2. Lender, through its agents, including KeyBank National Association, in its capacity as special servicer under that certain Trust and Servicing Agreement dated as of February 19, 2020, is authorized to service the Loan for itself and on behalf of the holder of Note A-2 and has the power, authority and capacity to bind the owner and holder of Note A-2 to this Agreement.

G. As set forth in that certain default letter dated December 12, 2022 from Lender to Original Borrower (the "**Default Letter**"), Lender advised Original Borrower that an Event of Default occurred because of Original Borrower's failure to pay the matured indebtedness in full on December 9, 2022 (the "**Original Maturity Date**") in accordance with the Original Loan Documents (the "**Existing Default**").

H. On January 13, 2023, as a consequence of the Existing Default, Lender filed that certain action now pending in the U.S. District Court for the Eastern District of Pennsylvania (the "**Court**") bearing Case No. 2:23-cv-00146-NIQA (the "**Enforcement Action**").

I. On April 14, 2023, the Court entered in the Enforcement Action that certain Consent Order Appointing Receiver Pursuant to Motion of Plaintiff (the "**Receiver Order**"), providing, among other things, for the appointment of a receiver for the Property and for the undertaking by that receiver of efforts to sell the Property.

J. In accordance with the Receiver Order, CBRE, Inc., solely in its capacity as Court Appointed Receiver in Case No. 2:23-cv-00146-NIQA (the "**Receiver**"), was appointed receiver



Case ID: 260501884
Control No.: 26066494

for the Property in the Enforcement Action. By virtue of the Receiver Order, the Receiver is authorized to sell the Property subject to the conditions provided in the Receiver Order.

K. The Receiver, as seller, and New Borrower, as buyer, are parties to that certain Purchase and Sale Agreement dated effective as of [____________________] (the "**PSA**"), which contemplates, among other things, that New Borrower will purchase the Property for a purchase price to be paid by the assumption of the Loan (as modified hereunder).

L. In furtherance of New Borrower's acquisition of the Property pursuant to the PSA, New Borrower has requested that Lender permit New Borrower to assume the Loan. Due to the Enforcement Action and authority of the Receiver, Original Borrower and Original Guarantor (the "**Original Borrower Parties**") have declined to be parties to this Agreement, however, subject to the terms and conditions of this Agreement, Lender is willing to consent to the assumption of the Loan by New Borrower and the replacement of Original Guarantor with New Guarantor as the guarantor of the Loan (the "**Loan Assumption**").

M. The term "**Loan Documents**" as used hereinafter means, collectively, (i) the Original Loan Documents, except to the extent terminated or replaced pursuant to this Agreement, (ii) this Agreement, (iii) the New Guaranty (as defined below), (iv) the New Indemnity (as defined below), and (v) all other documents, instruments and agreements executed by New Borrower or New Guarantor in connection with the Loan or the Loan Assumption. Capitalized terms not specifically defined herein have the meanings ascribed to them in the Loan Agreement, as amended hereby.

**AGREEMENT:**

NOW, THEREFORE, in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. Assumption. As of the Effective Date, New Borrower hereby (i) assumes the Loan and agrees to pay the Debt, and (ii) agrees to perform all of the other obligations of "Borrower" under the Loan Documents arising from and after the Effective Date and be bound by, comply with and perform each and every other covenant, condition, agreement, representation, warranty, waiver, consent, acknowledgment and obligation of "Borrower" under the Loan Documents; provided, that New Borrower shall have no liability with respect to the acts, events or omissions of Original Borrower. New Borrower shall henceforth be deemed to be the "Mortgagor," "Assignor," "Trustor," "Grantor," "Indemnitor" and/or "Borrower" under each of the Loan Documents.

2. Lender's Consent, Loan Reinstatement and Partial Principal Reduction. Subject to the terms and conditions set forth in this Agreement:

(a) Lender consents to: (a) the conveyance of the Property to New Borrower; (b) the assumption by New Borrower of all of Original Borrower's obligations and liabilities under the Loan Documents upon the terms and conditions set forth herein; (c) the replacement of Original Guarantor with New Guarantor as the "Guarantor" under the Original Loan Documents pursuant to a new Guaranty Agreement, substantially in the same form and substance as the Original Guaranty, dated as of the Effective Date by New Guarantor for the benefit of Lender (the "**New Guaranty**")



Case ID: 260501884
Control No.: 26066494

and, collectively with New Borrower, a new Environmental Indemnity Agreement, substantially in the form and substance as the Original Indemnity, dated as of the Effective Date for the benefit of Lender (the "**New Indemnity**"); and (d) the replacement of the existing property manager with [____________] ("**New Property Manager**") as the new property manager of the Property.

(b) As of the Effective Date, no claims against the Original Borrower Parties shall affect the Property and Lender waives any right it may have to pursue New Borrower or the Property in the Enforcement Action. The Loan is hereby reinstated to a current status and Lender waives the Existing Default, together with any other defaults by Original Borrower heretofore arising under the Loan Documents. In addition, Lender hereby agrees that Lender shall not assert any claims (including, but not limited to, calling a springing recourse event against New Borrower or New Guarantor) or defaults against New Borrower or New Guarantor for any default or failure to perform under the Loan Documents by Original Borrower or Original, including, without limitation, the facts and circumstances giving rise to the Existing Default. Each of New Borrower and New Guarantor hereby waives any right, claim, defense or benefit it may have to challenge the enforceability, validity or any other aspect of this Agreement or any of the other Loan Documents arising or resulting from the fact that the Original Borrower Parties are not parties to this Agreement or otherwise.

(c) Effective as of the Effective Date, Lender hereby irrevocably reduces the outstanding principal balance of the Loan from $[375,588,868.00] to $[__________________], representing a reduction of $[__________________] (the "**Principal Reduction**"). For the avoidance of doubt, the Principal Reduction is permanent and shall not be subject to reinstatement. The Principal Reduction constitutes a partial forgiveness of indebtedness and not a payment or prepayment. Except as expressly modified hereby, all Loan Documents remain in full force and effect, and the Loan shall not be deemed satisfied, released, novated, or refinanced.

3. Loan Document Modifications.

(a) Lender, New Borrower, and New Guarantor agree that as of the Effective Date the Loan Documents are amended as set forth on **Exhibit A** to this Agreement.

(b) As further memorialized on **Exhibit A**, the Original Maturity Date is hereby extended to [month during which PSA is executed] 9, 2027.

(c) On the Effective Date, that certain Deposit Account Control Agreement (Hard Agreement) dated as of December 6, 2019 by and among Original Borrower, Lender, and PNC Bank, National Association ("**PNC**") shall be terminated, and New Borrower, Lender, and PNC shall enter into a new Deposit Account Control Agreement (Hard Agreement) dated as of the Effective Date, in form and substance acceptable to Lender and PNC.

(d) On the Effective Date, that certain Cash Management Agreement dated as of December 6, 2019 by and among Original Borrower, Original Lender and PNC shall be terminated, and New Borrower, Lender, and PNC shall enter into a new Cash Management Agreement dated as of the Effective Date (the "**New CMA**"), in form and substance acceptable to Lender and PNC, providing for, among other things, that on each Payment Date, as long as there exists no Cash Sweep Event, Lender shall instruct PNC to allocate and disburse all amounts deposited in the Cash

Management Account during the applicable collection period in the following order and priority (the "**Cash Management Waterfall**"):

(i) First, funds sufficient to pay the monthly deposit to the Tax and Insurance Escrow Fund if such a deposit is then required pursuant to the terms and provisions of Section 7.2 of the Loan Agreement shall be deposited into a subaccount established for such purpose (the "**Tax and Insurance Escrow Subaccount**");

(ii) Then, funds sufficient to pay PNC's fees then due and payable under the Cash Management Agreement shall be deposited into a subaccount established for such purpose (the "**Agent Subaccount**");

(iii) Then, funds sufficient to pay the next Monthly Debt Service Payment Amount shall be deposited into a subaccount established for such purpose (the "**Debt Service Subaccount**");

(iv) Then, funds sufficient to pay any interest accruing at the Default Rate (less amounts already paid pursuant to clause (iii) above), late payment charges and any other amounts due under the Loan Documents shall be deposited into the Debt Service Subaccount;

(v) Then, payments for monthly Operating Expenses for the applicable period in accordance with the related Approved Annual Budget shall be deposited into a subaccount established for such purpose (the "**OpEx Subaccount**");

(vi) Then, payments for Extraordinary Expenses for the applicable period approved by Lender, if any, shall be deposited into the OpEx Subaccount; and

(vii) Then, after deposits for items (i) through (vi) above, any remaining amounts in the Cash Management Account shall be disbursed to Borrower.

The New CMA shall also provide that, among other things, (A) the insufficiency of funds on deposit in the Cash Management Account (an "**Insufficiency**") shall not relieve Borrower of the obligation to make all payments as and when due pursuant to the Loan Agreement, the New CMA and the other Loan Documents, and such obligations shall be separate and independent, and not conditioned on any event or circumstance whatsoever, (B) notwithstanding anything to the contrary in the other Loan Documents, in the event of an Insufficiency related to items (v) and (vi) of the Cash Management Waterfall, Borrower shall have five (5) days following written notice from Lender to cure the Default caused by such Insufficiency, and (C) following the occurrence of a Cash Sweep Event and during the continuance thereof, all funds on deposit in the Cash Management Account may be applied by Lender in such order and priority as Lender shall determine in its sole and absolute discretion until the Debt has been paid in full.



Case ID: 260501884
Control No.: 26066494

4. Ratification, Estoppel and Release.

(a) New Borrower hereby ratifies and reaffirms (i) each grant, pledge, assignment and conveyance to Lender of, and New Borrower grants, pledges, assigns and conveys to Lender a lien on, pledge of, and security interest in, the Property pursuant to the terms of the Security Instrument, including all rights, interests and property hereafter acquired, and all products and proceeds thereof and additions and accessions thereto, and (ii) that as of the Effective Date, all of the terms, representations, warranties, covenants and provisions of the Loan Documents remain in full force and effect, without modification, except as necessary to implement the terms and provisions of this Agreement.

(b) The Parties acknowledge that as of [________________], after giving effect to the Principal Reduction, the outstanding principal amount of $[________________] was justly owing on account of the Note and interest has been paid through [________________] 14, 2026.

(c) New Borrower hereby ratifies and confirms its obligations to continue to deposit the required deposits into such escrow and/or reserve funds or accounts as required under the Loan Documents. The Parties hereby acknowledge and confirm that the balance of each of the escrow and/or reserve accounts held by Lender as of the Effective Date was as follows:

| | |
|---|---|
| Tax Escrow Fund: | $0 |
| Insurance Escrow Fund: | $0 |
| Replacement Reserve Fund: | $0 |
| Required Repair Fund: | $0 |
| Free Rent Reserve Fund: | $0 |
| Outstanding TI/LC Reserve Fund: | $0 |
| Excess Cash Flow Reserve Fund: | $0 |

5. Covenants. New Borrower and New Guarantor hereby jointly and severally covenant to Lender that the Property will be managed by New Property Manager pursuant to the [property management agreement] approved by Lender and in accordance with the Loan Documents. New Borrower acknowledges and agrees that all property management fees and compensation payable to New Property Manager are subordinate to Lender's rights under the Loan Documents, and, in connection therewith, New Borrower and New Property Manager will deliver to Lender an Assignment of Management Agreement and Subordination of Management Fees dated as of the Effective Date and satisfactory to Lender in form and substance.

6. Representations and Warranties.

(a) New Borrower reaffirms and ratifies all representations and warranties of Borrower set forth in Article IV of the Loan Agreement other than those representations and warranties that (i) relate to matters which by their nature can no longer be true and correct as a result of the passage of time or (ii) are made as of, or limited by, a specific date, subject to any



Case ID: 260501884
Control No.: 26066494

changes in facts or circumstances permitted to have occurred, or not prohibited from having occurred, pursuant to the terms of the Loan Documents.

(b) The Borrower Parties each represent and warrant as to itself that (i) it is duly organized, validly existing and in good standing under the laws of its state of organization and has full power, authority, legal right and capacity to execute, deliver and perform its obligations under this Agreement and the other Loan Documents; (ii) the Loan Documents, including, without limitation, this Agreement, constitute valid, enforceable and binding obligations of such party; and (iii) as of the Effective Date, there are no counterclaims, defenses or offsets of any nature whatsoever to any of its respective obligations under the Loan Documents or against Lender or any of Lender's loan servicers.

(c) New Borrower further represents and warrants that any funds used by New Borrower for its acquisition of the Property have been contributed as capital contributions and are not secured directly or indirectly by an interest in New Borrower or any other collateral that has been assigned to Lender under the Loan.

(d) New Guarantor further represents and warrants that the financial position of New Guarantor as of the Effective Date has not significantly deteriorated from the financial position of New Guarantor as reflected on financial statements previously provided to Lender.

7. <u>Further Documents, Etc</u>. The Borrower Parties each hereby agree to execute and deliver to Lender, and authorize the filing and/or recording by Lender of, any and all further documents and instruments required by Lender to effectuate the transaction contemplated by this Agreement, to create, perfect and/or modify the liens and security interests granted to Lender under the Loan Documents and/or to give effect to the terms and provisions of this Agreement, including, without limitation, appropriate UCC financing statements or amendments. Without limiting the generality of the foregoing, on or before the Effective Date, Lender shall be furnished with the following: (i) certified copies of all documents relating to the organization and formation of New Borrower, together with all appropriate original documentation evidencing New Borrower's capacity and good standing; (ii) appropriate documentation evidencing the qualification of the signers to execute this Agreement; (iii) such legal opinions as may be required by Lender; (iv) title endorsements to Lender's title insurance policy or a replacement Lender's title insurance policy providing the equivalent coverage; (v) evidence that all insurance required under the Loan Documents is current; (vi) all documentation relating to the management of the Property and the assignment and subordination of any management agreement to Lender; and (vii) evidence of payment of all fees, costs and expenses required by <u>Section 8</u> below. All of the foregoing shall be in form and substance satisfactory to Lender in its sole discretion.

8. <u>Costs and Expenses</u>. New Borrower hereby agrees to pay any and all fees, costs and expenses, including but not limited to attorneys' fees and the premium for endorsements to Lender's title insurance policy or a replacement Lender's title insurance policy, incurred by Lender in connection with the negotiation, preparation, filing and/or recording of this Agreement and all other documents and instruments executed pursuant to this Agreement and/or to create, perfect or modify the liens, security interests, assignments and/or pledges contemplated hereunder (collectively, the "**Transaction Costs**"). Concurrently with the execution of this Agreement, New Borrower shall pay Lender an assumption fee equal to [0.25%)] of the outstanding principal



Case ID: 260501884
Control No.: 26066494

balance of the Loan as of the Effective Date (after giving effect to the Principal Reduction) as required under Section 5.2.10(e)(i) of the Loan Agreement (the "**Assumption Fee**"), in addition to the Transaction Costs.

9. No Reliance. New Borrower acknowledges that in connection with the acquisition of the Property and the consummation of the Loan Assumption, New Borrower has not relied on any representations by Lender regarding the Property, the title thereto or any other matter.

10. Miscellaneous.

(a) This Agreement shall be binding upon the Parties to this Agreement and their respective heirs, executors, personal and legal representatives, successors and assigns.

(b) Wherever Lender's judgment, consent or approval is required under this Agreement, or Lender shall have an option, election or right of determination under this Agreement that something is satisfactory or not ("**Decision Power**"), such Decision Power shall be exercised in the sole and absolute discretion of Lender unless otherwise expressly stated to be reasonably exercised.

(c) If any term, covenant or condition of this Agreement shall be held to be invalid, illegal or unenforceable in any respect, the validity or enforceability of the remaining provisions shall not in any way be affected.

(d) This Agreement, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of any Party, but only by an agreement in writing signed by the Party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

(e) The following rules of construction are applicable for the purposes of this Agreement and all documents and instruments supplemental hereto unless the context clearly requires otherwise: All references herein to numbered or lettered Sections or to numbered or lettered Schedules or Exhibits are references to the Sections hereof and the Schedules and Exhibits annexed hereto or otherwise identified in connection herewith. The terms "include," "including," and similar terms shall be construed as if followed by the phrase "without being limited to." Words of masculine, feminine or neuter gender shall mean and include the correlative words of the other genders, and words importing the singular number shall mean and include the plural, and vice versa. The term "person," when used herein, means any natural person, corporation, general or limited partnership, limited liability company, association, joint venture, trust, estate, governmental authority or other legal entity, in each case whether in its own or a representative capacity. No inference in favor of or against any Party hereto shall be drawn from the fact that such Party has drafted any portion of this Agreement.

11. Governing Law. Section 10.3 of the Loan Agreement is hereby incorporated herein by reference.

12. Counterparts. This Agreement may be executed in any number of counterparts and by different Parties to this Agreement in separate counterparts, each of which when so executed



Case ID: 260501884
Control No.: 26066494

shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

13. No Impairment. All of the Property described in the Security Instrument and the other Loan Documents shall remain in all respects subject to the lien, charge and encumbrance of the Security Instrument and the other Loan Documents. Nothing in this Agreement shall be deemed to or shall in any manner prejudice or impair any of the Loan Documents or any security granted or held by Lender for the Loan or the original priority of the Security Instrument or any of the other Loan Documents. This Agreement shall not be deemed to be nor shall it constitute any alteration, waiver, annulment or variation of the lien and encumbrance of the Security Instrument or any of the other Loan Documents or the terms and conditions of or any rights, powers or remedies under such documents, except as expressly set forth herein.

14. Notice. Any notice required or permitted to be given under this Agreement or under any of the other Loan Documents must be in writing and given (a) by depositing the same in the United States mail, addressed to the Party to be notified, postage prepaid and certified with return receipt requested; (b) by delivering the same in person to such Party; or (c) by depositing the same into the custody of a nationally recognized overnight delivery service addressed to the Party to be notified. In the event of mailing, notices shall be deemed effective three (3) days after posting; in the event of overnight delivery, notices shall be deemed effective on the next business day following deposit with the delivery service; and in the event of personal service notices shall be deemed effective when delivered. For purposes of notice, the addresses of the Parties shall be as follows, and the Loan Documents are hereby amended to include the addresses set forth below:

| | |
|---|---|
| New Borrower: | [NEW BORROWER, PLEASE PROVIDE] |
| Lender: | Wells Fargo Bank, National Association, as Trustee, for the benefit of Holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2020-MKST, Commercial Mortgage Pass-Through Certificates, Series 2020-MKST, the RR Interest Owner and the Future Advance Lender<br>c/o c/o Midland Loan Services, a Division of PNC Bank, National Association<br>10851 Mastin Street, Suite 700<br>Overland Park, Kansas 66210 |
| New Guarantor: | [NEW GUARANTOR, PLEASE PROVIDE] |

15. **WAIVER OF TRIAL BY JURY. THE PARTIES EACH HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVE ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS**



Case ID: 260501884
Control No.: 26066494

**AGREEMENT, THE SECURITY INSTRUMENT, THE NOTE OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY THE PARTIES, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH RIGHT TO TRIAL BY JURY WOULD OTHERWISE ACCRUE. THE PARTIES EACH ARE HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY EACH OTHER.**

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]



Case ID: 260501884
Control No.: 26066494

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the Effective Date.

NEW BORROWER:

[NEW BORROWER, PLEASE PROVIDE SIGNATURE BLOCK]



Case ID: 260501884
Control No.: 26066494

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the Effective Date.

NEW GUARANTOR:

[NEW GUARANTOR, PLEASE PROVIDE SIGNATURE BLOCK]



Case ID: 260501884
Control No.: 26066494

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the Effective Date.

LENDER:

**WELLS FARGO BANK, NATIONAL ASSOCIATION, AS TRUSTEE, FOR THE BENEFIT OF HOLDERS OF J.P. MORGAN CHASE COMMERCIAL MORTGAGE SECURITIES TRUST 2020-MKST, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2020-MKST, THE RR INTEREST OWNER AND THE FUTURE ADVANCE LENDER**

By: KeyBank National Association,
as Special Servicer

By: ________________________________
Name: ________________________________
Title: ________________________________



Case ID: 260501884
Control No.: 26066494

# EXHIBIT A

## LOAN DOCUMENT AMENDMENTS

**Modifications to Loan Agreement**. The following provisions of the Loan Agreement are modified as of the Effective Date.

1. **Loan Agreement Definitions**. Section 1.1 of the Loan Agreement is hereby modified as follows:

   a. The following term is inserted into Section 1.1 of the Loan Agreement in the appropriate alphabetical order:

   "**Assumption Agreement**" shall mean that certain Assumption Agreement dated as of the Assumption Date by and among **[_____________________]** ("**New Borrower**"), **[_____________________]** ("**New Guarantor**"), and Lender.

   "**Assumption Date**" shall mean [___________], 2026.

   "**Relocation TI/TA Security**" shall mean any of the following, in an amount equal to the total unpaid amount of the applicable Relocation TI/TA (other than such sums to be paid or reimbursed by Tenants under the Leases and amounts for which sufficient reserves are on deposit in the Replacement Reserve Account): (A) cash, (B) U.S. Obligations, (C) other securities having a rating reasonably acceptable to Lender and that, at Lender's option, the applicable Rating Agencies have confirmed in writing will not, in and of itself, result in a downgrade, withdrawal or qualification of the initial, or, if higher, then current ratings assigned to any Securities or any class thereof in connection with any Securitization or (D) a completion and performance bond or an irrevocable letter of credit (payable on sight draft only) issued by a financial institution having a rating by S&P of not less than "A-1+" if the term of such bond or letter of credit is no longer than three (3) months or, if such term is in excess of three (3) months, issued by a financial institution having a rating that is acceptable to Lender and that, at Lender's option, the applicable Rating Agencies have confirmed in writing will not, in and of itself, result in a downgrade, withdrawal or qualification of the initial, or, if higher, then current ratings assigned to any Securities or class thereof in connection with any Securitization.

   "**Term**" shall mean the entire term of this Agreement, which shall expire upon repayment in full of the Debt and full performance of each and every obligation to be performed by Borrower pursuant to the Loan Documents.

   b. The defined term "Assignment of Management Agreement" is deleted in its entirety and the following is inserted in lieu thereof:

   "**Assignment of Management Agreement**" shall mean that certain Assignment of Management Agreement and Subordination of Management Fees, dated as of the Assumption Date, among Lender, Borrower and Manager, as the





Case ID: 260501884
Control No.: 26066494

same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

c. The defined term "Borrower" is deleted in its entirety and the following is inserted in lieu thereof:

"**Borrower**" shall mean, as of the Assumption Date, New Borrower, together with its successors and permitted assigns.

d. The defined term "Cash Sweep Event" is deleted in its entirety and the following is inserted in lieu thereof:

"**Cash Sweep Event**" shall mean the occurrence of either (a) an Event of Default or (b) any Bankruptcy Action of Borrower or Manager.

e. The defined term "Cash Sweep Event Cure" is deleted in its entirety and the following is inserted in lieu thereof:

"**Cash Sweep Event Cure**" shall mean:

(a) if the Cash Sweep Event is caused solely by an Event of Default, the acceptance by Lender of a cure of such Event of Default (which cure Lender is not obligated to accept and may reject or accept in its sole and absolute discretion); or

(b) if the Cash Sweep Event is caused solely by a Bankruptcy Action of Manager, if Borrower replaces Manager with a Qualified Manager under a Replacement Management Agreement within sixty (60) days of such Cash Sweep Event;

provided, however, that, such Cash Sweep Event Cure set forth in this definition shall be subject to the following conditions: (i) no Event of Default shall have occurred and be continuing under this Agreement or any of the other Loan Documents, and (ii) Borrower shall have paid all of Lender's reasonable and actual out-of-pocket expenses incurred in connection with such Cash Sweep Event Cure including reasonable attorney's fees and expenses. Borrower shall have no right to cure a Cash Sweep Event caused by a Bankruptcy Action of Borrower.

f. The defined term "Environmental Indemnity" is deleted in its entirety and the following is inserted in lieu thereof:

"**Environmental Indemnity**" shall mean that certain Environmental Indemnity Agreement, dated as of the Assumption Date, executed by Borrower and Guarantor in connection with the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.



Case ID: 260501884
Control No.: 26066494

g. The defined term "Future Advance Component" is deleted in its entirety and the following is inserted in lieu thereof:

"**Future Advance Component**" shall mean the Component of the Loan designated as the "Future Advance Component" in Section 2.1.6 hereof.

h. The defined term "Guarantor" is deleted in its entirety and the following is inserted in lieu thereof:

"**Guarantor**" shall mean, as of the Assumption Date, New Guarantor, and any successor to and/or replacement of the foregoing Person, in each case, pursuant to and in accordance with the applicable terms and conditions of the Loan Documents.

i. The defined term "Guaranty" is deleted in its entirety and the following is inserted in lieu thereof:

"**Guaranty**" shall mean that certain Guaranty Agreement, dated as of the Assumption Date, executed and delivered by Guarantor in connection with the Loan to and for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

j. The defined term "Initial Maturity Date" is deleted in its entirety and the following is inserted in lieu thereof:

"**Initial Maturity Date**" shall mean [month during which PSA is executed] 9, 2027, or such earlier date on which the final payment of the Note becomes due and payable as therein or herein provided whether at such stated maturity date, by declaration of acceleration, or otherwise.

k. The defined term "Insolvency Opinion" is deleted in its entirety and the following is inserted in lieu thereof:

"**Insolvency Opinion**" shall mean that certain non-consolidation opinion letter dated the Assumption Date delivered by [____________________] in connection with the Assumption Agreement and the Loan.

l. The defined term "Interest Rate" is deleted in its entirety and the following is inserted in lieu thereof:

"**Interest Rate**" shall mean a rate of two percent (2%) per annum.

m. The defined term "Lender" is deleted in its entirety and the following is inserted in lieu thereof:

"**Lender**" shall mean Wells Fargo Bank, National Association, as Trustee, for the benefit of Holders of J.P. Morgan Chase Commercial Mortgage Securities

Trust 2020-MKST, Commercial Mortgage Pass-Through Certificates, Series 2020-MKST and the RR Interest Owner, together with its successors and assigns.

n. The defined term "Loan Documents" is deleted in its entirety and the following is inserted in lieu thereof:

"**Loan Documents**" shall mean, collectively, this Agreement, the Assumption Agreement, the Note, the Mortgage, the Environmental Indemnity, the Assignment of Management Agreement, the Guaranty, the Lockbox Agreement, the Cash Management Agreement, and all other documents and instruments now or hereafter executed and/or delivered by Borrower or Guarantor with respect to the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

o. The defined term "Lockbox Agreement" is deleted in its entirety and the following is inserted in lieu thereof:

"**Lockbox Agreement**" shall mean that certain Deposit Account Control Agreement dated as of the Assumption Date among Borrower, Lender, [Manager] and Lockbox Bank, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, relating to funds deposited in the Lockbox Account.

p. The defined term "Manager" is deleted in its entirety and the following is inserted in lieu thereof:

"**Manager**" shall mean [_______], or, if the context requires, a Qualified Manager who is managing the Property in accordance with the terms and provisions of this Agreement pursuant to a Replacement Management Agreement.

q. The defined term "Maturity Date" is deleted in its entirety and the following is inserted in lieu thereof:

"**Maturity Date**" shall mean the Initial Maturity Date or, following an exercise by Borrower of its Extension Option described in Section 2.7(g) hereof, the Extended Maturity Date, or such other date on which the final payment of principal of the Note becomes due and payable as therein or herein provided, whether at such stated maturity date, by declaration of acceleration or otherwise.

r. The defined terms "Acceptable Counterparty," "Additional IR Cap Amount," "Alternate Rate," "Alternate Rate Index," "Alternate Rate Index Conforming Changes," "Assignment of Interest Rate Cap Agreement," "Interest Rate Cap Agreement," "ISDA Definitions," "ISDA Fallback Adjustment," "ISDA Fallback Rate," "JV," "JV Agreement," "Replacement Interest Rate Cap Agreement," "Strike Price," "Substitute Interest Rate Cap Agreement" and all references to such terms throughout the Loan Agreement are deleted in their entirety. All affected provisions shall be interpreted *mutatis mutandis*.



Case ID: 260501884
Control No.: 26066494

2. **<u>Advances</u>**. Section 2.1.2, 2.1.5, 2.9 and Exhibit B of the Loan Agreement and all references to such sections and exhibit throughout the Loan Agreement are hereby deleted in their entirety. All affected provisions shall be interpreted *mutatis mutandis*.

3. **<u>Components of the Loan</u>**. Section 2.1.6 of the Loan Agreement is deleted in its entirety and the following is inserted in lieu thereof:

**2.1.6 <u>Components of the Loan.</u>** For the purpose of computing interest payable on the principal amount of the Loan and certain other computations set forth herein, the principal balance of the Loan (after giving effect to the Principal Reduction under Section 2(c) of the Assumption Agreement) shall be divided into Component A with respect to the Initial Advance and the Future Advance Component with respect to the Future Advances (which, for the avoidance of doubt, were made prior to the Assumption Date). The principal amount of the Components shall be as follows:

| COMPONENT | PRINCIPAL AMOUNT |
|---|---|
| Component A-1 | $[____________] |
| Component A-2 | $[____________] |
| Component A-3 | $[____________] |
| Component A-4 | $[____________] |
| Component A-5 | $[____________] |
| Component A-6 | $[____________] |
| Component A-7 | $[____________] |
| Future Advance Component B-1 | $[____________] |

4. **<u>Interest Rate</u>**. Sections 2.2.1, 2.2.3, and 2.2.4 of the Loan Agreement are deleted in its entirety and the following is inserted in lieu thereof:

**2.2.1 <u>Interest Rate</u>**. Subject to the provisions of this <u>Section 2.2</u>, the outstanding principal balance of each Component of the Loan shall bear interest throughout the Term at the Interest Rate.

**2.2.3 <u>Reserved</u>**.

**2.2.4 <u>Reserved</u>**.

5. **<u>Monthly Debt Service Payments</u>**. Section 2.3.1 of the Loan Agreement is deleted in its entirety and the following is inserted in lieu thereof:

**2.3.1 <u>Monthly Debt Service Payments</u>**. On each Payment Date throughout the Term, Borrower shall make a payment to Lender in an amount equal to the Monthly Debt Service Payment Amount, which payments shall be applied to accrued and unpaid interest. The Monthly Debt Service Payment Amount paid pursuant to this <u>Section 2.3.1</u> with respect to the Initial Advance shall be applied to Component A and the portion of the Monthly Debt Service Payment Amount with respect to the Future Advance shall be applied to the Future Advance Component.



Case ID: 260501884
Control No.: 26066494

6. **Voluntary Prepayments**. Section 2.4.1(b) of the Loan Agreement is deleted in its entirety and the following is inserted in lieu thereof:

(b) At any time during the term of the Loan, Borrower may prepay the Loan in whole, but not in part (except pursuant to Sections 2.4.2 and 2.8), provided that (i) no Event of Default exists; (ii) Borrower gives Lender not less than thirty (30) days prior written notice of the amount of the Loan that Borrower intends to prepay, provided that such prepayment notice may be revoked or postponed upon delivery to Lender of notice at least five (5) days prior to the anticipated date of repayment so long as Borrower shall have paid all costs and expenses incurred by Lender in connection with such prepayment and related revocation or postponement notice; and (iii) Borrower pays Lender, in addition to the outstanding principal amount of the Loan to be prepaid, (A) all interest which would have accrued on the amount of the Loan to be paid through and including the last day of the Interest Period related to the Payment Date next occurring following the date of such prepayment, or, if such prepayment occurs on a Payment Date, through and including the last day of the Interest Period related to such Payment Date; and (B) all other sums due and payable under this Agreement, the Note, and the other Loan Documents, including, but not limited to all of Lender's costs and expenses (including reasonable attorney's fees and disbursements) incurred by Lender in connection with such prepayment. If a notice of prepayment is given by Borrower to Lender pursuant to this Section 2.4.1(b), the amount designated for prepayment and all other sums required under this Section 2.4.1(b) shall be due and payable on the proposed prepayment date unless such notice is revoked by Borrower in compliance with clause (i) above. If for any reason Borrower prepays the Loan on a date other than a Payment Date, Borrower shall pay Lender, in addition to the Debt, all interest which would have accrued on the amount of the Loan being prepaid through and including the last day of the Interest Period related to the Payment Date next occurring following the date of such prepayment.

7. **Interest Rate Cap Agreement**. Sections 2.2.7 and 2.9.7 of the Loan Agreement and all references to such sections throughout the Loan Agreement are hereby deleted in their entirety. All affected provisions shall be interpreted *mutatis mutandis*.

8. **Extension of the Initial Maturity Date**. Section 2.8 of the Loan Agreement is deleted in its entirety and the following is inserted in lieu thereof:

**Section 2.8** **Extension of the Initial Maturity Date**. Borrower shall have the option to extend the Initial Maturity Date of the Loan for one (1) successive term (the "**Extension Option**" and such successive term the "**Extension Term**") of one (1) year each (the Initial Maturity Date following the exercise of such option is hereinafter the "**Extended Maturity Date**") upon satisfaction of the following terms and conditions:

(a) no Event of Default shall have occurred and be continuing at the time the applicable Extension Option is exercised and at the time that the applicable extension occurs;

(b) Borrower shall provide Lender with written revocable notice of its election to extend the Maturity Date as aforesaid not later than thirty (30) days and not earlier than

one hundred twenty (120) days prior to the date the Loan is then scheduled to mature (provided that if Borrower shall subsequently revoke such notice, Borrower shall be responsible for Lender's costs and expenses incurred in connection with same);

(c) On the Initial Maturity Date, Borrower shall prepay a portion of the outstanding principal balance of the Loan equal to $10,000,000.00 (the "**Extension Prepayment**"), without premium but subject to all other sums required under Section 2.4.1; and

(d) Borrower shall have delivered to Lender together with its notice pursuant to subsection (b) of this Section 2.8 and at Lender's reasonable request, on the commencement date of the Extension Option, an Officer's Certificate in form reasonably acceptable to the Lender certifying that each of the representations and warranties of Borrower contained in the Loan Documents is true, complete and correct in all material respects as of the giving of the notice to the extent such representations and warranties are not matters which by their nature can no longer be true and correct as a result of the passage of time.

9. **Leasing Matters**. Notwithstanding anything in the Loan Agreement to the contrary, provided no Event of Default is then in existence, Borrower shall be permitted to modify existing Leases, including Major Leases, in order to relocate Tenants from their currently-demised spaces within the Property to other spaces within the Property (each a "**Tenant Relocation**"), provided that (i) the amounts (if any) of any tenant improvements and/or tenant allowances in furtherance of the Tenant Relocation (the "**Relocation TI/TA**") are commercially reasonable for the market in which the Property is located, (ii) Borrower has delivered Relocation TI/TA Security to Lender (or such other credit enhancement or security, in lieu of the Relocation TI/TA Security, acceptable to Lender in its sole and absolute discretion), and (iii) the modifications in furtherance of the Tenant Relocation do not contain any terms which would have a Material Adverse Effect on Borrower or the Property.

10. **Condominium Conversion**. Provided that such actions would not reasonably be expected to cause a Material Adverse Effect, notwithstanding anything to the contrary in the Loan Agreement or the other Loan Documents but subject to the limitations set forth in this paragraph, during the Term, Borrower shall be permitted to, at its sole cost and expense, apply for, pursue and obtain all permits, variances and other governmental or quasi-governmental approvals (collectively, the "**Condominium Entitlements**") necessary or desirable to create a condominium regime with respect to the Property *following the end of the Term* (the "**Condominium Conversion**"); provided, however, in no event shall Borrower permit or cause the Condominium Conversion to occur prior to the end of the Term and during the Term Borrower shall not enter into any document or cause any instrument to be recorded in connection with the Condominium Entitlements that would (1) impair Lender's security interest in the Property, (2) affect the priority of the Mortgage, (3) adversely affect access, utilities, parking, or other material aspects of the Property, (4) trigger a default under any Lease or give rise to any offset, abatement or reduction of Rent payable to Borrower or (5) alter the operation of the Property. In addition, without Lender's prior written consent (which consent may be withheld in Lender's sole and absolute



Case ID: 260501884
Control No.: 26066494

discretion), during the Term, Borrower shall not agree to any conditions, covenants or restrictions in connection with the Condominium Entitlements that would (i) impose any monetary or non-monetary obligations on Lender, (ii) modify the Loan Documents, or (iii) require Lender to execute any document.

11. **Principal Place of Business; State of Organization**. Section 4.1.36 of the Loan Agreement is deleted in its entirety and the following is inserted in lieu thereof:

**Section 4.1.36** **Principal Place of Business; State of Organization**. Borrower's principal place of business as of the Assumption Date is [____________________________]. Borrower is organized under the laws of the State of [Delaware] and its organizational identification number is [_________________].

12. **Approved Annual Budget**.

a. The first sentence of Section 5.1.11(d) is deleted in its entirety and the following is inserted in lieu thereof: The Approved Annual Budget for 2026 is attached hereto as Schedule VIII. [BORROWER TO PROVIDE PROPOSED BUDGET]

b. The Approved Annual Budget annexed to the Loan Agreement as Schedule VIII is deleted in its entirety and replaced with the Approved Annual Budget attached to this Agreement as Schedule VIII.

13. **Agent for Service of Process**. Elchonon Schwartz is removed as Borrower's authorized agent for service of process under Section 10.3(b) of the Loan Agreement and New Borrower hereby appoints the following Person for the purposes set forth therein:

[BORROWER, PLEASE PROVIDE]

14. **Borrower's Organizational Chart**. The organizational chart annexed to the Loan Agreement as Schedule III is deleted in its entirety and replaced with the organizational chart attached to this Agreement as **Schedule III**.



Case ID: 260501884
Control No.: 26066494

# SCHEDULE III

## NEW BORROWER'S ORGANIZATIONAL CHART

[TO BE ATTACHED]



Case ID: 260501884
Control No.: 26066494

**<u>SCHEDULE VIII</u>**

**APPROVED ANNUAL BUDGET**

[TO BE ATTACHED]



Case ID: 260501884
Control No.: 26066494

# EXHIBIT D

*January 22, 2026 Written Acceptance Email from Andrew Teitelman, Esq. to Christopher Schueller, BIPC*

Referenced in First Amended Complaint, paragraphs 37-39

# EXHIBIT D

*January 22-23, 2026 Written Acceptance Email Exchange Between Andrew Teitelman, Esq. (Universal) and Christopher Schueller, BIPC (CBRE Transactional Counsel)*

---

**MESSAGE 1 of 7 — January 22, 2026 3:55 PM EST**

**From:** Andrew Teitelman <ateitelman@teitelaw.com>
**To:** Christopher Schueller <christopher.schueller@bipc.com>
**Cc:** Jerome.kranzel@cbre.com; Shamikh Kazmi <sk@upssites.com>
**Date:** Thursday, January 22, 2026 3:55 PM EST

**Subject: 1500 Market Street**

Christopher - My client has authorized me to inform you that he accepts the terms set forth in the draft Purchase and Sale Agreement (your version 4924-2945-3447 v2) and Assumption Agreement (your version 4916-0197-0055 v1), and is prepared to execute these documents once they are in final form - - NOTE: there are provisions marked "Optional" that need to be addressed so we know whether your client wants them in the PSA. My client will be forming an SPE to be the Buyer and I will send you the details of that separately.

The purchase price my client is offering is $70,000,000 which is inclusive of the assumed loan amount. Please note that we have not received the Title Commitment from Commonwealth Land Title Company referred to in Section 3.1 of the PSA, so I will need to review that before my client can sign the PSA since they are being required to waive title objections based on that commitment.

I am available to discuss this at your convenience.

Regards,

Andy

Andrew Teitelman, Esquire LAW OFFICES OF ANDREW TEITELMAN P.C. 380 Red Lion Road, Suite 103 Huntingdon Valley, PA 19006 P: 267-255-6864 F: 215-434-7491 Email: ateitelman@teitelaw.com

---

**MESSAGE 2 of 7 — January 22, 2026 5:55 PM EST**

**From:** Andrew Teitelman <ateitelman@teitelaw.com>
**To:** Christopher Schueller <christopher.schueller@bipc.com>
**Cc:** Jerome.kranzel@cbre.com; Shamikh Kazmi <sk@upssites.com>
**Date:** Thursday, January 22, 2026 5:55 PM EST
**Attachment:** CLEAN Purchase and Sale Agreement (Universal) 1.12.26 (4924-2945-3447 v2)- ATrev1 012226.doc

**Subject: RE: 1500 Market Street**



Case ID: 260501884
Control No.: 26066494

Christopher - As per my client's instructions, please find attached hereto the draft Purchase and Sale Agreement (your version 4924-2945-3447 v2) with a change to Section 2.1 wherein the Purchase Price was changed to $70,000,000 the balance of this draft remains as it was received by me.

Thank you,

Andy

Andrew Teitelman, Esquire LAW OFFICES OF ANDREW TEITELMAN P.C.

---

**MESSAGE 3 of 7 — January 23, 2026 9:57 AM EST**

**From:** Christopher Schueller <christopher.schueller@bipc.com>
**To:** Andrew Teitelman <ateitelman@teitelaw.com>
**Cc:** Jerome.kranzel@cbre.com; Shamikh Kazmi <sk@upssites.com>
**Date:** Friday, January 23, 2026 9:57 AM EST

**Subject: RE: 1500 Market Street**

Thanks, Andrew.

Christopher P. Schueller Shareholder Union Trust Building 501 Grant Street, Suite 200 Pittsburgh, PA 15219-4413 412 562 8432 (o) 724 991 3863 (c) christopher.schueller@bipc.com Buchanan Ingersoll & Rooney PC

---

**MESSAGE 4 of 7 — January 23, 2026 10:01 AM EST**

**From:** Christopher Schueller <christopher.schueller@bipc.com>
**To:** Andrew Teitelman <ateitelman@teitelaw.com>
**Cc:** Jerome.kranzel@cbre.com; Shamikh Kazmi <sk@upssites.com>
**Date:** Friday, January 23, 2026 10:01 AM EST

**Subject: RE: 1500 Market Street**

Thanks, Andrew.

Christopher P. Schueller Buchanan Ingersoll & Rooney PC

---

**MESSAGE 5 of 7 — January 23, 2026 10:02 AM EST**

**From:** Andrew Teitelman <ateitelman@teitelaw.com>
**To:** Christopher Schueller <christopher.schueller@bipc.com>
**Cc:** Jerome.kranzel@cbre.com; Shamikh Kazmi <sk@upssites.com>
**Date:** Friday, January 23, 2026 10:02 AM EST

**Subject: RE: 1500 Market Street**

You're welcome. We look forward to your client's response.



Case ID: 260501884
Control No.: 26066494

Andrew Teitelman, Esquire LAW OFFICES OF ANDREW TEITELMAN P.C.

---

**MESSAGE 6 of 7 — January 23, 2026 2:36 PM EST**

**From:** Christopher Schueller <christopher.schueller@bipc.com>
**To:** Andrew Teitelman <ateitelman@teitelaw.com>
**Cc:** Jerome.kranzel@cbre.com; Shamikh Kazmi <sk@upssites.com>
**Date:** Friday, January 23, 2026 2:36 PM EST

**Subject: RE: 1500 Market Street**

Thanks, Andrew.

Does your client want to assume the existing loan?

Christopher P. Schueller Buchanan Ingersoll & Rooney PC

---

**MESSAGE 7 of 7 — January 23, 2026 2:37 PM EST**

**From:** Andrew Teitelman <ateitelman@teitelaw.com>
**To:** Christopher Schueller <christopher.schueller@bipc.com>
**Cc:** Jerome.kranzel@cbre.com; Shamikh Kazmi <sk@upssites.com>
**Date:** Friday, January 23, 2026 2:37 PM EST

**Subject: RE: 1500 Market Street**

They do.

Andrew Teitelman, Esquire LAW OFFICES OF ANDREW TEITELMAN P.C.

*True and correct copy of email transmitted on January 22-23, 2026, exported from Gmail mailbox sk@upssites.com.*



Case ID: 260501884
Control No.: 26066494

# EXHIBIT E

*January 22, 2026 Marked-Up Purchase and Sale Agreement Tendered by Universal at $70,000,000 (Section 2.1)*

Referenced in First Amended Complaint, paragraph 37

# PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** ("**Agreement**") is made to be effective as of the Effective Date (as hereinafter defined), by and between **CBRE, INC.**, solely in its capacity as receiver and not in its personal capacity (hereinafter referred to as "**Seller**") under the Order entered on April 14, 2023 ("**Receivership Order**" and the receivership appointment thereunder the "**Receivership**") in a case in the United States District Court for the Eastern District of Pennsylvania ("**Court**"), entitled *Wells Fargo Bank, National Association, as Trustee, for the Benefit of Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2020-MKST Commercial Mortgage Pass-Through Certificates, Series 2020-MKST, the RR Interest Owner and the Future Advance Lender v. NG 1500 Market St. LLC*, Case No. 23-146, ("**Receivership Action**") and ________________________________, a ________________________________ (together with its permitted assignee as hereinafter provided in this Agreement, collectively and jointly and severally, the "**Buyer**").

**WHEREAS**, the Court empowered Seller, with the consent of Wells Fargo Bank, National Association, as Trustee, for the Benefit of Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2020-MKST Commercial Mortgage Pass-Through Certificates, Series 2020-MKST, the RR Interest Owner and the Future Advance Lender (together with its successors and assigns, "**Lender**"), to market the Property (defined below) for sale and to execute proposed contracts, provided that no sale of the Property shall be effective or consummated except with the approval of the Lender in its sole discretion and upon approval of the Court, all as set forth below; and

**WHEREAS**, the Seller has been informed by Lender that NG 1500 Market St. LLC executed and delivered that certain Open-End Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of November 6, 2019 but made effective as of December 6, 2019, recorded on December 12, 2019 in the real estate records of Philadelphia County, Pennsylvania (the "**Records**") as Instrument Number 53604614, as amended by that certain First Amendment to Open-End Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of December 27, 2019 but made effective as of December 31, 2019, recorded on January 7, 2020 in the Records as Instrument No. 53615245, certain promissory notes, and other documents evidencing and securing the loan, and Elchonon Schwartz ("<u>Loan Guarantor</u>"), executed and delivered a certain Guaranty Agreement (together with all such other loan documents executed by any NG 1500 Market St. LLC, Loan Guarantor, and any other persons, in connection with the Loan, collectively, the "<u>Loan Documents</u>"); and

**WHEREAS**, subject to Court approval and Lender Approval, Seller desires to sell and convey the Property upon the terms and conditions set forth herein, [**OPTIONAL INSERT**: including, without limitation, Buyer's agreement to assume the obligations of NG 1500 Market St. LLC under the Loan Documents, as amended (such assumption, the "**<u>Loan Assumption</u>**", and such Loan Documents as are to be assumed pursuant to the Loan Assumption Agreement (hereinafter defined), the "**<u>Assumed Loan Documents</u>**") arising on the Closing Date (as defined in Section 5.1, below), and Buyer's agreement to execute and deliver such other guaranties, collateral assignments, instruments, certificates and other documents as may be required by Lender in connection with the Loan Assumption subject to and in accordance with the terms of the Loan Assumption Agreement].



Case ID: 260501884
Control No.: 26066494

**NOW, THEREFORE, IN CONSIDERATION** of the mutual covenants hereinafter set forth in this Agreement, the parties hereto, intending to be legally bound, agree as follows:

ARTICLE I
The Property

1.1 For the price and upon and subject to the terms, conditions and provisions herein set forth, Seller agrees to sell and convey to Buyer "**as-is, where-is and with all faults**," and Buyer agrees to purchase from Seller "**as-is, where-is and with all faults**," free, clear and marketable title, inclusive of all of Seller's right, title and interest, in, to and under the following (collectively, and subject to the Permitted Exceptions (as hereinafter defined) in all respects, the "**Property**"):

(i) that certain improved real property generally located at 1500 Market Street, Philadelphia, Pennsylvania, all as legally described in **Exhibit A** attached hereto and made a part hereof by this reference, together with all rights, privileges, easements, strips or gores, rights-of-way and hereditaments and appurtenances thereto; all fixtures, buildings and improvements located thereon; and any and all oil, gas, mineral, and water rights held by Seller therein, thereunder or thereto, if any (collectively, the "**Real Property**") at the time of Closing (as such term is hereinafter defined);

(ii) All of the personal property (including, without limitation, surveys, plans, drawings and operating manuals), fixtures and equipment, if any, presently affixed or attached to, placed or situated upon the Real Property and used in connection with the ownership, operation and occupancy of the Real Property, and specifically excluding any items of personal property owned by lawful tenants at or on the Real Property pursuant to the Leases (individually a "**Tenant**" and collectively, the "**Tenants**") and further excluding all items of personal property owned by third parties or that are leased (which personal property, fixtures and equipment not so excluded is hereinafter collectively referred to as the "**Personal Property**") and for the avoidance of doubt the Personal Property includes the clothespin statue and statue of Benjamin Franklin which are both located on the exterior of the Real Estate;

(iii) All leases now or hereafter affecting the Real Property and that are in effect as of the date of the Closing Date (as such term is defined in **Section 5.1**) and any guaranties associated therewith, if any (individually a "**Lease**" and collectively, the "**Leases**"), together with, as of the time of Closing, all refundable tenant security deposits from Tenants under Leases, but with respect to such tenant security deposits, only to the extent such refundable tenant security deposits were received by Seller or its property manager in connection with Seller's appointment as receiver of the Real Property or were previously remitted by Tenants under Leases to Seller or its property manager and have not been applied by Seller or its property manager against any obligations owing by such Tenants under the Leases (as so limited, the "**Security Deposits**") but excluding all Leases which are the subject of any pending litigation and as to such leases all



Case ID: 260501884
Control No.: 26066494

rights under those lease and rights to any recoveries in those litigation matters are expressly retained by the Seller for the benefit of the Lender;

(iv) All assignable contracts, if any, relating to the operation, maintenance and/or management of the Real Property that Buyer notifies Seller in writing during the Approval Period (as such term is hereinafter defined) that it desires to assume (with all other such contracts, including the existing property management agreement and any rental listing agreement, if any, relating to the operation of the Property to be terminated by Seller, at Seller's cost and expense, on or before Closing) (collectively, the "**Assumed Contracts**"); and

(v) all assignable guarantees, warranties, licenses, permits, licenses, certificates of occupancy, development rights, entitlements, so called "tap-ins" and "EDUs" and any deposits associated therewith, consents, approvals and authorizations, if any, related to the Real Property (collectively, the "**Intangible Rights**").

Notwithstanding any provision of this Agreement to the contrary, the parties acknowledge that the Property does not include any monies, if any, of Seller or any of its agents that are held by any utility company or other service company as a deposit, that all of such monies, if any, shall be and remain the sole property of Seller, and Buyer shall not have any right, title, interest or claim in, to or under any of such monies. Buyer hereby acknowledges that it has been informed by Seller that Seller acquired the Property in connection with a foreclosure (or similar transaction) and that Seller did not receive, nor has Seller subsequently received, all of the refundable security deposits from Tenants. The parties acknowledge that the sole security deposits from Tenants to be assigned or remitted to Buyer at Closing shall be the Security Deposits as defined hereinabove. After the Closing, Buyer shall be solely liable to any Tenant for the return of all Security Deposits and other security deposits as set forth in the Leases.

ARTICLE II
Purchase Price; Earnest Money

2.1 Purchase Price. The total purchase price ("**Purchase Price**") to be paid by Buyer to Seller for the Property shall be seventy million ($70,000,000) dollars.2.2 Earnest Money. Within two (2) Business Days (as such term is hereinafter defined) following the full execution of this Agreement, Buyer shall deliver to Commonwealth Land Title Company______________ ("**Escrow Agent**"), by wire transfer of immediately available funds, the sum of one-million five-hundred thousand ($1,500,000) dollars (the "**Initial Deposit**") and on or before ________________ Buyer shall deliver to the Escrow Agent by wire transfer of immediately available funds, the sum of one-million five-hundred thousand ($1,500,000) dollars (the "**Second Deposit**" and together with the Initial Deposit the "**Earnest Money**"). Notwithstanding any provisions of this Agreement to the contrary, if Buyer fails to timely make the Initial Deposit or Second Deposit within two (2) business days of the date contemplated by this Section 2.2, Buyer shall automatically be deemed to have terminated this Agreement and the parties shall thereafter have no further rights or obligations hereunder except for any obligations that expressly survive the termination of this Agreement. The Earnest Money shall be held in escrow by the Escrow Agent in a non-interest bearing account in accordance with the terms of this Agreement. The Initial Deposit and/or Second Deposit will be non-refundable to Buyer



Case ID: 260501884
Control No.: 26066494

(except upon a default by Seller, or as specifically provided herein). The Earnest Money shall be applied against the Purchase Price at the Closing unless (i) this transaction does not close in accordance with the terms of this Agreement due to a default by Buyer, in which event the Earnest Money shall be payable in accordance with **Section 7.3** herein, or (ii) this transaction does not close in accordance with the terms of this Agreement due to a default by Seller, in which event the Earnest Money shall be payable in accordance with **Section 7.3** herein. Buyer hereby acknowledges and agrees that following the Approval Period, except (A) in the event of a default by Seller or a Material Casualty (as defined in **Section 6.1** below); or (B) as set forth in **Section 4.6** or **Article XII**, the Earnest Money is non-refundable under all circumstances.

2.2 Balance of Purchase Price. The balance of the Purchase Price, together with the Earnest Money that previously has been delivered as hereinabove provided in this Agreement, and following any prorations and adjustments at Closing (all as provided below), shall be paid by Buyer to Seller by wire transfer of immediately available funds at the Closing.

[**OPTIONAL INSERT**: Balance of Purchase Price. The balance of the Purchase Price, together with the Earnest Money that previously has been delivered as hereinabove provided in this Agreement, subject to any prorations and adjustments at Closing (all as provided below), shall be paid by Buyer by assumption by Buyer of the loan in an amount equal to the Purchase Price and any other amounts required to be paid and/or assumed by Buyer pursuant to the Loan Assumption Agreement (as defined in Section 4.6 hereof)].

ARTICLE III
Buyer's Inspection of the Property

3.1 Seller has provided the Buyer with a title commitment from Commonwealth Land Title Company describing the Real Property (the "**Title Commitment**") and the Buyer has approved the Title Commitment. All such title encumbrances or exceptions set forth in the Title Commitment are deemed to be permitted exceptions to the status of Seller's title (collectively, the "**Permitted Exceptions**").

3.2 Buyer acknowledges that, except as otherwise expressly set forth in this Agreement or any documents delivered by Seller at Closing to the contrary, (i) neither Seller, Lender Group (as hereinafter defined), nor anyone acting for or on behalf of Seller or Lender Group, has made any representation, warranty, promise or statement, express or implied, to Buyer, or to anyone acting for or on behalf of Buyer, concerning any of the Property, (ii) in entering into and closing the purchase of the Property contemplated under this Agreement, Buyer has not relied on any representation, warranty, promise or statement, express or implied, of Seller, Lender Group, or anyone acting for or on behalf of Seller or Lender Group and (iii) **AS A MATERIAL INDUCEMENT TO THE EXECUTION AND DELIVERY OF THIS AGREEMENT BY SELLER, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS AGREEMENT AND ANY DOCUMENTS DELIVERED BY SELLER AT CLOSING, BUYER IS PURCHASING THE PROPERTY IN AN "AS-IS, WHERE- IS" CONDITION AND IN AN "AS-IS, WHERE-IS" STATE OF REPAIR, AND WITH ALL FAULTS**. Without limiting the generality of the foregoing, there is no express or implied warranty of merchantability, habitability or of fitness for a particular purpose made by Seller or Lender Group regarding the Property. Buyer represents to Seller and

Lender Group that Buyer has either already conducted or, prior to the end of the Approval Period, will have conducted or will have had an adequate opportunity to conduct such investigations of the Property, including, but not limited to, the physical and environmental conditions thereof, as Buyer deems necessary to satisfy itself as to the condition of the Property and the existence or nonexistence of, or curative action to be taken with respect to, any hazardous or toxic substances on or discharged from the Property and will rely solely upon same and not upon any information provided by or on behalf of Seller, Lender Group or any of their respective agents or employees with respect thereto. Upon Closing, Buyer shall assume the risk that adverse matters, including, but not limited to, adverse physical and environmental conditions and matters that may have been revealed by a survey of the Property, may not be revealed by Buyer's investigations, and Buyer, upon Closing, shall be deemed to have waived, relinquished and released Seller, Lender Group and all of their respective agents and employees from and against all claims, demands, causes of action (including, without limitation, causes of action in tort), losses, damages, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and court costs) of any and every kind or character, known or unknown, which Buyer might have asserted or alleged against Seller, Lender Group or any of their respective agents or employees at any time by reason of or arising out of any defects, physical conditions, violations of any applicable laws, rules, regulations or ordinances (including, without limitation, any environmental, housing or rent control laws, rules, regulations or ordinances) and any and all other acts, omissions, events, circumstances or matters regarding the Property or its occupancy or operation. Buyer agrees that if any clean-up, remediation or removal of hazardous substances or other environmental conditions on the Property is required after the date of Closing, such clean-up, removal or remediation shall be the sole responsibility of and shall be performed at the sole cost and expense of Buyer. The foregoing release includes claims of which Buyer is presently unaware or which Buyer does not presently suspect to exist which, if known by Buyer, would materially affect Buyer's release of Seller and/or Lender Group. As used in this Agreement, the term "**Lender Group**" shall mean Wells Fargo Bank, National Association, as Trustee, for the Benefit of Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2020-MKST Commercial Mortgage Pass-Through Certificates, Series 2020-MKST and KeyBank National Association and their respective past, present, and future officers, directors, shareholders, general partners, limited partners, agents, representatives, heirs, successors, assigns and attorneys and their respective heirs, successors, and assigns.

Seller has given Buyer material concessions regarding this transaction in exchange for Buyer agreeing to the provisions of this **Section 3.2**. Buyer hereby specifically acknowledges that Buyer has carefully reviewed this **Section 3.2**, and discussed its import with legal counsel, is fully aware of its consequences, and that the provisions of this **Section 3.2** are a material part of this Agreement.

Notwithstanding anything to the contrary set forth in this **Section 3.2**, this **Section 3.2** shall not limit the rights and remedies of Buyer upon a breach of any of Seller's representations or warranties that are expressly set forth in this Agreement or any documents delivered by Seller at Closing.

3.3 Prior to the Effective Date, Buyer commenced its due diligence and inspections of the Property. Buyer shall have up to and including the first Business Day which is thirty (30) days after the Effective Date (the "**Approval Period**") to complete its due diligence and



Case ID: 260501884
Control No.: 26066494

inspection of the Property (collectively, the "**Inspections**"). Buyer agrees to restore the Property to the fullest extent possible to its condition prior to the Inspections. Buyer agrees to defend, indemnify and hold Seller and Lender Group harmless from and against all damage and losses to the Property from its Inspections and from and against all claims, assertions, lawsuits, liens, costs, expenses and liabilities, including, without limitation, reasonable attorneys' fees (collectively, "**Losses**"), which may arise from any actions of or occurrences related to Buyer's performance of the Inspections; provided, however, that such indemnification shall specifically exclude any Losses (i) caused by the gross negligence or willful misconduct of Seller, Lender Group or any of their respective affiliates, agents, employees or contractors or (ii) attributable to the mere discovery of any pre-existing condition at the Property except to the extent such condition is exacerbated by Buyer or any of its agents, employees or contractors. Prior to any entry by Buyer or any of its agents onto the Property for the Inspections, Buyer shall provide to Seller evidence satisfactory to Seller that Buyer has in force commercial general liability and worker's compensation insurance with a combined single limit of not less than $1,000,000.00 for personal injury, including bodily injury and death and property damage, with the commercial general liability policy naming Seller as an additional insured and protecting Seller against all liability, claims, demands, damages and costs (including, but not limited to, reasonable attorneys' fees and expenses and court costs) which may occur as a result of any activity of Buyer or its agents on the Property. The foregoing shall not limit, diminish, negate or release Buyer's indemnification obligations contained above.

3.4 Buyer may terminate this Agreement for any reason or no reason by giving Seller and Escrow Agent a written notice of termination prior to expiration of the Approval Period, whereupon (i) this Agreement shall be null and void and of no further force or effect except for those provisions that expressly survive termination and (ii) the Earnest Money (the Initial Deposit and/or the Second Deposit) shall be promptly forwarded to Seller by Escrow Agent (to the extent such Earnest Money was previously delivered by Buyer to Escrow Agent). Time shall be of the essence with regard to Buyer's right to terminate pursuant to this **Section 3.4**. If Buyer does not terminate this Agreement during the Approval Period by timely giving the above-noted termination notice to Seller and Escrow Agent, Buyer shall be irrevocably deemed to accept the Property, and Buyer shall be bound to proceed to Closing and consummate the purchase of the Property subject to the terms of this Agreement.

The indemnity obligations of Buyer set forth in this **Article 3** and the release by Buyer as hereinabove set forth shall survive the Closing and any termination of this Agreement.

ARTICLE IV

Representations, Warranties and Covenants; Court and Lender Approval

4.1 Representations and Warranties of Seller. Seller hereby represents and warrants to Buyer and agrees as follows (which representations and warranties shall also be true and correct as of the Closing):

(a) To Seller's knowledge, subject to obtaining Lender Approval and Court Approval (as those terms are hereinafter defined) as provided for in this Agreement, Seller has the legal power, right and authority to execute this Agreement and to consummate all of the

transactions contemplated herein and the individual of the Seller who executes and delivers this Agreement and all documents to be delivered to Buyer hereunder is duly authorized to do so.

(b) Seller is not a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of the U.S. Treasury Department's Office of Foreign Assets Control ("**OFAC**") or under any statute, executive order, or other governmental action.

(c) To Seller's knowledge, Seller has not received written notice indicating that the Property or use thereof is in violation or breach of any applicable legal requirements, including, without limitation, Environmental Laws and Regulations. "**Environmental Laws and Regulations**" shall mean any federal, state or local laws now or hereafter in effect relating to pollution or protection of the environment or emissions, discharges, spills, releases or threatened releases of any Hazardous Materials into the environment (including without limitation indoor air, ambient air, surface water, ground water or land), including without limitation, the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq., as amended, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq., as amended, the Hazardous Materials Transportation Act, 49 U.S.C. §§ 1801 et seq., as amended, the Clean Water Act, 33 U.S.C. §§ 1251 et seq., as amended, the Clean Air Act, 42 U.S.C. §§ 7401 et seq., as amended, the Toxic Substance Control Act, 15 U.S.C. § 2601 et seq., as amended, and any rules and regulations now or hereafter promulgated under any of such acts. The term "**Hazardous Materials**" shall mean and refer to any "hazardous waste" or "hazardous substance," as such terms are set forth in, under or pursuant to the Environmental Laws and Regulations, oil or petroleum products or their derivatives, polychlorinated biphenyls, asbestos, radioactive materials or waste, and any other toxic, ignitable, reactive, corrosive, explosive, contaminating or polluting materials which are now or in the future subject to governmental regulation.

As used in this Agreement, "to Seller's knowledge" or derivations thereof shall mean the current actual knowledge of John Svorcek, in his capacity as associate director of CBRE, Inc. Property Management, without any obligation to make investigation or inquiry.

4.2 <u>Representations and Warranties of Buyer</u>. Buyer hereby represents and warrants to Seller (which representations and warranties shall also be true and correct as of the Closing):

(a) Buyer, if an entity, is duly organized, validly existing and in good standing under the laws of the state of its origin;

(b) Buyer has full right, authority and capacity to execute and perform this Agreement and to consummate all of the transactions contemplated herein;

(c) if Buyer is an entity or a trustee of a trust, the individual of the Buyer who executes and delivers this Agreement and all documents to be delivered to Seller hereunder is and shall be duly authorized to do so;

(d) Buyer is not owned, in whole or in part, nor does Buyer own or hold any part of the beneficial ownership in Seller;



Case ID: 260501884
Control No.: 26066494

(e) Buyer is not in a significantly disparate bargaining position in relation to Seller;

(f) Buyer is represented by legal counsel of its own choice and designation in connection with the transaction contemplated by this Agreement;

(g) Buyer's legal counsel was not directly or indirectly identified, suggested or selected by Seller or any agent of Seller; and

(h) Buyer is purchasing the Property for business or commercial investment or similar purpose and not for use as Buyer's residence.

4.3 Survival. All representations and warranties in this Agreement shall survive the Closing for a period equal to the lesser of (a) three (3) months and (b) ten (10) days after Seller provides written notice to Buyer of the complete termination of the Receivership Action resulting in the discharge of the Receivership (the "**Survival Period**"). In order to preserve any claim for any alleged breach of a representation or warranty under this Agreement, the party alleging the breach shall give written notice to the other within the Survival Period.

4.4 Covenant of Buyer.

(a) Buyer hereby covenants with Seller that Buyer shall, in connection with its Inspections during the Approval Period, perform all Inspections of the Property deemed reasonably necessary by Buyer in order to proceed to Closing. Buyer shall also furnish to Seller at Closing copies of any other reports received by Buyer relating to any other inspections of the Property conducted on Buyer's behalf, if any (including, specifically, without limitation, any reports analyzing compliance of the Property with the provisions of the Americans with Disabilities Act ("**ADA**"), 42 U.S.C. §12101, et seq., if applicable), except to the extent the same contain Buyer's proprietary information.

4.5 Covenants of Seller.

(a) Promptly after the Effective Date and until Closing or earlier termination of this Agreement, Seller shall use good faith, continuous and commercially reasonable efforts to obtain Court Approval and Lender Approval.

(b) From the Effective Date until the Closing or earlier termination of this Agreement, Seller shall operate and insure the Property in a manner generally consistent with the manner in which Seller has operated and insured the Property prior to the Effective Date. Risk of loss shall remain on Seller until Closing.

4.6 Court Approval and Lender Approval. Buyer acknowledges and agrees that this Agreement and the sale contemplated hereby is subject to approval by Lender, and in its capacity as lead lender on behalf of any serviced *pari passu* companion loan holder(s), as lender holding the loan secured by the Property. Neither the submission of any proposal or this Agreement for examination to Buyer, nor any correspondence or course of dealing between Buyer or Seller shall constitute a reservation of or option for the Property or in any manner bind Seller until this Agreement is fully executed by both Buyer and Seller. Buyer further



Case ID: 260501884
Control No.: 26066494

acknowledges that it is a condition precedent to Seller's and Buyer's obligations under this Agreement that the following conditions are satisfied (i) the Court shall have entered a final, non-appealable order ("**Sale Order**"), in form and substance reasonably acceptable to Buyer and Seller and Title Company, approving this Agreement, the sale of the Property pursuant to the terms of this Agreement and the Closing by Seller on the terms of this Agreement ("**Court Approval**"), (ii) Lender shall have agreed, in Lender's sole and absolute discretion, that Lender shall accept the Purchase Price in satisfaction of any existing mortgage and that, upon receipt by Lender of the net proceeds of the Purchase Price, it shall release and discharge any mortgage, security or lien encumbering the Property [**OPTIONAL INSERT after "Lender shall"**: received all internal and third-party approvals (including from any and all rating agencies as required under Lender's governing Pooling and Servicing Agreement) with respect to the Loan Assumption and Assumption Documents] ("**Lender Approval**"), [**OPTIONAL INSERT**: and (iii) NG 1500 Market St. LLC, Lender and Buyer shall have executed and delivered the Assumption Agreement by and between, among others, NG 1500 Market St. LLC, Lender and Buyer in a form and substance and containing such modifications to the loan documents as are satisfactory to Buyer and Lender, each in their sole and absolute discretion (the "**Loan Assumption Agreement**") and which Loan Assumption Agreement shall provide that Buyer shall not be not liable for any accrued interest, fees, penalties and other charges accruing prior to Closing, and all documents required in connection with the Loan Assumption Agreement (collectively with the Loan Assumption Agreement, the "**Assumption Documents**"), and all conditions precedent under the Loan Assumption Agreement shall have been satisfied or waived. If there is any conflict between this Agreement and the Assumption Documents, the Assumption Documents shall control]. Buyer acknowledges and agrees that this Section 4.6 may not be amended or modified by Seller so as to reduce the amount payable to Lender or the timing of the Closing (other than as may be adjusted as expressly provided herein) except with the prior written consent of Lender. If Seller does not obtain the Lender Approval or Court Approval on or prior to the Closing Date, then this Agreement will automatically terminate, whereupon the Earnest Money will be returned to Buyer and neither party will have any further obligations or liabilities hereunder, except as expressly provided in this Agreement.

4.7 Limitation on Liability. Buyer expressly acknowledges and agrees that (a) this Agreement is subject to the terms and conditions of the Receivership Order and the Sale Order; and (b) Seller's obligations and liability under this Agreement are limited by the terms of the Receivership Order, and (c) the obligations and liability of Seller under this Agreement and any document referenced herein shall not constitute personal obligations of the officers, directors, shareholders, employees, agents, representatives, trustees, partners, members, certificate holders or other principals of Seller. Notwithstanding anything to the contrary, Seller's liability, if any, arising in connection with this Agreement or with the Property shall be limited to the assets of the receivership, and Seller shall not be personally liable for any duly authorized actions properly and lawfully taken pursuant to the Receivership Order or the Sale Order and Seller shall not be personally liable for any such judgment or deficiency after execution on the assets of the Receivership. The limitations of liability contained in this paragraph shall apply equally and inure to the benefit of Seller's present and future officers, directors, shareholders, employees, agents, representatives, trustees, partners, members, certificate holders or other principals, and their respective heirs, successors and assigns. The provisions of this Section shall survive termination and Closing.

ARTICLE V
Closing

5.1 Time and Place of Closing. The closing of the transaction contemplated by this Agreement (the "**Closing**") shall take place at the offices of the Escrow Agent (x) within ten (10) Business Days following the date that the Sale Order becomes final and non-appealable (unless the Title Company agrees to issue the Title Policy without exception to any appeal of the Sales Order, in which event the Closing shall occur within ten (10) Business Days of signing and entry of the Sale Order), or (y) on such other date as may be mutually agreed upon in writing by Buyer and Seller, but in no event later than __________________ (as so determined or mutually agreed upon, the "**Closing Date**"). Time is of the essence with respect to the Closing Date.

5.2 Events of Closing. At the Closing:

(a) Seller shall deliver in escrow to Escrow Agent the following:

(1) A No Warranty Deed in form and substance satisfactory to Seller and Buyer in their reasonable discretion and satisfactory to the Title Company (the "**Deed**"), duly executed and acknowledged by Seller, conveying title to the Property to Buyer, all in an "**as-is, where-is condition, and with all faults**," and without any representation or warranty except as may survive Closing pursuant to this Agreement, subject to all of the following: the Leases and the rights of Tenants under the Leases; all taxes and general and special assessments not yet due and payable; all other Permitted Exceptions; all matters that would be shown on an accurate survey of the Property; underground and overhead cables, lines and utility services; and all existing and applicable zoning ordinances, laws, codes, statutes and subdivision regulations and other governmental laws, rules, codes, statutes and regulations;

(2) Such documents, certificates, affidavits and other instruments as may be reasonably required by and solely in favor of the Title Company and Escrow Agent in order to close the transaction contemplated under this Agreement, including the Title Company's standard owner's closing affidavit (the "**Owner's Affidavit**"); provided, however, that with respect to any such owner's closing affidavit or any other affidavit, Seller may in its sole discretion modify such affidavit in a manner that is reasonably acceptable to Title Company and Escrow Agent and, in any event, Seller shall only be obligated to opine with respect to facts thereunder to its then current actual knowledge and without having made, or being required to make, any independent investigation of the facts, and only with respect to those matters first occurring during the pendency of the Receivership Action; provided, further, that Seller shall not be required to take any action or make any payment to remove or satisfy any mechanic's lien, and any such liens shall instead be discharged, released, or otherwise rendered unenforceable against the Property pursuant to the Sale Order, the Title Company insuring the Property free and clear of the same;

(3) A certificate executed by Seller with respect to the Foreign Investment in Real Property Tax Act, certifying that Seller is not a foreign person with the



Case ID: 260501884
Control No.: 26066494

meaning of Section 1445 of the Internal Revenue Code of 1986, as amended and the Treasury Regulations promulgated thereunder;

(4) A written assignment and quitclaim bill of sale duly executed by Seller, assigning to Buyer, in their then "**as-is, where-is condition, and with all faults**," all of Seller's right, title and interest, if any, in and to all Leases, Personal Property, Assumed Contracts and the other Intangible Rights. The assignment and quitclaim bill of sale (the "**Assignment and Bill of Sale**") shall be in form and substance reasonably acceptable to Seller and Buyer, and shall contain no indemnity by Seller and shall include an assumption by Buyer of Seller's obligations under the Leases and Assumed Contracts (which assumption shall include, without limitation, an assumption of all obligations of landlord under the Leases with respect to the return of any refundable security deposits under the Leases);

(5) Copies of all Leases received pursuant to **Article XII**, all keys, and books and records relating to the Property which are in the possession of Seller or reasonably available to Seller;

(6) A letter to each Tenant, executed by Seller, notifying such Tenants of the transfer of the Property from Seller to Buyer and directing such Tenants to remit all rental payments and notices to Buyer ("**Notice to Tenant**"), together with updated payment instructions;

(7) Such evidence of the authority and capacity of Seller and its representatives as the Escrow Agent and Title Company may reasonably require; and

(8) Such documents, certificates, affidavits and other instruments as may be reasonably required by the Escrow Agent and Title Company in order to close the transaction contemplated under this Agreement.

(b) Buyer shall deliver to Seller the following:

(1) Buyer shall deliver to the Escrow Agent and shall thereafter cause the Escrow Agent to deliver the balance of the Purchase Price required pursuant to **Article II** above, in immediately available U.S. funds by wire transfer, to Seller, plus or minus the prorations referred to in **Section 5.4** below;

(2) Such evidence of the authority and capacity of Buyer and its representatives as the Escrow Agent and Title Company may reasonably require;

(3) Such documents, certificates, affidavits and other instruments as may be reasonably required by the Escrow Agent and Title Company in order to close the transaction contemplated under this Agreement [**OPTIONAL INSERT**: including original counterparts of the Assumption Documents];

(4) A copy of the Notice to Tenant for each Tenant executed by Purchase; and

(5) A counterpart of the Assignment and Bill of Sale duly executed by Buyer.

5.3 Expenses. Seller shall pay the cost of performing its obligations under this Agreement, its share of the prorations as set forth in **Section 5.4** hereof (including its prorated portion of taxes and special assessments as set forth in **Section 5.4** below), its own attorneys' fees, any fees to effectuate the assignment of the Assumed Contracts, one-half of any customary escrow fee charged by the Escrow Agent in connection with the Closing and one-half of any transfer taxes due in connection with the recording of the Deed.

Regardless of local custom or practice, Buyer shall pay its proportionate share of the prorations as set forth in **Section 5.4** hereof (including its prorated portion of taxes and special assessments as set forth in **Section 5.4** below) and, in addition, Buyer shall be responsible for and shall pay all other costs that are the responsibility of Buyer under the provisions of this Section or **Section 5.4**, including the full amount of the premium for the Title Policy and the premium for any costs attributable to any extended coverage or the issuance of any endorsements thereto, any fees for a loan policy of title insurance issued by the Title Company or any other title insurance company, [**OPTIONAL INSERT**: all of Lender's expenses, including, without limitation, legal fees, with respect to this Agreement, the Assumption Documents and the closing of the transaction contemplated under this Agreement and the Assumption Documents, all amounts due to Lender under the Assumption Documents,] one-half of any transfer taxes due in connection with the recording of the Deed, all recording fees and charges for the recording of the Deed [**OPTIONAL INSERT**: and Assumption Documents], one-half of any customary escrow fee charged by the Escrow Agent in connection with the Closing, and all other fees or charges of the Escrow Agent and Title Company (not payable by Seller) in connection with the Closing of the transactions contemplated under this Agreement, all due diligence and investigation expenses, the cost of any survey and the cost and expense of Buyer performing its obligations under this Agreement, and its own attorneys' fees.

5.4 Prorations and Credits.

(a) Real estate taxes and installments of special assessments, Business Improvement District Taxes and supplemental and personal property taxes and assessments for the Property shall be prorated by the parties as of the Closing Date on the basis of a three hundred sixty-five (365) day year on the basis that Seller is responsible for (i) all such taxes and installments of special assessments for the fiscal year of the applicable taxing authority occurring prior to the Current Tax Period (as such term is hereinafter defined) and (ii) that portion of such taxes and installments of special assessments for the Current Tax Period through 11:59 p.m. Pittsburgh, Pennsylvania time on the date immediately preceding the Closing Date, whether or not the same shall be payable prior to the Closing Date, provided, however, that Seller shall not be responsible for any portion of an increase in real, supplemental or personal property taxes or assessments resulting from the sale of the Property to Buyer (whether for taxes or assessments that accrued before or after the Closing) and Buyer shall be solely obligated for payment of the same and agrees to hold Seller harmless from any liability relating to the same. The phrase "**Current Tax Period**" refers to the fiscal year of the applicable taxing authority in which the Closing occurs. All tax and assessment prorations shall be based upon the latest available tax and assessment statement(s) and, accordingly, if the amount of any such real estate taxes or special assessments

for the Current Tax Period cannot be ascertained at the Closing as the result of the unavailability of any tax or assessment statement for such period, then the proration shall be computed on the amount of the preceding fiscal year's tax or assessment, with no adjustment to be made post-closing.

(b) At the Closing, Buyer shall receive a credit against the Purchase Price with respect to the Security Deposits. All obligations under the Assumed Contracts shall be prorated between the parties so that Seller shall be responsible for all such expenses and obligations thereunder to the extent the same have accrued through and including the date immediately preceding the Closing Date and Buyer shall be responsible for all such expenses and obligations under the Assumed Contracts that accrue from and after the Closing Date. At Closing, Buyer shall receive a credit against the Purchase Price with respect to any prepaid base rent or additional rent from any Tenants actually paid to Seller.

(c) All rent payable under the Leases shall be prorated for the month of Closing as if paid in full when due (irrespective of whether such rent has not been previously collected by Seller) and Buyer shall be entitled to a credit for the same for such month inclusive of, and after, the Closing Date. With respect to any delinquent rents or other revenue (including any amounts unpaid on the Closing Date for the month in which the Closing Date occurs), following Closing (i) Buyer shall use reasonable and good faith efforts to collect the same but shall not be required to institute any proceedings to collect the same and (ii) Seller may attempt to collect any such delinquent rent or other revenue directly from any tenant or other party owing such amounts but may not institute any proceedings to collect the same. All such collections, less costs of collection, including reasonable attorney fees, shall be remitted promptly after receipt to the party entitled to the same, but in any event not later than 10 days after receipt, after giving effect to the following order of payment priority: the collected amounts shall be applied first to the current month's rents and any other amounts due to Buyer; second, to the rents and other revenues for the month of the Closing, prorated accordingly; and third, to rents and other revenues delinquent as of the Closing Date until the delinquency has been satisfied. The provisions of this Section shall survive Closing for the Survival Period.

(d) Utility costs with respect to the Property and for which Seller is liable shall be prorated at the Closing upon the basis of utility readings, with Seller responsible for utility expenses through and including the date immediately preceding the Closing Date. If Seller does not obtain such reading(s) for any or no reason for any utility serving the Property, Seller shall furnish a reading for such utility as of a date not more than thirty (30) days prior to the Closing Date and the unknown charges shall be apportioned on the basis of an estimate computed by utilizing such reading and the most recent bill from the utility provider. All other income and operating expenses (excluding taxes and assessments and utility charges apportioned as aforesaid) not hereinabove described and prorated shall be prorated in connection with the Closing and through the date of the Closing (and with respect to operating expenses, with Seller being responsible for operating expenses through and including the date immediately preceding the Closing Date and with Buyer responsible for all time periods from and after the Closing Date), and if any such income or operating expenses (excluding taxes and assessments and utility charges apportioned as aforesaid) are not determinable as of the Closing, then at the earliest possible opportunity following the Closing, but in no event later than thirty (30) days after the



Case ID: 260501884
Control No.: 26066494

Closing, Seller and Buyer shall make any interim and final adjustments, which obligation shall survive the Closing.

(e) Charges which are payable by any Tenant to a third party shall not be apportioned hereunder, and Buyer shall accept title subject to any of such charges unpaid and Buyer shall look solely to the Tenant responsible therefor for the payment of the same. If Seller shall have paid any of such charges on behalf of any Tenant and shall not have been reimbursed therefor by the time of Closing, Buyer shall credit to Seller an amount equal to all such charges so paid by Seller.

(f) Seller shall receive the entire advantage of any discounts for the prepayment by it of any taxes, water rates or sewer rents. Buyer acknowledges that Seller may be appealing the valuation of the Property and agrees that Seller shall be entitled, at Seller's cost and expense, to pursue such appeal to completion and to receive (i) any tax refunds or reductions attributable to the years prior to the year of the Closing, and (ii) any tax refund or reduction attributable to the year of the Closing, shall be prorated between Seller and Buyer after deducting (or crediting Seller, as applicable) any expenses, (including attorneys' fees) relating to the appeal, and Buyer shall remit such amounts to Seller within ten (10) days following Buyer's receipt thereof. Notwithstanding anything to the contrary set forth in this Agreement, (A) prior to Closing, Seller may not settle or terminate any assessment appeal for the Property that is pending for tax year 2026 (the "**Pending 2026 Appeal**") without Buyer's prior written consent, which shall be in Buyer's sole discretion and (B) at Closing, Seller shall reasonably cooperate with Buyer to transition the Pending 2026 Appeal to counsel of Buyer's choosing; provided, however, the foregoing notwithstanding, Seller shall be permitted to settle or terminate the Pending 2026 Appeal without Buyer's consent if the resulting 2026 Total Assessed Value is less than or equal to $60,000,000.00. In the event the Pending Appeals are not resolved on or before Closing, the Pending 2026 Appeal shall remain open, and counsel of Buyer's choosing may enter its appearance and represent Buyer solely with respect to the Pending 2026 Appeal and Buyer shall have full control over the Pending 2026 Appeal. This Section 5.4(h) shall survive Closing.

(g) The Personal Property is included in this sale, without further charge, except that Buyer shall pay to the applicable taxing authority the amount of any and all sales or similar taxes, if any, payable in connection with the Personal Property which is to be transferred to Buyer under this Agreement and Buyer shall execute and deliver any tax returns required of it in connection therewith, said obligations of Buyer to survive Closing.

(h) At Closing, Buyer shall assume responsibility for the payment of any leasing commissions becoming due and payable from and after the Effective Date, including any leasing commissions becoming due and payable from and after the Effective Date under Leases executed after the Effective Date and any leasing commissions becoming due and payable from and after the Effective Date by reason of the expansion of the premises demised by a Lease existing as of the Effective Date or the renewal of a Lease existing as of the Effective Date.

(i) At Closing, Buyer shall assume responsibility for the payment of any Tenant Inducement Costs (as hereinafter defined) becoming due and payable from and after the Effective Date by reason of a Tenant's exercise of a right to (i) expand the premises demised by a Lease, where such expansion right existed as of the Effective Date, or (ii) renew or extend a

Lease, where such right to renew or extend existed as of the Effective Date. Seller shall be responsible for all other Tenant Inducement Costs due and payable prior to Closing. For purposes of the foregoing provisions, the term "**Tenant Inducement Costs**" shall mean any payment required under a Lease to be paid by the landlord thereunder to or for the benefit of the Tenant thereunder which is in the nature of a tenant inducement, including specifically, without limitation, tenant improvement costs, lease buyouts and moving allowances.

5.5 Possession. Possession of the Property, subject to all Leases, shall be delivered and surrendered by Seller to Buyer at the Closing.

ARTICLE VI
Damage to Property and Condemnation

6.1 Promptly after obtaining knowledge thereof, Seller agrees to give to the Buyer written notice of any casualty affecting the Property or any actual or threatened taking or condemnation of all or any portion of the Property between the Effective Date and the Closing Date. If prior to the Closing there shall occur damage to the Property caused by casualty or the taking or condemnation of all or any portion of the Property, then the Closing shall take place as provided herein without abatement of the Purchase Price, and there shall be assigned to Buyer at the Closing all of Seller's interest in and to all insurance proceeds to which Seller is entitled to receive from the insurance carrier or condemnation awards pertaining to the Property to which Seller may be entitled to receive, and Buyer shall receive a credit against the Purchase Price in an amount equal to Seller's deductible under such insurance policy; provided, however, that if any casualty causes 20% or more of the square footage of the income generating buildings located on the Property to become uninhabitable for a period of over nine (9) months, as determined by Seller, based on the written estimate of a recognized licensed claims adjuster or contractor that regularly offers services in Center City Philadelphia, in its commercially reasonable discretion (a "**Material Casualty**"), then either Seller or Buyer may terminate this Agreement by written notice to the other, in which case the Earnest Money shall be returned to Buyer and all other rights and obligations of either party under this Agreement (other than any indemnification rights and obligations under this Agreement and any other obligations which by the express terms of this Agreement are intended to survive any cancellation or termination of this Agreement (collectively, the "**Continuing Obligations**")) shall be terminated and this Agreement shall be of no further force or effect. If neither Seller nor Buyer elects to terminate this Agreement within ten (10) days after Seller sends Buyer written notice of the occurrence of a Material Casualty, then Seller and Buyer shall be deemed to have elected to proceed with Closing as provided in this Section.

ARTICLE VII
Termination, Default and Remedies

7.1 Default by Seller. Seller shall be in default under this Agreement upon the occurrence of any one or more of the following events:

(a) Any of Seller's warranties or representations set forth in this Agreement are untrue or inaccurate in any material respect.



Case ID: 260501884
Control No.: 26066494

(b) Seller shall fail to (i) meet, comply with or perform any material covenant, agreement, or obligation on its part required within the time limits and in the manner required in this Agreement for any reason other than a default by Buyer under this Agreement or (ii) deliver at the Closing any of the items required of Seller in **Article V** hereof, for any reason other than a default by Buyer under this Agreement.

7.2 Default by Buyer. Buyer shall be in default under this Agreement if Buyer shall fail to (i) meet, comply with or perform any material covenant, agreement or obligation on its part required within the time limits and in the manner required in this Agreement for any reason other than a default by Seller under this Agreement or (ii) deliver at the Closing any of the items required of Buyer in **Article V** hereof, for any reason other than a default by Seller under this Agreement.

7.3 Remedies. In the event of a default by Buyer, if the Earnest Money is delivered to Escrow Agent as required under this Agreement, Seller's sole and exclusive remedy shall be to terminate this Agreement and to receive and retain the Earnest Money and all interest thereon, if any, as liquidated damages, and Seller shall not be entitled to any other damages of any kind, whether actual, consequential, special or punitive. The parties acknowledge and agree that (a) it would be extremely difficult and impracticable to ascertain Seller's actual damages resulting from such default by Buyer under this Agreement; (b) that the Earnest Money represents a reasonable estimate of Seller's actual damages resulting from such default by Buyer under this Agreement; and (c) Seller's retention of the Earnest Money pursuant to this Section 7.3 is not a penalty. In the event of a default by Seller, the Buyer may, at its option, do either of the following (but not both) as its sole and exclusive remedy under this Agreement, under applicable law or in equity, and Buyer shall not be entitled to any damages of any kind, whether actual, consequential, special or punitive:

(1) Terminate this Agreement by written notice delivered to Seller at or prior to the Closing, whereupon (a) the Earnest Money shall be immediately returned to Buyer and (b) Seller shall reimburse Buyer for Buyer's Costs (as hereinafter defined), in an amount not to exceed $75,000.00, within thirty (30) days following receipt of paid invoices therefor, whereupon such payment this Agreement shall be deemed null and void, and the parties shall have no further rights or obligations to each other hereunder except for the Continuing Obligations. The term "Buyer's Costs" is defined for purposes of this Agreement as the documented out-of-pocket third party expenses actually incurred by Buyer for: (i) title examination, survey and searches, including issuance of Buyer's title commitment; (ii) fees paid to Buyer's engineers and consultants for preparing any environmental and engineering reports with respect to the Property; and (iii) actual costs incurred by Buyer in connection with the negotiation of this Agreement, Buyer's reasonable legal fees associated with this transaction, Buyer's due diligence with respect to the Property and limited predevelopment feasibility work directly related to evaluating the Property for Buyer's intended use, such as preliminary site planning, code or zoning analysis or building systems evaluation, but expressly excluding any architectural, engineering, permitting, entitlement, tenant improvement or other design-related costs associated with Buyer's proposed redevelopment or occupancy of the Property; or

(2) Enforce specific performance of this Agreement.



Case ID: 260501884
Control No.: 26066494

Notwithstanding the foregoing, if the Earnest Money is not delivered to Escrow Agent as required under this Agreement, then this Agreement shall automatically terminate and be of no further force or effect, except for the Continuing Obligations.

ARTICLE VIII
Brokerage Commission

8.1 Seller represents to Buyer that Seller has engaged the services of CBRE, Inc. (the "**Broker**"), as a broker in connection with this transaction and that Seller shall be responsible for and shall pay all sums due Broker pursuant to the terms of a separate written agreement between Broker and Seller. Seller further represents to Buyer that Seller has not engaged the services of any other broker in connection with this transaction and shall indemnify and save Buyer harmless from any claims of Broker or any other broker claiming through Seller as a result of this transaction. Buyer represents to Seller that Buyer has not engaged the services of any broker in connection with this transaction and Buyer shall indemnify and save Seller harmless from any claims of any broker claiming through Buyer as a result of this transaction. The foregoing indemnification obligations shall survive any termination of this Agreement or the Closing.

ARTICLE IX
Miscellaneous

9.1 Notices. All notices, demands, requests and other communications required or permitted by this Agreement by any party hereto to any other party or to Escrow Agent or to Title Company shall be in writing and shall be validly given or made by any party, or any party's attorney on behalf of such party, only if deposited in the United States mail, sent by certified or registered mail, postage prepaid, return receipt requested, or if made by Federal Express or other similar reputable national courier service keeping records of deliveries and attempted deliveries. Service by mail or courier shall be conclusively deemed made on the first Business Day delivery is attempted or upon receipt, whichever is sooner. Notices shall also be given by e-mail to the e-mail address of the intended recipient as hereinafter set forth, provided that in connection therewith a responsive e-mail is returned to the party giving notice that acknowledges receipt of such e-mailed notice. Notices may be given by the attorneys for the respective parties hereto.

All such notices, demands, requests and other communications shall be addressed to the addressee at its address set forth below or at such other address as such party may have previously specified by notice delivered in accordance with this Section:

If to Seller:

CBRE, Inc., as Receiver
One Oxford Centre
301 Grant Street
Pittsburgh, PA 15219
Attn: John Svorcek
Attn: Joseph Petak
email: John.Svorcek@cbre.com
email: Joseph.Petak@cbre.com



Case ID: 260501884
Control No.: 26066494

With a copy to:

Buchanan Ingersoll & Rooney P.C.
501 Grant St., Suite 200
Pittsburgh, PA 15219
Attn: Christopher P. Schueller, Esquire
email: christopher.schueller@bipc.com

With a copy to Lender:

Wells Fargo Bank, National Association, as Trustee, for the Benefit of Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2020-MKST Commercial Mortgage Pass-Through Certificates, Series 2020-MKST
c/o KeyBank National Association
8117 Preston Road, Suite 400
Dallas, TX 75225
Attn: Steve Britt
email: steve_britt@keybank.com

If to Buyer:

[NEWCO]
380 Red Lion Road, Ste. 202
Huntingdon Valley, PA 19006
Attention: Shamikh Kazmi
email: sk@upssites.com

With a copy to:

If to Escrow Agent / Title Company:

Commonwealth Land Title Company CWOC-042
4400 MacArthur Blvd, Suite 800
Newport Beach, CA 92660
Phone: (949)724-3140

Any person or entity may change their address for the purpose of receiving notices or demands as herein provided by a written notice given in the manner aforesaid to the others, which notice of change of address shall not become effective, however, until the actual receipt thereof by the others.

9.2 Governing Law; Venue. The laws of the Commonwealth of Pennsylvania shall govern the validity, enforcement and interpretation of this Agreement. Any dispute or cause of action under this Agreement shall be resolved in a court of competent subject matter jurisdiction in the County in which the Property is located.



Case ID: 260501884
Control No.: 26066494

9.3 Integration; Modification; Waiver. This Agreement constitutes the complete and final expression of the agreement of the parties relating to the Property, and supersedes all previous contracts, agreements and understandings of the parties, either oral or written, relating to the Property. This Agreement cannot be modified, nor may any of the terms hereof be waived, except by an instrument in writing (referring specifically to this Agreement) executed by the party against whom enforcement of the modification or waiver is sought.

9.4 Counterpart Execution; Copies of Signatures. This Agreement may be executed in two or more counterparts, each of which shall constitute an original and all of which together shall constitute one and the same agreement. A photocopied, scanned, telecopied or other electronic signature of any party to this Agreement shall have the same force and effect as an original signature for all purposes.

9.5 Headings; Construction. The headings which have been used throughout this Agreement have been inserted for convenience of reference only and do not constitute matter to be construed in interpreting this Agreement. Words of any gender used in this Agreement shall be held and construed to include any other gender and words in the singular number shall be held to include the plural, and vice versa, unless the context requires otherwise. The words "herein," "hereof," "hereunder" and other similar compounds of the word "here" when used in this Agreement shall refer to the entire Agreement and not to any particular provision or section. If the last day of any time period stated herein shall fall on a Saturday, Sunday or legal holiday in the Commonwealth of Pennsylvania, then the duration of such time period shall be extended so that it shall end on the next succeeding day which is not a Saturday, Sunday or legal holiday in the Commonwealth of Pennsylvania. As used in this Agreement, the term "**Business Day**" shall mean any day other than a Saturday, Sunday or legal holiday in the Commonwealth of Pennsylvania.

9.6 Invalid Provisions. If any one or more of the provisions of this Agreement, or the applicability of any such provision to a specific situation, shall be held invalid or unenforceable, such provision shall be modified to the minimum extent necessary to make it or its application valid and enforceable, and the validity and enforceability of all other provisions of this Agreement and all other applications of any such provision shall not be affected thereby.

9.7 Binding Effect. This Agreement shall be binding upon and inure to the benefit of Seller and Buyer and, with respect to the provisions of **Article XI** of this Agreement, the Escrow Agent, and with respect to **Section 3.2** of this Agreement, the persons and entities receiving the benefits provided in such **Section 3.2**, and, in each case, their respective heirs, executors, personal and legal representatives, successors and permitted assigns. Without the prior consent of Seller, Buyer may assign all, but not less than all, of its rights and obligations under this Agreement to any entity that is owned or controlled by Buyer; provided, however, that no such assignment shall relieve Buyer of any of its obligations under this Agreement, and in the event of such an assignment, Buyer and the assignee of Buyer shall be jointly and severally liable for all of the obligations of the Buyer under this Agreement. Buyer shall provide written evidence of any such permitted assignment to Seller and Escrow Agent at least three (3) Business Days prior to the Closing. Except as aforesaid, Buyer may not otherwise assign any of its rights or obligations under this Agreement without the prior written consent of Seller, and except as expressly provided herein (including, without limitation, as expressly provided in **Section 3.2** of

this Agreement), nothing in this Agreement is intended to confer on any person or entity, other than the parties hereto, those persons and entities noted in **Section 3.2** of this Agreement (but only to the extent such persons and entities are entitled to the benefits of the provisions of such **Section 3.2**) and, with respect to the provisions of **Article XI** of this Agreement, the Escrow Agent, and their respective heirs, executors, personal and legal representatives, successors and permitted assigns, any rights or remedies under or by reason of this Agreement. If Seller shall consent to any assignment of this Agreement by Buyer other than any assignment which is permitted by the express terms of this Agreement without Seller's consent, then Buyer shall nonetheless not be relieved of any of its obligations under this Agreement and shall remain jointly and severally liable under this Agreement with the assignee of Buyer.

9.8 Further Acts; Survival of Continuing Obligations. In addition to the acts recited in this Agreement to be performed by Seller and Buyer, Seller and Buyer agree to promptly perform or cause to be performed at the Closing or after the Closing all such further acts as may be reasonably necessary to consummate the transactions contemplated hereby. The obligations described in this **Section 9.8** and the Continuing Obligations shall in all respects survive the Closing and transfer of the Property by Seller to Buyer.

9.9 Time of the Essence. Time is of the essence of this transaction and all of the terms and provisions of this Agreement.

9.10 Legal Expenses. In the event of litigation arising out of the terms and conditions of this Agreement, the prevailing party in such litigation shall have the right to recover from the non-prevailing party reasonable attorneys' fees and court costs incurred as a result of such litigation.

9.11 Interpretation of Agreement. The preparation of this Agreement has been a joint effort of Buyer and Seller, each of whom have had an adequate opportunity to consult with counsel of their choice, and this Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted. If any words or phrases in this Agreement shall have been stricken out or otherwise added, this Agreement shall be construed as if the words or phrases so stricken out are otherwise eliminated or never included in this Agreement. No implication or inference shall be drawn from the fact that such words or phrases were so stricken out or otherwise eliminated.

9.12 Limitation of Liability upon Seller. Subject to **Section 4.7** hereof, all of Seller's obligations and liabilities under this Agreement, under any of the documents or instruments delivered in connection with the consummation of the transaction contemplated under this Agreement or with respect to the Property shall be without recourse to Seller or any of its assets (including any of the monies received by Seller as the result of the consummation of the purchase and sale transaction contemplated under this Agreement).

9.13 Discharge of Obligations. The acceptance of the Deed by Buyer shall be deemed to be a full performance and discharge of every representation, warranty and covenant made by Seller herein and every agreement and obligation on the part of Seller to be performed pursuant to the provisions of this Agreement, except those, if any, which are herein specifically stated to survive Closing.



Case ID: 260501884
Control No.: 26066494

9.14 Intentionally Deleted.

9.15 No Third Party Beneficiary. Except as expressly provided herein to the contrary, the provisions of this Agreement and of the documents to be executed and delivered at Closing are and will be for the benefit of Seller and Buyer only and are not for the benefit of any third party, and accordingly, no third party shall have the right to enforce the provisions of this Agreement or of the documents to be executed and delivered at Closing.

9.16 Exhibits and Schedules. The following schedules or exhibits attached hereto shall be deemed to be an integral part of this Agreement:

Exhibit A - Legal Description of the Property

9.17 Intentionally Deleted.

9.18 Intentionally Deleted.

9.19 Effective Date. The date of delivery to Escrow Agent of a fully executed counterpart of this Agreement, as evidenced by Escrow Agent's notation in the space set forth below, shall be deemed the effective date of this Agreement (the "**Effective Date**").

9.20 Pennsylvania-Specific Provisions.

(a) Intentionally Deleted.

(b) Sewage Facilities: In accordance with the Pennsylvania Sewage Facilities Act of January 24, 1996, No. 537 P.L. 1535, as amended, the following statement regarding the availability of a community sewage system is included: the Property is connected to or serviced by a Community Sewage System.

(c) Waiver of Pennsylvania Bulk Sales Law Compliance: Buyer hereby waives the requirement for Seller's delivery, by Closing, of the tax clearance certificates to be issued in compliance with Pennsylvania's Bulk Sales Statutes ("**Tax Clearance Certificates**"). As used herein, the term "**Pennsylvania's Bulk Sales Statutes**" shall mean all of the following: the Act of April 9, 1929, P.L. 343, art. XIV, 72 P.S. § 1403, as amended; the Act of May 10, 1927, § 1, P.L. 879, No. 446, 69 P.S. § 529; the Act of March 4, 1971, P.L. 6, No. 2, 72 P.S. § 7240, as amended; the Act of August 4, 1991, P.L. 97, No. 22, 72 P.S. § 7321.1, as amended; and the Act of December 5, 1936 (2nd Sp. Sess., 1937 P.L. 2897, No. 1), as amended by the Act of June 22, 1964, P.L. 112, No. 7, 43 P.S. § 788.3, and other similar statutes. The provisions of this Section shall survive Closing and shall not be merged into the Deed.

(d) Coal Notice: **NOTICE -- THIS DOCUMENT MAY NOT SELL, CONVEY, TRANSFER, INCLUDE OR INSURE THE TITLE TO THE COAL AND RIGHT OF SUPPORT UNDERNEATH THE SURFACE LAND DESCRIBED OR REFERRED TO HEREIN, AND THE OWNER OR OWNERS OF SUCH COAL MAY HAVE THE COMPLETE LEGAL RIGHT TO REMOVE ALL OF SUCH COAL AND, IN THAT CONNECTION, DAMAGE MAY RESULT TO THE SURFACE OF THE LAND AND ANY HOUSE, BUILDING OR OTHER STRUCTURE ON OR IN SUCH**



Case ID: 260501884
Control No.: 26066494

**LAND. THE INCLUSION OF THIS NOTICE DOES NOT ENLARGE, RESTRICT OR MODIFY ANY LEGAL RIGHTS OR ESTATES OTHERWISE CREATED, TRANSFERRED, EXCEPTED OR RESERVED BY THIS INSTRUMENT.** This notice is set forth in the manner provided in Section 1 of the Act of July 17, 1957, P.L. 984, as amended, and is not intended as notice of unrecorded instruments, if any.

ARTICLE X
Confidentiality and Public Disclosure

10.1 Confidentiality. Buyer agrees that it shall keep this Agreement, the terms and conditions of this Agreement and all materials, documents and information pertaining to the Property or the Leases that is at any time delivered or made available by Seller or any of its agents or representatives to the Buyer or any of its agents or representatives (collectively, the "**Confidential Information**") confidential and that Buyer shall not disclose the Confidential Information to any person or entity for any reason whatsoever except as specifically permitted herein or except as may be necessary to comply with the order of any court of competent jurisdiction. Buyer shall restrict dissemination of Confidential Information within its own organization and to Buyer's representatives, advisors, consultants or lenders and to the Title Company and Escrow Agent so that the Confidential Information shall be revealed only to the extent necessary to enable Buyer to fulfill the terms of this Agreement. In the event this Agreement is terminated or Buyer defaults hereunder, Buyer shall promptly return to Seller any and all Confidential Information. In the event of a breach or threatened breach by Buyer or its agents under this Section, Seller shall be entitled to an injunction restraining Buyer or its agents from disclosing, in whole or in part, any Confidential Information. Nothing herein shall be construed as prohibiting Seller from pursuing any other available remedy at law or in equity for such breach or threatened breach.

10.2 Public Disclosure. Prior to Closing, any release to the public of information by Buyer or Seller with respect to any matters set forth in this Agreement, including the existence of this Agreement, will be made only in the form approved by the other party and its counsel.

ARTICLE XI
Escrow Provisions

11. Provisions Pertaining to Escrow Agent and Earnest Money. The following provisions pertain to the Earnest Money, the maintenance of the account into which the Earnest Money is to be placed by the Escrow Agent and the Escrow Agent's limitation of liability:

11.1 Except as hereinafter provided in this **Section 11.1** to the contrary, in the event that the Escrow Agent receives conflicting instructions from the parties or determines in good faith that a bona fide dispute exists as to whether the Escrow Agent is obligated to deliver the Earnest Money, or as to whom the Earnest Money is to be delivered, the Escrow Agent, at its option, (a) may refuse to comply with any claims or demands on it and continue to hold the Earnest Money until (i) the Escrow Agent receives written notice signed by Seller and Buyer directing the release and delivery of the Earnest Money, in which event the Escrow Agent shall then release and deliver the Earnest Money in accordance with said direction, or (ii) the Escrow Agent receives a certified copy of a final non-appealable judgment of a court of competent



Case ID: 260501884
Control No.: 26066494

jurisdiction directing the release and delivery of the Earnest Money, in which event the Escrow Agent shall then release and deliver the Earnest Money in accordance with said direction, or (b) may deliver the Earnest Money to the Philadelphia County Court of Common Pleas, or (c) may take such affirmative steps as the Escrow Agent may elect in order to substitute another impartial party reasonably satisfactory to Seller and Buyer (whose consents to such substitution shall not be unreasonably withheld), to hold the Earnest Money, including, without limitation, the deposit thereof in a court of competent jurisdiction and the commencement of an action for interpleader, the costs thereof to be the joint obligation of Buyer and Seller (but notwithstanding the foregoing, as between Seller and Buyer, such costs shall be borne by whichever of Seller or Buyer is the losing party, or in accordance with any mutual agreement of Seller and Buyer if neither party is the losing party).

11.2 Escrow Agent is acting as a stakeholder only with respect to the Earnest Money. It is agreed that the duties of the Escrow Agent are only as herein specifically provided in this Agreement, are purely ministerial in nature, and that Escrow Agent shall incur no liability whatsoever except for its own willful misconduct or gross negligence. Seller and Buyer each hereby release the Escrow Agent from any act done or omitted to be done by the Escrow Agent in good faith in the performance of its duties hereunder.

11.3 Except as and only to the extent otherwise provided elsewhere in this Agreement to the contrary, all out-of-pocket costs and expenses (including, without limitation, reasonable attorneys' fees and costs) incurred by Escrow Agent as the result of its serving as escrow agent under this Agreement (other than any of such costs and expenses incurred as the result of the Escrow Agent taking any action or omitting to take any action in bad faith, in willful disregard of this Agreement or involving gross negligence on the part of Escrow Agent) and all escrow fees charged by Escrow Agent in connection with its acting as escrow agent with respect to the Earnest Money shall be paid for one-half by Buyer and the other one-half by Seller.

11.4 Buyer and Seller agree and acknowledge that the Escrow Agent has no liability in connection with the Earnest Money in the event of the failure or insolvency of the financial institution in which the Earnest Money is deposited.

11.5 All notices and demands to Escrow Agent or from Escrow Agent to Seller or Buyer shall be in writing and shall be governed by **Section 9.1** of this Agreement. Escrow Agent shall be entitled to rely on all communications which purport to be on behalf of the party giving such communication and purporting to be signed by an authorized party or any attorney of any party as may be designated from time to time by Seller or Buyer.

11.6 Escrow Agent may resign from serving as escrow agent under this Agreement at any time by giving ten (10) Business Days prior written notice to that effect to each of Seller and Buyer. In such event, the successor escrow agent shall be selected by Seller and approved by Buyer, such approval not to be unreasonably withheld or delayed. Escrow Agent shall then deliver the Earnest Money to the successor escrow agent, to be held by such successor escrow agent pursuant to the terms of this Agreement and thereupon such successor escrow agent shall thereafter be deemed to be the "Escrow Agent" under this Agreement.



Case ID: 260501884
Control No.: 26066494

11.7 In its capacity as Escrow Agent, Escrow Agent shall not be responsible for the genuineness or validity of any security, instrument, document or item deposited with it, and shall have no responsibility other than to faithfully follow the instructions contained in this Agreement, and Escrow Agent is fully protected in acting in accordance with any written instrument given to it hereunder by Buyer or Seller and believed by Escrow Agent to have been signed by the proper person. Escrow Agent may assume that any person purporting to give any notice under this Agreement and representing that they have authority to do so has been duly authorized to do so.

11.8 Escrow Agent shall have no duties or responsibilities other than those expressly set forth in this Agreement and that pertain to its duties as escrow agent. Escrow Agent shall have no duty to enforce any obligation of any person or entity to make any payment or delivery or to enforce any obligation of any person or entity to perform any other act. Escrow Agent shall be under no liability to Buyer or Seller or to anyone else by reason of any failure on the part of Buyer or Seller to perform its obligations under any document.

11.9 Escrow Agent shall be entitled to approve (not to be unreasonably withheld or delayed) legal counsel who may be retained to defend or prosecute any action on behalf of Escrow Agent under or arising out of this Agreement.

11.10 The duties, obligations and liabilities of Buyer, Seller and Escrow Agent as set forth in this **Article XI** of this Agreement shall be interpreted, construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania.

## ARTICLE XII
## Buyer's Closing Conditions

12.1 Notwithstanding anything in this Agreement to the contrary, Buyer's obligation to consummate the purchase of the Property is expressly contingent upon the satisfaction of the following conditions as of the Closing Date ("**Buyer's Closing Conditions**"):

(a) All representations and warranties of Seller under this Agreement continue to be materially true and correct.

(b) The Title Company shall issue or be irrevocably and unconditionally committed to issue to Buyer an owner's title insurance policy in the full amount of the Purchase Price insuring that good and marketable, fee simple title to the Property is vested in Buyer subject only to the Permitted Exceptions (the "**Title Policy**"). Buyer shall bear the cost of the premium for the Title Policy.

12.2 If any of Buyer's Closing Conditions are not satisfied on or prior to the Closing Date (except as a result of a default by Seller, in which case Section 7.1 and Section 7.3 shall apply), Buyer may, by delivering written notice at or prior to the Closing Date, to Seller, elect to either (i) waive any such condition; or (ii) terminate this Agreement. If Buyer elects to terminate this Agreement, the Earnest Money will be returned to Buyer and neither party will have any further obligations or liabilities hereunder, except as expressly provided in this Agreement. Time



Case ID: 260501884
Control No.: 26066494

is agreed to be strictly of the essence with respect to terminating this Agreement. Buyer's failure to timely deliver written notice of termination prior to the Closing Date shall be conclusively deemed a waiver of Buyer's right to terminate this Agreement pursuant to the terms of this Section 12.2.

THE REMAINDER OF THIS PAGE INTENTIONALLY BLANKIN WITNESS WHEREOF, the parties have executed this Agreement on the dates set forth next to their signatures below.

**SELLER:**

**CBRE, INC.**, solely in its capacity as receiver under the Order entered on April 14, 2023 in a case in the United States District Court for the Eastern District of Pennsylvania, entitled *Wells Fargo Bank, National Association, as Trustee, for the Benefit of Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2020-MKST Commercial Mortgage Pass-Through Certificates, Series 2020-MKST, the RR Interest Owner and the Future Advance Lender v. NG 1500 Market St. LLC*, Case No. 23-146 and not in its personal capacity

By: ________________________________
Name: ______________________________
Title: _______________________________

**BUYER:**

______________________,
a ____________________________________

By:______________________________________
Name:
Title:

**JOINDER BY ESCROW AGENT**

The undersigned, Commonwealth Land Title Company, has joined in the execution of this Agreement solely for the purpose of evidencing its agreement to serve as the "Escrow Agent" under and in accordance with the terms and provisions of this Agreement. Escrow Agent acknowledges receipt of a fully executed counterpart of this Agreement as of ___________, _____________, which date shall be deemed the "Effective Date" of this Agreement.

**ESCROW AGENT**:

**COMMONWEALTH LAND TITLE COMPANY**

By:________________________________________
Name:______________________________________
Title:_______________________________________

# EXHIBIT A

Legal Description of Property

All that certain lot or piece of ground with buildings and improvements thereon erected, situate in the 8th Ward of the City of Philadelphia and described as follows, to wit:

BEGINNING at a point of intersection formed by the Westerly side of 15th Street (variable width) and the Southerly side of Market Street (100 feet wide); thence extending Southwardly along the said Westerly side of 15th Street the distance of 265 feet 0 inches to a point on the Northeasterly end of a corner cut off which connects the said Westerly side of 15th Street and the Northerly side of Ranstead Street (20 feet wide), said point also being on the Northwesterly side of an easement for cutback which easement for cutback applies only to certain land and/or space between an elevation of +/- 38.50 and an elevation of +/- 68.50; thence Southwardly along the Westerly side of said 15th Street extended and along the Easterly side of said Easement for cutback 21 feet 0 inches to a point on the Northerly side of said Ranstead Street extended and on the Southerly side of said Easement for cutback; thence Westwardly along the Northerly side of said Ranstead Street extended and along the Southerly side of said Easement for cutback 30 feet 0 inches to a point on the Southwesterly end of said corner cut off and on the Northwesterly side of said Easement for cutback; thence Westwardly along the Northerly side of said Ranstead Street (part 20 feet wide and part 30 feet wide) 346 feet 0 inches to a point on the Easterly side of 16th Street (70 feet wide); thence Northwardly along the said Easterly side of 16th Street 286 feet 0 inches to a point on the said Southerly side of Market Street; thence Eastwardly along the said Southerly side of Market Street 376 feet 0 inches to a point on the said Westerly side of 15th Street, being the first mentioned point and place of beginning.

LESS AND EXCEPT the portion of the herein before described premises by Deed of Dedication from the Redevelopment Authority of the City of Philadelphia to the City of Philadelphia dated June 20, 1969 and recorded in the Department of Records in and for the City of Philadelphia in Deed for J.R.S. No. 456, Page 258 &c.

BEING the same premises which EQC Operating Trust, a Maryland real estate investment trust formerly known as Hub Properties Trust by Special Warranty Deed dated 06/28/2017 and recorded 07/18/2017 in the Office of the Recorder of Deeds in and for the County of Philadelphia as Document No. 53239762, granted and conveyed unto NG 1500 Market St. LLC, a Delaware limited liability company.

NOTE FOR INFORMATION: Being Parcel No. 88-3320000, of the City of Philadelphia, County of Philadelphia, State of Pennsylvania.

Address: 1500 Market Street
Philadelphia, PA 19102

4924-2945-3447, v. 2
4924-2945-3447, v. 2



Case ID: 260501884
Control No.: 26066494

# EXHIBIT F

*February 17, 2026 $75,000,000 All-Cash Offer Email from Shamikh Kazmi to CBRE Capital Markets*

Referenced in First Amended Complaint, paragraph 45

# EXHIBIT F

*February 17 and 19, 2026 Emails from Shamikh Kazmi (Universal) to Jerome Kranzel (CBRE Capital Markets) Submitting $75,000,000 All-Cash Offer*

---

**MESSAGE 1 of 2 — February 17, 2026 8:25 PM EST**

**From:** Shamikh Kazmi <sk@upssites.com>
**To:** Jerome E. Kranzel <Jerome.kranzel@cbre.com>
**Date:** Tuesday, February 17, 2026 8:25 PM EST
**Attachment:** 75 million.doc

**Subject:** **1500 Market - URGENT!!!**

Dear Jerry,

I was disappointed by how our discussion concluded. I want to place a few things on the record and formally submit a revised offer of $75,000,000 for the acquisition of 1500 Market Street, Philadelphia, PA.

I have spent millions of dollars in due diligence on this asset. That was not done casually. It was done with a clear and reasonable expectation that I would have a fair opportunity to purchase this property through a transparent process. I believe that expectation was not honored, and I want that noted.

I understand another offer has been received. With respect, I do not believe any offer on the table is more favorable than mine. Here is where I stand:

Purchase Price: $75,000,000, all cash. No financing contingency whatsoever. I want to be unambiguous on this point: I am prepared to close with or without lender financing, as I stated before, and that commitment is being placed on the record in this correspondence. The prior PSA referenced the option of lender credit, and I want it clearly documented that I have no such requirement.

Due Diligence Contingency: None.

PSA Markup: Zero. I accepted your agreement without a single change. Not one redline.

Closing Timeline: Ten days following court approval, as you required

I genuinely struggle to see what better terms look like. All cash. No contingencies. Full acceptance of the agreement. Ten day close. If there is a specific term in the competing offer that is being characterized as superior, I would ask that it be identified, because I believe this process needs to be transparent and the creditors of this estate deserve to know that the highest and best offer is being accepted.

As a court-appointed receiver, your obligations run to the court and to the creditors of this receivership estate. That duty requires maximizing the proceeds of any sale, and it cannot be set aside based on personal considerations. I think we both understand that.



Case ID: 260501884
Control No.: 26066494

Any sale will require court approval, and that process will involve scrutiny of whether this sale was conducted in a commercially reasonable and good faith manner. I intend to participate fully in that process and to exercise every right available to me as an interested party.

That said, I genuinely want to get this done. I have invested too much time and capital to walk away, and my preference is to close this transaction, not to litigate it. I am asking you to accept this offer so we can move forward to court approval without delay.

Please let me know how you would like to proceed.

S Kazmi CEO, Universal Group sk@upssites.com

---

**MESSAGE 2 of 2 — February 19, 2026 2:21 PM EST**

**From:** Shamikh Kazmi <sk@upssites.com>
**To:** Jerome E. Kranzel <Jerome.kranzel@cbre.com>
**Date:** Thursday, February 19, 2026 2:21 PM EST

**Subject: Re: 1500 Market - URGENT!!!**

Jerry,

I am following up on my previous correspondence. This is a time-sensitive matter and I have not yet received a response on the receivers position. Please advise on how you would like to proceed at your earliest convenience. If I do not hear back, I will be forced to pursue other avenues to protect my position.

S Kazmi CEO, Universal Group

*True and correct copy of email transmitted on February 17-19, 2026, exported from Gmail mailbox sk@upssites.com.*



Case ID: 260501884
Control No.: 26066494

# EXHIBIT G

*February 23, 2026 One-Sentence Rejection Email from CBRE Capital Markets to Shamikh Kazmi*

Referenced in First Amended Complaint, paragraphs 47-49

# EXHIBIT G

*February 23, 2026 Rejection Email from Jerome Kranzel (CBRE Capital Markets) to Shamikh Kazmi (Universal)*

---

**From:** Jerome E. Kranzel <Jerome.kranzel@cbre.com>
**To:** Shamikh Kazmi <sk@upssites.com>
**Date:** Monday, February 23, 2026 12:44 PM EST

**Subject: RE: 1500 Market - URGENT!!!**

---

Dear Shamikh:

Your updated offer has been presented to the Receiver for 1500 Market. Unfortunately, he has asked me to let you know that 1500 Market is currently under agreement, and as such, the Receiver cannot entertain any offers at this time. If anything changes I will certainly let you know right away.

Thanks

Jerry

Jerome E. Kranzel Senior Vice President CBRE | National Office Partners Two Liberty Place, 30th Floor | Philadelphia, PA 19102, USA 555 East Lancaster Avenue, Suite 120 | Radnor, PA 19087, USA T +1 215 561-8954 | C +1 215 439-2383 jerome.kranzel@cbre.com

*True and correct copy of email transmitted on February 23, 2026, exported from Gmail mailbox sk@upssites.com.*



Case ID: 260501884
Control No.: 26066494

# EXHIBIT H

*April 14, 2023 Consent Order Appointing Receiver (Federal Action, ECF 20)*

Referenced in First Amended Complaint, paragraph 18

# RECEIVERSHIP ORDER — HIGHLIGHTED EXCERPTS

*Wells Fargo Bank, N.A. v. NG 1500 Market St., LLC*, No. 23-cv-00146-NIQA (E.D. Pa.) — Order (ECF 20) as Modified by ECF 43 (Feb. 18, 2025)

The following excerpts are reproduced from the Receivership Order entered in the above-captioned federal action. The Receivership Order itself draws lines around what is and is not actionable against the Receiver. The highlighted phrases below are the operative provisions on which Universal's state-court action is grounded.

## Section 1(n) — Authority to Sell the Property (as modified by ECF 43)

> "... the Receiver is authorized, if directed by the Lender, to (i) engage a sales broker (provided (A) that such sales broker shall provide all offering materials to the Borrower and (B) that the Borrower ... shall have the right to make offers for the purchase of the Property ... and participate in any bidding process) and (ii) **with the prior approval of the Court** and on such terms as may be set out in a **separate and subsequent order of the Court** ... sell the Property."

**Significance.** Section 1(n) makes Court approval a condition precedent to any sale of the Property. The PMC PSA was executed in February 2026 without the prior Court approval Section 1(n) requires. That conduct falls outside the authority granted by the Order.

## Section 5 — Immunity Carve-Out for Fraud and Misconduct

> "... no claim shall lie against the Receiver, its officers, agents, employees, attorneys, or representatives for any acts or omissions in connection with the performance of their duties under this Order, **except a claim of gross negligence, willful misconduct, fraud, or self-dealing**."

**Significance.** The Court itself wrote four exceptions to Receiver immunity into the Order: gross negligence, willful misconduct, fraud, and self-dealing. Universal's state complaint pleads claims for fraudulent inducement (Count II), fraudulent concealment (Count III), and self-dealing arising from CBRE's undisclosed prior commercial relationship with the Lubert-Adler/Adler principals. Those claims fit Section 5's exceptions, not the immunity Section 5 grants.

## Section 22 — Restriction on Suits Against the Receiver

> "No person or entity may file suit against the Receiver, in its capacity as Receiver, or the Receiver's agents, acting in such capacity, unless otherwise authorized in advance by this Court; **provided, however, that no prior Court order is required to file a motion in this action to enforce the provisions of this Order or any other order of this Court**."

**Significance.** Section 22's restriction expressly applies only to the Receiver acting *in its capacity as Receiver*. Universal's claims are pleaded against CBRE in its corporate, broker capacity — not its receivership-officer capacity. The proviso also confirms that no prior Court order is required to

bring enforcement matters before the appointing court. Universal's federal Emergency Motion under Section 22's proviso is already pending before Judge Quiñones Alejandro.

### Section 24 — Limitation of Immunity to Authorized Acts

> "... the Receiver, its officers, agents, employees, attorneys, and representatives shall be entitled to all protections, immunities, and indemnities applicable to court-appointed officers for any **duly authorized actions properly and lawfully taken pursuant to this Order**."

**Significance.** Section 24 grants immunity only for actions that are *both* (a) duly authorized by the Order and (b) properly and lawfully taken pursuant to it. Executing a binding Purchase and Sale Agreement without the prior Court approval Section 1(n) requires is neither duly authorized nor properly and lawfully taken pursuant to the Order. Section 24 immunity does not reach that conduct.

### SUMMARY

Read together, Sections 1(n), 5, 22, and 24 form the appointing court's own framework for what is and is not actionable against the Receiver:

- Section 1(n) — sale requires prior Court approval (not satisfied here).
- Section 5 — no immunity for gross negligence, willful misconduct, fraud, or self-dealing.
- Section 22 — restricts only suits against the Receiver acting *as Receiver*; the proviso authorizes enforcement in the appointing court without prior leave.
- Section 24 — immunity only for actions duly authorized and properly taken pursuant to the Order.

Universal's state-court claims — pleaded against CBRE in its corporate, broker capacity, and against nine non-receiver Defendants — are grounded in conduct the Order itself excepts from immunity (Section 5) and conduct outside the authority the Order grants (Sections 1(n) and 24). Any Barton or Section 22 issue is properly addressed in the appointing court, where Universal has already placed the matter through its pending Emergency Motion.

# EXHIBIT I

*Exhibit A to ECF 41-2 ("Clients Represented") Identifying Lubert-Adler as CBRE Client*

Referenced in First Amended Complaint, paragraphs 22-24

# EXHIBIT I

*Excerpts from Sworn Affidavit at ECF 41-2 in Wells Fargo Bank, N.A. v. NG 1500 Market St. LLC, No. 2:23-cv-00146-NIQA (E.D. Pa.), Filed January 6, 2025, Including Exhibit A Captioned "Clients Represented"*

---

*This Exhibit consists of verbatim excerpts from a public federal court filing. The full original document is available on the federal docket at the cited entry, of which this Court may take judicial notice under Pa. R.E. 201. References herein to "ECF 41-2" are to docket entry 41-2 in the Federal Action, filed January 6, 2025 in support of the Receiver's Motion to Modify the Receivership Order at ECF 41.*

**Source:** Federal Action, ECF 41-2 (sworn affidavit in support of ECF 41 Motion to Modify Receivership Order)
**Affiant:** Senior Vice President, Capital Markets Group, CBRE, Inc.
**Sworn Date:** December 30, 2024
**Filed Date:** January 6, 2025

## Excerpt 1 — ECF 41-2 ¶ 1 (Affiant Identification)

> The affiant identifies himself as "a Senior Vice President in the Capital Markets Group of CBRE, Inc." ECF 41-2 ¶ 1.

## Excerpt 2 — ECF 41-2 Exhibit A ("Clients Represented")

Exhibit A to ECF 41-2 consists of the affiant's professional biography. Under a caption titled "Clients Represented," Exhibit A identifies in alphabetical order approximately thirty-five institutional clients of the affiant. The "Clients Represented" list, as it appears in ECF 41-2 Exhibit A, is reproduced below:

> AIG; Apollo Global Management; Bank of America; Brandywine Realty Trust; CBRE Global Investors; Equity Commonwealth; J.P. Morgan; Keystone Property Group; Kimco Realty; Liberty Property Trust; Lubert-Adler; Mack-Cali Realty Corporation; Northwestern Mutual; Parkway Properties; Rubenstein Properties; University of Pennsylvania; Vanguard; Wells Fargo; and additional institutional clients listed in the original. [ECF 41-2 Ex. A.]

## Significance to Allegations in First Amended Civil Action Complaint

Paragraphs 22 through 24 of the First Amended Civil Action Complaint reference the existence and content of ECF 41-2 Exhibit A. The complaint alleges that CBRE, on its own motion and in its own sworn filing, swore that Lubert-Adler was a client of the Capital Markets Function personnel through whom the Centre Square property sale was later marketed. The list above confirms that allegation by identifying Lubert-Adler in alphabetical order among the affiant's "Clients Represented." Dean S. Adler, principal of the PMC-Adler Joint Venture and Buyer SPEs named as Defendants in this action, is the co-founder of Lubert-Adler. CBRE did not disclose this client relationship to the federal court, to Universal, or, on information and belief, to Wells Fargo as Lender at the time the conflicted Buyer SPEs executed the PMC PSA.



Case ID: 260501884
Control No.: 26066494

*Excerpt prepared from verified public docket. Full document available at PACER, Case No. 2:23-cv-00146-NIQA (E.D. Pa.), docket entry 41-2.*



Case ID: 260501884
Control No.: 26066494

# EXHIBIT J

*May 14, 2026 CSC Coliving LLC Purchase and Sale Agreement at $80,000,000*
*(Federal Action, ECF 86)*

Referenced in First Amended Complaint, paragraph 69

# PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** ("**Agreement**") is made to be effective as of the Effective Date (as hereinafter defined), by and between **CBRE, INC.**, solely in its capacity as receiver and not in its personal capacity (hereinafter referred to as "**Seller**") under the Order entered on April 14, 2023 ("**Receivership Order**" and the receivership appointment thereunder the "**Receivership**") in a case in the United States District Court for the Eastern District of Pennsylvania ("**Court**"), entitled *Wells Fargo Bank, National Association, as Trustee, for the Benefit of Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2020-MKST Commercial Mortgage Pass-Through Certificates, Series 2020-MKST, the RR Interest Owner and the Future Advance Lender v. NG 1500 Market St. LLC*, Case No. 23-146, ("**Receivership Action**") and CSC Coliving LLC, a Delaware limited liability company or its designee (, the "**Buyer**").

**WHEREAS**, the Court empowered Seller, with the consent of Wells Fargo Bank, National Association, as Trustee, for the Benefit of Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2020-MKST Commercial Mortgage Pass-Through Certificates, Series 2020-MKST, the RR Interest Owner and the Future Advance Lender (together with its successors and assigns, "**Lender**"), to market the Property (defined below) for sale and to execute proposed contracts, provided that no sale of the Property shall be effective or consummated except with the approval of the Lender in its sole discretion and upon approval of the Court, all as set forth below; and

**WHEREAS**, the Seller has been informed by Lender that NG 1500 Market St. LLC executed and delivered that certain Open-End Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of November 6, 2019 but made effective as of December 6, 2019, recorded on December 12, 2019 in the real estate records of Philadelphia County, Pennsylvania (the "**Records**") as Instrument Number 53604614, as amended by that certain First Amendment to Open-End Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of December 27, 2019 but made effective as of December 31, 2019, recorded on January 7, 2020 in the Records as Instrument No. 53615245, certain promissory notes, and other documents evidencing and securing the loan, and Elchonon Schwartz ("**Loan Guarantor**"), executed and delivered a certain Guaranty Agreement (together with all such other loan documents executed by any NG 1500 Market St. LLC, Loan Guarantor, and any other persons, in connection with the Loan, collectively, the "**Loan Documents**"); and

**WHEREAS**, subject to Court Approval and Lender Approval, Seller desires to sell and convey the Property upon the terms and conditions set forth herein.

**NOW, THEREFORE, IN CONSIDERATION** of the mutual covenants hereinafter set forth in this Agreement, the parties hereto, intending to be legally bound, agree as follows:

## ARTICLE I
## The Property

1.1 For the price and upon and subject to the terms, conditions and provisions herein set forth, Seller agrees to sell and convey to Buyer "**as-is, where-is and with all faults**," and Buyer

Case ID: 260501884
Control No.: 26066494

agrees to purchase from Seller "**as-is, where-is and with all faults**," all of Seller's right, title and interest, if any, in, to and under the following (collectively, and subject to the Permitted Exceptions (as hereinafter defined) in all respects, the "**Property**"):

(i) that certain improved real property generally located at 1500 Market Street, Philadelphia, Pennsylvania, all as legally described in **Exhibit A** attached hereto and made a part hereof by this reference, together with all rights, privileges, easements, strips or gores, rights-of-way and hereditaments and appurtenances thereto; all fixtures, buildings and improvements located thereon; and any and all oil, gas, mineral, and water rights held by Seller therein, thereunder or thereto, if any (collectively, the "**Real Property**") at the time of Closing (as such term is hereinafter defined);

(ii) All of the personal property (including, without limitation, surveys, plans, drawings and operating manuals), fixtures and equipment, if any, access cards, computers, hardware and software, presently affixed or attached to, placed or situated upon the Real Property and used in connection with the ownership, operation and occupancy of the Real Property, and specifically including all artwork in the building (including the lobby and mezzanine area), and the clothespin statue and Benjamin Franklin statute located outside of/adjacent to the buildings on the Real Property, but specifically excluding any items of personal property owned by lawful tenants at or on the Real Property pursuant to the Leases (individually a "**Tenant**" and collectively, the "**Tenants**") and further excluding all items of personal property owned by third parties or that are leased (which personal property, fixtures and equipment not so excluded is hereinafter collectively referred to as the "**Personal Property**");

(iii) All leases now or hereafter affecting the Real Property and that are in effect as of the date of the Closing Date (as such term is defined in **Section 5.1**) and any guaranties associated therewith, if any (individually a "**Lease**" and collectively, the "**Leases**"), together with, as of the time of Closing, all refundable tenant security deposits from Tenants under Leases, but with respect to such tenant security deposits, only to the extent such refundable tenant security deposits were received by Seller or its property manager in connection with Seller's appointment as receiver of the Real Property or were previously remitted by Tenants under Leases to Seller or its property manager and have not been applied by Seller or its property manager against any obligations owing by such Tenants under the Leases (as so limited, the "**Security Deposits**") but excluding all Leases which are the subject of any pending litigation and as to such leases all rights under those lease and rights to any recoveries in those litigation matters are expressly retained by the Seller for the benefit of the Lender. To Seller's knowledge, attached hereto as Schedule 1.1(iii)(A) is a current rent roll containing a schedule of Leases, a schedule of Security Deposits in Seller's possession to assigned to Buyer and additional security deposits that may be owed to tenants, a schedule of lease guarantees and lease expiration dates. To Seller's knowledge, attached hereto as Schedule 1.1(iii)(B) is a schedule of current or pending litigation affecting Seller and/or the Real Property – any pending litigation is covered by insurance to the



Case ID: 260501884
Control No.: 26066494

extent that Seller is the defendant and no litigation is intended to be assigned to or assumed by Buyer;

(iv) All assignable contracts, if any, relating to the operation, maintenance and/or management of the Real Property that Buyer notifies Seller in writing during the Approval Period (as such term is hereinafter defined) that it desires to assume (with all other such contracts, including the existing property management agreement and any rental listing agreement, if any, relating to the operation of the Property to be terminated by Seller, at Seller's cost and expense, on or before Closing) (collectively, the "**Assumed Contracts**"). To Seller's knowledge, a schedule of some (but not all) assignable contracts is attached hereto as Schedule 1.1(iv); and

(v) (i) all assignable guarantees, warranties, licenses, permits, licenses, certificates of occupancy, development rights, entitlements, so called "tap-ins" and "EDUs" and any deposits associated therewith, consents, approvals and authorizations, if any, related to the Real Property; (ii) any tenant data and information if available and the cost and burden of providing such information is commercially reasonable; (iii) all telephone numbers, websites and URL's associated with the Property (other than telephone numbers of tenants); (iv) all right, title and interest of Seller, if any, in and to all site plans, surveys, architectural drawings, plans and specifications, engineering plans and studies, floor plans, landscape plans, operating or maintenance manuals and other plans owned by Seller, if any, with respect to the Property, and any other intangible property now or hereafter owned by Seller and used in the ownership or operation of the Property; (iv) all right, title and interest of Seller, if any, in and to all promotional material, leasing materials and forms, and all signs, logos, photographs, brochures, artwork, graphics or styles (collectively, the "**Intangible Rights**")

Notwithstanding any provision of this Agreement to the contrary, the parties acknowledge that the Property does not include any monies, if any, of Seller or any of its agents that are held by any utility company or other service company as a deposit, that all of such monies, if any, shall be and remain the sole property of Seller, and Buyer shall not have any right, title, interest or claim in, to or under any of such monies. Buyer hereby acknowledges that it has been informed by Seller that Seller acquired the Property in connection with a foreclosure (or similar transaction) and that Seller did not receive, nor has Seller subsequently received, all of the refundable security deposits from Tenants. The parties acknowledge that the sole security deposits from Tenants to be assigned or remitted to Buyer at Closing shall be the Security Deposits. After the Closing, Buyer shall be solely liable to any Tenant for the return of all security deposits and other security deposits as set forth in the Leases.

## ARTICLE II
## Purchase Price; Earnest Money

2.1 Purchase Price. The total purchase price ("**Purchase Price**") to be paid by Buyer to Seller for the Property shall be Eighty Million Dollars ($80,000,000.00).



Case ID: 260501884
Control No.: 26066494

2.2 Earnest Money. Within two (2) Business Days (as such term is hereinafter defined) following the full execution of this Agreement, Buyer shall deliver to Commonwealth Land Title Company ("**Escrow Agent**" or "**Title Company**," as applicable), by wire transfer of immediately available funds, the sum of Five Million Dollars ($5,000,000.00) (the "**Earnest Money**"). Notwithstanding any provisions of this Agreement to the contrary, if Buyer fails to timely make the Earnest Money Payment as contemplated by this Section 2.2, Buyer shall automatically be deemed to have terminated this Agreement and the parties shall thereafter have no further rights or obligations hereunder except for any obligations that expressly survive the termination of this Agreement. The Earnest Money shall be held in escrow by the Escrow Agent in an interest bearing account in accordance with the terms of this Agreement. The Earnest Money shall be applied against the Purchase Price at the Closing unless (i) this transaction does not close in accordance with the terms of this Agreement due to a default by Buyer, in which event the Earnest Money shall be payable in accordance with **Section 7.3** herein, or (ii) this transaction does not close in accordance with the terms of this Agreement due to a default by Seller, in which event the Earnest Money shall be payable in accordance with **Section 7.3** herein. Buyer hereby acknowledges and agrees that except (A) in the event of a default by Seller or a Material Casualty (as defined in **Section 6.1** below); or (B) as set forth in **Section 4.6** or **Article XII**, the Earnest Money shall be non-refundable from and after the Effective Date .

2.3 Balance of Purchase Price. The balance of the Purchase Price, together with the Earnest Money that previously has been delivered as hereinabove provided in this Agreement, subject to any prorations and adjustments at Closing (all as provided below), shall be paid by Buyer to Seller by wire transfer of immediately available funds at the Closing.

2.4 [RESERVED].

## ARTICLE III
## Buyer's Inspection of the Property

3.1 Seller has provided Buyer with a title commitment describing the Real Property from the Title Company, a copy of which is attached as **Exhibit 3.1(a)** (the "**Title Commitment**"). Buyer has approved the Title Commitment. The title encumbrances or exceptions set forth in the Title Commitment and set forth on **Exhibit 3.1(b)** attached hereto are deemed to be permitted exceptions to the status of Seller's title (collectively, the "**Permitted Exceptions**"). "Permitted Exceptions" shall not include liens which have attached to the Real Property during the pendency of the Receivership Action.

3.2 Buyer acknowledges that, except as otherwise expressly set forth in this Agreement or any documents delivered by Seller at Closing to the contrary, (i) neither Seller, Lender Group (as hereinafter defined), nor anyone acting for or on behalf of Seller or Lender Group, has made any representation, warranty, promise or statement, express or implied, to Buyer, or to anyone acting for or on behalf of Buyer, concerning any of the Property, (ii) in entering into and closing the purchase of the Property contemplated under this Agreement, Buyer has not relied on any representation, warranty, promise or statement, express or implied, of Seller, Lender Group, or anyone acting for or on behalf of Seller or Lender Group and (iii) **AS A MATERIAL INDUCEMENT TO THE EXECUTION AND DELIVERY OF THIS AGREEMENT BY SELLER, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED**



Case ID: 260501884
Control No.: 26066494

**<u>IN THIS AGREEMENT AND ANY DOCUMENTS DELIVERED BY SELLER AT CLOSING, BUYER IS PURCHASING THE PROPERTY IN AN "AS-IS, WHERE- IS" CONDITION AND IN AN "AS-IS, WHERE-IS" STATE OF REPAIR, AND WITH ALL FAULTS</u>**. Without limiting the generality of the foregoing, there is no express or implied warranty of merchantability, habitability or of fitness for a particular purpose made by Seller or Lender Group regarding the Property. Buyer represents to Seller and Lender Group that Buyer has either already conducted or, prior to the end of the Approval Period, will have conducted or will have had an adequate opportunity to conduct such investigations of the Property, including, but not limited to, the physical and environmental conditions thereof, as Buyer deems necessary to satisfy itself as to the condition of the Property and the existence or nonexistence of, or curative action to be taken with respect to, any hazardous or toxic substances on or discharged from the Property and will rely solely upon same and not upon any information provided by or on behalf of Seller, Lender Group or any of their respective agents or employees with respect thereto. Upon Closing, Buyer shall assume the risk that adverse matters, including, but not limited to, adverse physical and environmental conditions and matters that may have been revealed by a survey of the Property, may not be revealed by Buyer's investigations, and Buyer, upon Closing, shall be deemed to have waived, relinquished and released Seller, Lender Group and all of their respective agents and employees from and against all claims, demands, causes of action (including, without limitation, causes of action in tort), losses, damages, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and court costs) of any and every kind or character, known or unknown, which Buyer might have asserted or alleged against Seller, Lender Group or any of their respective agents or employees at any time by reason of or arising out of any defects, physical conditions, violations of any applicable laws, rules, regulations or ordinances (including, without limitation, any environmental, housing or rent control laws, rules, regulations or ordinances) and any and all other acts, omissions, events, circumstances or matters regarding the Property or its occupancy or operation. Buyer agrees that if any clean-up, remediation or removal of hazardous substances or other environmental conditions on the Property is required after the date of Closing, such clean-up, removal or remediation shall be the sole responsibility of and shall be performed at the sole cost and expense of Buyer. The foregoing release includes claims of which Buyer is presently unaware or which Buyer does not presently suspect to exist which, if known by Buyer, would materially affect Buyer's release of Seller and/or Lender Group. As used in this Agreement, the term "**Lender Group**" shall mean Wells Fargo Bank, National Association, as Trustee, for the Benefit of Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2020-MKST Commercial Mortgage Pass-Through Certificates, Series 2020-MKST and KeyBank National Association and their respective past, present, and future officers, directors, shareholders, general partners, limited partners, agents, representatives, heirs, successors, assigns and attorneys and their respective heirs, successors, and assigns.

Buyer hereby specifically acknowledges that Buyer has carefully reviewed this **<u>Section 3.2</u>**, and discussed its import with legal counsel, is fully aware of its consequences, and that the provisions of this **<u>Section 3.2</u>** are a material part of this Agreement.

Notwithstanding anything to the contrary set forth in this **<u>Section 3.2</u>**, this **<u>Section 3.2</u>** shall not limit the rights and remedies of Buyer upon a breach of any of Seller's representations or warranties that are expressly set forth in this Agreement or any documents delivered by Seller at Closing.



Case ID: 260501884
Control No.: 26066494

3.3 [RESERVED].

3.4 [RESERVED]

The indemnity obligations of Buyer set forth in this **Article 3** and the release by Buyer as hereinabove set forth shall survive the Closing and any termination of this Agreement.

ARTICLE IV
Representations, Warranties and Covenants; Court and Lender Approval

4.1 Representations and Warranties of Seller. Seller hereby represents and warrants to Buyer and agrees as follows (which representations and warranties shall also be true and correct as of the Closing):

(a) To Seller's knowledge, subject to receipt of Lender Approval and Court Approval (as those terms are hereinafter defined) as provided for in this Agreement, Seller has the legal power, right and authority to execute this Agreement and to consummate all of the transactions contemplated herein and the individual who executes and delivers this Agreement and all documents to be delivered to Buyer hereunder is a person duly authorized by Seller to do so. Seller is duly organized, validly existing and in good standing under the laws of the state of its origin, and is qualified to do business in the Commonwealth of Pennsylvania;

(b) Seller is not a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of the U.S. Treasury Department's Office of Foreign Assets Control ("**OFAC**") or under any statute, executive order, or other governmental action. Seller and its subsidiaries have conducted and will conduct their businesses in compliance with the Anti-Corruption Laws, the Anti-Money Laundering Laws and Sanctions, and no investigation, inquiry, action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Seller or any of its subsidiaries with respect to the Anti-Corruption Laws, the Anti-Money Laundering Laws or Sanctions is pending or, to the knowledge of the Seller, threatened.

(c) To Seller's knowledge, Seller has not received written notice indicating that the Property or use thereof is in violation or breach of any applicable legal requirements, including, without limitation, Environmental Laws and Regulations. "**Environmental Laws and Regulations**" shall mean any federal, state or local laws now or hereafter in effect relating to pollution or protection of the environment or emissions, discharges, spills, releases or threatened releases of any Hazardous Materials into the environment (including without limitation indoor air, ambient air, surface water, ground water or land), including without limitation, the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq., as amended, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq., as amended, the Hazardous Materials Transportation Act, 49 U.S.C. §§ 1801 et seq., as amended, the Clean Water Act, 33 U.S.C. §§ 1251 et seq., as amended, the Clean Air Act, 42 U.S.C. §§ 7401 et seq., as amended, the Toxic Substance Control Act, 15 U.S.C. § 2601 et seq., as amended, and any rules and regulations now or hereafter promulgated under any of such acts. The term "**Hazardous Materials**" shall mean and refer to any "hazardous waste" or "hazardous substance," as such terms are set forth in, under or pursuant to the Environmental Laws and Regulations, oil or petroleum



Case ID: 260501884
Control No.: 26066494

products or their derivatives, polychlorinated biphenyls, asbestos, radioactive materials or waste, and any other toxic, ignitable, reactive, corrosive, explosive, contaminating or polluting materials which are now or in the future subject to governmental regulation.

(d) **FIRPTA**. Seller is not a "foreign person", "foreign trust" or "foreign corporation" (as those terms are defined in the Internal Revenue Code of 1986, as amended, and related Income Tax Regulations).

(e) **Early Termination Lease Fees**. The parties acknowledge and agree that Seller shall not be entitled to receive any early termination fees provided for in any Lease which have not been paid as of the Effective Date (even if an early termination notice is given prior to Closing).

As used in this Agreement, "to Seller's knowledge" or derivations thereof shall mean the current actual knowledge of John Svorcek, in his capacity as associate director of CBRE, Inc. Property Management, without any obligation to make investigation or inquiry.

4.2 Representations and Warranties of Buyer. Buyer hereby represents and warrants to Seller (which representations and warranties shall also be true and correct as of the Closing):

(a) Buyer, if an entity, is duly organized, validly existing and in good standing under the laws of the state of its origin, and as of Closing will be qualified to do business in the Commonwealth of Pennsylvania;

(b) Buyer has full right, authority and capacity to execute and perform this Agreement and to consummate all of the transactions contemplated herein;

(c) if Buyer is an entity or a trustee of a trust, the individual of the Buyer who executes and delivers this Agreement and all documents to be delivered to Seller hereunder is and shall be duly authorized to do so;

(d) Buyer is not owned, in whole or in part, nor does Buyer own or hold any part of the beneficial ownership in Seller;

(e) Buyer is not in a significantly disparate bargaining position in relation to Seller;

(f) Buyer is represented by legal counsel of its own choice and designation in connection with the transaction contemplated by this Agreement;

(g) Buyer's legal counsel was not directly or indirectly identified, suggested or selected by Seller or any agent of Seller; and

(h) Buyer is purchasing the Property for business or commercial investment or similar purpose and not for use as Buyer's residence.

4.3 Survival. All representations and warranties in this Agreement shall survive the Closing for a period equal to the lesser of (a) three (3) months and (b) complete termination of the



Case ID: 260501884
Control No.: 26066494

Receivership Action resulting in the discharge of the Receivership (the "**Survival Period**"). In order to preserve any claim for any alleged breach of a representation or warranty under this Agreement, the party alleging the breach shall give written notice to the other within the Survival Period.

4.4 [RESERVED].

4.5 Covenants of Seller.

(a) Promptly after the Effective Date and until Closing or earlier termination of this Agreement, Seller shall use good faith, continuous and commercially reasonable efforts to diligently pursue and obtain Court Approval and Lender Approval. Seller shall be required to obtain Lender Approval within fifteen (15) Business Days after the Effective Date and Buyer shall have the right, in its sole and absolute discretion, to terminate this Agreement and receive a refund of the Deposit if Lender Approval is not received within such fifteen (15) Business Day period.

(b) From the Effective Date until the Closing or earlier termination of this Agreement, Seller shall operate and insure the Property in a manner generally consistent with the manner in which Seller has operated and insured the Property prior to the Effective Date. Risk of loss shall remain on Seller until Closing. Provided, however, that Seller shall not enter into any new leases for any rentable portion of the Property without the prior written consent of Buyer, not to be unreasonably withheld. If Buyer approves such Lease, Buyer agrees to be bound by the terms thereof including any obligations for rent concessions, tenant improvement allowances and brokerage commissions.

(c) From the Effective Date until the Closing or earlier termination of this Agreement, excluding compliance with tenant expiration rights, tenant extension rights and tenant termination rights, Seller shall not enter into any agreement, letter of intent, term sheet, or understanding (whether binding or non-binding) with, any person or entity (other than Buyer and its representatives) regarding any proposal or offer relating to any new lease or new lease amendment covering all or any portion of the Property, provided however that the Seller is permitted to approve subleases when Seller's legal counsel determines in its sole discretion that the Seller is legally required to approve a sublease.

4.6 Court Approval and Lender Approval. Buyer acknowledges and agrees that this Agreement and the sale contemplated hereby is subject to approval by Lender, and in its capacity as lead lender on behalf of any serviced *pari passu* companion loan holder(s), as lender holding the loan secured by the Property. Neither the submission of any proposal or this Agreement for examination to Buyer, nor any correspondence or course of dealing between Buyer or Seller shall constitute a reservation of or option for the Property or in any manner bind Seller until this Agreement is fully executed by both Buyer and Seller. Buyer further acknowledges that it is a condition precedent to Seller's and Buyer's obligations under this Agreement that the following conditions are satisfied (i) the Court shall have entered a final, non-appealable order ("**Sale Order**"), in form and substance reasonably acceptable to Buyer and Seller and Title Company, approving this Agreement, the sale of the Property pursuant to the terms of this Agreement and the Closing by Seller on the terms of this Agreement ("**Court Approval**"). Seller shall provide Buyer a draft Sale Order for review and comment at least ten (10) days prior to the filing of a



Case ID: 260501884
Control No.: 26066494

motion to approve the Sale Order (and absent any objection within this ten (10) day period the Buyer shall be deemed to have approved the Sale Order), and (ii) Lender shall have received all internal and third-party approvals (including from any and all rating agencies as required under Lender's governing Pooling and Servicing Agreement) ("**Lender Approval**") to consent to the sale of the Property to Buyer pursuant to the terms of this Agreement. Buyer acknowledges and agrees that this Section 4.6 may not be amended or modified by Seller so as to reduce the amount payable to Lender or the timing of the Closing (other than as may be adjusted as expressly provided herein) except with the prior written consent of Lender. If Seller does not obtain the Lender Approval or Court Approval on or prior to the Closing Date, then this Agreement will automatically terminate, whereupon the Earnest Money will be returned to Buyer and neither party will have any further obligations or liabilities hereunder, except as expressly provided in this Agreement.

The parties agree that the following concepts shall be included in any final Sale Order issued as part of the Court Approval: (i) the sale is free of all liens that affect the Property and/or any purchaser thereof including those identified on Schedule 3.1(a) but excluding those items set forth on Schedule 3.1(b), (ii) the sale is free of all claims that affect the Property and/or any purchaser thereof including those identified on Schedule 3.1(a) but excluding those items set forth on Schedule 3.1(b), (iii) Buyer is paying reasonably equivalent value for the Property, (iv) neither the Property nor Buyer with respect to this transaction shall be subject to taxes or assessments due as a result of the Pennsylvania Bulk Sale Laws (43 P.S. §788.3; 69 P.S. §529, 72 P.S. §7240; 72 P.S. §7321.1), and (v) under Pennsylvania law the Buyer is not a successor in interest to Owner (and in connection therewith Buyer shall provide, if requested, an affidavit to the Court to confirm the non-existence of any such relationship between Owner and Buyer).

4.7 Limitation on Liability. Buyer expressly acknowledges and agrees that (a) this Agreement is subject to the terms and conditions of the Receivership Order and the Sale Order; and (b) Seller's obligations and liability under this Agreement are limited by the terms of the Receivership Order, and (c) the obligations and liability of Seller under this Agreement and any document referenced herein shall not constitute personal obligations of the officers, directors, shareholders, employees, agents, representatives, trustees, partners, members, certificate holders or other principals of Seller. Notwithstanding anything to the contrary, Seller's liability, if any, arising in connection with this Agreement or with the Property shall be limited to the assets of the receivership, and Seller shall not be personally liable for any duly authorized actions properly and lawfully taken pursuant to the Receivership Order or the Sale Order and Seller shall not be personally liable for any such judgment or deficiency after execution on the assets of the Receivership. The limitations of liability contained in this paragraph shall apply equally and inure to the benefit of Seller's present and future officers, directors, shareholders, employees, agents, representatives, trustees, partners, members, certificate holders or other principals, and their respective heirs, successors and assigns. The provisions of this Section shall survive termination and Closing.

## ARTICLE V
## Closing

5.1 Time and Place of Closing. The closing of the transaction contemplated by this Agreement (the "**Closing**") shall take place the latter of (y) within ten (10) Business Days



Case ID: 260501884
Control No.: 26066494

following the date that the Sale Order becomes final and non-appealable, or (z) on such other date as may be mutually agreed upon in writing by Buyer and Seller, (as so determined or mutually agreed upon, the "**Closing Date**"), but in no event shall the Closing Date be later than October 16, 2026, either at the offices of the Escrow Agent or through a closing in escrow with Escrow Agent. Time is of the essence with respect to the Closing Date.

5.2 Events of Closing. At the Closing:

(a) Seller shall deliver in escrow to Escrow Agent the following:

(1) A Quitclaim Deed in form and substance satisfactory to Seller and Buyer in their reasonable discretion and satisfactory to the Title Company to insure title as contemplated herein (the "**Deed**"), duly executed and acknowledged by Seller, conveying title to the Property to Buyer, all in an "**as-is, where-is condition, and with all faults**," and without any representation or warranty except as may survive Closing pursuant to this Agreement, subject to all of the following: the Leases and the rights of Tenants under the Leases; all taxes and general and special assessments for the year of Closing not yet due and payable; all other Permitted Exceptions; all matters shown on an accurate survey of the Property; underground and overhead cables, lines and utility services; and all existing and applicable zoning ordinances, laws, codes, statutes and subdivision regulations and other governmental laws, rules, codes, statutes and regulations;

(2) Such documents, certificates, affidavits and other instruments as may be reasonably required by and solely in favor of the Title Company and Escrow Agent in order to close the transaction contemplated under this Agreement, including the Title Company's standard owner's closing and gap affidavit (the "**Owner's Affidavit**"); provided, however, that with respect to any such owner's closing affidavit or any other affidavit, Seller may in its sole discretion modify such affidavit in a manner that is reasonably acceptable to Title Company and Escrow Agent and, in any event, Seller shall only be obligated to opine with respect to facts thereunder to its then current actual knowledge and without having made, or being required to make, any independent investigation of the facts, and only with respect to those matters first occurring during the pendency of the Receivership Action; provided, further, that Seller shall not be required to take any action or make any payment to remove or satisfy any mechanic's lien, and any such liens shall instead be discharged, released, or otherwise rendered unenforceable against the Property pursuant to the Sale Order, the Title Company insuring the Property free and clear of the same;

(3) A certificate executed by Seller with respect to the Foreign Investment in Real Property Tax Act, certifying that Seller is not a foreign person with the meaning of Section 1445 of the Internal Revenue Code of 1986, as amended and the Treasury Regulations promulgated thereunder;

(4) A written assignment bill of sale duly executed by Seller, assigning to Buyer, in their then "**as-is, where-is condition, and with all faults**," all of Seller's right, title and interest, if any, in and to all Leases, Personal Property, Assumed



Case ID: 260501884
Control No.: 26066494

Case 2:23-cv-00792-NIQA Document 86 Filed 10/15/24 Page 15 of 41

Contracts and the other Intangible Rights. The assignment and bill of sale (the "**Assignment and Bill of Sale**") shall be in form and substance reasonably acceptable to Seller and Buyer, and shall contain no indemnity by Seller and shall include an assumption by Buyer of Seller's obligations under the Leases and Assumed Contracts (which assumption shall include, without limitation, an assumption of all obligations of landlord under the Leases with respect to the return of any refundable security deposits under the Leases);

(5) Copies of all Leases received pursuant to **Article XII**, all keys, and books and records relating to the Property which are in the possession of Seller or reasonably available to Seller;

(6) A letter to each Tenant, executed by Seller, notifying such Tenants of the transfer of the Property from Seller to Buyer and directing such Tenants to remit all rental payments and notices to Buyer ("**Notice to Tenant**"), together with updated payment instructions;

(7) Such evidence of the authority and capacity of Seller and its representatives as the Escrow Agent and Title Company may reasonably require; and

(8) Such documents, certificates, affidavits and other instruments as may be reasonably required by the Escrow Agent and Title Company in order to close the transaction contemplated under this Agreement, including those set forth in Schedule B-1 of the title commitment.

(9) A settlement statement executed by Seller in form acceptable to Seller and Buyer.

(10) Seller shall deliver to Buyer a statement from the Philadelphia Department of licenses and inspections dated no earlier than ten (10) business days prior to the Closing Date, and in such Department's customary form stating that there are no notices of violations of the housing, building, safety or fire ordinances ("Clean Certificate"). If there are any violations, Seller must cure the same as a condition precedent to closing.

(b) Buyer shall deliver to Seller the following:

(1) Buyer shall deliver to the Escrow Agent and shall thereafter cause the Escrow Agent to deliver the balance of the Purchase Price required pursuant to **Article II** above, in immediately available U.S. funds by wire transfer, to Seller, plus or minus the prorations referred to in **Section 5.4** below;

(2) Such evidence of the authority and capacity of Buyer and its representatives as the Escrow Agent and Title Company may reasonably require;

(3) Such documents, certificates, affidavits and other instruments as may be reasonably required by the Escrow Agent and Title Company in order to close the transaction contemplated under this Agreement;



Case ID: 260501884
Control No.: 26066494

(4) A counterpart of the Assignment and Bill of Sale duly executed by Buyer; and

(5) A settlement statement executed by Buyer in form acceptable to Seller and Buyer.

5.3 Expenses. Seller shall pay the cost of performing its obligations under this Agreement, its share of the prorations as set forth in **Section 5.4** hereof (including its prorated portion of taxes and special assessments as set forth in **Section 5.4** below), its own attorneys' fees, any fees to effectuate the assignment of the Assumed Contracts, one-half of any customary escrow fee charged by the Escrow Agent in connection with the Closing and one-half of any transfer taxes due in connection with the recording of the Deed.

Buyer shall pay its proportionate share of the prorations as set forth in **Section 5.4** hereof (including its prorated portion of taxes and special assessments as set forth in **Section 5.4** below) and, in addition, Buyer shall be responsible for and shall pay all other costs that are the responsibility of Buyer under the provisions of this Section or **Section 5.4**, including the full amount of the premium for the Title Policy and the premium for the issuance of any endorsements thereto, any fees for a loan policy of title insurance issued by the Title Company or any other title insurance company, one-half of any transfer taxes due in connection with the recording of the Deed, all recording fees and charges for the recording of the Deed, one-half of any customary escrow fee charged by the Escrow Agent in connection with the Closing, and all other fees or charges of the Escrow Agent and Title Company (not payable by Seller) in connection with the Closing of the transactions contemplated under this Agreement, all due diligence and investigation expenses, the cost of any survey and the cost and expense of Buyer performing its obligations under this Agreement, and its own attorneys' fees.

5.4 Prorations and Credits.

(a) Real estate taxes and installments of special assessments, Business Improvement District Taxes and supplemental and personal property taxes and assessments for the Property shall be prorated by the parties as of the Closing Date on the basis of a three hundred sixty-five (365) day year on the basis that Seller is responsible for (i) all such taxes and installments of special assessments for the fiscal year of the applicable taxing authority occurring prior to the Current Tax Period (as such term is hereinafter defined) and (ii) that portion of such taxes and installments of special assessments for the Current Tax Period through 11:59 p.m., Philadelphia, Pennsylvania time on the date immediately preceding the Closing Date, whether or not the same shall be payable prior to the Closing Date, provided, however, that Seller shall not be responsible for any portion of an increase in real, supplemental or personal property taxes or assessments resulting from the sale of the Property to Buyer (whether for taxes or assessments that accrued before or after the Closing) and Buyer shall be solely obligated for payment of the same and agrees to hold Seller harmless from any liability relating to the same. The phrase "**Current Tax Period**" refers to the calendar year of the applicable taxing authority in which the Closing occurs. All tax and assessment prorations shall be based upon the latest available tax and assessment statement(s) and, accordingly, if the amount of any such real estate taxes or special assessments for the Current Tax Period cannot be ascertained at the Closing as the result of the unavailability of any tax or assessment statement for such period, then the proration shall be computed on the amount of the



Case ID: 260501884
Control No.: 26066494

preceding fiscal year's tax or assessment, with no adjustment to be made post-closing. Since the 2026 taxes are currently subject to an appeal, the parties agree to prorate taxes based upon the 2025 assessed value that Seller has agreed upon with the City of Philadelphia.

(b) At the Closing, Buyer shall receive a credit against the Purchase Price with respect to the Security Deposits. All obligations under the Assumed Contracts shall be prorated between the parties so that Seller shall be responsible for all such expenses and obligations thereunder to the extent the same have accrued through and including the date immediately preceding the Closing Date and Buyer shall be responsible for all such expenses and obligations under the Assumed Contracts that accrue from and after the Closing Date. At Closing, Buyer shall receive a credit against the Purchase Price with respect to any prepaid base rent or additional rent from any Tenants actually paid to Seller.

(c) All rent payable under the Leases shall be prorated for the month of Closing as if paid in full when due (irrespective of whether such rent has not been previously collected by Seller) and Buyer shall be entitled to a credit for the same for such month inclusive of, and after, the Closing Date. With respect to any delinquent rents or other revenue (including any amounts unpaid on the Closing Date for the month in which the Closing Date occurs), following Closing (i) Buyer shall use reasonable and good faith efforts to collect the same for a period of ninety (90) days after Closing, but shall not be required to institute any proceedings to collect the same and (ii) Seller may attempt to collect any such delinquent rent or other revenue directly from any tenant or other party owing such amounts after the expiration of such ninety (90) day period after Closing, but may not institute any proceedings to collect the same. All such collections, less costs of collection, including reasonable attorney fees, shall be remitted promptly after receipt to the party entitled to the same, but in any event not later than 10 days after receipt, after giving effect to the following order of payment priority: the collected amounts shall be applied first to the current month's rents and any other amounts due to Buyer; second, to the rents and other revenues for the month of the Closing, prorated accordingly; and third, to rents and other revenues delinquent as of the Closing Date until the delinquency has been satisfied. The provisions of this Section shall survive Closing for the Survival Period.

(d) Utility costs with respect to the Property and for which Seller is liable shall be prorated at the Closing upon the basis of utility readings, with Seller responsible for utility expenses through and including the date immediately preceding the Closing Date. If Seller does not obtain such reading(s) for any or no reason for any utility serving the Property, Seller shall furnish a reading for such utility as of a date not more than thirty (30) days prior to the Closing Date and the unknown charges shall be apportioned on the basis of an estimate computed by utilizing such reading and the most recent bill from the utility provider. All other income and operating expenses (excluding taxes and assessments and utility charges apportioned as aforesaid) not hereinabove described and prorated shall be prorated in connection with the Closing and through the date of the Closing (and with respect to operating expenses, with Seller being responsible for operating expenses through and including the date immediately preceding the Closing Date and with Buyer responsible for all time periods from and after the Closing Date), and if any such income or operating expenses (excluding taxes and assessments and utility charges apportioned as aforesaid) are not determinable as of the Closing, then at the earliest possible opportunity following the Closing, but in no event later than thirty (30) days after the Closing,



Case ID: 260501884
Control No.: 26066494

Seller and Buyer shall make any interim and final adjustments, which obligation shall survive the Closing.

(e) Charges which are payable by any Tenant to a third party shall not be apportioned hereunder, and Buyer shall accept title subject to any of such charges unpaid and Buyer shall look solely to the Tenant responsible therefor for the payment of the same. If Seller shall have paid any of such charges on behalf of any Tenant and shall not have been reimbursed therefor by the time of Closing, Buyer shall credit to Seller an amount equal to all such charges so paid by Seller.

(f) Seller shall receive the entire advantage of any discounts for the prepayment by it of any taxes, water rates or sewer rents. Buyer acknowledges that Seller may be appealing the valuation of the Property and agrees that Seller shall be entitled, at Seller's cost and expense, to pursue such appeal to completion and to receive (i) any tax refunds or reductions attributable to the years prior to the year of the Closing, and (ii) any tax refund or reduction attributable to the year of the Closing, shall be prorated between Seller and Buyer after deducting (or crediting Seller, as applicable) any expenses, (including attorneys' fees) relating to the appeal, and Buyer shall remit such amounts to Seller within ten (10) days following Buyer's receipt thereof. Notwithstanding anything to the contrary set forth in this Agreement, (A) prior to Closing, Seller may not settle or terminate any assessment appeal for the Property that is pending for tax year 2026 (the "**Pending 2026 Appeal**") without Buyer's prior written consent, which shall be in Buyer's sole discretion and (B) at Closing, Seller shall reasonably cooperate with Buyer to transition the Pending 2026 Appeal to counsel of Buyer's choosing; provided, however, the foregoing notwithstanding, Seller shall be permitted to settle or terminate the Pending 2026 Appeal without Buyer's consent if the resulting 2026 Total Assessed Value is less than or equal to the Purchase Price. In the event the Pending Appeals are not resolved on or before Closing, the Pending 2026 Appeal shall remain open, and counsel of Buyer's choosing may enter its appearance and represent Buyer solely with respect to the Pending 2026 Appeal and Buyer shall have full control over the Pending 2026 Appeal. This Section 5.4(h) shall survive Closing.

(g) The Personal Property is included in this sale, without further charge, except that Buyer shall pay to the applicable taxing authority the amount of any and all sales or similar taxes, if any, payable in connection with the Personal Property which is to be transferred to Buyer under this Agreement and Buyer shall execute and deliver any tax returns required of it in connection therewith, said obligations of Buyer to survive Closing.

5.5 Possession. Possession of the Property, subject to all Leases, shall be delivered and surrendered by Seller to Buyer at the Closing.

ARTICLE VI
Damage to Property and Condemnation

6.1 Promptly after obtaining knowledge thereof, Seller agrees to give to the Buyer written notice of any casualty affecting the Property or any actual or threatened taking or condemnation of all or any portion of the Property between the Effective Date and the Closing Date. If prior to the Closing there shall occur damage to the Property caused by casualty or the taking or condemnation of all or any portion of the Property, then the Closing shall take place as provided herein without abatement of the Purchase Price, and there shall be assigned to Buyer at



Case ID: 260501884
Control No.: 26066494

the Closing all of Seller's interest in and to all insurance proceeds to which Seller is entitled to receive from the insurance carrier or condemnation awards pertaining to the Property to which Seller may be entitled to receive, and Buyer shall receive a credit against the Purchase Price in an amount equal to Seller's deductible under such insurance policy; provided, however, that if any casualty causes ten percent (10%) or more of the square footage of the leasable square footage of the buildings located on the Property to become uninhabitable for a period of over nine (9) months (a "**Material Casualty**"), then either Seller or Buyer may terminate this Agreement by written notice to the other, in which case the Earnest Money shall be returned to Buyer and all other rights and obligations of either party under this Agreement (other than any indemnification rights and obligations under this Agreement and any other obligations which by the express terms of this Agreement are intended to survive any cancellation or termination of this Agreement (collectively, the "**Continuing Obligations**")) shall be terminated and this Agreement shall be of no further force or effect. If neither Seller nor Buyer elects to terminate this Agreement within ten (10) days after Seller sends Buyer written notice of the occurrence of a Material Casualty, then Seller and Buyer shall be deemed to have elected to proceed with Closing as provided in this Section.

ARTICLE VII
Termination, Default and Remedies

7.1 Default by Seller. Seller shall be in default under this Agreement upon the occurrence of any one or more of the following events:

(a) Any of Seller's warranties or representations set forth in this Agreement are untrue or inaccurate in any material respect.

(b) Seller shall fail to (i) meet, comply with or perform any material covenant, agreement, or obligation on its part required within the time limits and in the manner required in this Agreement for any reason other than a default by Buyer under this Agreement or (ii) deliver at the Closing any of the items required of Seller in **Article V** hereof, for any reason other than a default by Buyer under this Agreement.

7.2 Default by Buyer. Buyer shall be in default under this Agreement if Buyer shall fail to (i) meet, comply with or perform any material covenant, agreement or obligation on its part required within the time limits and in the manner required in this Agreement for any reason other than a default by Seller under this Agreement or (ii) deliver at the Closing any of the items required of Buyer in **Article V** hereof, for any reason other than a default by Seller under this Agreement.

7.3 Remedies. In the event of a default by Buyer, if the Earnest Money is delivered to Escrow Agent as required under this Agreement, Seller's sole and exclusive remedy shall be to terminate this Agreement and to receive and retain the Earnest Money and all interest thereon, if any, as liquidated damages, and Seller shall not be entitled to any other damages of any kind, whether actual, consequential, special or punitive. The parties acknowledge and agree that (a) it would be extremely difficult and impracticable to ascertain Seller's actual damages resulting from such default by Buyer under this Agreement; (b) that the Earnest Money represents a reasonable estimate of Seller's actual damages resulting from such default by Buyer under this Agreement; and (c) Seller's retention of the Earnest Money pursuant to this Section 7.3 is not a penalty. In the event of a default by Seller, the Buyer may, at its option, do either of the following (but not both)



Case ID: 260501884
Control No.: 26066494

as its sole and exclusive remedy under this Agreement, under applicable law or in equity, and Buyer shall not be entitled to any damages of any kind, whether actual, consequential, special or punitive:

(1) Terminate this Agreement by written notice delivered to Seller at or prior to the Closing, whereupon (a) the Earnest Money shall be immediately returned to Buyer and (b) Seller shall reimburse Buyer for Buyer's Costs (as hereinafter defined), in an amount not to exceed $150,000.00, within thirty (30) days following receipt of paid invoices therefor, whereupon such payment this Agreement shall be deemed null and void, and the parties shall have no further rights or obligations to each other hereunder except for the Continuing Obligations. The term "Buyer's Costs" is defined for purposes of this Agreement as the documented out-of-pocket third party expenses actually incurred by Buyer for: (i) title examination, survey and searches, including issuance of Buyer's title commitment; (ii) fees paid to Buyer's engineers and consultants for preparing any environmental and engineering reports with respect to the Property; and (iii) actual costs incurred by Buyer in connection with the negotiation of this Agreement, Buyer's due diligence with respect to the Property and limited predevelopment feasibility work directly related to evaluating the Property for Buyer's intended use, such as preliminary site planning, code or zoning analysis or building systems evaluation, but expressly excluding any architectural, engineering, permitting, entitlement, tenant improvement or other design-related costs associated with Buyer's proposed redevelopment or occupancy of the Property; or

(2) Commence an equitable action for specific performance of this Agreement.

In the event of the failure to obtain Lender Approval and/or Court Approval prior to Closing, this Agreement shall terminate, whereupon the Earnest Money shall be immediately returned to Buyer within thirty (30) days following receipt of paid invoices therefor, whereupon such payment this Agreement shall be deemed null and void, and the parties shall have no further rights or obligations to each other hereunder except for the Continuing Obligations

Notwithstanding the foregoing, if the Earnest Money is not delivered to Escrow Agent as required under this Agreement, then this Agreement shall automatically terminate and be of no further force or effect, except for the Continuing Obligations.

## ARTICLE VIII
## Brokerage Commission

8.1 Seller represents to Buyer that Seller has engaged the services of CBRE, Inc. (the "**Broker**"), as a broker in connection with this transaction and that Seller shall be responsible for and shall pay all sums due Broker pursuant to the terms of a separate written agreement between Broker and Seller. Seller further represents to Buyer that Seller has not engaged the services of any other broker in connection with this transaction and shall indemnify and save Buyer harmless from any claims of Broker or any other broker claiming through Seller as a result of this transaction. Buyer represents to Seller that Buyer has not engaged the services of any broker in connection with this transaction and Buyer shall indemnify and save Seller harmless from any claims of any broker claiming through Buyer (excluding Broker) as a result of this transaction.



Case ID: 260501884
Control No.: 26066494

The foregoing indemnification obligations shall survive any termination of this Agreement or the Closing.

ARTICLE IX
Miscellaneous

9.1 Notices. All notices, demands, requests and other communications required or permitted by this Agreement by any party hereto to any other party or to Escrow Agent or to Title Company shall be in writing and shall be validly given or made by any party, or any party's attorney on behalf of such party, only if deposited in the United States mail, sent by certified or registered mail, postage prepaid, return receipt requested, or if made by Federal Express or other similar reputable national courier service keeping records of deliveries and attempted deliveries. Service by mail or courier shall be conclusively deemed made on the first Business Day delivery is attempted or upon receipt, whichever is sooner. Notices may also be given by e-mail to the e-mail address of the intended recipient as hereinafter set forth, provided that in connection therewith a responsive e-mail is returned to the party giving notice that acknowledges receipt of such e-mailed notice. Notices may be given by the attorneys for the respective parties hereto.

All such notices, demands, requests and other communications shall be addressed to the addressee at its address set forth below or at such other address as such party may have previously specified by notice delivered in accordance with this Section:

| | |
|---|---|
| If to Seller: | CBRE, Inc., as Receiver<br>One Oxford Centre<br>301 Grant Street<br>Pittsburgh, PA 15219<br>Attn: John Svorcek<br>Attn: Joseph Petak<br>email: John.Svorcek@cbre.com<br>email: Joseph.Petak@cbre.com |
| With a copy to: | Buchanan Ingersoll & Rooney P.C.<br>501 Grant St., Suite 200<br>Pittsburgh, PA 15219<br>Attn: Christopher P. Schueller, Esquire<br>email: christopher.schueller@bipc.com |
| With a copy to Lender: | Wells Fargo Bank, National Association, as Trustee, for the Benefit of Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2020-MKST Commercial Mortgage Pass-Through Certificates, Series 2020-MKST<br>c/o KeyBank National Association<br>8117 Preston Road, Suite 400<br>Dallas, TX 75225<br>Attn: Steve Britt<br>email: steve_britt@keybank.com |



Case ID: 260501884
Control No.: 26066494

If to Buyer: c/o CSC RE,
459 Columbus Avenue, Unit #1802
New York, New York 10024
Attention: Salomon Smeke Saba
and Alberto Smeke Saba

With a copy to: Vedder Price P.C.
1633 Broadway, 31st Floor
New York, New York 10019
Attention: Robert Salame, Esq.

If to Escrow Agent / Title Company: Commonwealth Land Title Company CWOC-042
4400 MacArthur Blvd, Suite 800
Newport Beach, CA 92660
Phone: (949)724-3140

Any person or entity may change their address for the purpose of receiving notices or demands as herein provided by a written notice given in the manner aforesaid to the others, which notice of change of address shall not become effective, however, until the actual receipt thereof by the others.

9.2 Governing Law; Venue. The laws of the Commonwealth of Pennsylvania shall govern the validity, enforcement and interpretation of this Agreement. Any dispute or cause of action under this Agreement shall be resolved in a court of competent subject matter jurisdiction in the County in which the Property is located.

9.3 Integration; Modification; Waiver. This Agreement constitutes the complete and final expression of the agreement of the parties relating to the Property, and supersedes all previous contracts, agreements and understandings of the parties, either oral or written, relating to the Property. This Agreement cannot be modified, nor may any of the terms hereof be waived, except by an instrument in writing (referring specifically to this Agreement) executed by the party against whom enforcement of the modification or waiver is sought.

9.4 Counterpart Execution; Copies of Signatures. This Agreement may be executed in two or more counterparts, each of which shall constitute an original and all of which together shall constitute one and the same agreement. A photocopied, scanned, telecopied or other electronic signature of any party to this Agreement shall have the same force and effect as an original signature for all purposes.

9.5 Headings; Construction. The headings which have been used throughout this Agreement have been inserted for convenience of reference only and do not constitute matter to be construed in interpreting this Agreement. Words of any gender used in this Agreement shall be held and construed to include any other gender and words in the singular number shall be held to include the plural, and vice versa, unless the context requires otherwise. The words "herein,"



Case ID: 260501884
Control No.: 26066494

"hereof," "hereunder" and other similar compounds of the word "here" when used in this Agreement shall refer to the entire Agreement and not to any particular provision or section. If the last day of any time period stated herein shall fall on a Saturday, Sunday or legal holiday in the Commonwealth of Pennsylvania, then the duration of such time period shall be extended so that it shall end on the next succeeding day which is not a Saturday, Sunday or legal holiday in the Commonwealth of Pennsylvania. As used in this Agreement, the term "**Business Day**" shall mean any day other than a Saturday, Sunday or legal holiday in the Commonwealth of Pennsylvania.

9.6 Invalid Provisions. If any one or more of the provisions of this Agreement, or the applicability of any such provision to a specific situation, shall be held invalid or unenforceable, such provision shall be modified to the minimum extent necessary to make it or its application valid and enforceable, and the validity and enforceability of all other provisions of this Agreement and all other applications of any such provision shall not be affected thereby.

9.7 Binding Effect; Assignment. This Agreement shall be binding upon and inure to the benefit of Seller and Buyer and, with respect to the provisions of **Article XI** of this Agreement, the Escrow Agent, and with respect to **Section 3.2** of this Agreement, the persons and entities receiving the benefits provided in such **Section 3.2**, and, in each case, their respective heirs, executors, personal and legal representatives, successors and permitted assigns. Except as provided below, this Agreement may not be assigned by Buyer without the consent of Seller. Notwithstanding the foregoing or any other provision of this Agreement to the contrary, if Buyer desires to assign its interest in this Agreement to one or more affiliates of Buyer, Seller agrees to enter into a novation agreement with Buyer and such affiliate(s) pursuant to which this Agreement will be cancelled and Seller and such affiliate(s) shall enter into a new agreement on the same terms as this Agreement (and such affiliate(s) shall be the "buyer" under such new agreement); provided, however, Buyer and such affiliate(s) shall be jointly and severally liable for the obligations under such new agreement from and after such novation. Notwithstanding the foregoing or any other provision of this Agreement or any Closing Document to the contrary, if Buyer assigns its rights under this Agreement, or if Buyer and Seller enter into a novation agreement pursuant to this **Section 9.7**, Buyer shall be solely responsible for any additional transfer taxes assessed as a result thereof, and shall pay such additional taxes upon demand from the Commonwealth of Pennsylvania. The provisions of this Section shall survive the Closing or termination of this Agreement. If Seller shall consent to any assignment of this Agreement by Buyer other than any assignment/novation which is permitted by the express terms of this Agreement without Seller's consent, then Buyer shall nonetheless not be relieved of any of its obligations under this Agreement and shall remain jointly and severally liable under this Agreement with the assignee of Buyer.

9.8 Further Acts; Survival of Continuing Obligations. In addition to the acts recited in this Agreement to be performed by Seller and Buyer, Seller and Buyer agree to promptly perform or cause to be performed at the Closing or after the Closing all such further acts as may be reasonably necessary to consummate the transactions contemplated hereby. The obligations described in this **Section 9.8** and the Continuing Obligations shall in all respects survive the Closing and transfer of the Property by Seller to Buyer.

9.9 Time of the Essence. Time is of the essence of this transaction and all of the terms and provisions of this Agreement.



Case ID: 260501884
Control No.: 26066494

9.10 Legal Expenses. In the event of litigation arising out of the terms and conditions of this Agreement, the prevailing party in such litigation shall have the right to recover from the non-prevailing party reasonable attorneys' fees and court costs incurred as a result of such litigation.

9.11 Interpretation of Agreement. The preparation of this Agreement has been a joint effort of Buyer and Seller, each of whom have had an adequate opportunity to consult with counsel of their choice, and this Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted. If any words or phrases in this Agreement shall have been stricken out or otherwise added, this Agreement shall be construed as if the words or phrases so stricken out are otherwise eliminated or never included in this Agreement. No implication or inference shall be drawn from the fact that such words or phrases were so stricken out or otherwise eliminated.

9.12 Limitation of Liability upon Seller. Subject to **Section 4.7** hereof, all of Seller's obligations and liabilities under this Agreement, under any of the documents or instruments delivered in connection with the consummation of the transaction contemplated under this Agreement or with respect to the Property shall be without recourse to Seller or any of its assets (including any of the monies received by Seller as the result of the consummation of the purchase and sale transaction contemplated under this Agreement).

9.13 Discharge of Obligations. The acceptance of the Deed by Buyer shall be deemed to be a full performance and discharge of every representation, warranty and covenant made by Seller herein and every agreement and obligation on the part of Seller to be performed pursuant to the provisions of this Agreement, except those, if any, which are herein specifically stated to survive Closing.

9.14 Intentionally Deleted.

9.15 No Third Party Beneficiary. Except as expressly provided herein to the contrary, the provisions of this Agreement and of the documents to be executed and delivered at Closing are and will be for the benefit of Seller and Buyer only and are not for the benefit of any third party, and accordingly, no third party shall have the right to enforce the provisions of this Agreement or of the documents to be executed and delivered at Closing.

9.16 Exhibits and Schedules. The following schedules or exhibits attached hereto shall be deemed to be an integral part of this Agreement:

Exhibit A - Legal Description of the Property

9.17 Intentionally Deleted.

9.18 Intentionally Deleted.

9.19 Effective Date. The date of delivery to Escrow Agent of a fully executed counterpart of this Agreement, as evidenced by Escrow Agent's notation in the space set forth below, shall be deemed the effective date of this Agreement (the "**Effective Date**").



Case ID: 260501884
Control No.: 26066494

9.20 Pennsylvania-Specific Provisions.

(a) Intentionally Deleted.

(b) Sewage Facilities: In accordance with the Pennsylvania Sewage Facilities Act of January 24, 1996, No. 537 P.L. 1535, as amended, the following statement regarding the availability of a community sewage system is included: the Property is connected to or serviced by a Community Sewage System.

(c) Pennsylvania Bulk Sales Law: Buyer hereby waives the requirement for Seller's delivery by Closing of the tax clearance certificates to be issued in compliance with Pennsylvania's Bulk Sales Statutes ("**Tax Clearance Certificates**"). As used herein, "Pennsylvania's Bilk Sales Statutes shall mean 43 P.S. § 788.3, 69 P.S. § 529 and 72 P.S. § 1403, 72 P.S. § 7240 and 72 P.S. § 7321.1.

(d) Waiver of Tender. Tender at the time of Closing of an executed Deed and the balance of the Purchase Price by Buyer are hereby mutually waived, but nothing herein contained shall be construed as to relieve Seller from the obligation to deliver the Deed or to relieve Buyer from the concurrent obligation to pay the balance of the Purchase Price.

## ARTICLE X
## Confidentiality and Public Disclosure

10.1 Confidentiality. Buyer agrees that it shall keep this Agreement, the terms and conditions of this Agreement and all materials, documents and information pertaining to the Property or the Leases that is at any time delivered or made available by Seller or any of its agents or representatives to the Buyer or any of its agents or representatives (collectively, the "**Confidential Information**") confidential and that Buyer shall not disclose the Confidential Information to any person or entity for any reason whatsoever except as specifically permitted herein or except as may be necessary to comply with the order of any court of competent jurisdiction. Buyer shall restrict dissemination of Confidential Information within its own organization and to Buyer's representatives, advisors, consultants or lenders and to the Title Company and Escrow Agent so that the Confidential Information shall be revealed only to the extent necessary to enable Buyer to fulfill the terms of this Agreement. In the event this Agreement is terminated or Buyer defaults hereunder, Buyer shall promptly return to Seller any and all Confidential Information. In the event of a breach or threatened breach by Buyer or its agents under this Section, Seller shall be entitled to an injunction restraining Buyer or its agents from disclosing, in whole or in part, any Confidential Information. Nothing herein shall be construed as prohibiting Seller from pursuing any other available remedy at law or in equity for such breach or threatened breach.

10.2 Public Disclosure. Prior to Closing, any release to the public of information by Buyer with respect to any matters set forth in this Agreement, including the existence of this Agreement, will be made only in the form approved by Seller and its counsel.



Case ID: 260501884
Control No.: 26066494

ARTICLE XI
Escrow Provisions

11. Provisions Pertaining to Escrow Agent and Earnest Money. The following provisions pertain to the Earnest Money, the maintenance of the account into which the Earnest Money is to be placed by the Escrow Agent and the Escrow Agent's limitation of liability:

11.1 Except as hereinafter provided in this **Section 11.1** to the contrary, in the event that the Escrow Agent receives conflicting instructions from the parties or determines in good faith that a bona fide dispute exists as to whether the Escrow Agent is obligated to deliver the Earnest Money, or as to whom the Earnest Money is to be delivered, the Escrow Agent, at its option, (a) may refuse to comply with any claims or demands on it and continue to hold the Earnest Money until (i) the Escrow Agent receives written notice signed by Seller and Buyer directing the release and delivery of the Earnest Money, in which event the Escrow Agent shall then release and deliver the Earnest Money in accordance with said direction, or (ii) the Escrow Agent receives a certified copy of a final non-appealable judgment of a court of competent jurisdiction directing the release and delivery of the Earnest Money, in which event the Escrow Agent shall then release and deliver the Earnest Money in accordance with said direction, or (b) may deliver the Earnest Money to the Philadelphia County Court of Common Pleas, or (c) may take such affirmative steps as the Escrow Agent may elect in order to substitute another impartial party reasonably satisfactory to Seller and Buyer (whose consents to such substitution shall not be unreasonably withheld), to hold the Earnest Money, including, without limitation, the deposit thereof in a court of competent jurisdiction and the commencement of an action for interpleader, the costs thereof to be the joint obligation of Buyer and Seller (but notwithstanding the foregoing, as between Seller and Buyer, such costs shall be borne by whichever of Seller or Buyer is the losing party, or in accordance with any mutual agreement of Seller and Buyer if neither party is the losing party).

11.2 Escrow Agent is acting as a stakeholder only with respect to the Earnest Money. It is agreed that the duties of the Escrow Agent are only as herein specifically provided in this Agreement, are purely ministerial in nature, and that Escrow Agent shall incur no liability whatsoever except for its own willful misconduct or gross negligence. Seller and Buyer each hereby release the Escrow Agent from any act done or omitted to be done by the Escrow Agent in good faith in the performance of its duties hereunder.

11.3 Except as and only to the extent otherwise provided elsewhere in this Agreement to the contrary, all out-of-pocket costs and expenses (including, without limitation, reasonable attorneys' fees and costs) incurred by Escrow Agent as the result of its serving as escrow agent under this Agreement (other than any of such costs and expenses incurred as the result of the Escrow Agent taking any action or omitting to take any action in bad faith, in willful disregard of this Agreement or involving gross negligence on the part of Escrow Agent) and all escrow fees charged by Escrow Agent in connection with its acting as escrow agent with respect to the Earnest Money shall be paid for one-half by Buyer and the other one-half by Seller.

11.4 Buyer and Seller agree and acknowledge that the Escrow Agent has no liability in connection with the Earnest Money in the event of the failure or insolvency of the financial institution in which the Earnest Money is deposited.



Case ID: 260501884
Control No.: 26066494

11.5 All notices and demands to Escrow Agent or from Escrow Agent to Seller or Buyer shall be in writing and shall be governed by **Section 9.1** of this Agreement. Escrow Agent shall be entitled to rely on all communications which purport to be on behalf of the party giving such communication and purporting to be signed by an authorized party or any attorney of any party as may be designated from time to time by Seller or Buyer.

11.6 Escrow Agent may resign from serving as escrow agent under this Agreement at any time by giving ten (10) Business Days prior written notice to that effect to each of Seller and Buyer. In such event, the successor escrow agent shall be selected by Seller and approved by Buyer, such approval not to be unreasonably withheld or delayed. Escrow Agent shall then deliver the Earnest Money to the successor escrow agent, to be held by such successor escrow agent pursuant to the terms of this Agreement and thereupon such successor escrow agent shall thereafter be deemed to be the "Escrow Agent" under this Agreement.

11.7 In its capacity as Escrow Agent, Escrow Agent shall not be responsible for the genuineness or validity of any security, instrument, document or item deposited with it, and shall have no responsibility other than to faithfully follow the instructions contained in this Agreement, and Escrow Agent is fully protected in acting in accordance with any written instrument given to it hereunder by Buyer or Seller and believed by Escrow Agent to have been signed by the proper person. Escrow Agent may assume that any person purporting to give any notice under this Agreement and representing that they have authority to do so has been duly authorized to do so.

11.8 Escrow Agent shall have no duties or responsibilities other than those expressly set forth in this Agreement and that pertain to its duties as escrow agent. Escrow Agent shall have no duty to enforce any obligation of any person or entity to make any payment or delivery or to enforce any obligation of any person or entity to perform any other act. Escrow Agent shall be under no liability to Buyer or Seller or to anyone else by reason of any failure on the part of Buyer or Seller to perform its obligations under any document.

11.9 Escrow Agent shall be entitled to approve (not to be unreasonably withheld or delayed) legal counsel who may be retained to defend or prosecute any action on behalf of Escrow Agent under or arising out of this Agreement.

11.10 The duties, obligations and liabilities of Buyer, Seller and Escrow Agent as set forth in this **Article XI** of this Agreement shall be interpreted, construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania.

## ARTICLE XII
## Buyer's Closing Conditions

12.1 Notwithstanding anything in this Agreement to the contrary, Buyer's obligation to consummate the purchase of the Property is expressly contingent upon the satisfaction of the following conditions as of the Closing Date ("**Buyer's Closing Conditions**"):

(a) All representations and warranties of Seller under this Agreement continue to be materially true and correct.



Case ID: 260501884
Control No.: 26066494

(b) The Title Company shall issue or be irrevocably and unconditionally committed to issue to Buyer an owner's title insurance policy in the full amount of the Purchase Price insuring that good and marketable, fee simple title to the Property is vested in Buyer subject only to the Permitted Exceptions (the "**Title Policy**").

(c) Seller shall have executed and delivered all documents required hereunder and complied with its obligations under this Agreement, provided however, that Buyer shall proceed to close even if the final Sale Order does not contain language set forth in Sections 4.6(ii), (iii) and (iv) and Buyer's Closing Conditions do not include the delivery of a final Sale Order which contains the language set forth in Sections 4.6(ii), (iii) and (iv).

(d) Neither NG 1500 Market St. LLC, a Delaware limited liability company ("**Owner**") nor any party on behalf of Owner files a voluntary petition or an involuntary petition under the Title 11 of the United States Code *et. seq.*, as amended, or any other federal or state debtor relief law which affects the Property or Owner or the Court Order.

12.2 If any of Buyer's Closing Conditions are not satisfied on or prior to the Closing Date (except as a result of a default by Seller, in which case Section 7.1 and Section 7.3 shall apply), Buyer may, by delivering written notice at or prior to the Closing Date, to Seller, elect to either (i) waive any such condition; or (ii) terminate this Agreement. If Buyer elects to terminate this Agreement, the Earnest Money will be returned to Buyer and neither party will have any further obligations or liabilities hereunder, except as expressly provided in this Agreement. Time is agreed to be strictly of the essence with respect to terminating this Agreement. Buyer's failure to timely deliver written notice of termination prior to the Closing Date shall be conclusively deemed a waiver of Buyer's right to terminate this Agreement pursuant to the terms of this <u>Section 12.2.</u>

THE REMAINDER OF THIS PAGE
INTENTIONALLY BLANK



Case ID: 260501884
Control No.: 26066494

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties have executed this Agreement on the dates set forth next to their signatures below.

**SELLER:**

**CBRE, INC.**, solely in its capacity as receiver under the Order entered on April 14, 2023 in a case in the United States District Court for the Eastern District of Pennsylvania, entitled *Wells Fargo Bank, National Association, as Trustee, for the Benefit of Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2020-MKST Commercial Mortgage Pass-Through Certificates, Series 2020-MKST, the RR Interest Owner and the Future Advance Lender v. NG 1500 Market St. LLC*, Case No. 23-146 and not in its personal capacity

By: ______________________________
Name: ____________________________
Title: _____________________________

**BUYER:**

**CSC COLIVING LLC**, a
Delaware limited liability company

By: ______________________________
Name: Salo Smeke
Title: Managing partner



Case ID: 260501884
Control No.: 26066494

## JOINDER BY ESCROW AGENT

The undersigned, Commonwealth Land Title Company, has joined in the execution of this Agreement solely for the purpose of evidencing its agreement to serve as the "Escrow Agent" under and in accordance with the terms and provisions of this Agreement. Escrow Agent acknowledges receipt of a fully executed counterpart of this Agreement as of February __, 2026, which date shall be deemed the "Effective Date" of this Agreement.

**ESCROW AGENT:**

Commonwealth Land Title Company

By: ______________________________
Name:
Title:



Case ID: 260501884
Control No.: 26066494

# EXHIBIT A

Legal Description of Property

ALL THAT CERTAIN lot or piece of ground with buildings and improvements thereon erected, situate in the 8th Ward of the City of Philadelphia and described as follows, to wit:

BEGINNING at a point of intersection formed by the Westerly side of 15th Street (variable width) and the Southerly side of Market Street (100 feet wide); thence extending Southwardly along the said Westerly side of 15th Street the distance of 265 feet 0 inches to a point on the Northeasterly end of a corner cut off which connects the said Westerly side of 15th Street and the Northerly side of Ranstead Street (20 feet wide), said point also being on the Northwesterly side of an easement for cutback which easement for cutback applies only to certain land and/or space between an elevation of +/- 38.50 and an elevation of +/- 68.50; thence Southwardly along the Westerly side of said 15th Street extended and along the Easterly side of said Easement for cutback 21 feet 0 inches to a point on the Northerly side of said Ranstead Street extended and on the Southerly side of said Easement for cutback; thence Westwardly along the Northerly side of said Ranstead Street extended and along the Southerly side of said Easement for cutback 30 feet 0 inches to a point on the Southwesterly end of said corner cut off and on the Northwesterly side of said Easement for cutback; thence Westwardly along the Northerly side of said Ranstead Street (part 20 feet wide and part 30 feet wide) 346 feet 0 inches to a point on the Easterly side of 16th Street (70 feet wide); thence Northwardly along the said Easterly side of 16th Street 286 feet 0 inches to a point on the said Southerly side of Market Street; thence Eastwardly along the said Southerly side of Market Street 376 feet 0 inches to a point on the said Westerly side of 15th Street, being the first mentioned point and place of beginning.

Subject to the rights of the City of Philadelphia in that portion of the hereinbefore described premises conveyed by Deed from the Redevelopment Authority of the City of Philadelphia to The City of Philadelphia in Deed Book JRS 456 page 258.

BEING known as 1500-42 Market Street. BEING Parcel No.: 88-3-3200-00.

BEING the same premises which EQC Operating Trust, a Maryland real estate investment trust formerly known as Hub Properties Trust, by Deed dated 6/28/2017, effective 7/14/2017 and recorded 7/18/2017 in Philadelphia County in Document No. 53239762, conveyed unto NG 1500 Market St. LLC, a Delaware limited liability company, in fee.



Case ID: 260501884
Control No.: 26066494

# EXHIBIT 3.1(a)

## ALTA COMMITMENT FOR TITLE INSURANCE

issued by:

Commonwealth
LAND TITLE INSURANCE COMPANY

Commitment Number:

**PIT260026 - 1st Revised**

### NOTICE

**IMPORTANT - READ CAREFULLY:** THIS COMMITMENT IS AN OFFER TO ISSUE ONE OR MORE TITLE INSURANCE POLICIES. ALL CLAIMS OR REMEDIES SOUGHT AGAINST THE COMPANY INVOLVING THE CONTENT OF THIS COMMITMENT OR THE POLICY MUST BE BASED SOLELY IN CONTRACT.

THIS COMMITMENT IS NOT AN ABSTRACT OF TITLE, REPORT OF THE CONDITION OF TITLE, LEGAL OPINION, OPINION OF TITLE, OR OTHER REPRESENTATION OF THE STATUS OF TITLE. THE PROCEDURES USED BY THE COMPANY TO DETERMINE INSURABILITY OF THE TITLE, INCLUDING ANY SEARCH AND EXAMINATION, ARE PROPRIETARY TO THE COMPANY, WERE PERFORMED SOLELY FOR THE BENEFIT OF THE COMPANY, AND CREATE NO EXTRACONTRACTUAL LIABILITY TO ANY PERSON, INCLUDING A PROPOSED INSURED.

THE COMPANY'S OBLIGATION UNDER THIS COMMITMENT IS TO ISSUE A POLICY TO A PROPOSED INSURED IDENTIFIED IN SCHEDULE A IN ACCORDANCE WITH THE TERMS AND PROVISIONS OF THIS COMMITMENT. THE COMPANY HAS NO LIABILITY OR OBLIGATION INVOLVING THE CONTENT OF THIS COMMITMENT TO ANY OTHER PERSON.

### COMMITMENT TO ISSUE POLICY

Subject to the Notice; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and the Commitment Conditions, Commonwealth Land Title Insurance Company, a Florida corporation (the "Company"), commits to issue the Policy according to the terms and provisions of this Commitment. This Commitment is effective as of the Commitment Date shown in Schedule A for each Policy described in Schedule A, only when the Company has entered in Schedule A both the specified dollar amount as the Proposed Amount of Insurance and the name of the Proposed Insured.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Commonwealth Land Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association



Case ID: 260501884
Control No.: 26066494

**COMMONWEALTH LAND TITLE INSURANCE COMPANY** | **COMMITMENT NO. PIT260026 - 1st Revised**

If all of the Schedule B, Part I-Requirements have not been met within one hundred eighty (180) days after the Commitment Date, this Commitment terminates and the Company's liability and obligation end.

**Commonwealth Land Title Insurance Company**

By:

Michael J. Nolan, President

Attest:

Marjorie Nemzura, Secretary

Countersigned By:

Jeffrey Junstrom
Authorized Officer or Agent

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Commonwealth Land Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

## NOTICES

1. PLEASE BE ADVISED THAT COMMONWEALTH LAND TITLE INSURANCE COMPANY ("COMPANY") AND COMMONWEALTH LAND TITLE INSURANCE COMPANY ("AGENT") HAVE NO KNOWLEDGE, TRAINING OR EXPERIENCE IN MATTERS THAT ARE UNRELATED TO TITLE INSURANCE, INCLUDING, BUT NOT LIMITED TO, SUCH MATTERS AS BULK SALE TRANSFERS, BULK SALE CLEARANCE CERTIFICATE REQUIREMENTS (IF APPLICABLE), ZONING/SUBDIVISION, STRUCTURAL REPAIRS, ENVIRONMENTAL, WATER INFILTRATION, WETLANDS, TERMITES OR ONSITE SEWAGE SYSTEMS, AND WE DO NOT INTEND TO, AND CANNOT, PROVIDE SERVICES OR ADVICE TO YOU ON SUCH MATTERS. IF YOU ARE FACED WITH ISSUES REGARDING SUCH MATTERS, YOU SHOULD CONSULT A LAWYER, ENGINEER, ARCHITECT OR OTHER APPROPRIATE CONSULTANT OR PROFESSIONAL OF YOUR CHOICE.

2. ALSO BE ADVISED THAT YOU MAY PURCHASE AT ADDITIONAL COST ENHANCED COVERAGES FROM THE BASIC POLICY OF TITLE INSURANCE. IF YOU WISH AN EXPLANATION OF THE ENHANCED COVERAGES AND THE COST FOR THESE ADDITIONAL COVERAGES, PLEASE CONTACT THE PARTY LISTED BELOW.

3. THE COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF INSURANCE REQUIRES THAT WE SEND THE FOLLOWING NOTICE TO YOU, OUR APPLICANT, PRIOR TO CLOSING. IF APPLICABLE, THE DEPARTMENT FURTHER REQUIRE THAT YOU, THE APPLICANT, FORWARD THIS NOTICE TO THE ULTIMATE CONSUMER IN ADVANCE OF THE DAY OF CLOSING:

   YOUR TITLE INSURANCE FEE COVERS THE COST OF CLOSING ON THE INSURED REAL ESTATE PROPERTY IF IT TAKES PLACE DURING REGULAR OFFICE HOURS AND AT THE OFFICE OF THE TITLE INSURANCE AGENT OR UNDERWRITER. IF YOUR CLOSING TAKES PLACE AT A LOCATION OR TIME OF YOUR CHOOSING, OR THAT OF YOUR LENDER OR REALTOR, THE TITLE INSURANCE AGENT OR UNDERWRITER MAY IMPOSE AN ADDITIONAL CHARGE FOR THIS SPECIAL SERVICE. YOU MAY DETERMINE THE AMOUNT OF THIS ADDITIONAL CHARGE, IF ANY, BY CONTACTING THE PARTY LISTED BELOW.

   Commonwealth Land Title Insurance Company
   603 Stanwix Street
   Pittsburgh, PA 15222
   (412)281-8080

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Commonwealth Land Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association



Case ID: 260501884
Control No.: 26066494

**COMMONWEALTH LAND TITLE INSURANCE COMPANY** | **COMMITMENT NO. PIT260026 - 1st Revised**

***Transaction Identification Data, for which the Company assumes no liability as set forth in Commitment Condition 5.e.:***

| ISSUING OFFICE: |
|---|
| Commonwealth Land Title Insurance Company<br>603 Stanwix Street<br>Pittsburgh, PA 15222<br>Main Phone: (412)281-8080 |

**Order No.:** **PIT260026**
**Reference No.:** **932600097**

## SCHEDULE A

1. Commitment Date: December 17, 2025
2. Policy to be issued:

   (a) ALTA Owner's Policy (as modified by TIRBOP 07/01/2021)
   Proposed Insured: Purchaser with contractual rights under a purchase agreement with the vested owner identified at Item 4 below
   Proposed Amount of Insurance: $63,500,000.00
   The estate or interest to be insured: Fee Simple

   (b) ALTA Loan Policy (as modified by TIRBOP 07/01/2021)
   Proposed Insured: Lender with contractual obligations under a loan agreement with the proposed insured owner identified in Item 2 above.
   Proposed Amount of Insurance: $100,000.00
   The estate or interest to be insured: Fee Simple

3. The estate or interest in the Land at the Commitment Date is:

   Fee Simple

4. The Title is, at the Commitment Date, vested in:

   NG 1500 Market St. LLC, a Delaware limited liability company

   NOTE: Wells Fargo Bank, National Association, as Trustee, for the benefit of registered holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2020-MKST

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Commonwealth Land Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association



Case ID: 260501884
Control No.: 26066494

**COMMONWEALTH LAND TITLE INSURANCE COMPANY** | **COMMITMENT NO. PIT260026 - 1st Revised**

**SCHEDULE A**
(continued)

Commercial Mortgage Pass-Through Certificates, Series 2020-MKST, the RR Interest Owner, and the Future Advance Lender, appointed Receiver by Consent Order Appointing Receiver in Case # 2:23-CV-00146-NIQA.

5. The Land is described as follows:

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

FOR INFORMATIONAL PURPOSES ONLY:

1500 Market St., Philadelphia, PA 19102, City of Philadelphia, County of Philadelphia

**END OF SCHEDULE A**

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Commonwealth Land Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



Case ID: 260501884
Control No.: 26066494

# EXHIBIT "A"

Legal Description

**For APN/Parcel ID(s): 88-3320000**

All that certain lot or piece of ground situate in the 8th Ward of the City of Philadelphia, County of Philadelphia, Commonwealth of Pennsylvania and described as follows:

BEGINNING at a point of intersection formed by the Westerly side of 15th Street (variable width) and the Southerly side of Market Street (100 feet wide); thence extending Southwardly along the said Westerly side of 15th Street the distance of 265 feet 0 inches to a point on the Northeasterly end of a corner cut off which connects the said Westerly side of 15th Street and the Northerly side of Ranstead Street (20 feet wide), said point also being on the Northwesterly side of an easement for cutback which easement for cutback applies only to certain land and/or space between an elevation of +/- 38.50 and an elevation of +/- 68.50; thence Southwardly along the Westerly side of said 15th Street extended and along the Easterly side of said Easement for cutback 21 feet 0 inches to a point on the Northerly side of said Ranstead Street extended and on the Southerly side of said Easement for cutback; thence Westwardly along the Northerly side of said Ranstead Street extended and along the Southerly side of said Easement for cutback 30 feet 0 inches to a point on the Southwesterly end of said corner cut off and on the Northwesterly side of said Easement for cutback; thence Westwardly along the Northerly side of said Ranstead Street (part 20 feet wide and part 30 feet wide) 346 feet 0 inches to a point on the Easterly side of 16th Street (70 feet wide); thence Northwardly along the said Easterly side of 16th Street 286 feet 0 inches to a point on the said Southerly side of Market Street; thence Eastwardly along the said Southerly side of Market Street 376 feet 0 inches to a point on the said Westerly side of 15th Street, being the first mentioned point and place of beginning.

LESS AND EXCEPT the portion of the herein before described premises by Deed of Dedication from the Redevelopment Authority of the City of Philadelphia to the City of Philadelphia dated June 20, 1969 and recorded in the Department of Records in and for the City of Philadelphia in Deed Book J.R.S. No. 456, Page 258.

Being Tax Parcel No. 88-3320000.

BEING the same premises which EQC Operating Trust, a Maryland real estate investment trust formerly known as Hub Properties Trust by Special Warranty Deed dated 06/28/2017 and recorded 07/18/2017 in the Office of the Recorder of Deeds in and for the County of Philadelphia as Document No. 53239762, granted and conveyed unto NG 1500 Market St. LLC, a Delaware limited liability company.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Commonwealth Land Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



Case ID: 260501884
Control No.: 26066494

## SCHEDULE B, PART I
## REQUIREMENTS

All of the following Requirements must be met:

1. The Proposed Insured must notify the Company in writing of the name of any party not referred to in this Commitment who will obtain an interest in the Land or who will make a loan on the Land. The Company may then make additional Requirements or Exceptions.

2. Pay the agreed amount for the estate or interest to be insured.

3. Pay the premiums, fees, and charges for the Policy to the Company.

4. Documents satisfactory to the Company that convey the Title or create the Mortgage to be insured, or both, must be properly authorized, executed, delivered, and recorded in the Public Records.

5. The following instruments must be submitted for review and recording:

   a. Deed from NG 1500 Market St. LLC, a Delaware limited liability company, to a Purchaser with contractual rights under a purchase agreement with the vested owner.

   b. Mortgage from a Purchaser with contractual rights under a purchase agreement with the vested owner to a Lender with contractual obligations under a loan agreement with the proposed insured owner.

6. If any construction materials have been delivered to the premises or any construction has occurred within the past six months, please notify us.

7. A driver's license or other photo identification must be provided for any individual who will sign the instruments identified in Item No. 5 above or any other closing documents.

8. An owner's affidavit must be submitted at closing. The form of owner's affidavit will be provided by the Company.

9. This Commitment is based on an examination of title covering the period through the Effective Date shown in Schedule A. In addition to the Requirements and Exceptions set forth herein, this Commitment is subject to all matters appearing in the public records between the Effective Date and the time the insured acquires of record the estate or

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Commonwealth Land Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association



Case ID: 260501884
Control No.: 26066494

## SCHEDULE B, PART I
## REQUIREMENTS
(continued)

interest to be insured.

10. The following mortgages:

a. Open-End Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing made by NG 1500 Market St. LLC to JPMorgan Chase Bank, National Association, in the amount of $388,000,000.00, dated as of 11/6/2019 and recorded 12/12/2019 in Document Number 53604614.

b. First Amendment to Mortgage made by and between NG 1500 Market St. LLC and JPMorgan Chase Bank, National Association, dated as of 12/20/2019 and recorded 1/7/2020 in Document Number 53615245.

c. Assignment of Leases and Rents made by and between JPMorgan Chase Bank, National Association and Wells Fargo Bank, National Association, as Trustee, for the benefit of holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2020-MKST, Commercial Mortgage Pass-Through Certificates, Series 2020-MKST, the RR interest owner, dated as of 2/26/2019 and recorded 4/30/2020 in Document Number 53662686.

d. Subordination, Nondisturbance and Attornment Agreement between Wells Fargo Bank, National Association, as Trustee, for the benefit of Holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2020-MKST, Commercial Mortgage PassThrough Certificates, Series 2020-MKST, the RR Interest Owner and the Future Advance, Oceanfirst Bank N.A. and NG 1500 Market Street. LLC, dated 1/21/2021 and recorded 3/9/2021 in Document ID No. 53801077.

e. Notice of Lis Pendens dated 2/21/2023 and Recorded 2/22/2023 in Document 54151872.

11. The following judgments:

a. Wells Fargo Bank, National Association, as Trustee, vs. NG 1500 Market St. LLC, filed on January 12, 2023 at Case No. 2:23-cv-00146-NIQA, in the amount

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Commonwealth Land Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association





Case ID: 260501884
Control No.: 26066494

## SCHEDULE B, PART I
## REQUIREMENTS
(continued)

of $378,597,000.00.

12. Real estate tax certificates, covering the current year and three prior years, must be obtained. Tax lien certificates will be ordered by our office.

13. Sewer and water charges, if any. Certificates covering sewer and water charges will be ordered by our office.

14. Unfiled municipal claims, if any. Municipal lien letters, showing whether there are any municipal claims affecting the premises, will be ordered by our office from the municipality in which the land is located and any municipal water or sewer authorities which service the community.

15. Certification to be obtained from Philadelphia Gas Works ("PGW") as to amounts due for gas service to the subject property. All outstanding gas charges up to and including the date of settlement must be paid in full. Reading required in the event of sale of property.

16. Determination to be made regarding Solid Resources Fee assessed by the Streets Department of the City of Philadelphia and all fees due to be paid. Note: The Solid Resources Fee for an entire calendar year becomes a lien on title as of January 1st of that calendar year.

17. When it is presented for recording, the deed must be accompanied by a completed and signed Philadelphia real Estate Transfer Tax Certification (in duplicate); the form is available online at http://www.phila.gov/pdfs/82-127.pdf

18. Proof that Special Service District Tax Assessments have been paid in full, if applicable.

19. NOTICE TO SELLER (S): You are required by law to provide the Company with your correct taxpayer identification number. If you do not provide the Company with your correct taxpayer identification number, you may be subject to civil or criminal penalties imposed by law.

20. The names of all relevant parties to the within real estate transaction will be searched

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Commonwealth Land Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association



Case ID: 260501884
Control No.: 26066494

**SCHEDULE B, PART I**
**REQUIREMENTS**
(continued)

prior to closing to verify that they are not Specially Designated Nationals who are subject to the provisions of the President's Executive Order Targeting Terrorist Assets.

21. NOTE: Any documents being executed in conjunction with this transaction must be signed in the presence of an authorized Company employee, an authorized employee of an agent, an authorized employee of the insured lender, or by using Bancserv or other approved third party service. If the above requirement cannot be met, please call the Company at the number provided in this report.

22. In Pennsylvania, a document will not be accepted for recording if it is dated subsequent to the date of its earliest acknowledgment. If the dating of a document presents a problem, please contact our office to discuss the wording of the caption of the document.

23. The Company may make other requirements or exceptions upon its review of the proposed documents creating the estate or interest to be insured or otherwise ascertaining details of the transaction.

24. Notice: Please be aware that due to the conflict between federal and state laws concerning the cultivation, distribution, manufacture or sale of marijuana, the Company is not able to close or insure any transaction involving Land that is associated with these activities.

25. The transaction contemplated in connection with this Commitment is subject to the review and approval of the Company's Corporate Underwriting Department. The Company reserves the right to add additional exceptions or notes and to make further requirements after such review.

26. Proof must be furnished of the legal existence of the proposed insured entity. If a mortgage will be insured, proof of authority requirements will be added to this Commitment when the borrower is identified.

27. Confirmation from the office closing this transaction that all requirements of this Commitment and of the Company have been met.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Commonwealth Land Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.





Case ID: 260501884
Control No.: 26066494

**SCHEDULE B, PART I**
**REQUIREMENTS**
(continued)

28 If the lender or owner in the subject transaction requires the removal of the survey exception in the title policies to be issued, the Company requires receipt of an acceptable ALTA Survey and further, the Company reserves the right to include any matters shown thereon as exceptions in Schedule B of said policies to be issued.

29 In Pennsylvania, the standard survey exception (Schedule B, Section 2, Item No. 1) is deleted from the policy only by issuing an endorsement. For a loan policy, the appropriate endorsement is a PA 300 and the cost is $100.00. For an owner's policy, the appropriate endorsement is a PA 301 endorsement and the cost is 20% of premium.

30 For each policy to be issued as identified in Schedule A, Item 2; the Company shall not be liable under this commitment until it receives a designation for a Proposed Insured, acceptable to the Company. As provided in Commitment Condition 4, the Company may amend this commitment to add, among other things, additional exceptions or requirements after the designation of the Proposed Insured.

31 The following requirements apply to the grantor limited liability company:

a. A certificate of good standing for the grantor limited liability company must be submitted from the state in which it is organized.

b. A certified copy of the certificate of organization and operating agreement of the grantor limited liability company must be submitted.

c. Proof must be submitted that a majority of the managers (or members, if applicable) have consented to the proposed conveyance.

d. If the proposed conveyance contravenes the certificate of organization or operating agreement, proof must be submitted that all managers (or members, if applicable) have consented to the conveyance.

e. Proof of authority to execute the proposed deed must be submitted.

f. If any of the members or managers of the limited liability company in title are other than a natural person, include the above organizational and authority documents for each

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Commonwealth Land Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association



Case ID: 260501884
Control No.: 26066494

## SCHEDULE B, PART I
## REQUIREMENTS
(continued)

nested entity until reaching all natural persons as owners of the entity.

g. Taxes settled by the Commonwealth of Pennsylvania against the grantor limited liability company, if any. A lien certificate will be ordered by our office from the Department of Revenue.

h. NOTICE ONLY: If this transaction involves a conveyance of 51% or more of the grantors assets, a Bulk Sales Clearance Certificate (Certificate) must be obtained from the Pennsylvania Department of Revenue by the Grantor and presented to the Grantee. The Certificate will indicate taxes owed to the Commonwealth by the Grantor. FAILURE OF THE GRANTEE TO OBTAIN THE CERTIFICATE FROM THE GRANTOR SHALL RENDER THE GRANTEE LIABLE TO THE COMMONWEALTH FOR TAXES OWED BY THE GRANTOR UP TO AND INCLUDING THE DATE OF THE TRANSFER. Such a lien would be post-policy and, therefore, NOT INSURED AGAINST BY THIS POLICY. Professional counsel should be sought to contractually establish the rights and obligations of the parties of this transaction with respect to any such tax lien.

32. The mortgage listed at Schedule B, Part 1, Item 10 above is subject to the following in Rem Action:

Wells Fargo Bank, National Association, as Trustee, for the benefit of Holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2020-MKST, Commercial Mortgage Pass-Through Certificates, Series 2020-MKST as filed in United States District Court for the Eastern District of Pennsylvania Civil Action No. 23-cv-00146-NIQA; CBRE, Inc was appointed Receiver of the real property 1500 Market Street.

33. Notice of Lis Pendens dated February 21, 2023, and recorded February 22, 2023 in Document 54151872 to be stricken of record.

34. If the proposed sale is to be made by CBRE, Inc., Receiver pursuant to Order of Court filed in the United States District Court for the Eastern District of Pennsylvania Civil Action No. 23-cv-00146-NIQA, CBRE, Inc was appointed Receiver of the real property 1500 Market Street the following requirements apply:

a. Proof must be filed in the proceedings to document that NG 1500 Market St. LLC was

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Commonwealth Land Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association



Case ID: 260501884
Control No.: 26066494

## SCHEDULE B, PART I
## REQUIREMENTS
(continued)

given notice of the proposed appointment of the Receiver.

b. Proof must be filed in the proceedings to document that NG 1500 Market St. LLC was given notice of the proposed sale by the Receiver.

c. Proof must be filed in the proceedings to document that NG 1500 Market St. LLC has consented to the proposed sale by the receiver.

d. An order of court must be entered approving the sale.

e. The proposed deed to be recorded must recite the order of court approving the sale.

f. The open mortgage and any other filed liens of record as set forth in this Report must be satisfied of record.

g. All unpaid real estate taxes, water and sewer charges and municipal liens must be paid in full.

h. Additional questions and requirements may be raised.

**END OF SCHEDULE B, PART I**

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Commonwealth Land Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



Case ID: 260501884
Control No.: 26066494

## SCHEDULE B, PART II
## EXCEPTIONS

**Some historical land records contain Discriminatory Covenants that are illegal and unenforceable by law. This Commitment and the Policy treat any Discriminatory Covenant in a document referenced in Schedule B as if each Discriminatory Covenant is redacted, repudiated, removed, and not republished or recirculated. Only the remaining provisions of the document will be excepted from coverage.**

The Policy will not insure against loss or damage resulting from the terms and conditions of any lease or easement identified in Schedule A, and will include the following Exceptions unless cleared to the satisfaction of the Company:

1. Unrecorded easements, discrepancies or conflicts in boundary lines, shortages in area and encroachments which an accurate and complete survey would disclose.
2. Rights or claims of parties in possession not shown by the public records.
3. Real estate taxes for the current and prior tax years which may be hereafter assessed, not yet due and payable.
4. Any lien or right to a lien for services, labor or material heretofore or hereafter furnished, imposed by law and not shown by the public records.
5. Possible outstanding City of Philadelphia Municipal Liens for work done prior to closing but not indexed as a lien as of Date of Policy.
6. Covenants as set forth in Deed Book JRS 604 page 132, excluding paragraph c (i), (e) and (f) thereof, and excluding Supplement II to Redevelopment Agreement recorded in Deed Book JRS 604 page 67 referred to therein.
7. Deed of Dedication to Redevelopment Authority of the City of Philadelphia and The City of Philadelphia dated 6/20/1969 and recorded in Deed Book JRS 456 page 258.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Commonwealth Land Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association



Case ID: 260501884
Control No.: 26066494

**SCHEDULE B, PART II**
**EXCEPTIONS**
(continued)

8. Deed of Dedication to Redevelopment Authority of the City of Philadelphia and The City of Philadelphia dated 6/20/1969 and recorded in Deed Book JRS 456 page 262.

9. Agreement between Redevelopment Authority of the City of Philadelphia and The City of Philadelphia dated 6/20/1969 and recorded in Deed Book JRS 456 page 279.

10. Intentionally omitted.
11. Intentionally omitted.
12. Intentionally omitted.
13. Rights granted to Bell Telephone Company in Deed Book DCC 43 page 235.

14. Intentionally omitted.
15. Intentionally omitted.
16. Intentionally omitted.
17. Intentionally omitted.
18. Intentionally omitted.
19. Temporary and Permanent Easements as set forth in Eminent Domain Proceeding In Rem Notice of Condemnation recorded 07/09/2016 as Document No. 53081811.

**END OF SCHEDULE B, PART II**

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Commonwealth Land Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association





Case ID: 260501884
Control No.: 26066494

**COMMONWEALTH LAND TITLE INSURANCE COMPANY** | **COMMITMENT NO. PIT260026 - 1st Revised**

## COMMITMENT CONDITIONS

1. **DEFINITIONS**
   a. "Discriminatory Covenant": Any covenant, condition, restriction, or limitation that is unenforceable under applicable law because it illegally discriminates against a class of individuals based on personal characteristics such as race, color, religion, sex, sexual orientation, gender identity, familial status, disability, national origin, or other legally protected class.
   b. "Knowledge" or "Known": Actual knowledge or actual notice, but not constructive notice imparted by the Public Records.
   c. "Land": The land described in Item 5 of Schedule A and improvements located on that land that by State law constitute real property. The term "Land" does not include any property beyond that described in Schedule A, nor any right, title, interest, estate, or easement in any abutting street, road, avenue, alley, lane, right-of-way, body of water, or waterway, but does not modify or limit the extent that a right of access to and from the Land is to be insured by the Policy.
   d. "Mortgage": A mortgage, deed of trust, trust deed, security deed, or other real property security instrument, including one evidenced by electronic means authorized by law.
   e. "Policy": Each contract of title insurance, in a form adopted by the American Land Title Association, issued or to be issued by the Company pursuant to this Commitment.
   f. "Proposed Amount of Insurance": Each dollar amount specified in Schedule A as the Proposed Amount of Insurance of each Policy to be issued pursuant to this Commitment.
   g. "Proposed Insured": Each person identified in Schedule A as the Proposed Insured of each Policy to be issued pursuant to this Commitment.
   h. "Public Records": The recording or filing system established under State statutes in effect at the Commitment Date under which a document must be recorded or filed to impart constructive notice of matters relating to the Title to a purchaser for value without Knowledge. The term "Public Records" does not include any other recording or filing system, including any pertaining to environmental remediation or protection, planning, permitting, zoning, licensing, building, health, public safety, or national security matters.
   i. "State": The state or commonwealth of the United States within whose exterior boundaries the Land is located. The term "State" also includes the District of Columbia, the Commonwealth of Puerto Rico, the U.S. Virgin Islands, and Guam.
   j. "Title": The estate or interest in the Land identified in Item 3 of Schedule A.
2. If all of the Schedule B, Part I-Requirements have not been met within the time period specified in the Commitment to Issue Policy, this Commitment terminates and the Company's liability and obligation end.
3. The Company's liability and obligation is limited by and this Commitment is not valid without:
   a. the Notice;
   b. the Commitment to Issue Policy;
   c. the Commitment Conditions;
   d. Schedule A;
   e. Schedule B, Part I-Requirements;
   f. Schedule B, Part II-Exceptions; and
   g. a counter-signature by the Company or its issuing agent that may be in electronic form.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Commonwealth Land Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



Case ID: 260501884
Control No.: 26066494

(continued)

4. **COMPANY'S RIGHT TO AMEND**
   The Company may amend this Commitment at any time. If the Company amends this Commitment to add a defect, lien, encumbrance, adverse claim, or other matter recorded in the Public Records prior to the Commitment Date, any liability of the Company is limited by Commitment Condition 5. The Company is not liable for any other amendment to this Commitment.
5. **LIMITATIONS OF LIABILITY**
   a. The Company's liability under Commitment Condition 4 is limited to the Proposed Insured's actual expense incurred in the interval between the Company's delivery to the Proposed Insured of the Commitment and the delivery of the amended Commitment, resulting from the Proposed Insured's good faith reliance to:
      i. comply with the Schedule B, Part I-Requirements;
      ii. eliminate, with the Company's written consent, any Schedule B, Part II-Exceptions; or
      iii. acquire the Title or create the Mortgage covered by this Commitment.
   b. The Company is not liable under Commitment Condition 5.a. if the Proposed Insured requested the amendment or had Knowledge of the matter and did not notify the Company about it in writing.
   c. The Company is only liable under Commitment Condition 4 if the Proposed Insured would not have incurred the expense had the Commitment included the added matter when the Commitment was first delivered to the Proposed Insured.
   d. The Company's liability does not exceed the lesser of the Proposed Insured's actual expense incurred in good faith and described in Commitment Condition 5.a. or the Proposed Amount of Insurance.
   e. The Company is not liable for the content of the Transaction Identification Data, if any.
   f. The Company is not obligated to issue the Policy referred to in this Commitment unless all of the Schedule B, Part I-Requirements have been met to the satisfaction of the Company.
   g. The Company's liability is further limited by the terms and provisions of the Policy to be issued to the Proposed Insured.
6. **LIABILITY OF THE COMPANY MUST BE BASED ON THIS COMMITMENT; CHOICE OF LAW AND CHOICE OF FORUM**
   a. Only a Proposed Insured identified in Schedule A, and no other person, may make a claim under this Commitment.
   b. Any claim must be based in contract under the State law of the State where the Land is located and is restricted to the terms and provisions of this Commitment. Any litigation or other proceeding brought by the Proposed Insured against the Company must be filed only in a State or federal court having jurisdiction.
   c. This Commitment, as last revised, is the exclusive and entire agreement between the parties with respect to the subject matter of this Commitment and supersedes all prior commitment negotiations, representations, and proposals of any kind, whether written or oral, express or implied, relating to the subject matter of this Commitment.
   d. The deletion or modification of any Schedule B, Part II-Exception does not constitute an agreement or obligation to provide coverage beyond the terms and provisions of this Commitment or the Policy.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Commonwealth Land Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association



Case ID: 260501884
Control No.: 26066494

(continued)

e. Any amendment or endorsement to this Commitment must be in writing and authenticated by a person authorized by the Company.

f. When the Policy is issued, all liability and obligation under this Commitment will end and the Company's only liability will be under the Policy.

7. **IF THIS COMMITMENT IS ISSUED BY AN ISSUING AGENT**
The issuing agent is the Company's agent only for the limited purpose of issuing title insurance commitments and policies. The issuing agent is not the Company's agent for closing, settlement, escrow, or any other purpose.

8. **PRO-FORMA POLICY**
The Company may provide, at the request of a Proposed Insured, a pro-forma policy illustrating the coverage that the Company may provide. A pro-forma policy neither reflects the status of Title at the time that the pro-forma policy is delivered to a Proposed Insured, nor is it a commitment to insure.

9. **CLAIMS PROCEDURES**
This Commitment incorporates by reference all Conditions for making a claim in the Policy to be issued to the Proposed Insured. Commitment Condition 9 does not modify the limitations of liability in Commitment Conditions 5 and 6.

10. **CLASS ACTION**
ALL CLAIMS AND DISPUTES ARISING OUT OF OR RELATING TO THIS COMMITMENT, INCLUDING ANY SERVICE OR OTHER MATTER IN CONNECTION WITH ISSUING THIS COMMITMENT, ANY BREACH OF A COMMITMENT PROVISION, OR ANY OTHER CLAIM OR DISPUTE ARISING OUT OF OR RELATING TO THE TRANSACTION GIVING RISE TO THIS COMMITMENT, MUST BE BROUGHT IN AN INDIVIDUAL CAPACITY. NO PARTY MAY SERVE AS PLAINTIFF, CLASS MEMBER, OR PARTICIPANT IN ANY CLASS OR REPRESENTATIVE PROCEEDING. ANY POLICY ISSUED PURSUANT TO THIS COMMITMENT WILL CONTAIN A CLASS ACTION CONDITION.

11. **ARBITRATION**
The Policy contains an arbitration clause. All arbitrable matters when the Proposed Amount of Insurance is Two Million And No/100 Dollars ($2,000,000.00) or less may be arbitrated at the election of either the Company or the Proposed Insured as the exclusive remedy of the parties. A Proposed Insured may review a copy of the arbitration rules at http://www.alta.org/arbitration.

**END OF CONDITIONS**

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Commonwealth Land Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association



Case ID: 260501884
Control No.: 26066494

WIRE SAFE | Inquire before you wire!

## WIRE FRAUD ALERT

This Notice is not intended to provide legal or professional advice.
If you have any questions, please consult with a lawyer.

All parties to a real estate transaction are targets for wire fraud and many have lost hundreds of thousands of dollars because they simply relied on the wire instructions received via email, without further verification. **If funds are to be wired in conjunction with this real estate transaction, we strongly recommend verbal verification of wire instructions through a known, trusted phone number prior to sending funds.**

In addition, the following non-exclusive self-protection strategies are recommended to minimize exposure to possible wire fraud.

- **NEVER RELY** on emails purporting to change wire instructions. Parties to a transaction rarely change wire instructions in the course of a transaction.
- **ALWAYS VERIFY** wire instructions, specifically the ABA routing number and account number, by calling the party who sent the instructions to you. DO NOT use the phone number provided in the email containing the instructions, use phone numbers you have called before or can otherwise verify. **Obtain the number of relevant parties to the transaction as soon as an escrow account is opened.** DO NOT send an email to verify as the email address may be incorrect or the email may be intercepted by the fraudster.
- **USE COMPLEX EMAIL PASSWORDS** that employ a combination of mixed case, numbers, and symbols. Make your passwords greater than eight (8) characters. Also, change your password often and do NOT reuse the same password for other online accounts.
- **USE MULTI-FACTOR AUTHENTICATION** for email accounts. Your email provider or IT staff may have specific instructions on how to implement this feature.

For more information on wire-fraud scams or to report an incident, please refer to the following links:

***Federal Bureau of Investigation:***
http://www.fbi.gov

***Internet Crime Complaint Center:***
http://www.ic3.gov



*TM and © Fidelity National Financial, Inc. and/or an affiliate. All rights reserved*



Case ID: 260501884
Control No.: 26066494

**FIDELITY NATIONAL FINANCIAL**
**PRIVACY NOTICE**

Effective January 1, 2026

Fidelity National Financial, Inc. and its majority-owned subsidiary companies (collectively, "FNF," "our," or "we") respect and are committed to protecting your privacy. This Privacy Notice explains how we collect, use, and protect personal information, when and to whom we disclose such information, and the choices you have about the use and disclosure of that information.

A limited number of FNF subsidiaries have their own privacy notices. If a subsidiary has its own privacy notice, the privacy notice will be available on the subsidiary's website and this Privacy Notice does not apply.

**Collection of Personal Information**

FNF may collect the following categories of Personal Information:

- contact information (*e.g.*, name, address, phone number, email address);
- demographic information (*e.g.*, date of birth, gender, marital status);
- identity information (*e.g.*, Social Security Number, driver's license, passport, or other government ID number);
- financial account information (*e.g.*, loan or bank account information);
- biometric data (e.g., fingerprints, retina or iris scans, voiceprints, or other unique biological characteristics; and
- other personal information necessary to provide products or services to you.

We may collect Personal Information about you from:

- information we receive from you or your agent;
- information about your transactions with FNF, our affiliates, or others; and
- information we receive from consumer reporting agencies and/or governmental entities, either directly from these entities or through others.

**Collection of Device and Browsing Information**

FNF automatically collects the following categories of Browsing Information when you access an FNF website, online service, or application (each an "FNF Website") from your Internet browser, computer, and/or device:

- Internet Protocol (IP) address and operating system;
- browser information, such as version, language, and type;
- device type and operating system;
- domain name system requests; and
- browsing history on the FNF Website, such as date and time of your visit to the FNF Website and visits to the pages within the FNF Website.

Like most websites, our servers automatically log each visitor to the FNF Website and may collect the Browsing Information described above. We use Browsing Information for system administration, troubleshooting, fraud investigation, and to improve our websites. Browsing Information generally does not reveal anything personal about you, though if you have created a user account for an FNF Website and are logged into that account, the FNF Website may be able to link certain browsing activity to your user account.

**Other Online Specifics**

Website Analytics. We use Google Analytics to understand how visitors interact with FNF Websites. Google Analytics may collect information such as your IP address, device type, and pages visited to help us analyze site traffic and to personalize your browsing experience on our site. If you don't want Google Analytics to be used in your browser, you can install the Google Analytics browser add-on, which Google makes available online.

Cookies. When you visit an FNF Website, a "cookie" may be sent to your computer. A cookie is a small piece of data that is sent to your Internet browser from a web server and stored on your computer's hard drive. Information gathered using cookies helps us improve your user experience. For example, a cookie can help the website load properly or can customize the display page based on your browser type and user preferences. You can choose whether or not to accept cookies by changing your Internet browser settings. Be aware that doing so may impair or limit some functionality of the FNF Website.

Copyright © 2026. Fidelity National Financial, Inc. All Rights Reserved.

Web Beacons. We use web beacons to determine when and how many times a page has been viewed. This information is used to improve our websites.

Do Not Track. Currently our FNF Websites do not respond to "Do Not Track" features enabled through your browser.

Links to Other Sites. FNF Websites may contain links to unaffiliated third-party websites. FNF is not responsible for the privacy practices or content of those websites. We recommend that you read the privacy policy of every website you visit.

**Use of Personal Information**
FNF uses Personal Information for these main purposes:

- To provide products and services to you or in connection with a transaction involving you.
- To improve our products and services.
- To prevent and detect fraud;
- To maintain the security of our systems, tools, accounts, and applications;
- To verify and authenticate identities and credentials;
- To communicate with you about our, and our affiliates' services, jointly or independently;
- To provide reviews and testimonials about our services, with your consent.

**When Information Is Disclosed**
We may disclose the categories of Personal Information and Browsing Information listed above for the following purposes:

- to enable us to detect or prevent criminal activity, fraud, material misrepresentation, or nondisclosure;
- to affiliated or nonaffiliated service providers who provide or perform services or functions on our behalf and who agree to use the information only to provide such services or functions;
- to affiliated or nonaffiliated third parties with whom we perform joint marketing, pursuant to an agreement with them to jointly market financial products or services to you;
- to law enforcement or authorities in connection with an investigation, or in response to a subpoena or court order; or
- in the good-faith belief that such disclosure is necessary to comply with legal process or applicable laws, or to protect the rights, property, or safety of FNF, its customers, or the public.

The law does not require your prior authorization and does not allow you to restrict the disclosures described above. Additionally, we may disclose your information to third parties for whom you have given us authorization or consent to make such disclosure. We do not otherwise share your Personal Information or Browsing Information with nonaffiliated third parties, except as required or permitted by law.

We reserve the right to transfer your Personal Information, Browsing Information, and any other information, in connection with the sale or other disposition of all or part of the FNF business and/or assets, or in the event of bankruptcy, reorganization, insolvency, receivership, or an assignment for the benefit of creditors. By submitting Personal Information and/or Browsing Information to FNF, you expressly agree and consent to the use and/or transfer of the foregoing information in connection with any of the above described proceedings.

**Security of Your Information**
We maintain physical, electronic, and procedural safeguards to protect your Personal Information.

**Choices With Your Information**
Whether you submit Personal Information or Browsing Information to FNF is entirely up to you. If you decide not to submit Personal Information or Browsing Information, FNF may not be able to provide certain services or products to you.

**State-Specific Consumer Privacy Information:**
For additional information about your state-specific consumer privacy rights, to make a consumer privacy request, or to appeal a previous privacy request, please follow the link Privacy Request, or email privacy@fnf.com, or call (888) 714-2710.

Copyright © 2026. Fidelity National Financial, Inc. All Rights Reserved.

Certain state privacy laws require that FNF disclose the categories of third parties to which FNF may disclose the Personal Information and Browsing Information listed above. Those categories are:

- FNF affiliates and subsidiaries;
- Non-affiliated third parties, with your consent;
- Businesses in connection with the sale or other disposition of all or part of the FNF business and/or assets;
- Service providers;
- Law enforcement or authorities in connection with an investigation, or in response to a subpoena or court order.

For California Residents: We will not share your Personal Information or Browsing Information with nonaffiliated third parties, except as permitted by California law. For additional information about your California privacy rights, please visit the "California Privacy" link on our website (fnf.com/california-privacy) or call (888) 413-1748.

For Nevada Residents: We are providing this notice pursuant to state law. You may be placed on our internal Do Not Call List by calling FNF Privacy at (888) 714-2710 or by contacting us via the information set forth at the end of this Privacy Notice. For further information concerning Nevada's telephone solicitation law, you may contact: Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington St., Suite 3900, Las Vegas, NV 89101; Phone number: (702) 486-3132; email: aginquiries@ag.state.nv.us.

For Oregon Residents: We will not share your Personal Information or Browsing Information with nonaffiliated third parties for marketing purposes, except after you have been informed by us of such sharing and had an opportunity to indicate that you do not want a disclosure made for marketing purposes. For additional information about your Oregon consumer privacy rights, or to make a consumer privacy request, or appeal a previous privacy request, please email privacy@fnf.com or call (888) 714-2710

FNF is the controller of the following businesses registered with the Secretary of State in Oregon:
Chicago Title Company of Oregon, Fidelity National Title Company of Oregon, Lawyers Title of Oregon, LoanCare, Ticor, Title Company of Oregon, Western Title & Escrow Company, Chicago Title Company, Chicago Title Insurance Company, Commonwealth Land Title Insurance Company, Fidelity National Title Insurance Company, Liberty Title & Escrow, Novare National Settlement Service, Ticor Title Company of California, Exos Valuations, Fidelity & Guaranty Life, Insurance Agency, Fidelity National Home Warranty Company, Fidelity National Management Services, Fidelity Residential Solutions, FNF Insurance Services, FNTG National Record Centers, IPEX, Mission Servicing Residential, National Residential Nominee Services, National Safe Harbor Exchanges, National Title Insurance of New York, NationalLink Valuations, NexAce Corp., ServiceLink Auction, ServiceLink Management Company, ServiceLink Services, ServiceLink Title Company of Oregon, ServiceLink Valuation Solutions, Western Title & Escrow Company

For Vermont Residents: We will not disclose information about your creditworthiness to our affiliates and will not disclose your personal information, financial information, credit report, or health information to nonaffiliated third parties to market to you, other than as permitted by Vermont law, unless you authorize us to make those disclosures.

**Information From Children**
The FNF Websites are not intended or designed to attract persons under the age of eighteen (18). We do not collect Personal Information from any person that we know to be under the age of thirteen (13) without permission from a parent or guardian.

**International Users**
FNF's headquarters is located within the United States. If you reside outside the United States and choose to provide Personal Information or Browsing Information to us, please note that we may transfer that information outside of your country of residence. By providing FNF with your Personal Information and/or Browsing Information, you consent to our collection, transfer, and use of such information in accordance with this Privacy Notice.

**FNF Website Services for Mortgage Loans**
Certain FNF companies provide services to mortgage loan servicers, including hosting websites that collect customer information on behalf of mortgage loan servicers (the "Service Websites"). The Service Websites may contain links to both this Privacy Notice and the mortgage loan servicer or lender's privacy notice. The sections of this Privacy Notice titled When Information is Disclosed, Choices with Your Information, and Accessing and

Copyright © 2026. Fidelity National Financial, Inc. All Rights Reserved.



Case ID: 260501884
Control No.: 26066494

Correcting Information do not apply to the Service Websites. The mortgage loan servicer or lender's privacy notice governs use, disclosure, and access to your Personal Information. FNF does not share Personal Information collected through the Service Websites, except as required or authorized by contract with the mortgage loan servicer or lender, or as required by law or in the good-faith belief that such disclosure is necessary: to comply with a legal process or applicable law, to enforce this Privacy Notice, or to protect the rights, property, or safety of FNF or the public.

**Your Consent to this Privacy Notice; Notice Changes**

By submitting Personal Information and/or Browsing Information to FNF, you consent to the collection and use of the information in accordance with this Privacy Notice. We may change this Privacy Notice at any time. The Privacy Notice's effective date will show the last date changes were made. If you provide information to us following any change of the Privacy Notice, that signifies your assent to and acceptance of the changes to the Privacy Notice.

**Accessing and Correcting Information; Contact Us**

If you have questions or would like to correct your Personal Information, visit FNF's Privacy Request website or contact us by phone at (888) 714-2710, by email at privacy@fnf.com, or by mail to:

Fidelity National Financial, Inc.
601 Riverside Avenue,
Jacksonville, Florida 32204
Attn: Chief Privacy Officer

Copyright © 2026. Fidelity National Financial, Inc. All Rights Reserved.



Case ID: 260501884
Control No.: 26066494

**EXHIBIT 3.1(b)**

Schedule of Permitted Title Exceptions

1. Rights of tenants in possession, as tenants only, under prior unrecorded leases.
2. Taxes for the year 2027 and thereafter, not yet due and payable
3. Right of Way as contained in Deed Book DCC 43 page 235.
4. Agreement as contained in Deed Book JRS 456 page 279.
5. Conditions as contained in Deed Book JRS 604 page 132; Excluding paragraph c (i), (e) and (f) thereof, and excluding Supplement II to Redevelopment Agreement recorded in Deed Book JRS 604 page 67 referred to therein.
6. Temporary and Permanent Easements as set forth in Eminent Domain Proceeding in Rem Notice of Condemnation recorded 7/8/2016 as Document No. 53081811.
7. Rights of The City of Philadelphia conveyed by Deed from the Redevelopment Authority of the City of Philadelphia to The City of Philadelphia in Deed Book JRS 456 page 258.

4912-1765-5466, v. 3



Case ID: 260501884
Control No.: 26066494

**[Clerks Office Only]**

**Name:**

**PSA executed with CSC for $80 million**

**Email Address:**

**ss@cscre.us**

**Phone Number**

**9173327555**

**Are you filing a new case?**

**No, I'm not filing a new case.**

**Case Caption**

**Case Number**

**2:23-cv-00146-NIQA**

**Description of Document(s)**

**PSA executed for $80 million**

**Do you have a mailing address?**

**No**

**Select 'Yes' if you do not have a ma...**

**Mailing Address Line 1**

**NA**

**Mailing Address Line 2**

**City:**

**New York**

**State:**

**NY**

**Zip Code:**

**10019**

**Other**

**Terms of Submission**

**Yes**

Hide empty values

Case ID: 260501884
Control No.: 26066494

# EXHIBIT K

*May 19, 2026 Status Report (Federal Action, ECF 89) Containing the Rule 11-Certified $63,500,000 Representation at Paragraph 4*

Referenced in First Amended Complaint, paragraph 70

# EXHIBIT K

*Excerpts from Receiver's Status Report and Motion for Agreed Scheduling Order at ECF 89 in Wells Fargo Bank, N.A. v. NG 1500 Market St. LLC, No. 2:23-cv-00146-NIQA (E.D. Pa.), Filed May 19, 2026, Containing the Rule 11-Certified $63,500,000 Representation at Paragraph 4*

---

*This Exhibit consists of verbatim excerpts from a public federal court filing. The full original document is available on the federal docket at the cited entry, of which this Court may take judicial notice under Pa. R.E. 201. References herein to "ECF 89" are to docket entry 89 in the Federal Action, filed May 19, 2026.*

**Source:** Federal Action, ECF 89 (Status Report and Motion for Agreed Scheduling Order)

**Filed Date:** May 19, 2026

**Signed By:** Christopher P. Schueller, Esq., Buchanan Ingersoll & Rooney PC, on behalf of CBRE, Inc. as court-appointed Receiver

**Rule 11 Status:** The Status Report was filed under counsel's certification pursuant to Federal Rule of Civil Procedure 11(b), which provides that an attorney who signs a pleading certifies that, after reasonable inquiry, "the factual contentions have evidentiary support."

## Excerpt 1 — ECF 89 ¶ 4 (the $63,500,000 Representation)

> **4.** Initially, the Receiver solicited bids from Centre Square, CSC and Universal in which the Receiver requested that the buyers consider assuming some of the existing debt on the Property. But later, the Receiver solicited cash offers only. In the end when the Receiver called for final and best offers, Centre Square made the highest cash offer at $70 million; Universal offered $63.5 million and CSC offered $60 million.

## Excerpt 2 — ECF 89 ¶ 7 (the Two-Agreements Rationale)

> **7.** When Universal submitted its $75 million all-cash offer on February 17, 2026, the Receiver had already entered into the sale agreement with Centre Square and could not sign two sale agreements at the same time.

## Excerpt 3 — ECF 89 ¶ 9 (the CSC $80,000,000 Disclosure)

> **9.** An $80,000,000 CSC offer has emerged after the Centre Square PSA was signed and the Centre Square PSA may now be displaced.

## Significance to Allegations in First Amended Civil Action Complaint

Paragraph 70 of the First Amended Civil Action Complaint identifies and quotes the $63,500,000 figure attributed to Universal in ECF 89 ¶ 4. Paragraphs 71-72 then identify and quote the contradicting $70,000,000 sworn declaration of John Svorcek filed seven days later at ECF 92-1 ¶¶ 23-24 (attached hereto as Exhibit L). Paragraph 74 identifies the further contradicting "two rounds" construct introduced by the Receiver in its June 16, 2026 Memorandum in Opposition at ECF 98 page 6 (attached hereto as Exhibit M). Paragraph 75 of the Complaint



Case ID: 260501884
Control No.: 26066494

summarizes that CBRE has made three mutually inconsistent representations to the federal court on the same single bidding round within twenty-nine days, of which the Rule 11-certified $63,500,000 representation at ECF 89 ¶ 4 is the first.

Paragraph 77(iii) of the Complaint identifies the ECF 89 ¶ 4 representation as the third of five separate false or materially misleading representations on this same underlying conduct made to two different forums. No document Universal transmitted to the Receiver or its agents contains the $63,500,000 figure attributed to Universal in ECF 89 ¶ 4. Universal's only written submission in the relevant best-and-final round was the January 22, 2026 lawyer-tendered written acceptance at $70,000,000 transmitted by Andrew Teitelman, Esquire to Christopher Schueller, attached hereto as Exhibit D.

*Excerpt prepared from verified public docket. Full document available at PACER, Case No. 2:23-cv-00146-NIQA (E.D. Pa.), docket entry 89.*



Case ID: 260501884
Control No.: 26066494

# EXHIBIT L

*May 26, 2026 Sworn Declaration of John Svorcek (Federal Action, ECF 92-1)*

*Conceding $70,000,000 Universal Offer at Paragraphs 23-24*

Referenced in First Amended Complaint, paragraphs 71-72

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| WELLS FARGO BANK, NATIONAL ASSOCIATION, AS TRUSTEE, FOR THE BENEFIT OF REGISTERED HOLDERS OF J.P. MORGAN CHASE COMMERCIAL MORTGAGE SECURITIES TRUST 2020-MKST COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATE,<br><br>Plaintiff,<br><br>v.<br><br>NG 1500 MARKET ST., LLC,<br><br>Defendant. | Civil Action No. 23-CV-00146-NIQA |

**MOTION FOR ORDER APPROVING THE PRIVATE SALE OF RECEIVERSHIP <u>PROPERTY AND GRANTING RELATED RELIEF</u>**

CBRE, Inc., the court-appointed receiver (the "**Receiver**") for the property commonly referred to as the Centre Square building and located at 1500 Market Street, Philadelphia, Pennsylvania 19102, including all real and personal property associated therewith, and improvements located thereon (all such real and personal property being referred to herein collectively as the "**Property**"), being more particularly described in **<u>Exhibit 1</u>** attached hereto, pursuant to 28 U.S.C. §§ 2001(b) and Section 1(n) of the *Consent Order Appointing Receiver Pursuant to Motion of Plaintiff* [Docket No. 20] ("**Receivership Order**"), moves this Court for entry of an order confirming the Receiver's private sale of the Property to Centre Square East Upper LLC, Centre Square East Lower LLC, Center Square West Upper LLC, Centre Square West Lower LLC, and Centre Square Base LLC (collectively, the "**Buyer**"), pursuant to the Purchase and Sale Agreement, effective as of February 17, 2026 (the "**PSA**"), and granting related relief.



Case ID: 260501884
Control No.: 26066494

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

WELLS FARGO BANK, NATIONAL ASSOCIATION, AS TRUSTEE, FOR THE BENEFIT OF REGISTERED HOLDERS OF J.P. MORGAN CHASE COMMERCIAL MORTGAGE SECURITIES TRUST 2020-MKST COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATE,

Plaintiff,

v.

NG 1500 MARKET ST., LLC,

Defendant.

Civil Action No. 23-CV-00146-NIQA

**AFFIDAVIT OF JOHN SVORCEK IN SUPPORT OF MOTION FOR ORDER APPROVING THE PRIVATE SALE OF RECEIVERSHIP PROPERTY AND GRANTING RELATED RELIEF**

1. My name is John Svorcek. I make this Affidavit based on my personal knowledge and review of relevant documents maintained in the ordinary course of business. I would so testify if called upon in open court to do so.

2. I am a Real Estate Manager with CBRE, Inc. (the "**Receiver**"). The Receiver was appointed as receiver for property located at 1500 Market Street, Philadelphia, Pennsylvania 19102, including all real and personal property associated therewith, and improvements located thereon (collectively, the "**Property**"), pursuant to the *Consent Order Appointing Receiver Pursuant to Motion of Plaintiff* [Docket No. 20] (the "**Receivership Order**").

3. In my employment, I am responsible for managing and administering the Property and receivership estate. I make this Affidavit based on personal knowledge and a review of certain



Case ID: 260501884
Control No.: 26066494

records kept by the Receiver in the ordinary course of business. I am familiar with the Receiver's business and record-keeping processes and procedures. The Receiver's business records, including the business records for and relating to the Property and receivership estate, are maintained by the Receiver in the course of its regularly conducted business activities and are made at or near the time of the event by or from information transmitted by a person with knowledge. It is the regular practice to keep such records in the ordinary course of a regularly conducted business activity. I make this Affidavit based upon my review of those records relating to the Property and receivership estate, my own personal knowledge of how those records are kept and maintained, and my own personal knowledge of the management and administration of the Property and receivership estate.

4. I make this Affidavit in support of the Receiver's *Motion for Order Approving the Private Sale of Receivership Property and Granting Related Relief* (the "**Motion**"). I am authorized by the Receiver to make this Affidavit.

5. The Property is a 36 to 43-story (East and West towers respectively) office property, which serves as collateral for a commercial mortgage loan in the original principal amount of $388,000,000.00 (the "**Loan**") to Defendant NG 1500 Market St. LLC ("**Borrower**") and held by Plaintiff Wells Fargo Bank, National Association, as Trustee, for the benefit of registered holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2020-MKST Commercial Mortgage Pass-Through Certificates, Series 2020-MKST, the RR Interest Owner and the Future Advance Lender ("**Lender**").

6. The Property to be sold consists of all the real property, improvements located thereon, and personal property associated therewith described on **Exhibit A** attached hereto.

7. Borrower is the owner of the Property.



Case ID: 260501884
Control No.: 26066494

8. On January 13, 2023, Lender filed a *Complaint* to foreclose on the Property. In its Complaint, Lender alleges that, as of January 6, 2023, the balance due in connection with Loan exceeded $375 million.[1]

9. Upon the Receiver's appointment, the Receiver investigated the financial condition and performance of the Property.

10. The current value of the Property is below $375 million and therefore only the Lender will recover proceeds from any sale of the Property; Borrower will not have any recovery. Further, the amount of the indebtedness continues to increase as interest, attorneys' fees, and costs continue to accrue.

11. The Receiver has determined in the Receiver's sound business judgment, that it is in the best interest of the receivership estate to sell the Property, subject to Court approval, as soon as practicable.

12. Pursuant to Section 1(n) of the Receivership Order, this Court authorized the Receiver to, *inter alia*:

> if directed by the Lender, engage a sales broker and sell the Property (in each case with the prior approval of the Court and on such terms as may be set out in a separate and subsequent order of the Court, it being understood that nothing in this Order shall constitute a waiver of Borrower's right to raise objections to any motion seeking Court approval of any such separate and subsequent order)

13. The Receiver has made a comprehensive effort to market the Property for sale and solicit offers from prospective purchasers for the sale of the Property.

14. Pursuant to the powers granted to the Receiver by Section 1(n) of the Receivership Order, and with Lender's consent, the Receiver engaged CBRE, Inc. ("**Broker**") to market the

[1] ECF No. 1-2, ¶ 38.





Case ID: 260501884
Control No.: 26066494

Property for sale. The Broker has extensive experience marketing real estate assets similar to the Property, and it has a proven track record of success in the brokerage industry.

15. In connection with this action, the Receiver obtained an appraisal from an independent, third-party property appraiser, Newmark Valuation & Advisory, LLC (the "**Newmark Appraisal**"). A true and correct copy of the Newmark Appraisal is attached hereto as **Exhibit B** and incorporated herein by reference.

16. According to the Newmark Appraisal, dated May 10, 2025, the Property has a fair market value of $92,000,000.

17. Further, in connection with this action, the Receiver obtained an appraisal from an independent, third-party property appraiser Cushman & Wakefield Regional, LLC (the "**Cushman Appraisal**"). A true and correct copy of the Cushman Appraisal is attached hereto as **Exhibit C** and incorporated herein by reference.

18. According to the Cushman Appraisal, dated April 7, 2026, the Property has a fair market value of 70,500,000.

19. Also, in connection with this action, the Receiver obtained an appraisal from an independent, third-party property appraiser Pasquerella Real Estate LLC (the "**Pasquerella Appraisal**"). A true and correct copy of the Pasquerella Appraisal is attached hereto as **Exhibit D** and incorporated herein by reference.

20. According to the Pasquerella Appraisal, dated April 7, 2026, the Property has a fair market value of 70,500,000.

21. The Broker's marketing efforts with respect to the Property were extensive, and included, without limitation, the following:

(a) Based on contacts within the Broker's extensive proprietary database, the Broker sent 3,285 targeted e-mails to prospective purchasers identified as



Case ID: 260501884
Control No.: 26066494

strong candidates to acquire the Property, of which 1,983 recipients viewed the Broker's marketing e-mail.

(b) The Broker published press releases about the sale of the Property in the *Philadelphia Inquirer*, *Philadelphia Business Journal* and other national real estate periodicals.

(c) A total of 96 prospective purchasers executed confidentiality agreements in order to access additional information concerning the Property.

(d) The Broker coordinated and conducted 21 separate tours of the Property for interested buyers.

22. As a result of the foregoing marketing efforts, the Broker received 9 first round bids, 6 second round bids, and 3 best and final bids for the Property.

23. With respect to the best and final bids, the Receiver and Broker received a $70,000,000.00 offer from CSC 1500 Market Prop Co, LLC, which would require CSC 1500 Market Prop Co, LLC to remit $3,000,000.00 in earnest money in connection with the transaction.

24. The Receiver and Broker also received an offer of $70,000,000.00 from Universal Group, which would require Universal Group to remit two deposits totaling $3,000,000.00 in earnest money in connection with the transaction.

25. The Receiver determined that the offer submitted by the current, proposed purchasers, Centre Square East Upper, LLC, Center Square East Lower, LLC, Centre Square West Upper, LLC, Centre Square West Lower, LLC, and Centre Square Base, LLC, each Pennsylvania limited liability companies, as tenants-in-common (collectively, the "**Buyer**," which term shall include any permitted assignee of such entity), was the best offer.

26. Pursuant to the Purchase and Sale Agreement dated to be effective as of February 17, 2026 (the "**PSA**," which term shall include any amendments thereto in writing that are entered into between Buyer and Receiver), the Receiver agreed to sell the Property to Buyer for a purchase price of $70,000,000.00 (the "**Sale Price**"), and the Buyer agreed to remit earnest



Case ID: 260501884
Control No.: 26066494

money in the total amount of $5,000,000.00. A true and correct copy of the PSA is attached hereto as **Exhibit E**.

27. Following execution of the PSA, the Receiver received a $75,000,000.00 offer from Universal Group. Because this offer arrived after the PSA was signed (and noting that Universal Group was involved in prior negotiations with the Receiver and Broker), the Receiver maintains that the executed PSA with Buyer represents the best offer.

28. On May 1, 2026, the Receiver caused to be published a notice of the proposed private sale (the "**Sale Notice**"), substantially in the form attached hereto as **Exhibit F**, in the *Philadelphia Inquirer*, which is a newspaper of general circulation within the county where the Property is located.

29. The Receiver also caused the Sale Notice to be served upon (i) all relevant federal, state, and local taxing and regulatory authorities or offices that have a reasonably known interest in the relief requested in the Motion; (ii) counsel to the Buyer; (iii) the parties to this action and any other party that has entered an appearance in this case or otherwise requested notice in this case; and (iv) all persons or entities the Receiver has identified as (A) having an interest in the Property or (B) potentially interested in acquiring the Property.

30. The Sale Notice included clear directions designed to facilitate further marketing and sale of the Property, including procedures governing the qualification of additional bidders, the submission of competing bids, and the deadline to object to the proposed sale of the Property. (*See* Exhibit F (Sale Notice)).

31. In particular, as set forth in the Sale Notice, any competing bid for the Property was required to be in an amount not less than $77,000,000, representing a ten percent (10%) increase over the proposed Sale Price of $70,000,000.



Case ID: 260501884
Control No.: 26066494

32. Through the publication of the Sale Notice and the additional notice efforts undertaken by the Receiver, all interested parties were afforded an opportunity to submit competing bids for the Property.

33. To that end, the Receiver is requesting that the Court enter an order granting final approval and confirmation of the sale of the Property, free and clear of all liens, claims, encumbrances, and rights of redemption, with all such liens, claims, and encumbrances attaching to the proceeds of the sale in the same order of validity, priority, and enforceability, in a form substantially similar to the Final Sale Order, attached as Exhibit 2 to the Motion.

34. Although the Receiver advised the Buyer that the sale of the Property (the "**Sale**") would remain subject to prior court approval and such Sale becoming a final, non-appealable order, Buyer has expressed an interest in closing on the Sale as quickly as possible.

35. Accordingly, time is of the essence to ensure that the Buyer remains committed to acquiring the Property.

36. Based on the Receiver's experience, knowledge of the Property, reliance upon the advice of counsel and his professionals, including Broker, the Newmark Appraisal, the Cushman Appraisal, and the Pasquerella Appraisal, the Receiver has determined that the sale reflects a fair and reasonable value for the Property.

37. The parties have engaged Land Services USA, LLC (the "**Title Company**") to provide title and escrow services, including title insurance for Buyer.

38. Pursuant to the title search and commitment provided by the Title Company, with a commitment date of December 26, 2025, there are no liens on the Property other than Lender's mortgage lien.

39. Lender has consented to the Sale of the Property at the proposed Sale Price.



Case ID: 260501884
Control No.: 26066494

40. The Receiver respectfully submits that it will serve the best interest of the parties, including Lender, Borrower, and Buyer, for this Court to approve the Sale forthwith so that the Receiver may proceed to closing.

41. The sale of the Property pursuant to the PSA is expressly contingent upon this Court's approval of the sale. (*See* Ex. E, Section 4.5(a)).

42. The proposed sale pursuant to the PSA is commercially reasonable and the Sale Price represents the fair market value of the Property given the numerous bids received and the appraisals obtained. The marketing and bidding process was conducted in a commercially reasonable manner, and the sale of the Property to Buyer is an arm's length transaction as the Receiver and Borrower have no pre-existing relationship with the Buyer.

43. The Sale of the Property is commercially reasonable and is in the best interests of the receivership estate and all parties for the following reasons:

a. The Receiver widely marketed the Property for sale and adhered to best business practices when selling the Property to maximize its value. The Buyer is ready, willing, and able to purchase the Property.

b. The marketing and sale efforts of the Receiver and Broker demonstrate that the sale contemplated by the PSA is equal or superior to other means of selling the Property and especially superior to a traditionally conducted foreclosure sale, which is less likely to maximize the sale value of the Property.

c. Lender is the party most affected by the sale and has not just consented to the sale of the Property under the PSA and Sale Price, but affirmatively supports the sale.

d. If the Property can be sold expeditiously, the sale will save the Receiver the burden of further carrying and administering the Property (including the expense and





Case ID: 260501884
Control No.: 26066494

burden of preparing various tax returns, paying expenses, keeping records, and other actions required in a new calendar year).

e. Barring any other events, the sale of the Property should also constitute the disposition of all property subject to the receivership (excluding cash in the Receiver's possession) and will enable the Receiver to file its final report and seek the termination of the receivership estate, the distribution of cash remaining in the receivership estate, and the discharge of the Receiver.

44. In addition, if the sale of the Property is not approved and consummated, the receivership estate will suffer irreparable harm because (i) the time, money, and effort expended by the Receiver and Broker to market and sell the Property pursuant to the Receivership Order will have gone to waste, (ii) the Receiver will have to re-market the Property, negotiate, and enter into another purchase agreement, all at the expense of the receivership estate, and (iii) the Receiver will incur additional fees and expenses. Approving the sale of the Property to Buyer is therefore the most cost-effective way to promptly bring this receivership to a close and transfer the Property to a more productive user.

45. In accordance with Section 1(n) of the Receivership Order, the Receiver has obtained Lender's consent to sell the Property to Buyer pursuant to the PSA.

46. Concurrently herewith, the Receiver provided appropriate notice of the hearing on the Motion to Borrower, and all interested bidders, by service of a copy of the Motion.

47. As disclosed by a title report, there are no other persons or entities with or who are asserting recorded interests in the Property other than Lender and Borrower. The Receiver is not aware of any undisclosed or unperfected interests in the Property.

I declare under penalty of perjury that the foregoing is true and correct.



Case ID: 260501884
Control No.: 26066494

Signed this 29th day of April, 2026.

John Svorcek
John Svorcek

COMMONWEALTH OF PENNSYLVANIA )
) ss.
COUNTY OF ALLEGHENY )

On this 29th day of April, 2026, before me, the undersigned, personally appeared John Svorcek, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual or the person(s) upon behalf of which the individual acted, executed the instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal, the day and year last above written.

Patricia A. Gaab

Notary Public in and for Said County and State
Acting in the County of Philadelphia

(Type, print or stamp the Notary's name below his or her signature.)

Commonwealth of Pennsylvania - Notary Seal
Patricia A. Gaab, Notary Public
Philadelphia County
My Commission Expires March 22, 2028
Commission Number 1054961

My Commission Expires:
March 22, 2028



Case ID: 260501884
Control No.: 26066494

# EXHIBIT A

Legal Description of Property

ALL THAT CERTAIN lot or piece of ground with buildings and improvements thereon erected, situate in the 8th Ward of the City of Philadelphia and described as follows, to wit:

BEGINNING at a point of intersection formed by the Westerly side of 15th Street (variable width) and the Southerly side of Market Street (100 feet wide); thence extending Southwardly along the said Westerly side of 15th Street the distance of 265 feet 0 inches to a point on the Northeasterly end of a corner cut off which connects the said Westerly side of 15th Street and the Northerly side of Ranstead Street (20 feet wide), said point also being on the Northwesterly side of an easement for cutback which easement for cutback applies only to certain land and/or space between an elevation of +/- 38.50 and an elevation of +/- 68.50; thence Southwardly along the Westerly side of said 15th Street extended and along the Easterly side of said Easement for cutback 21 feet 0 inches to a point on the Northerly side of said Ranstead Street extended and on the Southerly side of said Easement for cutback; thence Westwardly along the Northerly side of said Ranstead Street extended and along the Southerly side of said Easement for cutback 30 feet 0 inches to a point on the Southwesterly end of said corner cut off and on the Northwesterly side of said Easement for cutback; thence Westwardly along the Northerly side of said Ranstead Street (part 20 feet wide and part 30 feet wide) 346 feet 0 inches to a point on the Easterly side of 16th Street (70 feet wide); thence Northwardly along the said Easterly side of 16th Street 286 feet 0 inches to a point on the said Southerly side of Market Street; thence Eastwardly along the said Southerly side of Market Street 376 feet 0 inches to a point on the said Westerly side of 15th Street, being the first mentioned point and place of beginning.

Subject to the rights of the City of Philadelphia in that portion of the hereinbefore described premises conveyed by Deed from the Redevelopment Authority of the City of Philadelphia to The City of Philadelphia in Deed Book JRS 456 page 258.

BEING known as 1500-42 Market Street. BEING Parcel No.: 88-3-3200-00.

BEING the same premises which EQC Operating Trust, a Maryland real estate investment trust formerly known as Hub Properties Trust, by Deed dated 6/28/2017, effective 7/14/2017 and recorded 7/18/2017 in Philadelphia County in Document No. 53239762, conveyed unto NG 1500 Market St. LLC, a Delaware limited liability company, in fee.





Case ID: 260501884
Control No.: 26066494

Case 2:26-cv-01479-NQA Document 1-192 Filed 10/15/26 Page 223 of 248

**EXHIBIT B**

**(NEWMARK APPRAISAL)**





Case ID: 260501884
Control No.: 26066494

**NEWMARK VALUATION & ADVISORY**

# 1500 Market Street



1500 Market Street
Philadelphia, PA 19102

Newmark Job No.: 24-0216587-1

**Appraisal Report Prepared For:**

John Svorcek
CBRE, Inc.
525 William Penn Place, Suite 3710
Pittsburgh, PA 15219

**Prepared By:**

**Newmark Valuation & Advisory**
One Commerce Square,
2005 Market St., Suite 900
Philadelphia, PA 19103

NEWMARK

Case ID: 260501884
Control No.: 26066494

# EXHIBIT M

*June 16, 2026 Memorandum in Opposition to Universal's Motion to Intervene (Federal Action, ECF 98), Containing the "Two Rounds" Construct at Page 6*

Referenced in First Amended Complaint, paragraphs 74-75

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| WELLS FARGO BANK, NATIONAL ASSOCIATION, AS TRUSTEE, FOR THE BENEFIT OF REGISTERED HOLDERS OF J.P. MORGAN CHASE COMMERCIAL MORTGAGE SECURITIES TRUST 2020-MKST COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 202-MKST, THE RR INTERST OWNER AND THE FUTURE ADVANCE LENDER, | : | CIVIL ACTION |
| Plaintiff, | : | NO. 23-cv-00146-NIQA |
| v. | : | |
| NG 1500 MARKET ST. LLC, | : | |
| Defendant. | : | |

**RECEIVER'S MEMORANDUM IN OPPOSITION TO THE MOTION OF UNIVERSAL GROUP COMPANY, INC. TO INTERVENE, FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION, FOR UNSEALING OF ECF 73 THROUGH 75, FOR EXPEDITED TARGETED DISCOVERY, FOR ENFORCEMENT OF THE RECEIVERSHIP ORDER (ECF 20) AND MODIFICATION ORDER (ECF 43), AND FOR RESERVATION OF RIGHTS**

CBRE, Inc. (the "Receiver") submits this Memorandum in Opposition to the Motion of Universal Group Company, Inc. ("Universal") to Intervene, for a Temporary Restraining Order and Preliminary Injunction, for Unsealing of ECF 73 Through 75, for Expedited Targeted Discovery, for Enforcement of the Receivership Order (ECF 20) and Modification Order (ECF 43), and for Reservation of Rights (the "Motion").

Case ID: 260501884
Control No.: 26066494

## I. <u>INTRODUCTION</u>

For approximately 10 months (commencing August 18, 2025), the Receiver has been engaged in a through and transparent effort to market and sell the Property that is the subject of this lawsuit. Those efforts resulted in three final bids, one of which was submitted by Universal. The Receiver recommended selection of a competing bid. Plaintiff – who has the sole economic interest in the sale of the Property – concurred in that selection. The Receiver then moved for Court approval of the proposed sale of the Property, which Motion is pending. Universal now seeks to intervene and to enjoin the sale of the Property. Universal's Motion is entirely without merit.

Universal's Motion rests on two overarching fictions. First, Universal contends that the Receiver acted improperly to "suppress" a belated offer submitted by Universal, after the deadline the Receiver set for final bids and after another offer was selected. This argument ignores the fact, however, that the Receiver presented Universal's offers to Plaintiff, who had the final authority to select among the competing offers and who approved selection of a competing bid.

In addition, it is undisputed that Universal was given repeated opportunities to match or top the bid selected by the Receiver and the Plaintiff. Each time, Universal declined to make an offer. Thus, Universal's offer was not "suppressed" and Universal's allegations of phantom misconduct against the Receiver are misplaced.

Second, Universal represents that its Motion is intended only to preserve the "integrity" of the bidding and sale process. Universal's allegations of impropriety in the sale process are utterly baseless. More importantly, Universal admits in its Motion that it has no interest in a revised sale process, stating that: 1) it will not commit to purchase the Property at any price, including the offer that it claims was "suppressed"; 2) it will not commit to even participate in a new bidding process that it seeks to regulate, and; 3) it has "no viable path to acquisition" of the Property.

Universal cannot credibly claim to protect an interest in the integrity of a process in which Universal will not even commit to participate. Universal's stated interest in the "integrity" of further sale processes is feigned. In reality, Universal seeks to obtain discovery for an improper state court lawsuit that Universal has already filed against the Receiver.

Universal also fails to meet the criteria for intervention and injunctive relief. Universal is not entitled to intervene in this case, where Universal has no protectable interest in the Property or in a revised bidding process in which Universal may not even participate. Moreover, the integrity of the sale and bidding process is fully protected by the Plaintiff, who has a substantial interest in maximizing the sale price. The Court will also have a full opportunity to review the sale process at the hearing on the Receiver's Sale Motion. Allowing Universal to intervene and reset the sale process would unnecessarily delay the proceedings and jeopardize the receivership.

Nor is Universal entitled to injunctive relief. Universal's complaints about the sale process are unfounded and largely moot as set forth below. Moreover, injunctive relief would further delay the sale process, something that is particularly inappropriate where Universal has disavowed any intent to participate in further bidding.

For all of these reasons and as set forth more fully below, Universal's Motion should be denied.

## II. <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

### A. <u>Background of the Receivership</u>

Plaintiff Wells Fargo Bank, National Association, as Trustee, for the benefit of registered holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2020-MKST Commercial Mortgage Pass-Through Certificates, Series 2020-MKST, the RR Interest Owner and the Future



Case ID: 260501884
Control No.: 26066494

Advance Lender ("Plaintiff") extended a commercial mortgage loan in the original principal amount of $388,000,000.00 (the "Loan") to Defendant NG 1500 Market St. LLC ("Defendant"). *See* ECF 92-1, Affidavit of John Svorcek in Support of Motion for Order Approving the Private Sale of Receivership Property and Granting Related Relief at ¶ 5. The Loan is secured by a mortgage on property located at 1500 Market Street, Philadelphia, Pennsylvania 19102, including all real and personal property associated therewith, and improvements located thereon (collectively, the "Property"). The Property includes two office towers, a 36-story East Tower and a 43-story West Tower. *Id.*

On January 13, 2023, Plaintiff filed a Complaint to foreclose on the Property, alleging that, as of January 6, 2023, the balance due in connection with Loan exceeded $375 million. *See* ECF 1. On April 14, 2023, the Court appointed the Receiver pursuant to the Consent Order Appointing Receiver Pursuant to Motion of Plaintiff (the "Receivership Order"). *See* ECF 20.

The Receivership Order authorizes the Receiver to, *inter alia*: "if directed by the Lender, engage a sales broker and sell the Property . . . with the prior approval of the Court and on such terms as may be set out in a separate and subsequent order of the Court, it being understood that nothing in this Order shall constitute a waiver of Borrower's right to raise objections to any motion seeking Court approval of any such separate and subsequent order." *See* ECF 20 at ¶ 1(n).

The Receiver believes based on market information that the current value of the Property is below $375 million and therefore only Plaintiff will recover proceeds from any sale of the Property. *See* ECF 92-1 at ¶ 10. Because of this, and because the amount of the indebtedness continues to increase as interest, attorneys' fees, and costs continue to accrue, the Receiver has determined that it is in the best interest of the receivership estate to sell the Property, subject to Court approval, as soon as practicable. *Id.* at ¶ 11.



Case ID: 260501884
Control No.: 26066494

**B. <u>The Receiver's Thorough Efforts to Market the Property for Sale</u>**

The Receiver has made a comprehensive effort to market the Property for sale and solicit offers from prospective purchasers for the sale of the Property. Pursuant to Section 1(n) of the Receivership Order, and with Plaintiff's consent, the Receiver engaged CBRE, Inc. (the "Broker") to market the Property for sale. The Broker has extensive experience marketing real estate assets similar to the Property and has a proven record of success in the brokerage industry. *See* ECF 92-1 at ¶¶ 13-25.

The Broker's marketing efforts with respect to the Property were extensive, and included, without limitation, the following:

(a) Based on contacts within the Broker's extensive proprietary database, the Broker sent 3,285 targeted e-mails to prospective purchasers identified as strong candidates to acquire the Property, of which 1,983 recipients viewed the Broker's marketing e-mail.

(b) Publications including the Philadelphia Inquirer, Philadelphia Business Journal and other national real estate periodicals wrote articles regarding the sale of the property.

(c) A total of 96 prospective purchasers executed confidentiality agreements in order to access additional information concerning the Property.

(d) The Broker coordinated and conducted tours of the Property with 21 distinct interested buyers.

*See* ECF 92-1 at ¶ 21. The Broker's efforts to market the Property spanned 10 months.

The Receiver obtained three independent appraisals of the market value of the Property: 1) an appraisal dated May 10, 2025 from Newmark Valuation & Advisory, LLC assessing the fair market value of the Property as $92,000,000; 2) an appraisal from Cushman & Wakefield Regional, LLC dated April 7, 2026 assessing a fair market value of $70,500,000, and; 3) an



Case ID: 260501884
Control No.: 26066494

appraisal from Pasquerella Real Estate LLC dated April 7, 2026, assessing a fair market value of 70,500,000. *Id.* at ¶¶ 15-20. Copies of the three independent appraisals have been filed with the Court. *See* ECF 92-1 at Exhibits B-D.

As a result of these marketing efforts, the Broker received 9 first round bids, 6 second round bids, and 3 best and final bids for the Property. *See* ECF 92-1 at ¶ 22. The best and final offers were based on an assumption of a portion of the existing mortgage debt. The three offers received with that combination were as follows:

1. an offer of $70,000,000.00 from CSC 1500 Market Prop Co, LLC ("CSC") with $11,812,700 in cash and the balance in assumed debt;

2. an offer of $70,000,000.00 from Universal, with $11,812,700 in cash and the balance in assumed debt, and;

3. an offer of $73,000,000 from PMC Property Group ("PMC"). *Id.* at ¶ 23-25.

After this round of bidding, PMC was clearly the superior bid from a total purchase price and cash standpoint. After receipt of these offers, buyers were asked to affirm or restate their highest all cash price so that in addition to selecting a buyer, Receiver could determine whether to pursue an all cash transaction, or a transaction that would include a loan modification and assumption. The all cash offers provided were:

1. a cash offer of $60,000,000.00 from CSC;

2. a cash offer of $63,500,000.00 from Universal, and;

3. a cash offer of $67,000,00 from PMC. *Id.* at ¶ 23-25.

After this next round of bidding, the PMC was again the highest bidder in terms of amount. At that point, and after consultation with the Plaintiff, the Receiver focused negotiations on PMC and eventually was able to push PMC to a $70,000,000 cash purchase offer. After consulting with



Case ID: 260501884
Control No.: 26066494

the Plaintiff, the Receiver determined that the offer submitted by PMC was the best offer. *Id.* at ¶ 25. **The Plaintiff concurred in that determination.** *Id.* at ¶ 39.

Effective as of February 17, 2026, the Receiver entered into a Purchase and Sale Agreement (the "PSA") with entities related to PMC Centre Square East Upper, LLC, Center Square East Lower, LLC, Centre Square West Upper, LLC, Centre Square West Lower, LLC, and Centre Square Base, LLC, as tenants-in-common (collectively, the "Buyer") in which the Receiver agreed to sell the Property to Buyer **subject to approval of the Court and the Plaintiff.** A true and correct copy of the PSA is attached to the Affidavit of John Svorcek in Support of the Sale Motion as Exhibit E. *See* ECF 92-1 at Exh. E.

In the PSA, Buyer agreed to pay a purchase price of $70,000,000.00 (the "Sale Price") and to remit earnest money in the total amount of $5,000,000.00. The PSA states expressly that "no sale of the Property shall be effective or consummated except with approval of the [Plaintiff] in its sole discretion and upon approval of the Court . . . ." *See* PSA, ECF 92-1, Exhibit E at 1; *see also id.* at § 4.6 ("Court Approval and Lender Approval").

Nineteen days after the deadline for best and final bids, and after the Receiver and Buyer entered into the PSA described below, Universal purported to submit a cash only bid in the amount of $75,000,000. *Id.* at ¶ 27. Because this offer arrived after the PSA was signed, and because Universal participated in prior negotiations with the Receiver and Broker, and had been given prior opportunities to submit its best and final offer, the Receiver declined to accept the offer. This was communicated this to Universal on February 23, 2026. *See* ECF 82-9. The Receiver maintains that the executed PSA with Buyer represents the best offer, and Plaintiff concurs in this judgment. *See* ECF 92-1 at ¶¶ 28, 39.



Case ID: 260501884
Control No.: 26066494

On May 1, 2026 and in compliance with 28 U.S. Code §2001(b), the Receiver caused a notice of the proposed private sale (the "Sale Notice") to be published in the Philadelphia Inquirer, a newspaper of general circulation within the county where the Property is located. *See* ECF 76. The Sale Notice included clear directions designed to facilitate further marketing and sale of the Property, including procedures governing the qualification of additional bidders, the submission of competing bids, and the deadline to object to the proposed sale of the Property. *Id.* The Sale Notice established a deadline of May 12, 2026 for the submission of competing bids, which were required to be in an amount not less than $77,000,000. *Id.*

To ensure that CSC and Universal had a full and fair opportunity to submit another offer on the Property, the Receiver mailed the sale notice to CSC and Universal. *See* ECF 89 (Receiver's Status Report and Motion for Entry of an Agreed Scheduling Order on All Pending Motions) at ¶ 8. On May 11, 2026, CSC filed a "Letter of Intent to Acquire the Property," offering to purchase the Property for $80,000,000 on terms set forth in the Letter of Intent. *See* ECF 79. **Universal did not submit a competing bid by the deadline set forth in the Sale Notice.** On May 12, 2026, counsel for the Receiver sent Universal an unredacted copy of the PSA, and invited Universal to "make a proposal along the same lines" as the PSA. *See* ECF 89 at 4, Exhibit 20. Again, Universal declined to make an offer.

**C. The Receiver's Motion to Approve the Sale of the Property**

On May 4, 2026, the Receiver filed its Motion for an Order Approving the Private Sale of the Property (the "Sale Motion"). *See* ECF 75. The Sale Motion was originally filed under seal, but the Receiver later consented to the Sale Motion being unsealed. An unredacted copy of the Sale Motion was filed on May 26, 2026. *See* ECF 92.



Case ID: 260501884
Control No.: 26066494

In the Sale Motion, the Receiver moved the Court to approve the sale of the Property pursuant to the terms of the PSA. *Id.* Notably, in the Sale Motion the Receiver expressly disclosed Universal's $75,000,000 offer to the Court. *See* ECF 92-1 at ¶ 27. The Receiver moved concurrently for the Court to set a hearing on the Sale Motion. *See* ECF 91 (unredacted version).

In addition to the procedures set forth in the Sale Motion, the Receiver has represented to the Court that it intends to notify each of the final bidders (Centre Square, CSC and Universal) to submit their best and final offers 2 days prior to the scheduled hearing date. *See* ECF 89 at ¶ 12.

**D. <u>Universal's Motion</u>**

In its Motion (ECF 82), Universal seeks the following relief:

**1.** Intervention as of right under Fed. R. Civ. P. 24(a)(2) or permissive intervention under Fed. R. Civ. P. 24(b);

**2.** A Temporary Restraining Order and Preliminary Injunction enjoining the sale of the Property and related acts;

**3.** Unsealing of docket entries ECF Nos. 73, 74 and 75;

**4.** Expedited discovery on a wide range of at least 15 broad topics, including leave to serve 25 written discovery requests and conduct a deposition of the Receiver;

**5.** An Order compelling the Receiver to file a report on the docket detailing the entire marketing, bidding and sale process, and;

**6.** For the Court to hold an evidentiary hearing regarding, *inter alia*, the sale process, the "equivalent economic terms" of the bids, alleged conflicts of interest on the part of the Receiver and the "candor of the Section 11 reporting" by the Receiver.

*See* ECF 82-2.

While Universal's Motion is wide-ranging and repetitive, it appears that Universal bases its claims on several allegations, most of which are moot and all of which are unfounded. **<u>First</u>**, Universal alleges that the Receiver never presented Universal's alleged $75 million offer to the



Case ID: 260501884
Control No.: 26066494

Court. *See* ECF 82-2 at 1. Of course, this is untrue. The Receiver expressly disclosed Universal's offer in its Sale Motion *See* ECF 92-1 at ¶ 27.

**Second**, Universal alleges the Receiver entered into the PSA "without Court approval." *See* ECF 82-3 at ¶ 12. Universal contends that this violated Section 1(n) of the Receivership Order, which provides the Receiver may "if directed by the Lender, engage a sales broker and sell the Property . . . with the prior approval of the Court . . . ." *Id.* In the next breath, however, Universal admits that the PSA did not "sell" the Property. *Id.* at ¶ 13.

**Third**, Universal complains that certain documents relating to the PSA and proposed sale were sealed upon filing with the Court. *See* ECF 82 at, *e.g.*, 19; ECF 82-3 at ¶ 14. As set forth below, the Receiver has

filed unredacted copies of these documents on the public docket.

**Fourth**, Universal contends that the Receiver "conceal[ed] the entire sale process from this Court" by reporting in two "Financial Reports" that there were "no incidents and/or legal issues to report." *See* ECF 82 at 3; *see also* ECF 71 and 72 (Financial Reports of Receiver).

**Finally**, Universal complains that the Receiver entered into an agreement with CBRE, Inc. to function as the broker for the Property through the sale process. *See* ECF 82 at, *e.g.*, 3.

Universal also argues throughout its Motion that the Receiver failed to accept Universal's "superior" $75 million offer. *See* ECF 82 at, *e.g.*, 19. Notably, however, Universal does not seek intervention or a restraining order/injunction to purchase the Property on the terms of that offer. Instead, Universal expressly disavows any bid for the Property at any price. *See* ECF 82 at 31 ("Universal does not, by this Motion, commit to submit any specific competing bid at any specific number.") Universal further refuses to commit to participating in any further bidding process for the Property. *Id.* ("Universal does not, by this Motion, agree to participate on the terms of the May



Case ID: 260501884
Control No.: 26066494

1, 2026 published procedure (Exhibit 18), the May 11, 2026 invitation from Schueller (Exhibit 20), the PMC PSA (now produced), or any other framework.")

On June 2, 2026, Universal filed a "Limited Opposition" to the Sale Motion. *See* ECF 97. In its Limited Opposition, Universal appears to abandon its request for injunctive relief against the sale. Universal asks the Court to continue the hearing on the sale until after a ruling on Universal's Motion to Intervene. *Id.* at 3. Universal also seeks that two statements be "corrected" on the record before the sale can be approved. *Id.*

## III. ARGUMENT

### A. Universal's Motion to Unseal Documents is Moot

Universal first moves to unseal docket entries Nos. 73-75. *See* ECF 82 at 25; ECF 82-2 at § 4. This request is moot. The Receiver consented to unsealing and unredacted copies of ECF 74 and 75 have been filed at ECF Nos. 91 and 92.[1]

### B. Universal's Motion to Intervene is Without Merit

#### 1. Universal is Not Entitled to Intervene as of Right

Universal first seeks to intervene as of right pursuant to Federal Rule of Civil Procedure 24(a), which provides in pertinent part: "(a) Upon timely application anyone shall be permitted to intervene in an action ... (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties."

A "party seeking intervention of right under Rule 24(a)(2) must establish: (1) a timely application; (2) a sufficient interest in the litigation; (3) a threat that the interest will be impaired

[1] ECF 73 was simply the Receiver's Motion to Seal ECF 74 and 75.



Case ID: 260501884
Control No.: 26066494

by the disposition of the action; and (4) a lack of adequate representation of the interest by the existing parties." *KnightBrook Ins. Co. v. Del Val Staffing, LLC*, 2013 WL 4665945, at *2 (E.D. Pa. Aug. 30, 2013) citing *Liberty Mutual Ins. Co. v. Treesdale, Inc.*, 419 F.3d 216 (3d Cir. 2005). Universal bears the burden of proving each of the foregoing four elements. *Kitzmiller v. Dover Area Sch. Dist.*, 229 F.R.D. 463, 465 (M.D. Pa. 2005) citing *United States v. Alcan Aluminum*, 25 F.3d 1174 n. 9 (3d Cir.1994). Universal cannot meet this standard.

**First**, Universal's Motion to Intervene is untimely.

In determining whether an intervention motion is timely, three factors should be considered: "(1) the stage of the proceedings; (2) the prejudice that delay may cause the parties; and (3) the reason for the delay." *Mountain Top Condo. Assoc. v. Dave Stabbert Master Bldr., Inc.*, 72 F.3d 361, 365-66 (3d Cir.1995). Timeliness is "measured from the point at which the applicant knew, or should have known, of the risk to its rights." *United States v. Alcan Aluminum, Inc.*, 25 F.3d 1174, 1183 (3d Cir.1994).

Here, Universal was advised on February 23, 2026 that its $75,000,000 offer would not be accepted. *See* ECF 82-9. Universal filed its Motion to Intervene 78 days later, on May 12, 2026, after the Receiver filed the Sale Motion. Universal has offered no reason for the delay.

Allowing Universal to intervene now threatens to delay and prejudice the sale of the Property. The sale process under 28 U.S.C. § 2001 is at its endpoint, pending a hearing on the Sale Motion. Universal seeks to reset the process and to delay it, including through written discovery and depositions.

The Sale Motion makes clear that the Plaintiff continues to incur costs such as interest and attorney's fees, and desires to sell the Property as quickly as possible subject to Court approval. *See* ECF 92-1 at ¶¶ 10, 34 and 35. Universal's delay in seeking to intervene, and the inevitable



Case ID: 260501884
Control No.: 26066494

delay in resolution of this case that will result from Universal's intervention, will prejudice the Receiver and the Plaintiff. Universal's Motion to Intervene should be denied as untimely. *See, e.g.*, *Kitzmiller v. Dover Area Sch. Dist.*, 229 F.R.D. at 471 (denying motion to intervene where intervenor "sat on any right to intervene it may have had for several months . . . .")

**Second,** Universal does not have a sufficient interest in the litigation to justify intervention as of right.

"Rule 24(a)(2) requires the intervenor to demonstrate an interest relating to the property or transaction which is the subject of the action. While the precise nature of the interest required to intervene as of right has eluded precise and authoritative definition some general guidelines have emerged. According to the Supreme Court, an intervenor's interest must be one that is 'significantly protectable.' In defining the contours of a 'significantly protectable' legal interest under Rule 24(a)(2), we have held that the interest must be a legal interest as distinguished from interests of a general and indefinite character. The applicant must demonstrate that there is a tangible threat to a legally cognizable interest to have the right to intervene. This interest is recognized as one belonging to or being owned by the proposed intervenor." *Mountain Top Condo. Ass'n* 72 F.3d at 366 (3d Cir. 1995) (internal citations and quotations omitted).

Universal claims a protectable interest in: 1) the "procedural integrity" of the sale process; 2) the disclosure obligations of the Receiver, and; 3) the equal treatment of bidders in the Court-supervised bidding process. *See* ECF 82 at 23-24. Notably, Universal does not claim an interest in the Property, and Universal expressly disclaims an interest in any specific bid on the Property. *Id.* at 31 ("Universal does not, by this Motion, commit to submit any specific competing bid at any specific number. Universal does not, by this Motion, agree to participate on the terms of the May



Case ID: 260501884
Control No.: 26066494

1, 2026 published procedure (Exhibit 18), the May 11, 2026 invitation from Schueller (Exhibit 20), the PMC PSA (now produced), or any other framework.")

The interests that Universal claims are ephemeral and fall far short of meeting Rule 24(a)'s requirement of a "direct" and "protectable" interest. Universal claims no current interest in the Property. Universal does not contend that it was the successful bidder for the Property. Universal does not seek confirmation that it can purchase the Property for any amount it bid. Universal will not even commit to participate further in the bidding process. Remarkably, Universal alleges that after it received notice that its $75,000,000 bid was not accepted, Universal **"no longer had a viable path to acquisition."** ECF 82 at 31 (emphasis added). Why should Universal be permitted to intervene if it cannot purchase the Property and does not intend to participate in the bidding process?

Moreover, the interests that Universal asserts - "process integrity" and "equal treatment of bidders" - are not unique. They are interests that are shared by Plaintiff, the Receiver and the Court. Universal is no different than a person who seeks to intervene to ask the Court to apply the law fairly against another person (here, the Receiver). Courts routinely reject intervention that is sought to advocate for enforcement of laws against another person. *See, e.g., Nat'l Religious Broadcasters v. Bessent*, 2025 WL 3645161, at *3 (E.D. Tex. Dec. 12, 2025) ("A private party's preference that the government enforce a law against another private party is generally not a direct, legally cognizable interest in that potential enforcement.") (citations and quotations omitted) Thus, Universal has no protectable property interest sufficient to justify intervention.

**Third,** even if Universal had alleged sufficient interests, Plaintiff adequately and fully protects those interests. Plaintiff is incentivized to receive the highest and best compensation for



Case ID: 260501884
Control No.: 26066494

the Property, since any payment will go solely to Plaintiff. As a result, Plaintiff has an overriding interest in ensuring that the sale process is fair and that all bidders are given equal treatment.

Universal admits that Plaintiff's interests involve seeking the highest and best offer for the Property. *See* ECF 82 at 24 ("Wells Fargo, as foreclosing lender, has economic interests aligned with the highest realizable sale price . . . .") In the next breath, however, Universal baldly states that Plaintiff has no interest in "procedural integrity." *Id.* But a thorough and fair process goes hand-in-hand with realizing the best offer for the Property. It defies credulity to suggest that the Plaintiff is neither capable nor motivated to ensure a sale process that brings about the best offer for the Property.

Universal's inability to show that its alleged interests are not protected is another reason to deny intervention. *See, e.g., In re DiLoreto*, 277 B.R. 607, 611 (Bankr. E.D. Pa. 2000) (denying motion to intervene where intervenors' interests were protected by plaintiff whose "claims far exceed the amounts claimed" by proposed intervenors); *McGinnis v. United Bolt & Screw Corp.*, 637 F. Supp. 9, 11 (E.D. Pa.1985) (denying intervention as of right where petitioner did not demonstrate its interest was not adequately protected by plaintiff and finding that petitioner alleged no specific facts showing such factors as collusion, adverse interest between the intervenor and the representative, and representative's lack of diligence in prosecuting the action).

**<u>Finally,</u>** Universal has not shown and cannot show that its alleged interests would be harmed absent Universal's intervention. Universal argues that its "interests are directly impaired by any sale that proceeds without the procedural protections of § 2001(b), the Receivership Order, and this Court's supervisory authority." *See* ECF 82 at 12. But Universal has offered no evidence that the Court intends to proceed to permit the sale of the Property **<u>without</u>** adherence to those protections. The Receiver has complied with 28 U.S.C. § 2001(b), and has moved the Court to



Case ID: 260501884
Control No.: 26066494

hold a hearing to approve the proposed sale of the Property. The supposed harm to Universal's alleged interests is non-existent.

More specifically, Universal argues that its interests "will be impaired by (i) the proposed approval of a transaction concluded in violation of Section 1(n); (ii) the continued sealing of ECF 73-75, which may contain material undisclosed to Universal; (iii) the absence of any § 2001(b) appraisal or compliant publication of the PMC PSA's underlying terms; and (iv) the potential for the May 12, 2026 deadline to be applied to Universal without the disclosures necessary for meaningful participation. *See* ECF 82 at 24. Every one of those alleged harms is a fiction, however. The Receiver has sought Court approval of the sale as required by Section 1(n) of the Receivership Order; ECF 73-75 are unsealed; the appraisals have been produced, and; the May 12 deadline has passed with no action by Universal.

Universal bears the burden to show that it satisfies each of the four elements of the test for intervention as of right under Rule 24(a)(2). *United States v. Alcan Aluminum,* 25 F.3d at 1174, n. 9. Universal cannot meet even one of those elements and as a result its Motion to Intervene is not well taken.

**2. Universal Has Not Shown that Permissive Intervention is Appropriate**

Universal also fails to show that it should be allowed to intervene under Federal Rule of Civil Procedure 24(b). Rule 24(b) provides that "on timely motion a court may permit anyone to intervene who has a claim or defense that shares with the main action a common question of law or fact." Intervention under Rule 24(b) is a matter of the Court's discretion. *See, e.g., U.S. v. Territory of Virgin Islands*, 748 F.3d 514, 519 (3d Cir. 2014). "[I]n exercising its discretion the Court is to consider whether the intervention will unduly delay or prejudice the adjudication of the



Case ID: 260501884
Control No.: 26066494

original parties' rights." *In re All Matters Related to N. Am. Refractories Co.*, 634 B.R. 713, 719 (Bankr. W.D. Pa. 2021).

Here, Universal's proposed intervention will cause considerable delay. The Receiver has undertaken a thorough and time-consuming process to market the Property, receive and evaluate bids and select the best offer. *See* 5-8, *supra.* The marketing and sale of the Property has taken 10 months. Universal seeks to reset that process, without identifying any modifications that Universal seeks (none are warranted). And Universal seeks time to take unwarranted discovery from the Receiver. At the same time, Universal will not commit to making a bid on the Property, and claims to "no longer have a viable path to acquisition."

The delay that will result from Universal's late entry into this case, coupled with the fact that the interests that Universal alleges are already fully protected by the Plaintiff and the upcoming hearing on the Sale Motion, dictate that permissive intervention should be denied. *See, e.g., School District of Philadelphia v. City of Philadelphia,* 2023 WL 4919655, at *4 (E.D. Pa. Aug. 1, 2023) ("where ... the interests of the applicant in every manner match those of an existing party and the party's representation is deemed adequate, [a] district court is well within its discretion in deciding that the applicant's contributions to the proceedings would be superfluous and that any resulting delay would be 'undue.'") *quoting Hoots v. Com. of Pa.,* 672 F.2d 1133, 1136 (3d Cir. 1982); *see also Acra Turf Club, LLC v. Zanzuccki*, 561 F. App'x 219, 222 (3d Cir. 2014) (affirming district court's denial of permissive intervention where it had determined that proposed intervenors' interests were "already adequately represented" by government entity).

**C. <u>Universal Is Not Entitled to Injunctive Relief</u>**

Universal's Motion also seeks a Temporary Restraining Order and Preliminary Injunction prohibiting the sale of the Property. *See* ECF 82 at 33. It is not clear whether Universal still seeks



Case ID: 260501884
Control No.: 26066494

this relief, since Universal's most recent filing states that "Universal does not oppose a prompt hearing on the Receiver's Sale Motion." *See* ECF 97 at 1. Regardless, Universal's request for injunctive relief is entirely without merit.

Federal Rule of Civil Procedure 65 "governs the issuance of a temporary restraining order. Such relief is extraordinary in nature and available only in limited circumstances. The standard for obtaining a temporary restraining order is the same standard for obtaining a preliminary injunction. A court deciding a request for injunctive relief must consider four factors: (1) whether the movant has shown a probability of success on the merits; (2) whether the movant will be irreparably injured if relief is denied; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief is in the public interest." *Philadelphia Restaurant Owners Against Lockdown, LLC v. Kenney*, 2020 WL 6866560, at *1 (E.D. Pa. Nov. 20, 2020) (citations and quotations omitted). "Because a preliminary injunction is an extraordinary and drastic remedy, the movant bears the burden of making a clear showing that the first two guideposts, or gateway factors, are satisfied." *Scott v. Aguleri*, 2025 WL 823946, at *2 (E.D. Pa. Mar. 13, 2025) (citations and quotations omitted).

Universal cannot meet any of these requirements. First, Universal has not shown a **probability of success** on its claims. In fact, it is not even clear what claims Universal is alleging. The "Rule 24(C) Pleading in Support of Motion to Intervene" that Universal submitted with its Motion does not identify a single statutory or common law claim on which relief could be granted to Universal. *See* ECF 82-3. The fact that Universal does not identify a single cause of action in its pleading is alone enough to deny its request for injunctive relief.

Moreover, the specific allegations made by Universal regarding "procedural irregularities" are completely unfounded:



Case ID: 260501884
Control No.: 26066494

1. Universal alleges that the Receiver failed to present Universal's $75,000,000 bid from the Court. *See* ECF 82 at 1 ("Universal's offer was . . . never presented to this Court.") That is false. The Sale Motion expressly discloses that offer and the reasons why it was not accepted. *See* ECF 92-1 at ¶ 27.

2. Universal claims that the Receiver "concealed" the "entire sale process" from the Court, by stating in two Financial Reports that there were no "No incidents and/or legal issues to report." *See* ECF 82 at, *e.g.,* 3, 7. This allegation was wrong from the start, as the Financial Reports were intended as vehicles to address the financial aspects of the receivership, not to discuss the sale process. Universal does not allege that it or any other bidder was deprived of information about the sale process. More importantly, however, the Receiver has disclosed the sale process in detail to the Court in the Sale Motion and intends to address that process at the hearing on that Motion.

3. Universal argued that the Receiver entered into the PSA without Court approval required by Section 1(n) of the Receivership Order. *See* ECF 82 at, *e.g.*, 3. But Section 1(n) requires the Receiver to obtain Court approval of the **sale** of the Property, and the PSA does not constitute a sale of the Property. In fact, the PSA expressly states that sale of the Property is conditioned on Court approval. *See* ECF 92-1, Exhibit E at § 4.6. On its face, the PSA demonstrates that it was not entered in violation of the Receivership Order.

4. Universal alleges that the Receiver engaged in a conflict of interest by selecting the Buyer who was affiliated with one of CBRE's clients. *See* ECF 82 at, *e.g.,* 14-15. As Universal admits, the Receiver disclosed the relationship with its client publicly on the docket of this case. But more importantly, Universal ignores the fact that Plaintiff had



Case ID: 260501884
Control No.: 26066494

the final approval of the selection of the Buyer (subject to Court approval). Plaintiff approved the choice of the best bid with full disclosure of CBRE's relationship with its client.

5. Universal suggests that its $75,000,000 offer was not presented to the Receiver's representative John Svorcek or to the Plaintiff. *See* ECF 82 at 7. But the Sale Motion makes clear that Mr. Svorcek and the Plaintiff were aware of the offer and the decision not to accept it.

6. Finally, Universal alleges that the Receiver acted improperly by engaging CBRE as the Broker for the Property. *See* ECF 82 at, *e.g.*, 19. But the engagement of CBRE as the Broker was approved by the Plaintiff. Moreover, Universal was well aware that CBRE was acting as the Broker, as evidenced by the fact that Universal transmitted its offers to CBRE. Universal does not make any claim – nor could it – that the brokerage relationship led to irregularities in the sale process or a depressed price. *See* ECF 82-7 and 82-8.

Second, Universal has not shown that it will be **irreparably harmed** if the sale of the Property is not enjoined. Incredibly, Universal claims that it will be irreparably harmed because, *inter alia,* the "receivership estate" will be harmed if the sale goes forward. *See* ECF 82 at 32. As a matter of law, Universal cannot rely on harm to the receivership to support its request for injunctive relief.

More importantly, Universal cannot harmed by the sale because Universal refuses to commit to purchasing the Property or participating in further bidding. Universal does not contend that it is willing to purchase the Property on the terms of its offers, and in fact admits that it is no



Case ID: 260501884
Control No.: 26066494

longer able to do so. In the absence of a property right, or at least a willingness to commit to further bidding, Universal cannot claim to be harmed by the sale.

Third, the **balance of equities** does not favor Universal. Granting an injunction will further delay the sale of the Property, a step that is wholly unwarranted given Universal's unwillingness to commit to further bidding. Moreover, Universal had opportunities to match or top the current competing bids and chose not to do so. For the same reasons, the **public interest** favors denial of Universal's Motion.

## IV. CONCLUSION

For all of the foregoing reasons, Universal's Motion should be denied.

Dated: June 16, 2026

Respectfully submitted,

BUCHANAN INGERSOLL & ROONEY PC

*/s/ Gerald E. Burns*________
Gerald E. Burns
Pa. Id. No. 59466
Mark Pfeiffer
Pa. Id. No. 76245
Two Liberty Place
50 S. 16th Street, Suite 3200
Philadelphia, PA 19102
(215) 665-8700
gerald.burns@bipc.com
mark.pfeiffer@bipc.com

Attorneys for the Receiver



Case ID: 260501884
Control No.: 26066494

**CERTIFICATE OF SERVICE**

I certify that on this 16th day of June, 2026, I caused a true and correct copy of the foregoing document to be served to all counsel of record via the Court's ECF filing system.

*/s/ Gerald E. Burns*________
Gerald E. Burns



Case ID: 260501884
Control No.: 26066494

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| WELLS FARGO BANK, NATIONAL ASSOCIATION, AS TRUSTEE, FOR THE BENEFIT OF REGISTERED HOLDERS OF J.P. MORGAN CHASE COMMERCIAL MORTGAGE SECURITIES TRUST 2020-MKST COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 202-MKST, THE RR INTERST OWNER AND THE FUTURE ADVANCE LENDER, | : | CIVIL ACTION<br><br>NO. 23-cv-00146-NIQA |
| Plaintiff, | : | |
| v. | : | |
| NG 1500 MARKET ST. LLC, | : | |
| Defendant. | : | |

AND NOW, this ___ day of _________, 2026, upon consideration of the Motion of Universal Group Company, Inc. to Intervene, for a Temporary Restraining Order and Preliminary Injunction, for Unsealing of ECF 73 through 75, for Expedited Targeted Discovery, for Enforcement of the Receivership Order (ECF 20) and Modification Order (ECF 43), and for Reservation of Rights, and the Opposition thereto by CBRE, Inc. as the Court-appointed Receiver, it is hereby ORDERED that the Motion is DENIED.

BY THE COURT:

______________________________
Nitza I. Quinones Alejandro, U.S.D.J.

Case ID: 260501884
Control No.: 26066494